# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# WESTERN DIVISION

| | |
|---|---|
| BRUHN FARMS JOINT VENTURE,<br><br>Plaintiff,<br><br>vs.<br><br>FIREMAN'S FUND INSURANCE COMPANY,<br><br>Defendant. | No. C13-4106-LTS<br><br>**MEMORANDUM OPINION AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

## I. INTRODUCTION

This case is before me on defendant's February 27, 2015, motion (Doc. No. 24) for summary judgment. Plaintiff has filed resistance materials (Doc. Nos. 25, 29, 30) and defendant has filed a reply (Doc. No. 31). Neither party has requested oral argument. *See* N.D. Ia. L.R. 7(c). The motion is fully submitted and ready for decision.

## II. PROCEDURAL HISTORY

Plaintiff Bruhn Farms Joint Venture (Bruhn) commenced this action on October 3, 2013, by filing a petition (Doc. No. 3) against defendant Fireman's Fund Insurance Company (FFIC) in the Iowa District Court for Crawford County. The petition alleges that Bruhn and FFIC are parties to a contract of insurance. Doc. No. 3 at ¶¶ 5-6. The petition further alleges that hail storms in 2012 damaged Bruhn's crops, that the damage is covered by the insurance contract and that FFIC has failed to fully compensate Bruhn for the amount of the loss. *Id*. at ¶¶ 7-10. Bruhn seeks damages for breach of contract

and also contends that punitive damages are appropriate on a theory of first party bad faith.  *Id*. at pp. 2-4.

FFIC filed a notice (Doc. No. 2) of removal to this court on November 4, 2013, invoking the court's diversity jurisdiction pursuant to 28 U.S.C. § 1332(a).  FFIC then filed an answer (Doc. No. 6) denying Bruhn's operative allegations and raising various affirmative defenses.  This case was referred to me (Doc. No. 12) on January 16, 2014, after the parties unanimously consented to trial, disposition and judgment by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c)(3).  Discovery has now closed and trial is scheduled to begin July 13, 2015.  *See* Doc. Nos. 22, 23.

### III.  *SUMMARY JUDGMENT STANDARDS*

Any party may move for summary judgment regarding all or any part of the claims asserted in a case.  Fed. R. Civ. P. 56(a).  Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A material fact is one that "'might affect the outcome of the suit under the governing law.'"  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Thus, "the substantive law will identify which facts are material."  *Id*.  Facts that are "critical" under the substantive law are material, while facts that are "irrelevant or unnecessary" are not.  *Id*.

An issue of material fact is genuine if it has a real basis in the record, *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), or when "'a reasonable jury could return a verdict for the nonmoving party' on the question."  *Woods v. DaimlerChrysler*

*Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248). Evidence that only provides "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249-50, does not make an issue of material fact genuine.

As such, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 248-49. The party moving for entry of summary judgment bears "the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323). Once the moving party has met this burden, the nonmoving party must go beyond the pleadings and by depositions, affidavits, or otherwise, designate specific facts showing that there is a genuine issue for trial. *Mosley v. City of Northwoods,* 415 F.3d 908, 910 (8th Cir. 2005). The nonmovant must show an alleged issue of fact is genuine and material as it relates to the substantive law. If a party fails to make a sufficient showing of an essential element of a claim or defense with respect to which that party has the burden of proof, then the opposing party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 323.

In determining if a genuine issue of material fact is present, I must view the evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587-88. Further, I must give the nonmoving party the benefit of all reasonable inferences that can be drawn from the facts. *Id.* However, "because we view the facts in the light most favorable to the nonmoving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004). Instead, "the court's function is to determine

whether a dispute about a material fact is genuine." *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996).

## IV.　RELEVANT FACTS

Viewing the evidence most favorably to Bruhn, the relevant facts are as follows:

Rural Community Insurance Agency, Inc., d/b/a Rural Community Insurance Services (RCIS), acting as managing general agent for FFIC, issued a policy of crop-hail insurance to Bruhn, designated as policy number IA-090-120853 (the Policy). The Policy afforded coverage during the 2012 crop year to those crops identified by line, county and legal description in the Policy Declaration Page. The Policy afforded coverage for direct loss due to hail and certain other, specified perils.

