IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION

BRUHN FARMS JOINT VENTURE                                         PLAINTIFF

v.                                                    Case No. 13-CV-4106-CJW

FIREMAN'S FUND INSURANCE COMPANY                              DEFENDANT

**DEFENDANT'S APPENDIX IN SUPPORT OF MOTION TO STRIKE
SECOND SUPPLEMENTAL REPORT OF DAVID TRITSCH**

The Defendant, Fireman's Fund Insurance Company, submits the following Appendix in

Support of Its Motion to Strike the Second Supplemental Report of David Tritsch:

**Table of Contents**

| Document | Page # |
|---|---|
| Declaration of Jeffrey S. Dilley | 1 |
| Exhibit 1 – Original Tritsch Report | 2 |
| Exhibit 2 – First Supplemental Tritsch Report | 12 |
| Exhibit 3 – Defendant's Amended and Supplemental Expert Disclosure | 36 |
| Exhibit 4 – Second Supplemental Tritsch Report | 40 |

Date: January 13, 2017                    Respectfully submitted,

s/ Jeffrey S. Dilley
Jeffrey S. Dilley, Pro Hac Vice
jsd@henke-bufkin.com
Elizabeth T. Bufkin, *Pro Hac Vice*
etb@henke-bufkin.com
W. Kurt Henke, *Pro Hac Vice*
wkh@henke-bufkin.com
HENKE BUFKIN, P.A.
Post Office Box 39
Clarksdale, MS 38614
662-624-8500 (telephone)
662-624-8040 (fax)

Michael W. Ellwanger, AT0002283
mellwanger@rawlings-law.com
RAWLINGS, ELLWANGER, JACOBS
MOHRHAUSER & NELSON, L.L.P.
522 4TH Street, #300
Sioux City, IA 51101-1624
712-277-2373 (telephone)
712-277-3304 (fax)

***Attorneys for Fireman's Fund*
*Insurance Company***

## Certificate of Service

I, Jeffrey S. Dilley, do hereby certify that on January 13, 2017, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which will send a notification of such filing to all counsel of record.

s/ Jeffrey S. Dilley

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION

BRUHN FARMS JOINT VENTURE                                    PLAINTIFF

v.                                                           Case No. 13-CV-4106-CJW

FIREMAN'S FUND INSURANCE COMPANY                             DEFENDANT

## DECLARATION OF JEFFREY S. DILLEY

1.     My name is Jeffrey S. Dilley.  I am one of the attorneys representing the Defendant, Fireman's Fund Insurance Company, in this matter.  I am over eighteen years of age and am fully competent to make this declaration.  I make this declaration based on my personal knowledge.

2.     Attached as Exhibit 1 is a true and correct copy of the first expert report submitted in this matter by Plaintiff's expert, David Tritsch, and served on January 5, 2015.

3.     Attached as Exhibit 2 is a true and correct copy of Mr. Tritsch's first supplemental expert report. The first supplemental report was served on October 17, 2016.

4.     Attached as Exhibit 3 is a true and correct copy of the Defendant's Amended and Supplemental Rule 26(a)(2) Expert Disclosure Statement, which was served on December 1, 2016. (The expert reports that accompanied this disclosure are omitted from Exhibit 3.)

5.     Attached as Exhibit 4 is a true and correct copy of Mr. Tritsch's second supplemental expert report.  The second supplemental report was served on January 6, 2017.

6.     I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 13, 2017.


                                                    _____
                                                    Jeffrey S. Dilley

# Exhibit 1

January 5, 2015

TO: Bruhn v Fireman's Fund File

FROM: David Tritsch, CPCU

RE: Negligence first-party property claim by insurer

During the summer months 2012 strong storms occurred along the dividing line between drier than normal weather in the southern corn-belt and normal weather in the northern corn-belt. A maxim in the crop insurance business is: "it rains before it hails" meaning rain is welcome but your crop can still be damaged by hail. Crop-Hail claims are paid on a percentage of the lost potential. Applying elementary arithmetic the formula is: 1 – (number of units did made/number of units should have made). The remaining percentage is multiplied by the amount of liability purchased. Farmers purchase crop-hail insurance for the peace of mind their claims will be paid fairly and promptly.

On May 9, 2012 Bruhn Farms Joint Venture applied for a crop-hail insurance policy issued by Fireman's Fund through their Managing General Agent (MGA) Rural Community Insurance Services (RCIS) for Bruhn's rye. The application was faxed to RCIS at 11:00 pm and coverage was bound at 12:01 am May 10, 2012. Policy number IA-090-120853 was assigned and subsequently endorsed on May 22, 2012 to include corn and soybeans replacing coverage previously provided by Pro Ag. The insurance producer (Terry Nielsen) represented both RCIS and Pro Ag and he made the decision to change carriers.

On Monday June 4, 2012 RCIS received a notice of loss on the above referenced policy. The plaintiff called his agent for RCIS, Terry Nielsen, who reported the claim using RCIS's website. The purpose of Bruhn's notice of loss to RCIS was to allow RCIS to form an adequate estimate of their liability and to set in motion the process of investigating the claim. The notice of loss also enabled RCIS to take prompt action to protect their interest. A claim number was assigned to this policy as 208696. Seven days later, Monday June 11, 2012 this claim was assigned to Jim Baldwin who I believe is identified in the RCIS system as Code No. 015106. Baldwin worked this claim with the assistance of Clay Manes.

This crop-hail policy like all standard first-party property insurance contracts was not drawn up through negotiations. Bruhn was required to accept the following provision when agreeing to purchase the policy:

RCIS GP IA-MN (01-07) GENERAL PROVISIONS 3. DUTIES AFTER LOSS. c. Adjustment Procedures.

Both you and we agree that the percentage of loss will be determined using the crop-hail loss adjustment procedures published by National Crop Insurance Services, or in the

1

absence of such procedures, other procedures as determined by us, for the particular crop insured and the applicable crop year.

NCIS provided loss adjusting procedures for rye, corn, and soybeans for crop year 2012. I believe this reference makes the loss adjustment manual part of the policy. The procedures become provisions.

On Friday June 15, 2012 Bruhn submitted a signed Proof of Loss to Fireman's Fund Insurance Company witnessed by Baldwin and Manes. This proof of loss lists only the rye acreage and failed to list the corn and soybeans. Iowa Administrative Code 191-15.42(4) states "Upon receiving notification of claim, an insurer shall promptly provide necessary claim forms, instructions and reasonable assistance so that first-party claimants can comply with the policy conditions and the insurer's reasonable requirements." Because the corn and soybeans are not listed it appears Bruhn's agreement to accept tender for the rye damage closes the entire claim on this policy. It hailed on all crops listed on this policy not just rye. It appears the corn and soybeans were worked on a Non-Waiver Agreement.

Manes states later in his narrative: "Weeks later another claim was submitted for acres in counties north of the Bruhn farm headquarters. Baldwin and I again worked the claim." In fact the notice of loss claim number 213205 was submitted June 18, 2012 but not assigned to Baldwin until July 16, 2012. This was 28 days after RCIS received notice. Iowa Administrative Code 191-15.42(1) "Upon receiving notification of a claim, an insurer shall, within 15 days, acknowledge the receipt of such notice unless payment is made within that period of time. If an acknowledgment is made by means other than in writing, an appropriate notation of the acknowledgment shall be made in the claim file of the insurer and dated." Nothing in RCIS's testimony mentioned contacting the insured within the statutory required time period.