Section 4(a) of the Policy's General Provisions stated:

> The amount payable by acre will be the limit of insurance applying on the date of loss multiplied by the percentage of loss. However, the amount payable may not exceed the actual cash value of the portion of the crop destroyed by perils insured against.

Doc. No. 24-3 at 17. Section 3(c) of the Policy's General Provisions stated:

> [T]he percentage of loss will be determined using the crop-hail loss adjustment procedures published by National Crop Insurance Services or, in the absence of such procedures, other procedures as determined by us, for the particular crop insured and the applicable crop year.

*Id.* at 16-17. For crop year 2012, National Crop Insurance Services (NCIS) did, in fact, publish crop-hail loss adjustment procedures for the crops at issue.

Bruhn sustained a significant hail loss on or about September 11, 2012,[1] and reported that loss to RCIS.[2] Adjustment of the loss was assigned to RCIS adjuster Galen Sornson. While the adjustment process was pending, Bruhn requested and obtained approval from RCIS to harvest its crops and leave "check strips" for the adjusters. Because the loss potentially involved over 5,000 acres, a six-person team (including Sornson and his supervisor, Larry Grieme) was assembled to work the loss.

The team of adjusters arrived at the Bruhn farm on October 29, 2012,[3] and spent the following two days adjusting the loss. The adjusters completed their counts using the check strips that had been left in the fields and reported that sufficient check strips were left in each field to complete the adjustment process. According to their survey sheets, the adjusters determined that 4,120.5 acres of soybeans had payable hail losses. In addition, the adjusters inspected certain corn acreage with respect to an earlier loss.[4]

Based on the crop-hail loss adjustment procedures set forth in the respective NCIS manuals, the RCIS adjusters found losses ranging from 2.3% to 71.4%. Using the survey information obtained by the adjusting teams, Sornson completed the proof of loss

---

[1] Bruhn sustained other, lesser hail losses prior to September 11, 2012. The parties agreed to defer the adjustment of those losses to the end of the growing season.

[2] Bruhn contends it reported the loss within a few days after September 11. FFIC contends the loss was not reported until September 26. Neither side explains why the exact date matters. I find that it does not.

[3] FFIC states that the adjusters visited the farm on October 22 and 23, not October 29 and 30. Bruhn insists the visit did not occur until the later dates. Again, no one has explained why the exact dates matter. Again, I find that they do not.

[4] Alan Bruhn (Alan) states in a declaration that the adjusters spent only seven hours in Bruhn's fields during their two-day inspection. Doc. No. 25-4 at ¶ 9. However, he admits that he was not personally present. *Id.* at ¶¶ 8-9. Bruhn cites no evidence (apart from Alan's affidavit) in support of the seven-hour figure. Doc. No. 30 at ¶ 4. I find that Bruhn has failed to provide proper evidentiary support for its claim that the adjusters spent only seven hours in the fields. Thus, even if that allegation has potential relevance, I must disregard it.

for the September 11 claim on or around October 30, 2012. Sornson attempted to meet with Alan Bruhn on October 30, 2012, to discuss the proof of loss, but Alan was sick and unable to meet. Sorenson faxed a copy of the proof of loss to Alan on November 5, 2012.

Bruhn did not agree with the adjusters' calculations and, therefore, refused to sign the proof of loss. On November 28, 2012, RCIS issued payment to Bruhn for the amount RCIS had determined was payable for the losses to soybeans and corn: $417,636 for the loss, less a premium credit of $184,578, for a net payment of $233,058. A check in that amount was delivered to Alan's residence via FedEx on December 4, 2012.