At RCIS there appears to a general lack concern with crop-hail claims. In an email supplied by Larry Burkhart (FFIC 0087) received January 9, 2013 the following timeline for this claim was provided:

1. Claim 213205 DOL (date of loss) 6-14
2. Notice 6-18
3. Assigned to Jim Baldwin 7-16 – could not find anyone to get involved in this policy
4. Jim sent to auditor 7-23

The "deferral" from the initial claim was paid on claim 213205. The deferral was really a non-waiver situation where the claim was actually worked but the RCIS did not waive any of their rights. They had not accepted liability on the corn and soybean acres at that time. It appears the first claim was closed with the rye proof of loss. A second claim was immediately opened as there was no place for the "deferrals" to land if there was not an open claim. This information should have been communicated to Bruhn in writing.

On August 16, 2012 the fourth storm occurred generating Notice of Loss the same day with claim number 216639 assigned to Mike Gamber. From Gamber's narrative: "On 8-27 called

insured and had a short conversation about loss . . . we inspected 35 lines in three counties and the only payable loss was one line of soybeans by the home place".

September 11, 2012 was a Tuesday and the fifth storm occurred. Bruhn and agent Terry Nielsen provided testimony Bruhn notified Nielsen soon after the storm.

September 26, 2012 RCIS receives a Notice of Loss for the September 11, 2012 storm and assigned claim number 219247. Why was another claim number assigned? On page FFIC 0303 part of discovery adjuster code 015137 stated: "to process claim correctly only one open claim can exist." There already was an open claim.

September 30, 2012 marked 45 days after claim 216639 was received. Iowa Administrative Code 191-15(3) required RCIS to send a letter providing reasons additional time was needed to for investigation. There is no record of a letter.

October 1, 2012 claim number 216639 is reassigned from Mike Gamber to Craig Polson.

October 3, 2012 claim number 219247 is assigned to Galen Sornson 9 days after receiving notice of loss. Gamber and Polson already had the deferral material for claim 213205 with claim 216639 in their possession. Why did RCIS wait a week to assign to a new adjuster?

October 11, 2012 the 15 notice to acknowledge receiving a claim is due and deadline passed without contacting the insured. Violation of Iowa Administrative Code 191-15.42(1). The second claim during the policy year this occurred. Absolutely no since of urgency to protect RCIS's interest.

October 16, 2012 Craig Polson performs a reenactment of Pontius Pilate's washing of the hands concerning claim number 216639: "This claim is being sent up in order for it to be re-assigned to another adjuster in the area. Larry Greime is going to make the assignment. I was given the claim only to have a computer to work it on. The primary adjuster, Mike Gamber, had a glitch in his Quest Hail program that would not allow defoliation to be entered on a soybean hail loss. There has been another loss since the loss Mike and I worked, therefore there is a need to now get both losses addressed. The agent is aware of the process this claim is taking for re-assignment." Gamber did not complete a proof of loss after he determined the amount due following his conversation with Bruhn on August 27, 2012.

October 17, 2012 fourteen days after being assigned claim 219247 adjuster Galen Sornson calls and ask for help. Sornson made the following statement in his narrative: "Our 1st conversation centered on prior claims 2012, one was a replant claim on sbeans and a corn claim, finally conversation about this shatter loss claim. . . I told him (Al Bruhn) I could not work this claim alone because of all the acres and was waiting for other adjusters workloads to ease up so they could help." Bruhn certainly remembered Baldwin and Manes deferring the corn adjustment when the rye claim was tendered. Galen Sornson was the 5th adjuster Bruhn had heard from since June 4, 2012 when RCIS received the first notice of loss.

October 25, 2012 note created by Randy Feldman for claim number 216639 nine days after Craig Polson "sent up for re-assignment". Withdrew this claim. Galen Sornson has the 219247 claim. There are many acres of Soybeans to be adjusted. Galen will enter these two items on his claim and will be paid on same claim. Did anybody think to notify Bruhn this was going to happen? This was done 26 days after Bruhn should have received a letter from RCIS providing reasons for the extra time needed to investigate the claim.

October 29, 2012 the loss adjustment process finally begins for the September 11 storm. Adjuster Craig Woodford reports in his narrative: "Drove down Ida Grove on Monday met with adjusters then on to Mapleton met insured and hired man did shatter counts with Galen all afternoon."

The NCIS Soybean Loss Adjusting Manual provides instruction to determine "Shatter Loss" prior to harvest and post-harvest. The soybeans were harvested prior to RCIS making their inspection. There are seven (7) steps: "To determine shatter loss on a crop that was combined before it could be inspected:" stated on page 22 of the manual as follows:

1. Count the number of seeds on the ground in a representative area of ten or more square feet (see information below for selecting a representative area).
2. Divide total number of seeds by the number of square feet.
3. Convert seeds per square feet to bushels per acre. The number of seeds required to constitute a bushel of loss per acre will average five seeds per square foot.
4. Subtract a minimum of two to three bushels per acre for natural or harvest loss. The difference will be the number of bushels of shatter loss from hail.
5. Obtain bushels per acre harvested by the insured.
6. Add items three and five to determine total production per acre.
7. Divide item four by item six to determine percentage of hatter loss.

I would allow a team of two adjusters one hour per sample. From the Soybean Survey with the proof of loss there are 109 samples. With 3 teams working this would take a minimum of 36 hours. Three teams of adjusters were at the farm the afternoon of October 29 and two teams all day October 30. Less than one third the minimum time required.

Working only from information submitted for the October 29 and 30 inspections I made the following determination on what the damage for the September 11, 2012 storm should have been. This adjustment was made following procedures for un-harvested soybeans (R4-Maturity). The soybean loss manual states on page 18: "Direct damage in reproductive state (R4 or later) consists of dead or non-harvestable plants, broken over plants, pod loss, seed damage and shatter loss." Because these adjusters used this portion of the manual for un-harvested soybeans they were required to account for indirect damage (Plant damage from field notes). Plant damage from field notes include the Cut-off/Broken and Defoliation.

Page 29 of the NCIS Soybean Loss Adjusting manual provides the procedure for adjusting losses at Stage of Growth R4 – MATURITY LOSS EXAMPLE as follows:

4

Record all information on the Soybean Survey Sheet (NCIS 6301).

A. Determine the STAGE OF GROWTH AT DATE OFF ADJUSTMENT.
B. Determine the STAGE OF GROWTH AT DATE OF LOSS.
C. Determine the amount of direct damage (dead plants, non-harvestable plants, pod loss, seed damage and shatter).
  1. Count 100 consecutive plants.
  2. Determine the number of dead and non-harvestable plants.
  3. Record the direct loss percentage (30 plants broken over below cutting height out of the 100 plant sample = 10% loss factored on three-for-one basis). See page 18, item 2.
  4. Count ten consecutive plants. Determine the total number of full length pods (containing a seed of at least 1/8 inch long) that have been damaged or removed from the plant. Divide the total number of damaged or removed pods by the total number of pods in the ten plant sample to determine the percentage of pod loss.