Grieme conducted a "high dollar" review of the Bruhn claim in late November 2012 and determined that the loss had been properly adjusted in accordance with NCIS crop-hail procedures. After the claim had been adjusted and paid, Bruhn's agent, Nielsen, contacted both Rod Nelson (manager of RCIS's Regional Service Office) and Chuck Eldredge (RCIS's National Claim's Manager) to request that RCIS reconsider its payment determination. Eldredge then asked Larry Burkhart, RCIS's Crop-Hail/Named Peril Field Claims Manager, to meet with Alan. The meeting took place in Mapleton, Iowa, on December 18, 2012. During the meeting, Burkhart advised Alan that he would conduct a review of the claim and would, among other things, look at Bruhn's historical yields, which Alan suggested would show the claim had been underpaid. Alan did not indicate any specific percentage of loss that he contended was determined in error or any specific amount by which he believed the claim had been underpaid.

After reviewing the available information, Burkhart concluded that RCIS's original loss determinations were correct. On January 25, 2013, Burkhart sent a letter to Bruhn indicating that RCIS had completed the review and determined that the claim was properly adjusted and paid. Doc. No. 24-3 at 42. While the Policy includes an

appraisal procedure[5] to resolve disputes over the amount of claims, Bruhn did not demand an appraisal in accordance with the Policy.

Bruhn commenced this lawsuit on October 3, 2013. During discovery, Bruhn served sworn answers to written interrogatories, including the following:

> Interrogatory No. 11: If you contend that FFIC incorrectly adjusted the hail claims at issue, please state for each claim the manner in which the claim adjustment was incorrect, inadequate, and/or contrary to policy and applicable loss adjustment procedures.
>
> Answer:
>
> Alan's position is the loss was properly adjusted using the average yield method chosen by the company. The company is the one that said the loss could not be properly adjusted in the field and they chose to use average yields. Alan asked them to compare the 2012 hailed acres to the 2012 non-hailed acres to determine the loss. The company said that would not work and they would use a five year average.
>
> Prior to the company's decision to use average yields to calculate the loss, Alan attempted to sit down with the adjusters to discuss the field adjustment records and numbers. Galen Sornson would not sit down with Alan to discuss the field adjustment and simply told Alan he would pass it on. Sornson was not willing to discuss it. The company determined the loss could not be properly adjusted under the manual due to the passage of time.
>
> The company also denied Bruhn the opportunity to have an independent appraisal of the loss which is afforded under the policy.

Doc. No. 24-3 at 46.

## V. *DISCUSSION*

As noted above, Bruhn asserts two causes of action – breach of contract and first party bad faith. FFIC contends that summary judgment is appropriate with regard to both.

---

[5] See Doc. No. 24-3 at 17 (Section 6 of the Policy's General Provisions).

### A. Breach of Contract

#### 1. Overview of Bruhn's Claim

Based on Bruhn's answer to interrogatory no. 11, as set out above, FFIC understood Bruhn to be making a claim that FFIC breached an oral modification to the Policy. Specifically, FFIC construed Bruhn's theory to be that instead of utilizing the loss adjustment procedures published by NCIS, as required by the Policy, FFIC agreed to apply an average-yield analysis to determine the amount of the loss. Thus, FFIC's opening brief addressed the requirements for an enforceable oral modification to a written agreement and argued that the record does not support such a theory. Doc. No. 24-1 at 7-11.

> In its resistance, Bruhn disclaimed the oral modification theory, stating:
>
> Finally, Plaintiff must again respectfully dispute Defendant's contention in its Brief that this lawsuit is based on an oral contract. Plaintiff did not plead oral contract. Nowhere in the depositions, discovery, or otherwise has oral contract ever been mentioned. What Defendant seems to refer to is the fact that two of Defendant's managers, Nelson and Burkhart, requested that Plaintiff provide his field records. This is clearly provided for in the written contract: "25. The insurance contract provides the Defendant may choose its own method to determine the extent of Plaintiff's damages if traditional adjustment methods do not work." (Plaintiff's Petition). <u>This case is wholly and completely grounded upon the Defendant's breach of the written contract</u>.