     300 total pods, 50 pods removed or damage;

     50/300=16.7% gross pod

     Crop remaining = 90% (100%-10%)

     90%x16.7%=15% net pod loss.

D. Determine the percentage of defoliation, through stage R6 ONLY.
  1. Count 20 consecutive plants.
  2. Determine the percent of defoliation on each plant in the sample. Enter this information on the Soybean Field Notes.

On the Date of Adjustment all fields were determined to be at the R8 stage of growth. Using the TIME INTERVAL CHART on page 10 of the soybean manual the stage of growth on the Date of Loss, September 11, would be R5. On the date of inspection I am certain it hailed on all lines direct hail damage was paid per soybean survey sheets and the plants were 100% defoliated. Page 46 of the Soybean manual provides a defoliation chart and at R5 stage 100% defoliation the percentage of loss is 75. Corrections to 2012 Hail Loss Summary on Policy #: 14-090-120853 for claim #219247 on the soybean portion result in an indemnity due Bruhn Farms Joint Venture $1,654,342. RCIS paid $387,263 on these same lines.

On the afternoon of October 30, 2012 all six adjusters: Sornson, Carlson, Winquist, Thompson, Grieme, and Woodford met and "Galen (Sornson) set up his computer and Quest work was completed for this claim." Per Curt Thompson. Sornson reported: "After completing the claim on the afternoon of Oct. 30th I had intended to go and see Al but his hired man told us he had been really sick that day so I cancelled on that." I have zero

5

confidence the adjusters spent enough time in the fields to complete the number of inspections claimed.

On Wednesday October 31, 2012 RCIS management is informed of a high dollar soybean claim in Iowa. At 9:29pm Larry Burkhart, Crop Hail/Named Peril Field Claims Manger, writes: "OMG no, had not heard." If Burkhart had read Steve Kevorkian report which set a higher loss reserve he should had known. There was no reasons for Burkhart to be surprised.

On November 1, 2012 Tim Buckingham reports the following to Larry Burkhart; "Galen Sorenson has claim #6 and called me yesterday. I asked him why we waited so long and he said the insured was too busy and kept putting it off. Returning to the idea RCIS made the contract with no input from Bruhn we return to form RCIS GP 3 IA-MN (01-07) GERNERAL PROVISIONS.

Provision 3. DUTIES AFTER LOSS. b. Our Duties Are: (1) Adjust all losses.

It was the responsibility of RCIS to make an inspections immediately after each notice to protect RCIS's interest. In my opinion RCIS's crop insurance employees just do not understand the principles of insurance.

For the next two weeks Galen Sornson and agent Terry Nielsen attempt a settlement proposal. Then on November 19, 2012 Steve Kevorkian writes Ed Cerven: "Ed, As I stated Larry Grieme and 5 adjusters worked this policy about 4 weeks ago, Larry state the adjuster has made numerous attempts to contact the insured with no luck. Larry stated he has called the agent Terry Nielsen about not being able to contact Mr. Bruhn." Cerven forwards to Ed Longman, East District Field Claims Manager, "Normally I would say send it up without signatures but….This is the policy which had rye on it with big loss, the insured was one that kicked Grieme off farm about 3 years ago and also the one that Nelson took liab for corn and soybeans when effective date was questionable. High dollar review is complete pay about $450K. What should we do with it??" Ed Longman asks Larry Burkhart: "What should we do with this one?" Burkhart responds to Longman and cc's Cerven; "Any idea why the insured has not been available to sign for ½ M $ check. Any possible reason he has something to argue about, be pretty gutsy if he does." Burkhart knows RCIS delayed making this inspection for 33 days after receiving notice of loss; instead of making Bruhn look like the bad guy he should be apologizing.

Ed Cerven's statement provides insight. Larry Grieme and Al Bruhn have some history and it is obvious Cerven takes Larry Grieme's side. RCIS did not endorse the rye policy accepting the corn and soybean liability immediately requiring the non-waiver by Baldwin and Manes. Cerven suggest Nielsen added corn and soybeans liability after the May 23 storm. If Bruhn had Pro Ag coverage crop year 2011 he would have had carry over coverage through May 30, 2012. There would have been no reason to do what Cerven is suggesting. It does explain why initial proof of loss listed only rye without any corn or soybeans. Manes stated in his report: "In addition to working the rye claim, Baldwin and I

looked at roughly five thousand acres of corn and soybeans on a policy that was still pending." Manes should have reported the claim was worked on a non-waiver instead of saying it was deferred. Soybeans are not to be deferred damage is pretty high.

Later November 19, 2012 Larry Grieme writes to Larry Burkhart: "I talked with Galen Sornson today and Bruhn is saying that there is a loss on some corn that was worked by a Kansas adjuster, is not on the total loss to date. Don't know if that is the case or not. Also he said he has taken counts in these fields of shatter we worked and came up with more of a loss than we did. I can assure you that there were counts made in all samples left, which he did leave a lot of samples to look at. I think he is being well taken care of on the shatter since it was a while after the hail when it was adjusted. We got rid of this guy 10 years ago because of things just like this." Burhart responded: "Please see if we missed a field of corn and if we did we will need to add it, otherwise we will pay without signature because the bean strips have deteriorated now to the point we cannot get accurate count and if we were there late after the storm he is probably overpaid anyway. Let me know what you come up with on the corn. Thanks" We learn from this statement RCIS does not follow NCIS instructions for harvested soybean shatter claims. It is their policy to do all claims as if they are un-harvested. It is also clear Larry Grieme was offended by Bruhn's statement he came up with more damage than Grieme and his 5 cohorts did.

On Monday November 26 Steve Kevorkian wrote Larry Burkhart: "Could not make contact last week, insured's mail box full. Adjuster contacted him this morning and would not sign claim, not happy with RCIS. Agent has been updated." Burkhart replied: "not much to do but pay it. Include complete explanation in the claim documentation.

On November 27, 2012 Larry Grieme, apparently with Larry Burkhart's blessing, completed the "High Dollar Audit" known as 2012 Hail Field Review. Larry Grieme assigned the claim to adjuster Galen Sornson; accompanied the adjusters on the inspection; then completed an audit.

There are eleven audit boxes to check off. The first box is: Is the Staging Correct? The stage Date of Adjustment was given as R8 and Date of Loss R7. It takes only 7 days to go from R7 to R8 and it had been 48 days since the hail storm. The adjusters did not follow procedure.

The second item to check off is: Were the correct charts/factors used? Since the time interval chart mentioned above would have put the correct staging at R5 the Date of Loss and they adjusters did not account for defoliation (unless they want to say all leaves were attached to the plants and alive) the correct answer was no, but auditor said yes.

Third item: Do the acres reflect the percent of damage? Grieme answered Yes again.

Fourth item is "Is complete documentation included for Non-Waiver situations? Grieme answered N/A. RCIS was accepting the situation as it was.

The fifth item: Are all facts noted in the fact sheet? Grieme says Yes, even though he does not acknowledge he is auditing work he completed and supervised.

Sixth item: Were the minimum number of counts taken? Grieme says Yes, depends on the definition of counts. It would be impossible to complete "counts" according to NCIS Soybean Loss Adjustment procedures to complete the required number of counts in the time spent.