Doc. No. 25-1 at 3 [emphasis added]. Bruhn described its breach of contract claim as follows:

> Defendant breached that contract in the following particulars:
>
> 1. In failing to send adjusters to Plaintiff's farm in a reasonable and timely fashion;
>
> 2. In failing to ensure that the adjusters spent sufficient time to properly inspect the fields pursuant to the RCIS and NCIS Guidelines;

8

3. In failing to properly and timely communicate with the Plaintiff regarding the adjustment process as required by the RCIS and NCIS Manuals;

4. In failing to make even minimal efforts to negotiate an adjustment settlement with the insured as required by the RCIS and NCIS Manuals;

5. In delivering an adjustment check to the insured without his knowledge, without his consent, and without attempting to meet with him;

6. After the check was delivered Defendant assigned two management employees to talk to the insured, both of whom indicated that the claims process had been "grossly mishandled" by the Defendant; both of whom indicated that they would take further steps to help the insured, and then both of whom almost immediately called back to say they would do nothing further;

7. One of them in particular, Burkhart, indicated to Defendant's agent, Nielsen, that the claim was worth somewhere between $900,000.00 and $925,000.00, but then almost immediately recanted that and said the insured would be paid nothing further;

8. Because of Defendant's delays, and utter failure to communicate with the insured, Plaintiff was deprived of his right under the contract to engage his own adjusters or appraisers to evaluate the loss;

9. As a result of all of the above, the Defendant breached the contract in failing to pay the proper amount due to him under the contract.

*Id.* at 2.

Based on Bruhn's resistance, FFIC addressed the clarified breach of written contract theory in its reply brief, arguing that the summary judgment record fails to demonstrate any breach of the Policy. Doc. No. 31.

9

## 2. Applicable Law

Under Iowa law,[6] insurance policies are interpreted like other contracts:

> The intent of the parties controls. We determine the parties' intent from the language of the policy, unless the policy is ambiguous. Ambiguity exists when, after application of principles of contract interpretation, a genuine uncertainty remains as to which one of two or more meanings is the proper one. A mere disagreement between the parties as to the meaning of policy language does not establish an ambiguity. Only when the policy language is susceptible to two reasonable interpretations do we find an ambiguity.

*Kibbee v. State Farm Fire & Cas. Co.*, 525 N.W.2d 866, 868 (Iowa 1994) (citations omitted). Courts "give policy language its plain and ordinary meaning and do not indulge in a strained or unnatural interpretation merely to find ambiguity." *Tropf v. American Family Mut. Ins. Co.*, 558 N.W.2d 158, 159 (Iowa 1997) (citing *Kibbee*, 525 N.W.2d at 868-69).

A breach of contract occurs when a party fails to perform any promise which forms a whole or a part of the contract without legal excuse. *Employers Mut. Cas. Co. v. United Fire & Cas. Co.*, 682 N.W.2d 452, 455 (Iowa Ct. App. 2004); *see also* Iowa Civil Jury Instruction 2400.5. To prevail on a claim for breach of contract, the plaintiff must prove (1) the existence of a contract, (2) the terms and conditions of the contract, (3) that it has performed all the terms and conditions required under the contract, (4) the defendant's breach of the contract in some particular way, and (5) that the plaintiff has suffered damages as a result of the breach. *Molo Oil Co. v. River City Ford Truck Sales, Inc.*, 578 N.W.2d 222, 224 (Iowa 1998).

---

[6] Neither party argues that the law of any other state applies to Bruhn's claims.

*3. Analysis*

In arguing that FFIC breached the Policy, Bruhn makes scant reference to the actual terms of that Policy. Indeed, Bruhn cites only one provision: Section 3(c) of the Policy's General Provisions. Doc. No. 25-1 at 4. Thus, while itemizing nine separate ways in which FFIC supposedly failed to perform obligations contained in the Policy, Bruhn largely fails to point to Policy language imposing the alleged obligations.