Seventh item: Was loss uploaded or mailed on a timely basis? Grieme says NO, what is timely? Bruhn and Nielsen have both provided testimony the notice to Nielsen was soon. Notice to Nielsen is notice to RCIS but the question is uploaded not when Bruhn contacted Nielsen. RCIS waited 33 days after notice to inspect this loss and the auditor is complaining the agent did not upload it for 15 days. If an auditor wants to respond NO he should have noted the correct time frame.

Eighth item: Were NCIS procedures followed? Grieme says Yes, Yet, if they would have followed NCIS procedures they would have paid an additional $1.3 million.

Ninth item: Was the insured or authorized representative signature verified? Grieme says: will not sign. We have a situation where the insured has not agreed with the proof of loss being submitted.

Tenth item: Was agent contacted by adjuster before and after the loss was completed? Grieme says Yes.

Eleventh item: Are all signatures and pictures included? Grieme says Yes.

In the comments section of the audit Grieme states the date of adjustment was October 22 and 23 even though his traveling partner, Curt Thompson, reported October 29 and 30. Galen Sornson stated: "Two dates I can be sure of when 6 adjusters met Al Bruhn on Oct 29 & 30." Since Grieme did not provide any bills putting him in Mapleton on October 22 and 23 its 'looks like the auditor did not check his records and the others did."

On Monday December 17, 2012 Larry Burkhart writes to Larry Grieme: "Please take a few minutes and write back with anything you can think of about the claims with Bruhn. I cannot get into QUEST right now to check the special report. I have to call Al and need to know what all happened this summer. Did he ever go to the field, how many fields does he think we owe him more on, is he arguing about beans or corn, or both, did he have anyone go to the field for adjustments, anything else you can fill me in on would be helpful. Thanks Larry, I think all the adjusting was correct, but you know Al................" In my 38 years of experience as an insurance professional or in my personal experience as a crop-hail insured have I seen an insurer treat their policyholder with so much disrespect?

On page FFIC 0086 from Burkhart's testimony is a hand written note dated 1/22/13. Apparently Bruhn is in contact with Pro-Ag the insurer for Bruhn's Federal Crop Insurance policy also purchased from agent Terry Nielsen. The following notes are handwritten: Dave Bussholt (Bousselot) – Supervisor followed by Jeff Camereon – Adjuster ----Cause of loss on NOL (notice of loss) – Heat and Drought; (Cause of loss on) PW (Production Worksheets) Drought. The following day January 24, 2013 (FFIC 0073) Burkhart calls Al

8

Bruhn and made the following notations: "advise (Al) we were not paying more . . . . (Al) disputed that drought had a part in reduced yield." Further down the page Burkhart confirms telephone call with executives of RCIS on same day "discussed collected data" which I take to mean all information I have reviewed in this memo and the Federal Crop Production Worksheets from Pro Ag.

On January 25 Burkhart called Terry Nielsen "advised we do not plan to pay more...... PWs show drought as total cause of loss. Is there room for negotiation – yes, always open to reasonable settlement. Later the same day telephone call with Al Bruhn "upset". Eight months and 1 day after Al Bruhn called Terry Nielsen to let him know it hailed on his crops.

Bringing Federal Crop Insurance into this claim shows a general lack of knowledge of insurance principles of the RCIS claims staff. Federal Crop Insurance is a social insurance program administrated by private companies. By way of analogy it is like saying a retiree with a private pension should have those benefits considered when receiving social security. The two are mutually exclusive. But since RCIS brought drought into the conversation I must address the doctrine of concurrent causation. The gist of this doctrine is if an insured peril and an excluded peril damage property and the insured peril contributes greater than 50% of the damage all the damage is covered. If I am asked to compute damages based on the following formula: 1 – (number of bushels soybean made per acre/number of bushels soybeans should have made per acre) the drought peril will be ignored.

In summary, if corporations are people too, they must be held accountable to the same values and morals. First RCIS must be held accountable to the Iowa Code, which they ignored. Secondly, RCIS stated time after time the adjusters followed procedures but this was not the case. Third, Bruhn was under no obligation to leave strips for RCIS to investigate the claim using the procedures they used but Bruhn was notified of this. It was RCIS's choice to use the R-4 Maturity method for un-harvested soybeans. RCIS must follow the procedure they chose. Because of RCIS's errors the claim should be corrected to reflect a $1, 654,342 soybean indemnity on claim 219247. I cannot quantify the damages required to compensate Bruhn for RCIS's treatment. RCIS wanted Bruhn's business and should have treated him with respect and not let claims from previous policies prejudice the claim activity of the current policy.

# Exhibit 2

This is my first supplemental report of the Bruhn matter. This report begins where my January 5, 2015 report ended, stating FFIC/RCIS should have indemnified Al Bruhn $1,654,342 for his crop-hail claim. FFIC/RCIS drastically and intentionally underpaid Bruhn's losses because adjusters, auditors, and senior management did not follow policy provisions of the insurance contract, did not follow NCIS mandated loss adjustment procedures, did not follow their own manual, and ignored evidence as to proper adjustment of the losses to Bruhn Farms.

I am writing this paper to offer additional opinions and clarification after reviewing the RCIS 2012 Crop-Hail Loss Adjustment Manual and sworn testimony of the Regional Claims Manager, Ed Cerven, and the field claim adjuster and auditor, Larry Grieme. This report is written, in part, as a corrected claim (correcting the adjustment errors made by FFIC/RCIS) using only information supplied by the FFIC/RCIS adjusters, and then correctly following the loss adjusting provisions of the insurance policy. The corrected claim is attached to this report as well.

## CORRECTED CLAIM 219247-00

According to Larry Grieme's deposition, he and five other FFIC/RCIS loss adjusters made their initial adjustment on Monday October 29, 2012. By that time, it had been 48 days since the September 11, 2012, storm, and the soybeans had matured and were harvested. According to the deposition of Larry Grieme, it appears that senior management did not appropriately staff the high number of hail claims that were made in 2012. This falls on the shoulders of senior management at FFIC/RCIS, and the insureds, like Bruhn Farms, should not be underpaid for claims because of understaffing issues.

Whether harvested or unharvested crop, the insurance policy requires the Soybean Loss Instructions published by National Crop Insurance Services (NCIS) be followed. Step "A." on page 29 of the NCIS Soybean Loss Instructions states: "Determine the STAGE OF GROWTH AT DATE OF ADJUSTMENT." The FFIC/RCIS Soybean Survey Sheet lists R8 (Mature) as the stage of growth on the date of adjustment. Given the soybeans were harvested R8, this is correct stage of growth. That is only step one of proper staging, though.

Step "B." follows on the next line: "Determine the STAGE OF GROWTH AT DATE OF LOSS." The FFIC/RCIS adjusters made a horrible error by incorrectly setting the Stage of Growth at Date of Loss at R6.5 or R7 depending on the field. According to the NCIS Soybean Loss Instructions, which must be followed pursuant to the insurance contract and FFIC/RCIS manual, both R6.5 or R7 are impossible determinations for this loss. Page 10 of the NCIS loss adjuster's manual contains the TIME INTERVAL CHART providing a timeline for the number of days in each of the seven periods from R1 to the beginning of R8. Following the chart, and working backwards from the date of adjustment, the stage of growth is R4. Grieme's testimony states this claim was assigned to adjuster Galen Sornson, and Galen did the staging. Apparently there was no discussion between the team of six on this critical determination, and it was clearly staged incorrectly.