As for Section 3(c), Bruhn states:

No deposition, interrogatory answer, or other discovery refers to oral contract. Defendant apparently bases this new argument on the fact that two of its senior managers, Nelson and Burkhart, requested yield records from the Plaintiff and conducted loss calculations based on the yield records. However, such a procedure is clearly provided for in the contract:

> *"c. Adjusters Procedures. Both you and we agree that the percentage of loss will be determined using the crop-hail loss adjustment procedures published by the National Crop Insurance Services, <u>or in the absence of such procedures, other procedures as determined by us, for the particular crop insured and the applicable crop year period</u>" (Exhibit 1 to Plaintiff's Appendix, pages 14, 15, emphasis supplied).*

Doc. No. 25-1 at 4 [all emphasis added by Bruhn]. So far as I can tell (and it is hardly clear from Bruhn's brief[7]), Bruhn argues that FFIC agreed to employ an alternative claims procedure, as supposedly permitted by Section 3(c).

However, Section 3(c) permits alternative claims procedures only "in the absence of" any "crop-hail loss adjustment procedures published by the National Crop Insurance Services." Doc. No. 24-3 at 16-17. It is undisputed that NCIS did, in fact, publish

---

[7] Unfortunately, Bruhn's resistance brief not helpful. Incredibly, it does not contain a single cite to any case, statute or other legal authority. Doc. No. 25-1. The "Argument" portion of the brief consists of less than two pages. If Bruhn has a good argument for resisting FFIC's motion, it did not share that argument with the court.

crop-hail loss adjustment procedures for crop year 2012. Bruhn admitted the following assertion contained in FFIC's Statement of Material Facts:

> 7. For crop year 2012, National Crop Insurance Services ("NCIS") published crop-hail loss adjustment procedures for the crops at issue, which were incorporated in the policy by virtue of section 3(c) of the General Provisions.

Doc. No. 24-2 at 2; Doc. No. 29 at 1. Thus, the alternative language ("or, in the absence of") contained in Section 3(c) does not apply. Pursuant to the express, unambiguous terms of Section 3(c), Bruhn and FFIC agreed "that the percentage of loss will be determined using the crop-hail loss adjustment procedures published by the National Crop Insurance Services." Doc. No. 24-3 at 16-17. Unless an enforceable modification to the Policy occurred – which Bruhn now states did not happen – it is very clear that Section 3(c) mandated the use of the NCIS procedures.

Paragraph 17 of FFIC's Statement of Material Facts states:

> 17. The adjusters completed their counts using the check strips that had been left in the fields and reported that sufficient check strips were left in each field to complete the adjustment process. According to their survey sheets, the adjusters determined that 4,120.5 acres of soybeans had payable hail losses. In addition, the adjusters inspected certain corn acreage with respect to an earlier loss. Based on the crop-hail loss adjustment procedures set forth in the respective NCIS manuals, the RCIS adjusters found losses ranging from 2.3% to 71.4%.

Doc. No. 24-2 at 3. Bruhn's response was: "Deny. Adjusters arrived on October 29th." Doc. No. 29 at 2. Bruhn cited only to paragraph 8 of Alan's declaration in support of this denial. *Id.* As Bruhn's response suggests, paragraph 8 addressed the dates of the inspection, stating that it occurred October 29 and 30. Doc. No. 25-4 at 5. This is odd, as paragraph 17 of the Statement of Material Facts made no reference to the inspection dates. Meanwhile, Bruhn cited no evidence contradicting any of the assertions actually made in paragraph 17 of the Statement of Material Facts. Thus,

Bruhn is deemed to have admitted those assertions. *See* N.D. Ia. L.R. 56(b).[8] This means, *inter alia*, Bruhn admits that the adjusters based their findings "on the crop-hail loss adjustment procedures set forth in the respective NCIS manuals." Doc. No. 24-2 at 3.