The NCIS manual states on page 13: "Time interval between reproductive stages must be used to determine the reproductive stage at date of loss." Because there was a previously adjusted hail loss that occurred on August 16, according to the manual, staging had already been occurred at that time based upon R 3.5. Using the manual, as the contract requires, the staging at time of loss September 12 would be R5.5.

Because RCIS adjusters wrongly placed the Stage of Growth at maturity, their adjustment accounted only for DIRECT DAMAGE. Page 18 of the NCIS Loss Adjusters Manual provides the following instruction: **DIRECT DAMAGE – REPRODUCTIVE STAGES (R4 – MATURITY)** Direct damage in reproductive stages (R4 or later) consists of dead or non-harvestable plants, broken over plants, pod loss seed damage and shatter loss. Of the items to adjust, the team only completed shatter loss.

**PLANT DAMAGE** (defoliation) was ignored in this adjustment. Plant Damage is considered in the stages of growth from R1 through R6. At R6.5 and R7, there is no consideration for plant damage as the plants near maturity. The NCIS Loss Adjusters Manual provides a definition of defoliation on page 4 stating: "Defoliation is the amount of leaf area removed." It is undisputed that the plants were 100% defoliated on the date of adjustment, which is the only evidence of the amount of defoliation in this case. Using the defoliation chart for R5.5 soybeans, the percentage of damage is 75.

Attached are corrected Soybean Survey Sheets following the NCIS instructions for loss adjusting completed on an excel spreadsheet. For the September 11, 2012 storm date the claim should have been paid $1,639,600. The work that I have performed on the Soybean Survey Sheets attached to this report should have been done by Galen Sornson during the original adjustment of the loss. If done incorrectly by Galen Sornson, it should have been corrected by Larry Grieme on the review of the loss (notwithstanding comments below concerning the conflict of interest with Grieme). If not corrected on review, it should have been corrected by senior management in 2012 and 2013, who reviewed the file. Instead, it appears from the internal emails amongst FFIC/RCIS that senior management's attitude towards Bruhn Farms was "be happy for what we give you" despite having no basis to underpay Bruhn well over $1 Million.

The FFIC/RCIS manual (see FFIC 0748) requires the adjusters to explain to the insured how the crops are staged for loss adjusting, and this clearly wasn't done here. In fact, Grieme couldn't even explain during his deposition how the staging was done, deferring to Sornson after trying to explain the staging. The FFIC/RCIS manual also states that company procedure requires that the agent and insured be reached within 24 hours of the claim. Yet, here it was 48 days from the date of loss to the date of adjustment. This claim was grossly mishandled by the adjusters and senior management, and it can be easily corrected now, but FFIC/RCIS refuses to do so.

### CORRECTED CLAIM 216639-00

An adjustment was made for the August 16, 2012 storm. Even though the claim was apparently never paid, it should be because previous losses are applied multiplicative not additive. For example, line 39 had damage on June 14, August 16, and September 11. NCIS instructions for second and subsequent losses call for the amount of damage on the current adjustment be multiplied by the remaining crop from the previous loss or losses. To correctly pay the September 11 storm, the August 16 storm needs to be paid.

FFIC/RCIS's procedure for computing prior damage on soybeans does not follow NCIS instructions. Line 39 Soybean Survey Sheet FFIC 0310 was completed for the August 16 storm. The adjusters took 15 samples and determined Plant Damage (defoliation) on each sample. The percentage of loss was recorded in column H of the RCIS form (column L on NCIS form). Then in column I a larger number appears. The instructions on the survey sheet for column I are to multiply column H X G. Column G of the sheet is labeled Percent Crop Remaining. 100% is the maximum which can be remaining. Following

the rules of multiplication Column, I can either be identical to column H or smaller. It is mathematically impossible to be larger.

The entry in Column I is the sum of the August 16 storm and the June 14 storm (survey sheet FFIC0270). Again the NCIS rules call for previous storms to be applied multiplicatively. I seriously doubt each of the samples from the August 16 storm were taken from the exact same soybean plants as the June 14 storm. By working line by line the assumption is each sample is from the exact same location.

The correct percentage of loss from the August 16 storm is 2.5% not 9.3. The damage on line 11, corn, is listed as 8.9% and should be paid at this amount. FFIC/RCIS owes Bruhn $42,886 for the August 16 storm.

**RED FLAG WARNINGS IGNORED**

Page FFIC 0310 referenced above provided notice to everyone with access to Bruhn's crop-hail policy of the state of growth on August 16 was R.3.5. Everyone from Galen Sornson, adjuster of record, to Chuck Eldredge, the highest ranking claims official at FFIC/RCIS had access to this information. I was highly critical of Larry Grieme's audit in my previous report, and I remain critical of his audit after his deposition. In his deposition, Larry Grieme failed to provide a detailed explanation how the stage of growth at time was loss was determined. His explanation was to pass the fault to Galen Sornson. Yet, Grieme audited the claim and confirmed staging was correct according to the documents. He expressed no facts to support the improper staging of the crop by FFIC/RCIS for the September hail loss. This violates the insurance policy and FFIC/RCIS' manual.

FFIC 0311 through FFIC 0315 are the field notes attached to Line 39 Survey Sheet for the August 16 storm. The notes account only for defoliation on Plant Damage listing 2% for the first sample. The notes from the June 14 storm lists all Plant Damage from Nodes Cut Off/Broken on pages FFIC 0276 through FFIC 0280. The amount of damage for the first sample is 5.6%. Following RCIS's logic of summing previous losses Galen Sornson should have entered 7.6% in column I for the first sample on his Survey Sheet for the September 11 storm. He entered 64.4%. When Sornson looked at the previous losses he would have seen:

1. The soybeans were R3.5 on August 16.
2. The previous damage on the first line summed to 7.6%
3. He would have seen earlier claims on this acreage had a sample size of 70 acres per sample. His number provides earlier samples were well over 200 acres per sample.
4. The 200 acre weights of earlier claim were only given the weight of 50 acres on his claim.

The only conclusion is everyone at FFIC/RCIS intentionally ignored the staging of the previous claims when working the September loss. FFIC/RCIS' decision to intentionally ignore the previous claims was financially beneficial to them because they wouldn't pay for R-stage defoliation losses the way that they decided to incorrectly stage the crop.

Grieme further admitted in his deposition that the method of staging they used allowed them to be in the fields the least amount of time possible. Grieme even admitted he never follows the NCIS procedure for shatter loss because it takes too much time. Again, senior management was apparently not training adjusters correctly and understaffed for the claims in 2012 resulting in a drastic underpayment to Bruhn Farms in 2012. The FFIC/RCIS manual claims "zero tolerance" for failing to

follow claim appraisal procedures (see FFIC 0743), but they clearly are not following their own zero tolerance mandates. Zero tolerance must mean something different to FFIC/RCIS than it does to everyone else.