Bruhn expressly admitted other assertions contained in the Statement of Material Facts, including:

> a. Based on the adjusters' findings, RCIS completed a proof of loss setting forth the respective percentages of loss by field and issued payment to Bruhn based on these percentages of loss; and
>
> b. All of the discussions Bruhn had with RCIS regarding historical yields occurred during the claim review process, *i.e.* after the subject losses had been adjusted and paid.

*See* Doc. No. 29 at ¶¶ 18-27 (admitting Doc. No. 24-2 at ¶¶ 18-27). Thus, it is undisputed that (a) FFIC (through RCIS) adjusted the claim pursuant to the published NCIS procedures, (b) the claim was paid based on the adjusters' findings and (c) all discussions about historical yield records took place after the claim had already been adjusted and paid.

Having carefully reviewed the summary judgment record, I find that Bruhn has failed to demonstrate the existence of any genuine issues of material fact as to whether

---

[8] Rule 56(b) states, in relevant part:

> A response to an individual statement of material fact that is not expressly admitted must be supported by references to those specific pages, paragraphs, or parts of the pleadings, depositions, answers to interrogatories, admissions, exhibits, and affidavits that support the resisting party's refusal to admit the statement, with citations to the appendix containing that part of the record. The failure to respond, with appropriate citations to the appendix, to an individual statement of material fact constitutes an admission of that fact.

N.D. Ia. L.R. 56(b).

FFIC violated Section 3(c) of the Policy's General Provisions. It is undisputed that FFIC complied with Section 3(c) by following the crop-hail loss adjustment procedures published by NCIS for the 2012 crop year. Bruhn's argument that some other method of adjusting the claim should have been employed is contrary to the Policy language and is unsupported by the evidentiary record. Nor has Bruhn pointed to evidence supporting a finding that FFIC's determinations in accordance with the NCIS procedures were inaccurate.[9]

As for other alleged breaches of the Policy, I find that they, too, are without legal merit. Indeed, most are little more than customer-service complaints. For example, Bruhn complains about the amount of time it took for FFIC to send adjusters to inspect the crops and to complete the adjustment of the claim. However, the Policy did not impose time limits on the adjustment of any loss. Instead, FFIC was required to "[a]djust all losses" and "[p]ay the loss within 30 days after we reach agreement with you, entry of a final judgment, or the filing of any appraisal award with us." Doc. No. 24-3 at 16. The loss at issue here occurred on September 11, 2012, and FFIC completed the adjustment process on November 5, 2012, by submitting the proof of loss to Bruhn. Doc. No. 24-2 at 4 (¶ 19). After Bruhn refused to sign the proof of loss, payment was issued on November 28, 2012. *Id.* (¶ 22). As a matter of law, the passage of time between these various events did not constitute a breach of any Policy provision.

Bruhn also complains about an alleged lack of negotiation on FFIC's part. As FFIC notes, however, the Policy imposed no obligation on FFIC's part to negotiate

---

[9] In contending that the actual amount of its losses was $1,630,605, Bruhn cites only to page 61 of its Appendix. Doc. No. 30 at ¶ 2. That page contains a chart entitled "Bruhn Damage Calculation Recap." Doc. No. 25-4 at 63. Bruhn cited to no evidence providing an evidentiary foundation, or even an explanation, for the numbers shown on the chart. The chart is clearly a summary exhibit that cannot – by itself – support a finding that FFIC's calculations in accordance with the NCIS procedures were incorrect.

concerning the amount of the loss. Instead, the Policy stated that FFIC would adjust all losses and determine the percentage of loss using the applicable crop-hail loss adjustment procedures. Doc. No. 24-3 at 16-17. If Bruhn did not agree with FFIC's determination, it had the right to invoke an appraisal under Section 6 of the Policy's General Provisions. *Id.* at 17. It did not do so. FFIC's alleged failure to engage in negotiations concerning the amount of the loss did not breach any provision of the Policy.