## CONFLICT OF INTEREST

The FFIC/RCIS manual discusses identifying conflicts of interest (see FFIC 0743). FFIC/RCIS had knowledge of a conflict of interest on the part of Larry Grieme being involved with Al Bruhn claims. According to Grieme's testimony, ten years earlier he had worked a soybean adjustment at Bruhn's farm after harvest. Grieme paid damage only on part of the damaged acreage claimed by Bruhn. Larry Grieme did not disclose to Al Bruhn he would be involved in this claim. Larry stated: "I did not talk with Al at all, since I have had dealings with him in the past and thought it would be best." As stated earlier, Grieme picked the adjusters assisting this adjustment. Grieme was also present during the adjustment without giving Bruhn the courtesy of notification. If Larry Grieme felt that he could not even talk with Al Bruhn, then he is admitting a conflict of interest that should have resulted in his disqualification on this claim. The FFIC/RCIS manual requires that the adjusters have open communication with the insured, and that was not possible here because of Grieme's apparent conflict. It was also a conflict of interest for him to audit his own work, which likely resulted in the staging error not being identified during the review. Senior management should have never put Grieme in that position.

In addition to violating the provisions of the contract concerning following NCIS loss adjusting procedures, FFIC/RCIS also failed to deal with Bruhn fairly. The objective of the contract was for FFIC to assume the peril of hail to Bruhn's crops. During the life of this policy, FFIC/RCIS received 7 notice of losses and assigned 7 claims. Yet, Al Bruhn apparently only signed one proof of loss, for the first claim.

## DESTRUCTION OF EVIDENCE

I am troubled by FFIC/RCIS' decision to intentionally destroy evidence in this case. Larry Grieme testified there were handwritten notes made while the adjusters were in the soybean fields. That information was given to Galen Sornson. Once the data was allegedly transferred to Galen Sornson's computer, the hand written notes were intentionally destroyed. By destroying those notes, all evidence of the actual counts was destroyed. The FFIC/RCIS manual requires upload of the claim as soon as possible (see FFIC 0748) and upload of losses daily (see FFIC 0742). Larry Grieme testified (page 70-71) that he would also sometimes just throw away the handwritten paperwork while adjusting losses. That means that on review of these claims, there really were no notes from the field inspections to verify the accuracy of the counts.

In my academic experience, if you do not show your work you get no credit. The answers do not show up magically. Correcting this claim was much more difficult by the lack of "showing their work." It also means that FFIC/RCIS benefits from the intentional destruction of key evidence in the adjustment of this loss. The FFIC/RCIS manual (see FFIC 0742) emphasizes that the accuracy of the adjustment procedure is determined by the counts (and location), yet they intentionally destroy this evidence, meaning that the insured and others reviewing the claim cannot verify the accuracy.

## OTHER PERILS

I have read documents and testimony in this case where FFIC/RCIS after the fact is claiming that Bruhn Farm's reduced yields in 2012 were caused by a peril other than hail (drought). I have reviewed the

deposition testimony of Larry Grieme who very clearly identified the peril as hail while in the fields. I see no documents in the file indicating that any of the six adjusters who adjusted this loss believed that the peril causing the loss was anything other than hail. The FFIC/RCIS manual requires that "during your adjusting activities, if you encounter a crop condition not caused by hail and you do not know the cause of the crop stress, seek help from a more experienced adjuster, company supervisory personnel, professional agronomists, or others who can help you satisfy the insured's concerns." (see FFIC 0742). Moreover, the adjuster qualifications require adjusters to "understand crop-hail policies provisions and endorsements" (see FFIC 0743) and "recognize and identify stress factors other than hail that can affect crop yields, primarily to differentiate between perils insured and not insured under a crop-hail policy. (see FFIC 0743). The adjusters who were in the fields never raised the issue of a different peril causing the damage to the crop other than hail. From the documents I have reviewed no other conclusion can be drawn other than the fact that senior management had actual knowledge of the mishandling of this claim, and instead of attempting to pay the correct amounts, they searched for an excuse to affirm the actions of the adjusters by improperly claiming drought.

## SUMMARY

The provisions of a standard fire policy require an insured to submit a signed proof of loss. In a crop-hail policy, the insurer assumes all loss adjustment responsibility. The insured is relieved from determining how much hail he received; rather the insurance company must show how little it did hail. Because of the delay in adjustment and incorrect staging of the plants, FFIC/RCIS failed in their duties. The total indemnity due Al Bruhn on October 30, 2012 was $1,682,486.

The above contains a statement of my opinions, based on the information provided to me, my experience and expertise, and all opinions are offered to a reasonable degree of certainty.

*David Tritsch*        *10/17/2016*

David Tritsch

Compensation

I will be compensated at the rate of $75/hour, plus expenses, for my study and testimony in this case.

Documents/Materials Reviewed

Documents produced by RCIS – FFIC 0001 through FFIC 0399
Deposition of Larry Burkhart
Deposition of Plaintiff, Al Bruhn
Deposition of Terry Nielsen
Brad Nelson letter to Chuck Eldredge
Report of Gregory Meek
Deposition of Larry Grieme
Deposition of Ed Cerven
RCIS 2012 Crop – Hail Loss Adjustment Manual

| | | | | | |
|---|---|---|---|---|---|
| | | SUMMARY OF CORRECTED CLAIMS | | | |
| | | | | | |
| | Corrected Claim: | 219247-00 | | Soybeans | |
| | | | | Line 24 | $54,453 |
| | | | | Line 25 | $114,474 |
| | | | | Line 28 | $246,898 |
| | | | | Line 29 | $87,515 |
| | | | | Line 30 | $57,415 |
| | | | | Line 31 | $38,203 |
| | | | | Line 32 | $97,293 |
| | | | | Line 34 | $27,280 |
| | | | | Line 37 | $110,063 |
| | | | | Line 38 | $86,806 |
| | | | | Line 39 | $410,821 |
| | | | | Line 40 | $59,776 |
| | | | | Line 41 | $55,630 |
| | | | | Line 42 | $105,958 |
| | | | | Line 43 | $59,822 |
| | | | | Line 54 | $27,192 |
| | | | Sub Total | | $1,639,600 |
| | | | | | |
| | Corrected Claim: | 216639-00 | | Soybeans | |
| | | | | Line 39 | $13,739 |
| | | | | Corn | |
| | | | | Line 11 | $29,148 |
| | | | Sub Total | | $42,886 |
| | | | | | |
| | | | | TOTAL | $1,682,486 |

# SOYBEAN SURVEY SHEET

| | | | |
|---|---|---|---|
| INSURED | BRUHN FARMS JOINT VENTURE | POLICY NO. IA - 090 - 120853 | LOSS NO. 219247-00 |
| INSURANCE CO. | FIREMAN'S FUND INSURANCE COMPANY | DATE OF LOSS September 11, 2012 | |