Bruhn also alleges that FFIC's actions deprived it of the right "to engage [its] own adjusters or appraisers to evaluate the loss." Doc. No. 25-1 at 2. Bruhn presents no evidence supporting this allegation. As noted above, Bruhn received the proof of loss form, showing FFIC's calculations, on November 5, 2012. Bruhn does not explain why it could not have retained its own adjusters or appraisers then, or even earlier, if it so chose.[10]

In short, I find that Bruhn has failed to show that there are any genuine issues of material fact concerning any alleged breach of contract on the part of FFIC. FFIC is entitled to summary judgment on Count One.

B. *Bad Faith*

Count Two asserts a claim for first party bad faith. Under Iowa law, to prevail on a bad faith claim the insured "must prove by substantial evidence (1) the absence of a reasonable basis for denying the claim, and (2) that the defendant knew or had reason to know that its denial was without reasonable basis." *Sampson v. Am. Standard Ins. Co.*, 582 N.W.2d 146, 149-50 (Iowa 1998) (citations omitted). The first element is objective

---

[10] Alan's lengthy declaration addresses this issue in a single sentence: "It was too late for me to obtain an independent appraiser by the time they finally told me they were not going to pay anything further." Doc. No. 25-4 at 8. He offers no evidence that FFIC did anything to prevent him from retaining his own appraiser or adjuster at an earlier stage.

while the second is subjective. *Bellville v. Farm Bureau Mut. Ins. Co.*, 702 N.W.2d 468, 473 (Iowa 2005). While Iowa cases typically describe this tort in the context of a "denial" of a claim, I have previously concluded that it can apply to the underpayment of a claim, as well. *Mapleton Processing, Inc. v. Society Ins. Co.*, No. C12–4083–LTS, 2013 WL 3467190, at *17 (N.D. Iowa July 10, 2013).

Even if an insurer's position is ultimately found to lack merit, that finding alone does not establish the first element of a bad faith claim. *Thompson v. U.S. Fid. and Guar. Co.,* 559 N.W.2d 288, 292 (Iowa 1997); *Cent. Life Ins. Co. v. Aetna Cas. & Sur. Co.*, 466 N.W.2d 257, 263 (Iowa 1991). An insurance company has the right to debate claims that are fairly debatable without being subject to a bad faith tort claim. *Gardner v. Hartford Ins. Accident & Indem. Co.*, 659 N.W.2d 198, 206 (Iowa 2003). Here, I have already concluded that no breach of contract occurred. As a matter of law, then, FFIC's position as to the amount of the claim was – at minimum – fairly debatable. While Bruhn clearly disagrees with FFIC's determination, it has not demonstrated that FFIC lacked a reasonable basis for refusing to pay the amount Bruhn demands. FFIC is entitled to summary judgment on Count Two.[11]

---

[11] Bruhn's sole response to FFIC's motion for summary judgment regarding Count Two was to declare that there is "AMPLE evidence" supporting that claim and to refer the court, generally, to its Appendix and Statement of Material Facts. Doc. No. 25-1 [capitalization in original]. Bruhn's failure to provide an actual argument concerning Count Two – and to cite specific evidence in the record supporting its argument – provides an alternative basis for granting FFIC's motion as to that count. *See, e.g., Knutson v. Ag Processing, Inc.,* 273 F. Supp. 2d 961, 998-99 n.8 (N.D. Iowa 2003) (arguments not fully briefed are deemed abandoned), *reversed on other grounds*, 394 F.3d 1047 (8th Cir. 2005).

## VI. CONCLUSION

For the reasons set forth herein:

1. Defendant Fireman's Fund Insurance Company's motion (Doc. No. 24) for summary judgment is **granted** with regard to all counts.

2. Judgment shall enter in favor of defendant Fireman's Fund Insurance Company and against plaintiff Bruhn Farms Joint Venture.

3. The trial of this case, currently scheduled to begin July 13, 2015, is hereby **canceled**.

**IT IS SO ORDERED.**

**DATED** this 8th day of May, 2015.

_____
LEONARD T. STRAND
UNITED STATES MAGISTRATE JUDGE