Fill all spaces asking for information on each loss

| | | A | B | C | D | E | F | G | H | I | J | K | L | M | N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | **DIRECT DAMAGE** | | | | | | | | | (C + D + E) | 100 - F | **PLANT DAMAGE** | | (F + I) |
| | | Stage of Growth | | Original Number Plants Per Acre (1000) | Plants Remaining Per Acre (1000) | % Loss From Stand Reduction | Percent Crop Remaining 100 - C | Plants Destroyed | | Percent Crop Remaining D - F | Pod Loss | | Total Direct Damage C + F + I | Percent Crop Remaining 100 - J | Total from Field Notes | | Actual Hail Loss |
| Item No. | Test No. | Date of Loss | Date of adjust-ment | | | | | Totals + Factored | | | | | | | Gross | Net L x K | Percent J + M |
| 24 | | | | | | | | Gross | Net | | Gross | Net | | | | | |
| No. of Acres | 1 | R 5.5 | R8 | | | | | | | | 11.3 | 11.3 | 11.3 | 88.7 | 75 | 66.5 | 77.8 |
| 142 | 2 | R 5.5 | R8 | | | | | | | | 1.7 | 1.7 | 1.7 | 98.3 | 75 | 73.7 | 75.4 |
| Variety | 3 | R 5.5 | R8 | | | | | | | | 5.5 | 5.5 | 5.5 | 94.5 | 75 | 70.9 | 76.4 |
| | 4 | R 5.5 | R8 | | | | | | | | 3.6 | 3.6 | 3.6 | 96.4 | 75 | 72.3 | 75.9 |
| Row Width | 5 | R 5.5 | R8 | | | | | | | | 11.8 | 11.8 | 11.8 | 88.2 | 75 | 66.2 | 78.0 |
| 15 | | | | | | | | | | | | | | | | | |

| | |
|---|---|
| Total of Tests | 383.5 |
| Average of Tests | 76.7 |

EXCPTION - FOR SECOND AND SUBSEQUENT LOSSES, REFER TO HANDBOOK

## SOYBEAN FIELD NOTES

| Sample No | Plant No. | 1 | 2 | 3 | 4 | 5 | 6 | 7 thru 15 | 16 | 17 | 18 | 19 | 20 | Total | % | % Loss |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 thru 5 | No. of Nodes Cut-off/Broken | | | | | | | | | | | | | | | |
| Total Node | % Defoliation | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 2000 20 | 100 Total | 75 |

Adjuster"s Commnents

LOCATION OF TESTS
Outline Field Insured; Designate location of test by number, NOT BY PERCENTAGE OF LOSS

| Qtr | Sec 23 | Twp 84N | Rge 43W |
|---|---|---|---|

Date Tests Were Made (month, day, year)     at   o'clock   M.

| Adjuster | | Date | Insured | | Date |
|---|---|---|---|---|---|

| | |
|---|---|
| Acres | 142 |
| Ins Per Ac | 500 |
| liability | 71,000 |
| loss % | 76.7 |
| payment | $54,453 |

# SOYBEAN SURVEY SHEET

| INSURED | BRUHN FARMS JOINT VENTURE | | | POLICY NO. IA - 090 - 120853 | | | | | | LOSS NO. | 219247-00 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| INSURANCE CO. | FIREMAN'S FUND INSURANCE COMPANY | | | | | DATE OF LOSS | September 11, 2012 | | | (H X G) | |

Fill all spaces asking for information on each loss

| | | | A | B | C | D | E | F | G | H | I | J | K | L | M | N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | DIRECT DAMAGE | | | | | | (C + D + E) | 100 - F | PLANT DAMAGE | | (F + I) |
| | | Stage of Growth | Original Number Plants Per Acre (1000) | Plants Remaining Per Acre (1000) | % Loss From Stand Reduction | Percent Crop Remaining 100 - C | Plants Destroyed | | Percent Crop Remaining D - F | Pod Loss | | Total Direct Damage C + F + I | Percent Crop Remaining 100 - J | Total from Field Notes | | Actual Hail Loss Percent |
| Item No. | Test No. | Date of Loss | Date of adjust-ment | | | | | Totals + Factored | | | | | | Net | J + M |
| 25 | | | | | | | | Gross | Net | Gross | Net | | | Gross | L x K | |
| No. of Acres | 1 | R 5.5 | R8 | | | | | | | 37.1 | 37.1 | 37.1 | 62.9 | 75 | 47.2 | 84.3 |
| 260 | 2 | R 5.5 | R8 | | | | | | | 37.7 | 37.7 | 37.7 | 62.3 | 75 | 46.7 | 84.4 |
| Variety | 3 | R 5.5 | R8 | | | | | | | 51.6 | 51.6 | 51.6 | 48.4 | 75 | 36.3 | 87.9 |
| | 4 | R 5.5 | R8 | | | | | | | 78.9 | 78.9 | 78.9 | 21.1 | 75 | 15.8 | 94.7 |
| Row Width | 5 | R 5.5 | R8 | | | | | | | 45.6 | 45.6 | 45.6 | 54.4 | 75 | 40.8 | 86.4 |
| 15 | 6 | R 5.5 | R8 | | | | | | | 67.5 | 67.5 | 67.5 | 32.5 | 75 | 24.4 | 91.9 |
| | 7 | R 5.5 | R8 | | | | | | | 51.4 | 51.4 | 51.4 | 48.6 | 75 | 36.5 | 87.9 |
| | 8 | R 5.5 | R8 | | | | | | | 63.8 | 63.8 | 63.8 | 36.2 | 75 | 27.2 | 91.0 |
| | 9 | R 5.5 | R8 | | | | | | | 66.5 | 66.5 | 66.5 | 33.5 | 75 | 25.1 | 91.6 |
| | 10 | R 5.5 | R8 | | | | | | | 74.4 | 74.4 | 74.4 | 25.6 | 75 | 19.2 | 93.6 |
| | 11 | R 5.5 | R8 | | | | | | | 0 | 0 | 0 | 100 | 75 | 75.0 | 75.0 |

| | | |
|---|---|---|
| Total of Tests | | 968.6 |
| Average of Tests | | 88.1 |

EXCPTION - FOR SECOND AND SUBSEQUENT LOSSES, REFER TO HANDBOOK

## SOYBEAN FIELD NOTES

| Sample No | Plant No. | 1 | 2 | 3 | 4 | 5 | 6 | 7 thru 15 | 16 | 17 | 18 | 19 | 20 | Total | % | % Loss |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 thru 11 | No. of Nodes Cut-off/Broken | | | | | | | | | | | | | | | |
| Total Node | % Defoliation | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 2000 20 Total | 100 | 75 |

LOCATION OF TESTS

Adjuster''s Commnents

Outline Field Insured; Designate location of test by number, NOT BY PERCENTAGE OF LOSS

| Qtr | Sec 23 | Twp 84N | Rge 43W |
|---|---|---|---|

Date Tests Were Made (month, day, year)          at     o'clock    M.

| Adjuster | | | Date | Insured | | | Date |
|---|---|---|---|---|---|---|---|

| | |
|---|---|
| Acres | 260 |
| Ins Per Ac | 500 |
| liability | 130,000 |
| loss % | 88.1 |
| payment | $114,474 |

# SOYBEAN SURVEY SHEET

| INSURED | BRUHN FARMS JOINT VENTURE | | POLICY NO. | IA - 090 - 120853 | | | | | LOSS NO. | | 219247-00 |
| INSURANCE CO. | FIREMAN'S FUND INSURANCE COMPANY | | | | | DATE OF LOSS | | September 11, 2012 | | (H x G) | |

Fill all spaces asking for information on each loss

| | | A | B | C | D | E | F | G | H | I | J | K | L | M | N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | **DIRECT DAMAGE** | | | | | (C + D + E) | 100 - F | **PLANT DAMAGE** | | |
| | | Stage of Growth | Original Number Plants Per Acre (1000) | Plants Remaining Per Acre (1000) | % Loss From Stand Reduction | Percent Crop Remaining 100 - C | Plants Destroyed | Percent Crop Remaining D - F | Pod Loss | | Total Direct Damage | Percent Crop Remaining | Total from Field Notes | | Actual Hail Loss |
| Item No. | Test No. | Date of Loss | Date of adjust-ment | | | | Totals + Factored | | | | C + F + I | 100 - J | Gross | Net | Percent |
| 28 | | | | | | | Gross | Net | Gross | Net | | | | L x K | J + M |
| No. of Acres | 1 | R 5.5 | R8 | | | | | | 44.9 | 44.9 | 44.9 | 55.1 | 75 | 41.3 | 86.2 |
| 620 | 2 | R 5.5 | R8 | | | | | | 47.5 | 47.5 | 47.5 | 52.5 | 75 | 39.4 | 86.9 |
| Variety | 3 | R 5.5 | R8 | | | | | | 35.4 | 35.4 | 35.4 | 64.6 | 75 | 48.5 | 83.9 |
| | 4 | R 5.5 | R8 | | | | | | 23.4 | 23.4 | 23.4 | 76.6 | 75 | 57.5 | 80.9 |
| Row Width | 5 | R 5.5 | R8 | | | | | | 19.9 | 19.9 | 19.9 | 80.1 | 75 | 60.1 | 80.0 |
| 15 | 6 | R 5.5 | R8 | | | | | | 21.5 | 21.5 | 21.5 | 78.5 | 75 | 58.9 | 80.4 |
| | 7 | R 5.5 | R8 | | | | | | 24.2 | 24.2 | 24.2 | 75.8 | 75 | 56.9 | 81.1 |
| | 8 | R 5.5 | R8 | | | | | | 73.2 | 73.2 | 73.2 | 26.8 | 75 | 20.1 | 93.3 |
| | 9 | R 5.5 | R8 | | | | | | 34.1 | 34.1 | 34.1 | 65.9 | 75 | 49.4 | 83.5 |
| | 10 | R 5.5 | R8 | | | | | | 15.9 | 15.9 | 15.9 | 84.1 | 75 | 63.1 | 79.0 |
| | 11 | R 5.5 | R8 | | | | | | 18 | 18 | 18 | 82 | 75 | 61.5 | 79.5 |

| | |
|---|---|
| Total of Tests | 914.5 |

914.5 (Total of all tests) X .958 (remaing liability from 213205)/11(number of samples)

| | |
|---|---|
| Average of Tests | |

EXCPTION - FOR SECOND AND SUBSEQUENT LOSSES, REFER TO HANDBOOK  79.6

## SOYBEAN FIELD NOTES

| Sample No | Plant No. | 1 | 2 | 3 | 4 | 5 | 6 | 7 thru 15 | 16 | 17 | 18 | 19 | 20 | Total | % | % Loss |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 thru 11 | No. of Nodes Cut-off/Broken | | | | | | | | | | | | | | | |
| Total Node | % Defoliation | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 2000 / 20 | 100 | 75 |
| | | | | | | | | | | | | | | | Total | |

Adjuster's Commnents

**LOCATION OF TESTS**

Outline Field Insured; Designate location of test by number, NOT BY PERCENTAGE OF LOSS

| Qtr | Sec  23 | Twp 84N | Rge 43W |
|---|---|---|---|

Date Tests Were Made (month, day, year)  at  o'clock  M.

| Adjuster | | Date | | Insured | | Date |
|---|---|---|---|---|---|---|

| | |
|---|---|
| Acres | 620 |
| Ins Per Ac | 500 |
| liability | 310,000 |
| loss % | 79.6 |
| payment | $246,898 |

# SOYBEAN SURVEY SHEET

| INSURED | BRUHN FARMS JOINT VENTURE | | | | POLICY NO. | IA - 090 - 120853 | | | | | LOSS NO. | 219247-00 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| INSURANCE CO. | FIREMAN'S FUND INSURANCE COMPANY | | | | | | DATE OF LOSS | September 11, 2012 | | | (H X G) | | |

Fill all spaces asking for information on each loss

| | | | A | B | C | D | E | F | G | H | I | J | K | L | M | N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | DIRECT DAMAGE | | | | | (C + D + E) | 100 - F | PLANT DAMAGE | | (F + I) |
| | | Stage of Growth | Original Number Plants Per Acre (1000) | Plants Remaining Per Acre (1000) | % Loss From Stand Reduction | Percent Crop Remaining 100 - C | Plants Destroyed | | Percent Crop Remaining D - F | Pod Loss | | Total Direct Damage C + F + I | Percent Crop Remaining 100 - J | Total from Field Notes | | Actual Hail Loss Percent |
| Item No. | Test No. | Date of Loss | Date of adjust-ment | | | | Totals + Factored | | | | | | | Gross | Net L x K | J + M |
| | | | | | | | Gross | Net | | Gross | Net | | | | | |
| 29 | | | | | | | | | | | | | | | | |
| No. of Acres | 1 | R 5.5 | R8 | | | | | | | | 6.3 | 6.3 | 6.3 | 93.7 | 75 | 70.3 | 76.6 |
| 230 | 2 | R 5.5 | R8 | | | | | | | | 5.4 | 5.4 | 5.4 | 94.6 | 75 | 71.0 | 76.4 |
| Variety | 3 | R 5.5 | R8 | | | | | | | | 1.1 | 1.1 | 1.1 | 98.9 | 75 | 74.2 | 75.3 |
| | 4 | R 5.5 | R8 | | | | | | | | 4.8 | 4.8 | 4.8 | 95.2 | 75 | 71.4 | 76.2 |
| Row Width | | | | | | | | | | | | | | | | |
| 15 | | | | | | | | | | | | | | | | |

| | |
|---|---|
| Total of Tests | 304.4 |
| Average of Tests | |
| EXCPTION - FOR SECOND AND SUBSEQUENT LOSSES, REFER TO HANDBOOK | 76.1 |

## SOYBEAN FIELD NOTES

| Sample No | Plant No. | 1 | 2 | 3 | 4 | 5 | 6 | 7 thru 15 | 16 | 17 | 18 | 19 | 20 | Total | % | % Loss |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 thru 4 | No. of Nodes Cut-off/Broken | | | | | | | | | | | | | | | |
| Total Node | | | | | | | | | | | | | 2000 | | | |
| | % Defoliation | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 / 20 | 100 Total | 75 |

Adjuster''s Commnents

### LOCATION OF TESTS
Outline Field Insured; Designate location of test by number,
NOT BY PERCENTAGE OF LOSS

| Qtr | Sec 23 | Twp 84N | Rge 43W |
|---|---|---|---|

Date Tests Were Made (month, day, year)        at    o'clock    M.

| Adjuster | | Date | Insured | Date |
|---|---|---|---|---|

| | |
|---|---|
| Acres | 230 |
| Ins Per Ac | 500 |
| liability | 115,000 |
| loss % | 76.1 |
| payment | $87,515 |