| | |
|---|---|
| BRUHN FARMS JOINT VENTURE,<br><br>    Plaintiff,<br><br>-vs-<br><br>FIREMAN'S FUND INSURANCE<br>COMPANY,<br><br>  Defendant. | No. ____13-CV-4106CJW_____<br><br><br>**PLAINTIFF'S DESIGNATION OF<br>DEPOSITION TRANSCRIPT OF LARRY<br>BURKHART** |

COMES NOW, the Plaintiff Bruhn Farms Joint Venture and hereby designates the deposition transcript of Larry Burkhart as shown on the attached bracketed/marked portions of the said Deposition Transcript of Larry Burkhart taken on June 11, 2014 in this matter.

For the Court, the outlined/bracketed portion is Plaintiff's designation and the Defendant's objections are noted by the following notations:

A = Argumentative

F = Foundation

H = Hearsay

R = Relevance

S = Speculation

BEATTIE LAW FIRM, P.C.


By___/s/ _Donald G. Beattie_____
    Donald G. Beattie (AT0000736)
    Nile Hicks (AT0009391)
    4300 Grand Ave.
    Des Moines IA  50312
    Phone:  (515) 263-1000
    FAX:    (515) 263-1411
    don.beattie@beattielawfirm.com
    nile.hicks@beattielawfirm.com


SPAULDING, BERG & SCHMIDT, P.L.C.


    Nicholas L. Shaull (AT0010096)
    2423 Ingersoll Ave.
    Des Moines IA  50312
    Phone:  (515 277-6559
    Fax:  (515) 277-7536
    Email:  nick.shaull@sbsattorneys.com
Attorneys for Plaintiff


CERTIFICATE OF SERVICE

The undersigned hereby certifies that on February 21, 2017, a true and correct copy of the foregoing was served via email upon the following counsel of record:

Jeff Dilley
Elizabeth Bufkin
Henke Bufkin
Post Office Box 39
Clarksdale, MS 38614
ATTORNEYS FOR DEFENDANT


___/s/ Kelly L. Brandt Beattie_____

2

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE NORTHERN DISTRICT OF IOWA

WESTERN DIVISION

BRUHN FARMS JOINT VENTURE,)
                            )    CASE NO.
        Plaintiff,     )    13-CV-4106-DEO
                            )
        vs.             )
                            )
FIREMAN'S FUND INSURANCE  )
COMPANY,               )    DEPOSITION OF
                            )
        Defendant.     )    LARRY BURKHART
                            )


        THE DEPOSITION OF LARRY BURKHART, taken
before Stephanie J. Cousins, Certified and
Registered Professional Reporter, commencing at
9:28 a.m., June 11, 2014, at 233 Pearl Street,
Council Bluffs, Iowa.

A P P E A R A N C E S

Plaintiff by:          SCOTT H. PETERS
                       Attorney-at-Law
                       Peters Law Firm
                       233 Pearl Street
                       Council Bluffs, Iowa 51503
                       (712) 328-3157
                       scott.peters@peterslawfirm.com

                       BRADLEY J. NELSON
                       Attorney-at-Law
                       Norelius Nelson Law Firm
                       1317 Broadway
                       Denison, Iowa 51442
                       (712) 263-4245

A = Argumentative
F = Foundation
R = Relevance
H = Hearsay
S = Speculation

Reported by: Stephanie J. Cousins, CSR-IA, RPR

1                    A P P E A R A N C E S

2    Defendant by:        ELIZABETH T. BUFKIN
                          JEFFREY S. DILLEY
3                         Attorneys-at-Law
                          Henke-Bufkin Law Firm
4                         408 Hopson Street
                          Lyon, Mississippi 38645
5                         (662) 624-8500
                          etb@henke-bufkin.com
6
     Also Present:        Al Bruhn
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    I N D E X
 2    Examination by:                    Page
 3    Mr. Peters                          5
 4    Ms. Bufkin                         115
 5
 6    Exhibit                      Marked/Offered
 7    Exhibit 1                           59
 8    Exhibit 2                           77
 9    Exhibit 3                           78
10    Exhibit 4                           68
11    Exhibit 5                           73
12    Exhibit 6                           80
13    Exhibit 7                           81
14    Exhibit 8                           83
15    Exhibit 9                           86
16    Exhibit 10                          33
17    Exhibit 11                           *
18    Exhibit 12                          87
19    Exhibit 13                          40
20    Exhibit 14                          24
21    Exhibit 15                          59
22    Exhibit 16                          90
23    Exhibit 17                          41
24    Exhibit 18                          95
25    Exhibit 19                          27
```

1                          I N D E X

2    Exhibit                           Marked/Offered

3    Exhibit 20                              27

4    Exhibit 21                              20

5    Exhibit 22                              97

6    Exhibit 23                             107

7    Exhibit 24                             108

8    Exhibit 25                             109

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (Exhibits 1 through 25 were marked
 2   for identification by the reporter.)
 3                    LARRY BURKHART,
 4   called as a witness, having been first duly
 5   sworn, testified as follows:
 6                  DIRECT EXAMINATION
 7   BY MR. PETERS:
 8      Q.    Did you participate at all with the
 9   attorneys in preparing the Answers to the Request
10   for Admissions?
11      A.    I think so.  I'm not sure exactly what
12   you're referring to, but --
13      Q.    I'll actually ask you about a couple of
14   them in particular, so that might help.
15      A.    Okay.
16      Q.    The Interrogatories are the ones that
17   you actually signed, and those were questions
18   where I asked you to give me answers.  The
19   Request for Admissions are the ones that just
20   the lawyers sign, but they ask about certain
21   facts.
22      A.    Okay.
23      Q.    With regard to either answering the
24   Interrogatories or Request for Admissions, did
25   you ever speak with Terry Nielsen?
```

Def
F,R

```
 1    A.    Yes -- well, tied to those, no.

 2    Q.    All right.  That's what I meant.  And

 3  here's just an example.  No. 5 says with regard

 4  to the June and September hail losses, No. 5,

 5  and then it says in B -- 5-B, Liz -- during

 6  that time, Bruhn made repeated inquiries of

 7  Nielsen as to why Defendant -- that's Fireman's

 8  Fund Defendant -- why Defendant had sent no

 9  adjusters.  The Answer says without waiving

10  objection, Defendant has made reasonable inquiry

11  on this matter, but the information known or

12  readily obtainable is insufficient to admit or

13  deny.

14             So my question to you is, did you

15  ever call or otherwise talk to Terry Nielsen to

16  find out whether that was true or not, that Bruhn

17  had called him repeatedly?

18    A.    No.

19    Q.    Would your answer be the same with

20  regard to any of those Requests for Admission

21  questions about what Terry Nielsen said to Bruhn

22  or Terry Nielsen said to anybody?

23    A.    I haven't talked to Terry Nielsen about

24  anything for several months.

25    Q.    I asked in No. 5-E -- this deals with
```

Def. F,R.

Def. DFR

1    when adjusters went out to the Bruhn Farm on

2    approximately the 29th or 30th of October to

3    actually do the adjustment -- I asked whether it

4    was true that the adjuster spent four hours the

5    first day and three hours the second day; and

6    that's denied.  Did you ever actually talk

7    yourself to any of the adjusters to determine

8    whether they spent four hours the first day,

9    three hours the second?

10    A.    No.

11    Q.    No. 6-A says, shortly after the two

12   days -- those are the adjustment days -- in

13   question, Plaintiff spoke with Sornson -- that's

14   Galen Sornson -- spoke to Sornson on the

15   telephone.  During that phone conversation,

16   Sornson stated that the claim should have been

17   adjusted a long time ago.  Did you ever talk --

18   again, I'm talking about in preparing these

19   Answers -- did you ever talk to Galen Sornson to

20   determine if that was true or not true?

21    A.    No.

22    Q.    Do you know if anybody else with

23   Fireman's Fund did that?

24    A.    I don't know.

25    Q.    One of the issues in this case is what,



1   if any, contact there was between Fireman's Fund

2   and Al Bruhn between the time of the adjustment

3   on October 29th and 30th and the time that a

4   check showed up on his garage floor on December

5   4th or 5th.  In RFA No. 7, I say, Bruhn's next

6   contact was when he arrived home on December 4th

7   or December 5th to find a check from Defendant.

8   And the Answer is, Defendants made reasonable

9   inquiry.  The information is not known or

10  obtainable by Defendant.

11          Do you know of any documents, such

12  as a letter or an e-mail, to Al Bruhn from

13  Fireman's Fund that indicates a contact between

14  October 30th and December 4th?

15      A.    Not a letter or e-mail.  Not that I'm

16  aware of.

17      Q.    I know that there are some e-mails, and

18  we'll talk about them later on this morning when

19  we go through the exhibits.  I know that there

20  are some e-mails.  For example, there's one from

21  Galen Sornson that was his after-the-fact

22  summary.  I'll have to look at my list here, but

23  someone asked all the adjusters that were there

24  to set down their thoughts about what had

25  happened.

*Def. — F.R.*

*Def. F,H,S*

    1     A.    Uh-huh.

    2     Q.    And I know in one of Galen Sornson's, he

    3   says, I may have phone records to show my calls

    4   to Al Bruhn.  That's the type of written evidence

    5   of contact.  Do you know of anything like that as

    6   you sit here today?

    7     A.    I don't know of anything.

    8     Q.    All right.

    9     A.    I mean, I haven't seen anything.

   10     Q.    All right.  That's all I'm interested

   11   in, is what you've seen or what you're aware of.

   12   Do you know whether Galen Sornson ever did find

   13   any phone records indicating they had made

   14   calls to Bruhn between October 30th and December

   15   5th?

   16     A.    I don't know if he did or not.

   17     Q.    Thank you.  Then in 7-C, I ask you, the

   18   agreement -- that's your contract -- the

   19   agreement requires Defendant to work in good

   20   faith in obtaining the insured's agreement to a

   21   crop loss adjustment.  Do you personally agree

   22   with that statement?

   23     A.    Can you say it again?

   24     Q.    Of course.

   25               (Requested portion of the record

Def, F, HS

1    was read.)

2                 MS. BUFKIN:  Just to clarify, I

3    think in the discovery agreement, it's defined as

4    the policy.

5                 MR. PETERS:  Yes.

6                 MS. BUFKIN:  Okay.  I don't think

7    he knows that.

8                 MR. PETERS:  Oh, well, and that's

9    why I said, Larry, contract.  Policy is the word

10   you guys have got.

11                MS. BUFKIN:  Yeah.

12                THE WITNESS:  Yeah.

13   BY MR. PETERS:

14   Q.    I'll just reread the sentence.  The

15   policy requires Defendant to work in good faith

16   in obtaining the insured's agreement to a crop

17   loss adjustment.  Do you agree with that?

18   A.    I'd have to look at the policy to be

19   sure.

20   Q.    Isn't that what most of them say?

21   A.    I don't know what most of them say,

22   but --

23   Q.    Let me ask you the question in a

24   slightly different way.  Isn't that what you

25   normally try to do in adjusting these hail

1   losses?

2             MS. BUFKIN:   I'm going to object to

3   the form, just because I don't know if he --

4   "that".   I don't know if he knows what "that"

5   is, Scott.   I'm just --

6       Q.    I understand.

7       A.    I would ask that -- I would ask that

8   "that" be clarified.

9       Q.    How long have you been doing this?

10      A.    42 years.

11      Q.    In your 42 years, isn't it true that you

12  try to work in good faith with the insured to

13  obtain the insured's agreement to the crop loss

14  adjustment?

15      A.    In the typical claim, in the average

16  claim, the majority of claims, yes.

17      Q.    For example, your claim adjustment

18  template has a column that says agreed percentage

19  of loss; right?

20      A.    The proof of loss has an agreed

21  percentage of loss on it.

22      Q.    And that would be the percentage that

23  Fireman's Fund and the insured agreed upon;

24  right?

25      A.    That would be the percentage that the

1  adjuster found during the course of the

2  adjustment,

3      Q.    Okay.  Now, in this case, a check was

4  delivered without the consent of the insured to

5  the amount; correct?

6      A.    The check was sent before Mr. Bruhn

7  agreed to the amount, yes.

8      Q.    Well, he didn't ever agree to the

9  amount, did he?

10     A.    Not to my knowledge, no.

11     Q.    All right.

12     A.    I'm just saying the check was sent

13  without his signature.

14     Q.    Without his consent --

15     A.    Or agreement.

16     Q.    Sorry, Stephanie.  Without his consent

17  or his signature.  Isn't that true?

18     A.    Without his signature of agreement.

19     Q.    Thank you.  In your 42 years, how many

20  times have you seen that happen?

21     A.    I don't know how many.

22     Q.    Have you ever seen it happen before?

23     A.    Absolutely.

24     Q.    Can you give me a range?  One to ten or

25  ten to a hundred?

```
 1    A.    Probably over a hundred.  I don't --
 2  I'm -- I don't know.  I mean, I haven't kept
 3  track.  So I can't really give you a number.
 4    Q.    Isn't it true that during the meeting
 5  with Al Bruhn -- by that, I mean your meeting
 6  with him at his home on December 18th -- isn't it
 7  true that you told him that you had never heard
 8  of a claim being adjusted without an agreement
 9  and signature from the insured?
10    A.    During that meeting, I never said that.
11    Q.    Did you say it to him at some later
12  time?
13    A.    I never told Mr. Bruhn that.
14    Q.    Is Rod Nelson still with Fireman's
15  Fund?
16    A.    Yes.
17    Q.    Do you know what his current job title
18  is?
19    A.    No, I don't.
20    Q.    Do you know where he's located?
21    A.    Again, I think I'm guessing here a
22  little bit.  I believe he's RSM manager.
23    Q.    What does that mean?
24    A.    Regional service manager.  I'm sorry.
25  No.  He was, but he took a different position,
```

and I'm not exactly sure what that is.

Q. Do you know where he is?

A. He's in Anoka.

Q. Now, again, you have not ever talked to Rod Nelson since this matter was in litigation. Did you know that Rod -- from something you may have heard from someone else, that Rod Nelson called Al Bruhn and said, there's nothing else I can do to help you with this claim?

MS. BUFKIN: I want to object to the form. I don't -- that first part, you lost me on.

Q. In the Answer to Request for Admission 9-D, it says, Defendant -- Fireman's Fund -- Defendant admits that after speaking with the individuals handling claim, Rod Nelson advised Al Bruhn that there was no further assistance he could provide. Do you know whether that statement is true or not true?

A. I don't have any way of knowing exactly if it is or not. I don't know what -- I don't know for sure what Rod said.

Q. Do you know whether after that conversation, Terry Nielsen called Chuck Eldridge?



```
 1    A.    Terry Nielsen called Chuck Eldridge.

 2    Q.    Okay.

 3    A.    But I don't know relative to when.

 4    Q.    Thank you.  And it was Chuck Eldridge

 5    that called you to suggest that you take a

 6    meeting with Al Bruhn at his home?

 7    A.    Correct.

 8    Q.    Correct?

 9    A.    Yes.

10    Q.    RFA No. 13.  This is again a written

11    question I asked.  After hearing the facts from

12    Bruhn, Burkhart indicated that the claim was

13    mishandled by the Defendant.  Is that true?

14    A.    What I told Mr. Bruhn in our meeting was

15    that based on the information he had given me and

16    the time frame he had laid out, which is all I

17    had at that point -- I didn't have any other

18    information as to -- I didn't even know at that

19    point who had been there or when or anything

20    else.  So based on what he told me that morning,

21    I told him that we don't typically have that long

22    a time frame between loss or notice of loss and

23    adjustment.

24    Q.    And with regard to your comment that you

25    didn't know who had been there, didn't he tell
```

Def.
— F, H, S

1  you at that meeting that you are the first person

2  that had actually come to meet with him

3  face-to-face since the adjustment?

4      A.    I think he did tell me that.  I don't

5  remember exactly, but I think he did.

6      Q.    No. 14 says, Burkhart requested Bruhn's

7  yield records, which Nielsen immediately provided

8  to Burkhart.  Is that true?

9      A.    Yes.  Terry provided those records.

10     Q.    But more importantly, it's true that you

11 requested of Al that he provide you with yield

12 records?

13     A.    I did tell Al that --  Is it okay if I

14 call you Al (Indicating)?

15     Q.    Of course, please.

16     A.    Mr. Bruhn sounds a little cumbersome.

17     Q.    Yes.

18     A.    -- that that would be the start of any

19 reconsideration of the claim, and that would

20 be -- and I did tell him that we would look at a

21 lot of things, in addition to the yield.

22     Q.    But my point, Larry, is there's some

23 indication in this case that it was Al Bruhn that

24 first brought up the idea of yields; and my

25 understanding of your answer, it was actually you

1   that first suggested or asked Al to provide yield

2   records.  Am I right?

3       A.      I don't know who first suggested it.

4       Q.      All right.

5       A.      I don't know if somebody did before me

6   or not.  I do know that I did tell Al that we

7   would need the production records.

8       Q.      Thank you.  And then there was a

9   conversation between you and Al and Terry

10  Nielsen about whether you should have one-year or

11  three -- whether you should use one-year or

12  three-year or five-year records; and Al said to

13  you, I don't care.  You two guys, meaning

14  Burkhart and Nielsen -- you guys figure it out.

15  Do you remember that?

*Def. H*

16              MS. BUFKIN:  I'm going to object to

17  the form.  Because I lost what he was supposed to

18  remember.  But that's okay.

19      Q.      Do you remember that conversation?

*Def. H*

20      A.      I remember a conversation -- I think it

21  was with -- I'm not sure -- I guess it probably

22  was with Terry -- discussing whether five or

23  ten-year.  I don't remember a three-year or

24  one-year.

25      Q.      But my point there, Larry, is whatever

1    it was that you and Terry Nielsen were talking

2    about, Al Bruhn said, I don't care, I'll give you

3    guys whatever you want. Isn't that true?

4        A.    I don't know.

5        Q.    Well, let's put it this way. At any

6    time after you first brought up the question of

7    production and yield records, did Al Bruhn make

8    any objection or squawk or --

9        A.    No.

10       Q.    Okay. Thank you. Now, Request for

11   Admission No. 16-A says, after several weeks --

12   and the questions before that after several weeks

13   was, during the time that you and Terry Nielsen

14   were talking about these production records.

15   Okay?

16       A.    Okay.

17       Q.    After several weeks, Burkhart contacted

18   Nielsen to compare his loss calculations to

19   Nielsen's loss calculations using yields. Is

20   that correct so far?

21       A.    What we were trying to determine,

22   because -- what we were trying to determine was

23   what Al was wanting. We had -- at that point, we

24   had never been given -- Al had never told us that

25   he felt like we were off 10 percent here, 15

1   percent here, or this field was okay and that

2   field wasn't.  So what Terry and I were working

3   with --  And it's pretty complicated and

4   confusing.  It took a lot of time.  Obviously, we

5   came up with different numbers.  But what we were

6   trying to determine was what is Al asking for?

7   How far apart are we?

8       Q.   The reason for the question being

9   phrased that way, Larry, is it was my

10  understanding that Terry Nielsen was going to do

11  some calculations and you were going to do some

12  calculations, and that at some point after a few

13  weeks, you called Terry so you could compare his

14  numbers with yours.  Is that true?

15      A.   Yes.  Again, trying to figure out

16  where -- what are we being asked for?

17      Q.   Now, that sentence in 9 -- sorry -- 16-A

18  goes on to say, at which point -- that's when

19  you're on the phone with Nielsen -- at which

20  point, Nielsen replied that the loss was around

21  $900,000 after crediting the prior payments and

22  unpaid premium.  Is that correct?

23      A.   I don't remember the 900,000.  I'm not

24  saying it's incorrect, but I don't remember that

25      Q.   All right.  Let me ask you then about

Def.
H

1    16-B.  After that conversation, Nielsen told

2    Bruhn that he and Burkhart were pretty close in

3    their calculations, about $25,000 apart.  Do you

4    know if that's true or not true?

5         A.    We were -- between the two of us and our

6    different ways to calculate it, we were

7    approximately probably that far apart in

8    establishing what Al expected us to do.

9         Q.    C then says, Burkhart then called Bruhn

10   to advise him of this, at which point, Bruhn told

11   Burkhart that he was satisfied with those numbers

12   and would be willing to accept the lower of the

13   two numbers reached by Burkhart and Nielsen.  Is

14   that true?

15        A.    I don't remember the conversation.  So I

16   don't know for sure.

17        Q.    Going down to No. 21 -- in 20, I had

18   asked about a January 25th phone call that you

19   made to Al Bruhn -- and 21 says, at that time,

20   Bruhn asked Burkhart whether it was the

21   Defendant's position that Bruhn had done anything

22   wrong with regard to the claim or the claim

23   adjustment process, to which Burkhart responded,

24   quote, absolutely not, unquote.  Is that true?

25        A.    I'm not sure I used absolutely, but I

Def.
H.

1    did answer that he had done nothing wrong.

2    Q.    In No. 25 I say, immediately after the

3    September 11th storm, Defendant sent adjusters to

4    a farm neighboring the Plaintiff's, Leo

5    Erlemeier, adjusted the loss and promptly paid

6    it.  Is that true?

7              MS. BUFKIN:  Scott, we're going to

8    have to object to him testifying about other

9    people's claims based on privacy concerns.  He

10   can talk about claims in general, but I'm a

11   little nervous under, you know, the privacy

12   restrictions that we have, unless Mr. Erlemeier

13   said it was okay and that we could talk about

14   particulars about his claim.  But he doesn't have

15   any problem talking about, in general, claims in

16   the area.

17   Q.    Well, let me ask you this question.  Do

18   you know anything at all about Leo Erlemeier's

19   claim or his adjustment?

20   A.    Yes.  I know he had a claim, and I know

21   some of the details of it.

22   Q.    Do you know that a farm adjoining Al's,

23   which was also reported to you on September 25th

24   or 26th, was adjusted the next day?

25             MS. BUFKIN:  I'm going to object to

1    the form.  And if you know about something, you

2    can -- if you can answer that, I guess you can

3    answer it, if you know.

4        A.    I don't know of any claim that was

5    adjusted the next day.

6        Q.    When I said the next day, I was talking

7    about the 25th or 26th of September.  Did you

8    understand that was what I was asking?

9        A.    No.  I thought you meant the next day

10   after it was turned in or something like that.

11       Q.    After 35 years of doing this, I still

12   ask stupid, complicated questions.  And that's

13   not your fault.  That's my fault.  Are you aware

14   that a neighbor of one of the Bruhn Farms was

15   adjusted on September 25th or 26th?

16       A.    I don't know the specific dates.  So I

17   guess I can't be specific on dates as to when

18   anyone else may have been adjusted.

19       Q.    As you sit here this morning, do you

20   recall that the last loss we're going to be

21   talking about here occurred on September 11th of

22   2012?

23       A.    That was the date that was turned in to

24   us as the date of loss.

25       Q.    All right, sir.  And according to the

Def.
F,R

1   documents that I've seen, it appears that the

2   report to you on the Bruhn loss for that date was

3   made to you on September 25th.  Does that sound

4   correct?

5        A.    I think it was either the 25th or 26th.

6        Q.    And as you gathered from one of my

7   earlier questions, your Discovery Answers

8   indicate that the -- sorry -- there are some

9   documents in the Discovery that seem to indicate

10  that the adjustment was done on October 29th and

11  October 30th.  Are those the days that you

12  believe the adjustment was done as you're sitting

13  here today?

14       A.    I'm not sure if the adjustment was done

15  on the 22nd and 23rd or 29th and 30th.

16       Q.    Yeah.

17       A.    There's -- I'm just not sure.

18       Q.    I could only find one --

19       A.    References to both.

20       Q.    Sorry.

21       A.    I'm sorry.  There was references to

22  both.

23       Q.    Yeah.  I could only find one from one of

24  the adjusters that gave his after-the-fact report

25  that says 22nd and 23rd.  But as you sit here

1   now, you really don't have a recollection?

2       A.      No.  I'm not absolutely sure what dates

3   they were there.

4       Q.      Because the closing document, the

5   settlement summary, whatever you call that -- the

6   documents that went along with the check -- those

7   documents say the adjustment was the 29th and

8   30th, I'm going to use those days for purposes of

9   my questions.  I'm not binding you to agreeing to

10  that.

11      A.      Okay.

12      Q.      Okay?

13      A.      (The witness nods head affirmatively).

14              MR. PETERS:  Liz, this is Exhibit

15  14.

16  BY MR. PETERS:

17      Q.      I'm handing you Exhibit 14.  Can you

18  tell us what that is.

19      A.      I'm not a very good person to ask this.

20  I can tell you that this is how our system tracks

21  claims.  What each one means exactly, I don't

22  know.  We have some claims that will have a

23  string this long (Indicating).  It's a history of

24  where the claim went and what happened to it.

25      Q.      There are three lines on there under

1  status that say withdrawn.  Do you know as you
2  sit here today, did Al Bruhn agree to withdraw
3  certain claims during 2012?
4      A.    That's not what that means.
5      Q.    What does that mean?
6      A.    It's an internal process.
7      Q.    Thank you.
8      A.    It's part of the --
9      Q.    Thank you.
10     A.    Like I said, I can't really answer,
11 because I've never done it.  So --
12     Q.    Look down to the very bottom line.  Do
13 you know who CHR103 is?
14     A.    I don't know what that is.  It's not a
15 person.
16     Q.    Robot?  No.  Sorry.
17     A.    CHR103, I don't know what that is, no.
18     Q.    All right.  It appears that this
19 particular document was generated on June 7th of
20 2013.  Am I correct in the way I read that?
21     A.    Where is that?
22     Q.    The same line, over to the right.
23     A.    That's -- I'm guessing again.  I think
24 that's the print date.
25     Q.    Any idea why this would have been

1   printed out on that date?

2       A.      No.

3       Q.      Just one more question here.  Go up to
4   the very top right-hand side, created by HAASE01.
5   Do you know who that is?

6       A.      No, I don't.

7       Q.      Then if you would look at the second
8   page of this, which for the record is FFIC 0458,
9   it has a lot of the same stuff we already talked
10  about, HAASE01, CHR103, date 6-7 of '13; but it
11  has some other information.  I'm going to start
12  at the very bottom.  Over on the far left,
13  there's a column with numbers; and the very
14  bottom line says 2.  Do you know what that number
15  means?

16      A.      Again, I'm not an expert on this.  I
17  believe that number is the status number.

18      Q.      Then if you go over across that bottom
19  line, it says Galen Sornson, G-A-L-E-N,
20  S-O-R-N-S-O-N.  It appears to say then next,
21  inactive.  Do you know what that means?

22      A.      No.

23      Q.      All right.  The next entry is October
24  3rd, a date.  Do I read from that, that Galen
25  Sornson was assigned on October 3rd, if you

1  know?

2    A.    I think the claim was assigned on

3  October 3rd, and the adjuster received it on

4  October 3rd.

5    Q.    But it was my understanding -- and this

6  is some other document that we're going to talk

7  about today -- it was my understanding that the

8  claim was originally assigned to somebody else

9  who had a computer problem and that then Larry

10 Grieme reassigned it to Sornson on or around the

11 17th of October.  Do you know whether I'm correct

12 there or not?

13   A.    I don't know.

14             MR. PETERS:  All right.  Liz, I'm

15 going to 19.

16             MS. BUFKIN:  Okay.

17             MR. PETERS:  And I'm specifically

18 going to start with Page 86 there, Liz.

19             MR. DILLEY:  It might be just one

20 page.

21             MS. BUFKIN:  Yeah.  We've only got

22 one page.

23             MR. PETERS:  I apologize.  It

24 should be 20.

25             MS. BUFKIN:  Okay.

1          MR. PETERS:  Sorry.

2          MS. BUFKIN:  Got you.

3    BY MR. PETERS:

4    Q.    I'm going to hand you Exhibit 20, and

5  the third page is FFIC 0086.  Is that your

6  handwriting?

7    A.    Yes.

8    Q.    If you look at the middle box there, it

9  shows 9-11, date of loss -- sorry -- DOL.  Does

10  that mean date of loss?

11    A.    Yes.

12    Q.    9-26, notice of loss.

13    A.    Correct.

14    Q.    NOL.  10-3, assigned.  When you wrote

15  that -- do you know when you wrote these notes?

16    A.    I don't know when I wrote them, no.

17    Q.    All right.  When you wrote there

18  assigned, did you know when you wrote that to

19  whom the claim had been assigned at that point?

20    A.    I don't remember if I knew who it had

21  been assigned to or not.

22    Q.    The next line, 10-17, ADJ, that means

23  adjuster.  Yes?

24    A.    Yes.

25    Q.    Adjuster called - need help.  Do you

1   remember who it was that called or to whom they

2   called?

3       A.      I believe the adjuster called his

4   supervisor.

5       Q.      Do you know, in fact, that the adjuster

6   that called the supervisor was Galen Sornson?

7       A.      I think it was Galen Sornson.

8       Q.      That's what I think too, just based on

9   the notes; but I wondered if you knew.  Do you

10  know why it took Galen Sornson from October 3rd

11  until the 17th to figure out that he needed more

12  people?

13      A.      I don't know how many claims Galen had

14  assigned to him at the time; and I do know that

15  we had many, many, many losses.  So what Galen or

16  any other adjuster would have done, as they get

17  assigned claims, they work them as they can.

18      Q.      When you say many, many, many claims,

19  you mean besides Al Bruhn's claims?

20      A.      We had claims all over the place.  I

21  mean, we had a lot of adjusters working.

22      Q.      These were big storms around September

23  11th?

24      A.      They weren't necessarily big storms, but

25  we had losses turned in that adjusters were tied

1   up on.

2       Q.     And this goes back to something I was

3   asking you about ten minutes ago.  Isn't it true

4   that what happened was, that when whoever it was

5   computer crashed and part of this claim got

6   reassigned to Galen, that then he felt that he

7   needed more adjusters?

8       A.     I don't know what --

9       Q.     The next line says 10-22, 6 adjusters

10  worked.  Do you know where that information came

11  from?

12      A.     I don't.

13      Q.     All right.  Thank you.  Do you recall

14  telling Terry Nielsen around that time, around

15  the -- let's say the October 3rd to October 17th

16  time -- that you were short of adjusters for his

17  area?

18      A.     I don't remember talking to Terry at

19  that time.

20      Q.     Was that, in fact, the case though, that

21  you guys in that time frame were short on

22  adjusters?

23      A.     Our adjusters were busy.

24      Q.     So you don't agree with the word short,

25  but they were busy?

1    A.    No, I don't agree with short.

2    Q.    All right.  Still on 20 on the first

3    page, the middle box says, cross check the 18

4    hail losses with their, T-H-E-I-R, MP.  What does

5    that mean?

6    A.    It was a note to myself as part of the

7    research for the whole project.  One of the

8    things that I was checking along with the yield

9    records was the surrounding -- whatever

10   information I could get regarding the other hail

11   policies that we had in the area.

12   Q.    So it was your understanding --  By the

13   way, I apologize.  Because this is, in fact, your

14   writing on Page 82?

15   A.    Yes.

16   Q.    Do you know -- do you remember when this

17   was written?

18   A.    Not exactly, no.

19   Q.    So it was your understanding when you

20   wrote this that there were 18 other losses that

21   your company had in the area?

22   A.    What I was looking for was the other

23   losses that we had and their MP records to see

24   if --

25   Q.    What's --

1    A.    Sorry.

2    Q.    Okay.  I'm sorry.

3    A.    -- to see if those MP records indicated

4    hail and how much.

5    Q.    And did they?

6    A.    I don't think there was one that did.

7    Q.    Do you remember how it was you thought

8    that there were 18?  And I'll tell you why I'm

9    asking you that.  I'm not trying to box you, but

10   I remember seeing some documents where you had

11   asked about other losses and somebody wrote back

12   and said, we only had one and that was pumpkins

13   and sweet corn, so that doesn't count, or words

14   to that effect.

15   A.    The 18 would have come from a query to

16   determine what other policies and losses we had

17   in the area.

18   Q.    And do you know whether or not you're

19   specifically talking there about hail losses in

20   September of 2012?

21   A.    That wasn't restricted to September.

22   Q.    Then the very last box says harvest

23   records, and then there's an arrow down to a

24   little box.  It looks like PW.

25   A.    Production worksheet.

1    Q.    Production worksheet.  And then below

2  harvest records, it says when harvested = dates.

3  What does that mean?

4    A.    The harvest dates.

5    Q.    Harvest dates.  And then load records,

6  that would mean off-loaded to the elevator?

7    A.    Yes.

8    Q.    And the same question.  Do you know when

9  you wrote these notes?

10    A.    Not exactly, no.

11    Q.    Do you know whether it would have been

12  in 2012, before you met with Al in December?

13    A.    It would not have been before.

14    Q.    It would have been --

15    A.    Sometime after.

16    Q.    All right.

17            MR. PETERS:  10, you guys.

18  BY MR. PETERS:

19    Q.    Do you remember seeing this exhibit

20  before this morning?

21    A.    No.

22    Q.    Do you recognize the names on there,

23  Craig Polson, Randy Feldmann?

24    A.    Yes.

25    Q.    I'm not quite sure what to make of the

Def. F,R,1

1  format of this.  These two -- Let's just take

2  the Craig Polson box of 10-16.  That appears to

3  overlay another e-mail.  Is that the way it

4  appears to you?

5     A.    (No response.)

6     Q.    That's all right.  You don't need to --

7               (An off-the-record discussion was

8  held.)

9  BY MR. PETERS:

10    Q.    All right.  Then let's go back on.

11    A.    It's not an e-mail underneath.  It's a

12  screen shot of our automated claims program.

13    Q.    But my question, Larry, would be, is it

14  possible for me to see what lies underneath those

15  two notes from Polson and Feldmann?

16    A.    No.

17    Q.    Is it --

18    A.    I mean, not -- well --

19    Q.    Again --

20    A.    Like I say, it's a screen shot.  So you

21  would have to go back and reconstruct where it

22  came from, I guess.

23               MR. PETERS:  Again, off the record.

24               (An off-the-record discussion was

25  held.)

1    BY MR. PETERS:

2        Q.    This is the note that I was talking to

3    you about before, and it looks to me like what's

4    written at the top is just a reproduction of

5    what's in that little box with Craig Polson in

6    the middle.  But do I read this correctly, this

7    is something sent by Polson on October 16th of

8    '12?

9        A.    It wouldn't have been sent.  He would

10   have created that note in the Quest -- Quest is

11   our hail adjusting program.  So he would have

12   written that note into Quest on the 16th.

13       Q.    That's why you say it wasn't an e-mail.

14   It was just a note to the file?

15       A.    Yes.

16       Q.    Is that what you're saying?

17       A.    Yes.

18       Q.    Okay.  He says, this claim is being sent

19   up in order for it to be reassigned to another

20   adjuster in the area.  Larry -- how do you say

21   that?

22       A.    Grieme.

23       Q.    Larry Grieme is going to make the

24   assignment.  Do you take that to mean Polson?

25       A.    I assume.

1    Q.    I was given the claim only to have a

2    computer to work it on.  The primary adjuster,

3    Mike Gamber, G-A-M-B-E-R -- I don't think that's

4    the correct spelling.

5    A.    Yes.

6    Q.    Is it?  -- had a glitch in his Quest

7    Hail program that would not allow defoliation,

8    etcetera.  Do you have any way of knowing whether

9    this, in fact, was when this claim was assigned

10   to Galen Sornson?

11   A.    I don't know for sure.  I can't tell

12   you.

13   Q.    Do you have any knowledge or do you know

14   of any documents that talk about what went on, if

15   anything, with regard to this claim between

16   October the 3rd and October the 16th?

17   A.    What went on as far as --

18   Q.    Any activity at all.  Conversations

19   among people, visits to the Bruhn Farm, calls to

20   Al Bruhn, calls to Terry Nielsen, between October

21   3rd and October the 16th.

22   A.    I don't know that I have anything.

23   Q.    If we --

24   A.    I don't know that I've seen anything.

25   There may be information on that in the reports

37

```
 1    that the adjusters wrote up.  I'm not -- I don't

 2    remember what all is in there.  There could be

 3    reference in there.

 4                    (An off-the-record discussion was

 5    held.)

 6                    (A recess was taken.)

 7    BY MR. PETERS:

 8        Q.    I'm going to go back to just one thing

 9    we've already talked about.  You and I had a

10    discussion about after your December 18th meeting

11    with Al, that you and Terry Nielsen worked on

12    those production records to try to come up with

13    numbers.  Do you remember that conversation?

14        A.    Uh-huh.

15        Q.    Yes?

16        A.    Yes.  I'm sorry.

17        Q.    And I asked you about the phone call

18    that you made to Terry, where you guys compared

19    your calculation sheets and that you were $25,000

20    apart.  Do you remember the conversation about

21    that phone call?

22        A.    Yes, yes.

23        Q.    Did you have other phone calls with

24    Terry between December 18th when you met with Al

25    and the time that you and Terry had that last --
```

Def
F, R,
H

1    what I gather was the last conversation?

2        A.    I don't remember.  I don't know.

3        Q.    All right.  And then the only other

4    question on that area is, I have not seen

5    anywhere in any of the documents produced those

6    calculations that you did during that time

7    period.  That is, between December the 18th when

8    you met with Al and whenever it was in January

9    that you and Terry decided that your calculations

10   were similar and only about 25,000 apart.

11             MS. BUFKIN:  Is there a question,

12   though?  I don't -- are you asking are there any

13   documents?

14       Q.    That's what I was asking.  I haven't

15   seen any, so I wondered if you could tell me why

16   I haven't seen those.

17       A.    I don't know if there are any.

18       Q.    Well, in order for you and Terry to have

19   had a discussion, wherein, you said or he said,

20   oh, great, your numbers are only 25,000 away from

21   mine, you must have done some calculations.

22       A.    Obviously, I did.  I'm trying to think.

23   I don't remember exactly what I did, but the

24   factors that went into the calculation -- so

25   definitely there were calculations based on --

1    part of the process was the difference in

2    acres between the hail policy and the MP policy,

3    and justifying making those match up. So we

4    were talking about the same field to establish

5    production for the correct field, back and

6    forth.

7      Q.    We have a lot of your notes in the file;

8    and I'm just wondering why we don't have those

9    calculations, the writings.

10     A.    I don't even remember what I did. I

11    mean, I didn't -- I don't have a spread sheet or

12    anything like that. I don't remember exactly

13    what I did to come up with that number.

14     Q.    And, Larry, we're going to go through

15    all these documents, and I may just be wrong

16    about it.

17     A.    Okay.

18     Q.    Maybe some of these calculations are.

19    Well --

20     A.    There may be something in there that

21    makes it come back to me. I don't know.

22     Q.    Well, just by absolute coincidence, when

23    I reached into my pile, I came up with Exhibit

24    18. That didn't look to me like your handwriting

25    (Indicating).

1    A.    No, it's not.

2    Q.    Thank you.  All right.  Let's see.

3              MR. PETERS:  13, Liz.

4  BY MR. PETERS:

5    Q.    Have you ever seen Exhibit 13 before

6  today?

7    A.    Yes.

8    Q.    Do you remember when you saw it?

9    A.    Well, I don't remember exactly when I

10  saw it.

11    Q.    I can't tell, can you, what date this

12  document was prepared?

13    A.    It looks like 11-27.

14    Q.    At least those are the dates in the two

15  boxes that Larry Grieme --  Am I saying that

16  right?

17    A.    Grieme, yes.

18    Q.    I don't know why I have a hard time with

19  that.

20    A.    Yeah.  It's hard, because it's not

21  spelled that way.

22    Q.    So it looks to both you and I that this

23  was written -- signed at least by Larry Grieme on

24  November 27th of '12.  Do you have any concept at

25  all of whether you saw this before you went out

```
 1   to meet with Al Bruhn on December 18th?

 2       A.    No, I didn't.

 3       Q.    This is another document that shows the

 4   date of adjustment as the 22nd and 23rd.  Do you

 5   see that up in the upper right?

 6       A.    Yes.

 7       Q.    I want to go down to the comments box.

 8   It first says the loss was submitted to the

 9   company on September -- is that a 6 or a 5, if

10   you can tell?

11       A.    I think it's 26th.

12       Q.    Then he goes on to say Galen -- that

13   would be Sornson.  Yes?

14       A.    Yes.

15       Q.    Galen called me on 10-17 saying he

16   needed some help on this claim because of all

17   the acres to be looked at.  And I already asked

18   you this question; but again, do you have any

19   idea why it took from October 3rd until the 17th

20   for Galen to determine that he needed more

21   people?

22       A.    No, I don't.

23                  (An off-the-record discussion was

24   held.)

25                  MR. PETERS:  17, Liz.
```

```
 1  BY MR. PETERS:
 2      Q.    Exhibit 17, Larry, is a whole bunch of
 3  the e-mails that you and I talked about a
 4  little earlier, and I just grouped them all
 5  together.  So I'll try not to go through every
 6  single line, but I just want you to tell me what
 7  you know about these documents.  On the first
 8  page, 0087, can you tell me who wrote this time
 9  line that's at the bottom of the page below
10  thanks, Steve?
11      A.    I believe it was Steve Kevorkian.
12      Q.    The date of the e-mail at the top from
13  Steve -- K-E-V-O-R-K-I-A-N, by the way.  The date
14  of the e-mail is January 9th of 2013.  Do I
15  understand from reading this that even as of
16  January 9th, some people were under the
17  impression that the adjustment had been done on
18  October 22nd?
19      A.    I'm not sure where you're getting that
20  on here.
21      Q.    The fourth line from the very bottom,
22  10-22, six of us met and covered 6,500 acres of
23  beans for shatter.
24      A.    Yes.
25      Q.    Go to the next page, please, 0089.  The
```

Def.
S,H

1    very top of that page in the caption, it says

2    from Galen Sornson. Can you explain to me who it

3    went to? It looks like a comma and then com.

4         A.    No, I don't. I don't know.

5         Q.    Now, the e-mail itself is dated January

6    11th. I should have asked you first, have you

7    seen this before?

8         A.    Yes.

9         Q.    It's dated January 11th, but it appears

10   to me that Sornson is giving a historical recount

11   of what happened with this loss back in October

12   and perhaps November.

13        A.    I think that's correct.

14        Q.    All right. So he says there in the

15   middle, he -- that means Bruhn -- he felt it

16   should have been worked before he had to leave

17   samples. Do you read that?

18        A.    Yes.

19        Q.    I told him I could not work this claim

20   alone because of all the acres and was waiting

21   for other adjusters' work loads to ease up, so

22   they could help. Do you remember reading this

23   before today?

24        A.    Yes.

25        Q.    You're aware of the fact that Al Bruhn,

Def.
S, H

Def.
S, H

1  at some point, finally said to his agent, Terry

2  Nielsen, look, I've got to harvest.  Get me

3  permission to harvest and leave test strips.  Or

4  did you know that?

5     A.   I don't know that I did.

6     Q.   All right.  You know that that's, in

7  fact, what happened?

8     A.   I know that he did harvest and he left

9  samples.

10    Q.   So you don't know that someone from

11 Fireman's or from RCIS called Terry Nielsen and

12 said, yeah, tell him okay, go ahead and harvest

13 and leave test trips?

14    A.   I don't know either way.

15    Q.   All right.  Now, this is -- at least

16 since you and I have been talking this morning,

17 Larry, this is the first reference to what I have

18 concluded were the actual adjustment dates of

19 October 29th and 30th.  Go back down about

20 two-thirds of the way to the bottom where he says

21 after completing.

22    A.   Uh-huh.

23    Q.   After completing the claim on the

24 afternoon of October 30th, I had intended to go

25 and see Al.  Were you aware before today that

1    Galen Sornson was writing or saying that the

2    adjustment was actually done on the 29th and

3    30th?

4         A.    Yes.

5         Q.    All right.  Is that what you think is

6    actually the correct date that the adjustment was

7    done, 29th and 30th?

8         A.    No.

9         Q.    So you think Sornson's mistaken?

10        A.    (No response.)

11        Q.    Or are you saying you just don't know

12   which one of them it was?

13        A.    I think the adjustment was done the 22nd

14   and 23rd.

15        Q.    Were you aware that Sornson was planning

16   to meet with Al on the 30th?

17        A.    From this report.

18        Q.    All right.  Hired man said he was sick,

19   cancelled that appointment.  Some days later, I

20   talked to Al about the proof.  And do you know

21   what that means, about the proof?

22        A.    Okay.  I lost track.

23        Q.    Sorry.  The third line from the bottom

24   in that first paragraph.

25        A.    Okay.  What do you --

Def. R

Def R.

1    Q.    I asked you if you know what that means,

2    proof.  Proof of loss?

3    A.    Yes.

4    Q.    Okay.  And he wanted me to send it to

5    his agent, so they could go over it.  Do you know

6    whether that proof was ever sent to Terry

7    Nielsen?

8    A.    I don't know.

9    Q.    He goes on to say in closing, the agent,

10   Terry Nielsen, has been very cooperative and

11   helpful.  Do you remember reading that?

12   A.    Yes.

13   Q.    Did you ever deal with Terry Nielsen,

14   either before this claim, on some other claim, or

15   during this claim at any time?

16   A.    Yes.

17   Q.    Did you do it in this claim?

18   A.    Yes.  I talked to Terry several times.

19   Q.    All right.  Do you agree with Sornson's

20   assessment that Nielsen was cooperative and

21   helpful?

22   A.    Yes.

23   Q.    And this is the one that you and I

24   talked about earlier this morning, the next

25   sentence.  As far as phone call times and dates,

Def.
S

1    I believe I could get my phone records and
2    pinpoint some dates.  But I think you already
3    told me you don't know whether Sornson ever did
4    that --
5        A.    I don't know.
6        Q.    -- or whether there were any such
7    records?
8        A.    I don't know.
9        Q.    And you have no personal information as
10   to what, if any, phone calls, in-person contacts
11   or other contacts there were between Galen
12   Sornson and either Al Bruhn and Terry Nielsen
13   after this last referenced -- I was going to say
14   phone call, but we don't know if it was a phone
15   call or not.  The one we discussed where he
16   says, some days later, I talked to Al about the
17   proof?
18                MS. BUFKIN:  I'm going to object to
19   the form, because I lost it.  But if he followed
20   it, then he can answer.
21       A.    I'm sorry.  I lost it too.  I'm not sure
22   what you're asking.  I'm sorry.
23       Q.    Are you aware of any other contacts by
24   Sornson after this last contact where he says, I
25   talked to Al about the proof?

1    A.    I don't think so.

2    Q.    Okay.  Go all the way to the very last

3    line, right above where somebody has printed

4    Galen Sornson.  It says, doesn't remember how it

5    got removed.  Do you have any idea what that's

6    talking about?

7    A.    No.

8    Q.    Go back up to the printed portion, and

9    then that first line under the printed portion.

10   Do you know who wrote those handwritten things?

11   A.    I did.

12   Q.    You did.  The first line says, had to

13   wait for help - cause delay.  Did you write that

14   based on what Sornson told you?

15   A.    Yes.

16   Q.    That is essentially what Sornson wrote

17   in the printed portion that you and I already

18   went through.  Why did you write it down again in

19   handwriting?

20   A.    I don't know.

21   Q.    If you recall?

22   A.    I don't know.

23   Q.    All right.  What I'm wondering is, this

24   e-mail from Sornson to whoever is dated January

25   11th.  I'm wondering if this handwriting was

1   based on some kind of a phone conversation or

2   in-person meeting that you and Sornson had after

3   January 11th.

4       A.     I don't know that.  It's -- I guess I

5   don't know.  They're just chronological notes.

6   So I don't know when I put them there.

7       Q.     All right.  Presumably, it couldn't have

8   been before January 11th, because the e-mail

9   hadn't been generated until that date.

10      A.     Right.

11      Q.     Okay.  And the next line says, faxed to

12  bank for Al.  Do you know what we're talking

13  about there?  Faxed what?

14      A.     Yes.

15      Q.     What?

16      A.     The proof.

17      Q.     The proof of loss?

18      A.     Yes.

19      Q.     Do we know from this writing when that

20  was faxed?

21      A.     I don't know.

22      Q.     All right.  The next line you write is,

23  met with Terry later within the week.  Does that

24  mean you met or Sornson met?

25      A.     Sornson.

1    Q.    And it says, Terry said he wanted more.

2    I presume he is Al Bruhn?

3    A.    I presume.

4    Q.    Okay.  And is this the type of writing

5    that precipitated your -- Never mind.  I'll

6    abandon that question.  That was going to be one

7    of those ones -- Would you turn to the next

8    page, please, No. 90.  This is from Larry Grieme

9    to you.  It's December 17th of 2012.  In the very

10   middle, maybe five lines down, it says, there

11   were many sample areas to count in all parts of

12   the fields, which was surprising.  Do you know

13   why Grieme said that was surprising?

14   A.    We often find when samples are left that

15   there's a shortage of samples.

16   Q.    So what Grieme was saying, he was

17   surprised in a good way?

18   A.    Yes.

Def.
S

19   Q.    Okay.  The next page, please, 91.  And

20   by the way, as we're going through these

21   things -- I think I asked you this -- these

22   e-mails were generated by folks that had part --

23   had something to do in this claim process, when

24   they were requested to do so, I think, by Steve

25   Kevorkian who wrote to them and said, hey, will

1  you write down your thoughts.

2      A.    Yes.

3      Q.    Okay.  Thank you.  So the next is Craig

4  Woodford, and it's January 16th of '13.  It says,

5  drove down to Ida Grove on Monday, met with

6  adjusters, then on to Mapleton.  Met insured and

7  hired man.  Did you ever talk to Woodford to find

8  out what day he was talking about?

9      A.    No.

10     Q.    The only reason I ask is because October

11  29th was a Monday.

12     A.    Okay.

13     Q.    Have you ever explored that to see if

14  that helps give any clarification?

15     A.    No.

16     Q.    Okay.  Go two more pages, please, Larry,

17  to 93.  This is Clay Manes, and it's also dated

18  January 11th of '13.  In the second paragraph,

19  first sentence, in general, Mr. Bruhn was

20  agreeable to work with.  Did you ever talk

21  with --  By the way, do you agree with that

22  statement, based on your experience in this case?

23     A.    I didn't actually have any experience

24  working with him.

25     Q.    Fair enough.  I'm going to go forward to

1  ask about December 18th and that meeting.  Was he

2  agreeable to work with during that meeting at his

3  house?

4     A.    Yes.

5     Q.    He was very pleasant?

6     A.    Yes.

7     Q.    He was not mad?

8     A.    No.

9     Q.    You fellows had a good give and take

10 conversation?

11    A.    Yes.

12    Q.    All right.  The next page, 94, is Curt

13 Thompson, also January 11th.  This is another one

14 of the fellows that felt they adjusted on October

15 29th and 30th.  Do you see that in the first

16 paragraph?

17    A.    Yes.

18    Q.    The next paragraph, so one of his

19 employees had a listing of farm tracts the

20 insured wanted inspected/adjusted for possible

21 loss due to hail.  Did you know that one of those

22 fields was 640 acres?

23    A.    I didn't particularly know it, unless

24 it's in one of these reports or something.

25    Q.    The name of the employee that went along

1    with them that day is Ryan Gotto, G-O-T-T-O.

2    Have you heard that name before?

3        A.    I've seen the name.

4        Q.    Do you know that Ryan Gotto will testify

5    at trial that on the 640-acre field, the

6    adjusters were only there for half an hour?

7        A.    I don't know that.

8        Q.    You've never heard that before today?

9        A.    I don't think so.

10       Q.    Is a half hour enough time to adjust a

11   640-acre field?

12       A.    I guess I can't answer that.   I -- it

13   would depend on the field and -- it would depend

14   on a lot of things.   So I don't know.

15       Q.    All right.   You do know that for 640

16   acres, they need to take ten counts?

17       A.    If that's -- I don't recall exactly what

18   the chart is; but if that's what the chart is, it

19   is

20       Q.    The next page, 95, is Curt Winquist,

21   C-U-R-T, W-I-N-Q-U-I-S-T.   In the last two

22   sentences --   Sorry.   For the record, this is

23   Curt Winquist to Steve Kevorkian, January 11th,

24   '13.   He says, we had spots left in field to work

25   with that to me seemed to be as representative as

1  could be.  Have you read this before today?

2  A.    Yes.

3      Q.    Did you take Winquist to be saying that

4  the samples left by Bruhn were good?

5      A.    On the fields he looked at.

6      Q.    Thank you.  He also says, hired man was

7  very good to work with, as far as I was

8  concerned.

9      A.    Yeah.

10     Q.    Is that true, to the best of your

11  knowledge?

12     A.    I have no reason to dispute that.

13     Q.    The next page is 96.  This is Jim

14  Baldwin.  Do you have any idea when this was

15  written?

16     A.    I don't know exactly.

17     Q.    Since it's with these other e-mails, do

18  you think that it's fair for me to assume that

19  this was also part of this history recitation

20  that was requested by --

21     A.    I assume it was.

22     Q.    -- Kevorkian or somebody?

23     A.    Yes.

24     Q.    Thank you.  In any event, as you get

25  about three-quarters of the way down, Baldwin

1    says, it was apparent to me that Al was difficult

2    to pin down at times, but we were able to work

3    through it.  Had you read that before today?

4        A.    Yes.

5        Q.    Have you ever read anything to the

6    contrary of that?

7              MS. BUFKIN:  I object to the form

8    of that.

9        Q.    If you understand what I'm asking.

10             MS. BUFKIN:  Yeah.

11       A.    And I don't.

12       Q.    That's fair.  The next sentence says,

13   the agent met with us upon more than one occasion

14   to get us county maps, directions, etcetera, and

15   even rode with us once to look for acreage.  Had

16   you read that before today?

17       A.    Yes.

18       Q.    Okay.

19             (An off-the-record discussion was

20   held.)

21   BY MR. PETERS:

22       Q.    I'm pretty sure I already asked this.

23   December 18th of '12 was the first time you had

24   ever spoken with Al Bruhn?

25       A.    Other than to set up the appointment to

1   meet with him, yes.

2       Q.      Thank you.  It's my understanding that

3   when you arrived at Al's house, that the first

4   thing that happened was, you fellows shook hands?

5       A.      I'm sure it was, yeah.

6       Q.      All right.  And that you started out the

7   conversation by apologizing to him?

8       A.      I don't remember that.

9       Q.      That you said to him you were dismayed

10  and dissatisfied by how his claim had been

11  handled up to that point?

12      A.      I'm sure I never used the word dismayed

13  or dissatisfied.

14      Q.      What about ashamed?

15      A.      No.  Definitely didn't say ashamed.

16      Q.      You asked him to be patient with you, to

17  give you another chance?

18      A.      I asked him to be patient while we

19  worked through all of the information that we had

20  to gather to reconsider, and that that was going

21  to take some time.

22      Q.      All right.  And you told him that you

23  didn't want to lose him as a customer?

24      A.      I'm sure I told him that.

25      Q.      And you told him that things would be

1   better next year?

2       A.      Rel --

3               MS. BUFKIN:   I'm just going --   Is

4   there a question?   Did he --

5       Q.      You told him that things would be better

6   next year?

7       A.      Relative to the information he gave me

8   and the time lines he gave me -- and I didn't

9   have any other time lines, and I had no

10  information as to the reasons for the delay or

11  anything else -- based on that, I probably

12  would have told him, yes, we can do better next

13  year.

14      Q.      You and I already talked about this a

15  little bit, but that at some point toward the end

16  of the conversation, you said that in light of

17  what had happened up to that point, that you

18  wanted to see his yield histories; correct?

19      A.      I told him to -- for us to reconsider

20  and reevaluate the loss, we would need his yield

21  histories, yes.

22      Q.      And he showed you the check that they

23  had put under his garage door?

24      A.      I think he did.

25      Q.      And you told him to hold onto the check

Def.
A,R

1   and don't cash it, while you were doing further

2   work; correct?

3       A.      I don't recall telling him that.

4       Q.      As I understand -- Oh, by the way, at

5   the end of your meeting with him, did you fellows

6   shake hands again?

7       A.      Yes.

8       Q.      Would you call it a friendly meeting?

9       A.      Yes.

10      Q.      As I understand from the documents, you

11  were the one that ordered the check delivered to

12  his house?

13      A.      Yes.

14      Q.      As you sit here today, do you know of

15  anyone that sat down with Al Bruhn to discuss his

16  claims or review the numbers between October the

17  30th and December the 18th when you met with

18  him?

19      A.      I don't know.

20      Q.      Were you aware that Galen Sornson at

21  some point in early November told Al Bruhn that

22  he would pass the claim up the chain of command?

23      A.      I don't know what he may have said,

24  unless it's in his reports somewhere.

25      Q.      Do you know whether Galen, in fact, did

1 that or not?

2    A.    He would have contacted his supervisor

3 at some point.

4    Q.    Who would that have been?

5    A.    Steve Kevorkian.

6    Q.    But you don't know if or when he did

7 that?

8    A.    I don't know for sure.

9    Q.    All right.  Now, this next part should

10 be pretty easy.  Exhibit 1, do you know what that

11 is?

12    A.    Yes.  It's the general provisions from

13 the Iowa policy.

14    Q.    And just for the record, so we're clear,

15 it's Pages PLF 62-64.  And I gather that you've

16 seen that sort of thing before today?

17    A.    Yes.

18    Q.    All right.

19              MR. PETERS:  Exhibit 15, Liz.

20 BY MR. PETERS:

21    Q.    It's my understanding that you took a

22 bunch of notes when you were with Al on the 18th

23 of December.

24    A.    Yes, I took notes.

25    Q.    Is that what's on Exhibit 15?

1    A.    For the most part, I think, yes.

2    Q.    All right.  And I'm sorry.  That's

3 again my fault, Larry, and not yours.  At the top

4 of Exhibit 15, there's a bunch of stuff in

5 typing.  Do you know, was that one of the things

6 you took with you to Al's house, is that top half

7 of that page?

8    A.    Yes.

9    Q.    And then after you arrived, then you

10 proceeded to make notes on the bottom half of

11 that page?

12    A.    Yes.

13    Q.    And it says there, 12-18-12.  Do you

14 remember how long you were at his house?

15    A.    A couple hours?

16    Q.    I'm going to go down the left-hand

17 column first.  The second box says Rod - grossly

18 mishandled, may take few more drinks to get this

19 done.  Who was Rod?

20    A.    Rod Nelson.

21    Q.    And is this what my client told you on

22 the 18th?

23    A.    Yes.

24    Q.    That Rod had told him -- that Rod had

25 told Al that the claim had been grossly

Def
— H

1    mishandled?

2       A.    Yes.

3       Q.    Did you ever talk to Rod to find out

4    whether that was true or not?

5       A.    I have not talked to Rod.

6       Q.    All right.  Now, the next box says,

7    finished in November.  Who was last adjuster.

8    Is that your question to yourself?

9       A.    Yes.

10       Q.    You didn't know who the adjusters were

11    as of December 18th in this meeting?

12       A.    Correct.

13       Q.    You did make a note there of Galen?

14       A.    Yes.

15       Q.    Is that something you made that day or

16    later?

17       A.    I think it was later, when I found out

18    who it was.

19       Q.    Got you.  Two boxes down, it says

20    something was September.  Is that -- is that

21    A-S-S, assignment?

22       A.    Loss.

23       Q.    Oh, loss was September.  Then it says

24    loss worked in November.  This is again what Al

25    is telling you?

Def.
H

1    A.    Yes.

2    Q.    You had no knowledge before December

3    18th of when the adjusting was actually done?

4    A.    No.  I hadn't had time to do any

5    research on it at all.

6    Q.    The very last box on the left, adjusters

7    didn't want to be there - talked more about --

8    and then my copy is cut off.  Can you remember

9    anything of what's written below there?

10   A.    I know the steak part is there.  I'm not

11   sure what else it was.

12                  MR. PETERS:  Okay.  Off the record.

13                  (An off-the-record discussion was

14   held.)

15   BY MR. PETERS:

16   Q.    Then let's move over to the right-hand

17   column, 4,400 acres of beans in question.  Is

18   that what that says?

19   A.    Yes.

20   Q.    And then below that, dealing with Rod

21   for six weeks.  Is he referring to Rod Nelson?

22   A.    Yes.

23   Q.    Did you ever talk to Rod to see if, in

24   fact, he and Bruhn had been talking about this

25   claim for six weeks?

1    A.    No.

2    Q.    The next box, Rod said last week claim

3    is paid.  Is that again something Al told you on

4    the 18th?

5    A.    Yes.

6    Q.    Then the next box, Galen saying not know

7    why it took so long to get there.  Is that

8    something you wrote after the fact, after you

9    talked to Galen?

10   A.    No.  That would have been something that

11   Al told me.

12   Q.    And then after December 18th, you

13   apparently found out from somebody that Galen

14   was one of the adjusters, and you wrote it there

15   on the left column.  Did you talk to Galen to

16   find out why it took him so long to get out

17   there?

18   A.    I -- yes, I did later.

19   Q.    Do you remember when that was?

20   A.    No.

21   Q.    Would it have been somewhere in late

22   December or maybe January?

23   A.    It would have been after the 18th.

24   Q.    The reason I ask you that question is,

25   we went through an e-mail from Galen earlier that

1 he wrote as part of that Kevorkian request, and

2 he wrote in that e-mail that he was having

3 trouble finding enough adjusters. And I

4 wondered, did he ever confirm that to you

5 verbally, either on the phone or in person?

6     A.     I -- I don't remember talking to Gale.

7 I mean, I don't remember -- or Galen.  I don't

8 remember going through his report with him.

9     Q.     Okay.  Well, I may have misunderstood

10 here.  I thought you said that you had after the

11 18th, in response to what Al told you, Galen

12 saying he does not know why it took so long to

13 get there.

14     A.     I'm kind of guessing, because I don't

15 remember exactly.  But it appears to me now that

16 Al gave me Galen's name as the person saying he

17 didn't know why it took so long to get there, and

18 then I wrote Galen's name over on the left.  I

19 don't remember exactly, though.

20     Q.     Fair enough.  Now, it looks -- we only

21 have one page of these notes, and Al has told me

22 he thought that you wrote at least two pages of

23 notes.  Do you have a recollection about that?

24     A.     I did not write two pages.  This is all

25 I have.

1    Q.    Thank you.   Exhibit 1 says -- and I can

2  pull it out and we can look at it specifically,

3  if you want to -- but it says, in essence, that

4  if there is a disagreement between you and an

5  insured over a proof of loss, that the insured

6  can hire their own adjuster to do field counts

7  and then you guys can compare them.   Do you

8  recall that in general?

9    A.    That's -- no, I don't recall that being

10  in this policy.

11    Q.    Okay.   I'm just going to read --  Why

12  don't you read the first part of Paragraph 6,

13  where it says appraisal.

14    A.    Okay.

15    Q.    Read that for the record, please.

16    A.    If you and we fail to agree on the

17  percentage of loss caused by one of the insured

18  perils, the following procedure will be used.

19    Q.    And you don't need to read it on the

20  record, but doesn't that go on to say that the

21  insured can hire their own appraiser?

22    A.    Through the appraisal process, yes.

23    Q.    Okay.   When you finally told Al Bruhn on

24  January 25th, approximately, that the claim was

25  done and you weren't going to work on it anymore,

```
 1   would there have been any way that Al could have

 2   hired his own appraiser?

 3       A.    Well, Al could have started the

 4   appraisal process in November.  As soon as he

 5   didn't agree with what we found, he could have

 6   requested an appraisal.

 7       Q.    But isn't it true in November, Rod

 8   Nelson and your other people were telling him,

 9   just be patient, we're going to get this worked

10   out?

11       A.    I never told him to be patient, we're

12   going to get this worked out.  I told him it

13   would take some time to gather all the

14   information for us to reconsider doing anything.

15       Q.    I'm sorry.  But you misunderstood my

16   question.  I didn't include you in that.  You, of

17   course, hadn't done anything with Al until

18   December 18th.  You said November, and that's

19   when he was working with Rod Nelson; right?

20       A.    It appears that way.  I don't -- I

21   didn't have any -- I don't know.

22       Q.    Fair enough.

23       A.    I didn't have any -- I didn't know he

24   was working with Rod Nelson prior to that.

25       Q.    When did you first become aware that
```

Def
S,H

1    Larry Grieme had had some kind of a problem with

2    Al in prior years before this claim?

3        A.    I don't know exactly.

4        Q.    Do you know if it was before you met

5    with Al on December 18th?

6        A.    Yes.  It was in prior years.

7        Q.    There's an e-mail from Grieme where he

8    talks about a problem three years ago.  Do you

9    remember that one, just generally?

10       A.    I don't remember the specifics.

11       Q.    Would you have learned about that back

12   then, three years ago?

13       A.    If that's when it was.

14       Q.    If that's when it was?

15       A.    Yeah.

16       Q.    In your 42 years of experience, if you

17   have an adjuster that doesn't get along with an

18   insured, is it appropriate to send that adjuster

19   out on a new loss claim?

20       A.    I don't know that they didn't get

21   along.  The only thing I know is that Al wasn't

22   satisfied with what he came up with.

23       Q.    And, of course, you had nothing to do

24   with Grieme being assigned as an adjuster on this

25   claim?

1    A.    No, I didn't.

2                    MR. PETERS:  No. 4, Liz.

3    BY MR. PETERS:

4    Q.    The first page is from you to Tim

5    Buckingham.  Who was Tim at that time?

6    A.    Tim was the regional claims manager.

7    Iowa was one of his states.

8    Q.    And what was your job title at that

9    time?

10   A.    Multi-peril and crop hail, national

11   claims -- field claims manager.

12   Q.    So can you give me a sense of where you

13   and Tim would be relatively in the chain of

14   command?

15   A.    Tim reported to me.

16   Q.    Thank you.  The very first line there

17   from you says, thanks, thought I recognized the

18   name.  What name are you talking about?

19   A.    Galen Sornson.

20   Q.    The next sentence says, my only concern

21   is delaying a shatter loss for any reason.  They

22   only get worse.  Nothing to do about it now,

23   though.  Does that sentence speak for itself, or

24   was there something you were trying to tell Tim

25   that isn't apparent from that sentence?

1    A.    No.  The concern is on a shatter loss,

2  beginning the day after it happens, it can only

3  get worse.  So if we're delayed in getting there,

4  we're likely going to overpay the claim, because

5  the damage is worse the longer it's delayed.

6    Q.    And at this point, September 11th to

7  November 1st, whatever number of days that is --

8  Almost two months; right?  Since the loss of

9  September 11th?

10    A.    Uh-huh.

11    Q.    Yes?

12    A.    Yes.  If the loss was on the 11th, yes.

13    Q.    Fair enough.  Go to 103, please.  That's

14  two more pages.  The same day, the same folks,

15  you writing to Tim.  The first line, Larry -- by

16  that, you're talking about Larry Grieme?

17    A.    Yes.

18    Q.    Larry probably enough, although, you

19  being there would be better.  Why?

20    A.    Because of the size of the claim, the

21  dollar amount of the claim involved.

22    Q.    By that, you mean two heads are better

23  than one?

24    A.    We have certain sign-offs based upon the

25  size of the claim.

1    Q.    So did it have something to do with

2   Buckingham's place in the chain of command

3   compared to Grieme's?

4    A.    Yes.

5    Q.    Thank you.  And as I understand from

6   prior -- or from other documents, the reason

7   Buckingham didn't go was because of the

8   distance?  250 miles, he said?

9    A.    Yes.  And Larry Grieme is a -- was a

10  past supervisor.  So he was well qualified to do

11  the review.

12    Q.    Then go down to after your typed Larry.

13  Then there's a November 1st, 9:15.  Is that from

14  Tim Buckingham?

15    A.    That's part of the same as the first

16  page, if I understand you right.  I guess I'm not

17  sure which part you're asking about.

18    Q.    No.  Never mind.  That is from Tim

19  Buckingham.  Because if you look, it says

20  November 1st.  Then after his e-mail signature,

21  it says wrote.  So I at least read that to say

22  Tim Buckingham writing that.

23    A.    I believe it is.

24    Q.    All right.  Is he writing to you?

25    A.    Yes.

1    Q.    He says, I agree that it should have

2    been worked much sooner.  Larry G -- that's

3    Grieme?

4    A.    Yes.

5    Q.    Larry G said it was not huge loss

6    percent, but rather big acres that made it so

7    large.  Why would he say that?  I mean, what's

8    the relevance or importance of that, if anything?

9    A.    I don't know that it has any relevance.

10   He was just stating that the percentages were

11   small, but the total was large.

12   Q.    The next line says, Steve Kevorkian said

13   he had included this one in his estimates he gave

14   earlier.  What estimates is Tim talking about?

15   A.    We collect estimates to project future

16   payouts, particularly in the fall.  So Kevorkian

17   would have submitted that estimate or included

18   that amount in his estimate.

19   Q.    So there was some kind of an estimate

20   done on Bruhn by Steve Kevorkian before Bruhn was

21   even adjusted?

22   A.    It would have been -- I'm not sure when

23   he did the estimate.

24   Q.    Okay.  Because I read this to say that

25   Kevorkian had done some general estimates

Def.
S,R

1  countywide or adjustment region wide, or

2  something like that, after the September 11th

3  storm, and then had presented these estimates to

4  chain of command people, here's what we might be

5  looking at in the area.

6     A.    No, it wouldn't have been that.

7     Q.    It wouldn't have?

8     A.    It would have been on an individual

9  policy basis.

10     Q.    So when he says -- when Tim says,

11  included this one in his estimates plural, were

12  all of his estimates dealing with Bruhn?

13     A.    There would only have been one estimate

14  for that policy.

15     Q.    Oh, all right.  That sentence goes on to

16  say, but had projected a higher number.  Do you

17  have any knowledge of what that higher number

18  was?

19     A.    No.

20     Q.    Do you know of any document that

21  Kevorkian prepared with those estimates?

22     A.    No.

23     Q.    You've never seen one before today?

24     A.    No.

25     Q.    Go down to the next one, which is you to

1  Buckingham. We already went through what you

2  said, but then here's another one from Buckingham

3  back to you. Maybe we've already gone through

4  this one. Halfway down, Larry Grieme said Galen

5  called him and asked for help, so he took six

6  guys down and worked it in pairs. He said plenty

7  of good sample areas were left. Have you seen

8  that e-mail before today?

9      A.    Yes.

10     Q.    Do you have any reason to disagree with

11 what Buckingham said, that Grieme said that Galen

12 said?

13     A.    I think no.

14     Q.    Okay.

15              MR. PETERS: Let me do just one

16 more, Liz, and then we'll take a little break.

17 BY MR. PETERS:

18     Q.    This is 5. Is that your handwriting on

19 there at the bottom right?

20     A.    Yes.

21     Q.    This is January 24th, '13. You're

22 writing to Pat Koster, K-O-S-T-E-R, and Dennis

23 Hoye, H-O-Y-E. Quick - what are the current

24 field count requirements? And then this is what

25 they -- the top of the page is what they sent

1  back to you?

2      A.    Correct.

3      Q.    And do you know when this handwritten

4  portion was written on there?

5      A.    No.

6      Q.    Do you know why you wrote that on there

7  or where you received that information?

8      A.    Someone would have told me that, but I

9  don't know who.

10     Q.    And what is this telling me?  Is that a

11  good thing that you wrote that was done, or a bad

12  thing, or is it neither one?

13            MS. BUFKIN:  I object to the form.

14  But if you understand what he's asking, you can

15  answer.

16     A.    I guess it just means what it says.

17     Q.    By that, I mean are you being critical

18  of something or someone by what you write there?

19     A.    Well, like I said, somebody told me, and

20  I don't know where it came from.  So this was

21  somebody's opinion based on looking at the field,

22  and I don't know which field or --

23     Q.    I'm going to go back for just a second

24  to Exhibit 4, which is a bunch of e-mails of

25  November 1st that we went through.  The

1   conversation had been that you were talking with

2   Tim Buckingham about whether Tim should go with

3   Larry, and because of the distance, Larry went

4   alone.  Do you remember that discussion?

5       A.    Yes.

6       Q.    Do you know when Larry Grieme went?

7       A.    I don't know.

8       Q.    This e-mail chain again of November 1st,

9   do you know if it was in the next week or the

10  next two weeks or any estimate even?

11      A.    I don't know.

12      Q.    All right.  Do you know what Larry

13  Grieme did when he went out there?

14      A.    No.

15      Q.    And do you know, when he went out there,

16  did he make any contact with Al Bruhn?

17      A.    I don't know.

18      Q.    Do you know if he made any contact with

19  Terry Nielsen?

20      A.    I don't know.

21                    MR. PETERS:  Off the record.

22                    (An off-the-record discussion was

23  held.)

24                    (A recess was taken.)

25  BY MR. PETERS:

1    Q.    Larry, have you ever looked at a plat

2    map to see all the different plots of land that

3    are involved in this claim?

4    A.    Yes.

5    Q.    And do you have a feeling in your mind

6    of how many different parcels there are?

7    A.    I don't remember.

8    Q.    Dozens?

9    A.    Probably.

10    Q.    Do you have a feeling in your mind of

11    how big of an area is encompassed by all these

12    different plots?

13    A.    I haven't looked at one for a long

14    time.  So I -- I don't remember, you know, what

15    it would be.

16    Q.    If I told you --  Sorry.

17    A.    I don't remember what areas it covered

18    offhand.

19    Q.    All right.  You did know it was in three

20    different counties?

21    A.    Yes.

22    Q.    Have you ever sat down and looked at the

23    number of different plots to be adjusted and how

24    many different counts would be taken in total

25    from all the different plots?

1    A.    No.

2                MR. PETERS:  All right.  Off the

3    record.

4                (An off-the-record discussion was

5    held.)

6    BY MR. PETERS:

7    Q.    No. 2, as part of No. 2, I have Pages

8    PLF 82 and 83.  Are these both part of the same

9    document?

10   A.    As far as I can tell, yeah.

11   Q.    We have a date on the front page of

12   December 3rd of 2012.  Do you see that, the first

13   page?

14   A.    Yes.

15   Q.    Why was this document generated, if you

16   know?

17   A.    It would have been generated when the

18   claim was paid.

19   Q.    And you and I talked about this a little

20   bit very early this morning.  If you look halfway

21   over, there's a column that says AGRD % of loss.

22   That stands for agreed percentage of loss?

23   A.    Yes.

24   Q.    But we've already -- you and I discussed

25   that Al Bruhn never agreed to any of these

1  numbers; correct?

2     A.    Yes.

3     Q.    You don't have within your system or

4  protocols a way to generate a document where an

5  insured hasn't agreed with a column that says

6  something different than agreed percentage of

7  loss?

8     A.    Do we have a column in addition to

9  agreed percentage of loss, but doesn't say agreed

10 percentage of loss?

11    Q.    No.  I meant, you knew, obviously, that

12 Al wasn't agreeing.  Is there some kind of a

13 document that you guys have available to you that

14 has a column that says paid, but not agreed, for

15 an example?

16    A.    Not that I am aware of.

17    Q.    All right.  Exhibit 3, are you able to

18 read that at the top?

19    A.    Which part?  The big letters, I can.

20    Q.    What I was basically looking at is in

21 the very top box, over on the right-hand side,

22 can you read what those -- there's a column that

23 says loss adjuster.  The next column says claim

24 status.  Can you read what that next column

25 says?

1    A.    Effective date.

2    Q.    What does that mean?

3    A.    It would be the -- Let me see.  I can't

4  read the dates.  I'm not sure what it pertains

5  to.

6    Q.    Turn to the next page, if you would,

7  which is Page -- it looks to me like that top box

8  is the same as what you and I were looking at,

9  except printed a little wider so we can read it.

10    A.    Okay.  Yeah, I can read it.

11    Q.    Okay.  So does that help you understand

12  what effective date means?

13    A.    It appears to be the effective date of

14  the individual policies.

15    Q.    Then the next one says storm date.  I

16  presume that means the same thing as date of

17  loss?

18    A.    Yes.

19    Q.    Let's go all the way down to the bottom,

20  and the adjuster there is Sornson.  The storm

21  date is 9-11 of '12.  Do you see that?

22    A.    I'm sorry.  I don't know where you're

23  at.

24    Q.    The very last line in this first box.

25    A.    Oh, here.  Okay.

1     Q.     Sorry.

2     A.     Okay.

3     Q.     It says storm date, the 11th.  Notice

4  date, 9-26-12.  Do you see that?

5     A.     Yes.

6     Q.     And what does that next column mean,

7  received date, if you know?

8     A.     I'm not sure.

9     Q.     I'm going now to No. 6.  That's a big

10  fat packet, Larry.

11     A.     There.

12     Q.     Yeah, that's it.  I thought I had her

13  staple all those.  Well, I just have one

14  question.  There's a lot of pages here, Larry.

15  They all go up to Page FFIC 0180.

16     A.     Okay.

17     Q.     These are labeled production worksheets

18  from Producers Ag Insurance.  Have you seen these

19  before today?

20     A.     Yes.

21     Q.     Have you seen these in the past, prior

22  to the claim we're talking about in this

23  lawsuit?

24     A.     Prior to when?

25     Q.     This type of worksheet from Producers Ag

1  Insurance.

2     A.    I've seen this type of worksheet.

3     Q.    Thank you.  Do you know why these

4  documents were requested in this case?

5     A.    Yes.

6     Q.    Why?

7     A.    To establish production and cause of

8  loss.

9     Q.    And do you understand that all of these

10 pages, Exhibit 6, indicate that the cause of loss

11 was drought?

12    A.    Yes.

13    Q.    Do you know whether Al Bruhn had any

14 input into that cause of loss being listed on

15 these sheets?

16    A.    I don't know.

17    Q.    Do you know, in fact, that the man in

18 charge of these documents, Cameron, wrote drought

19 on here without discussing it with Al Bruhn at

20 all?

21    A.    I have no idea.

22    Q.    You don't know one way or the other?

23    A.    No.

24    Q.    Thank you.  We're done with that one.

25 Exhibit 7 is three pages of what I would call

1    section maps.  Have you ever seen these before

2    today?

3        A.    Yes.

4        Q.    Do you know who generated these?

5        A.    I did.

6        Q.    Where did you get these sheets?

7        A.    I'm sorry?

8        Q.    Where did you get them?  In other words,

9    did these come out of some sort of form book?

10   Because we have a whole bunch of typed in columns

11   and squares, and then there are things written

12   in.

13       A.    It's just a township arranged template.

14       Q.    So you would pull that either out of a

15   volume or off the internet or something like

16   that?

17       A.    This came off the internet.

18       Q.    And then did you write in all the

19   information that's written onto these?

20       A.    Yes, I think so.

21       Q.    Do you have any idea when that would

22   have been done?

23       A.    Sometime between the 18th of December

24   and the 25th of January.

25       Q.    On Page No. 3, which is 0183, right in

1   the middle on Section 13, you've written Leo.

2   What does that mean?

3       A.      That was in reference to one of the

4   insureds that Al told me about.

5       Q.      This was the Leo Erlemeier Farm that was

6   adjusted on September 26th; correct?

7       A.      Yes.

8       Q.      Thank you.  And then look at the last

9   page.  There's another handwriting pointing to --

10  it looks like Section 2, neighbor from Rod's

11  e-mail.  What does that mean?

12      A.      I'm not sure who that neighbor was.

13      Q.      We're talking Rod Nelson?

14      A.      Yeah.  Yes.

15      Q.      But you don't have any recollection of

16  why the location of that neighbor would have had

17  any meaning?

18      A.      I don't remember.  I'm not sure.

19      Q.      Do you know what Exhibit 8 is?

20      A.      Yes.

21      Q.      Tell me.

22      A.      It's a list of policies.  I think -- I

23  can't tell for sure.  I think they're all Monona

24  County.

25      Q.      Is that your handwriting at the very

1    top?

2        A.      Yes.

3        Q.      Does it say all RCIS policies with

4    soybean payments in the county?

5        A.      Yes.

6        Q.      Does this document tell me the date of

7    loss on the far right?

8        A.      Yes.

9        Q.      So just, for example, at the very bottom

10   of the first page, we have a 9-11 date of loss

11   for Al Bruhn.

12       A.      Correct.

13       Q.      Correct?

14       A.      Yes.

15       Q.      Does this document tell me when any of

16   these losses were adjusted?

17       A.      No.

18       Q.      Does this tell me what percentage of

19   loss was paid on any of these claims?

20       A.      Yes.

21       Q.      Is that the column in the middle that

22   says agreed percent?

23       A.      Yes.

24       Q.      Does this document -- by that, I mean

25   all three pages -- tell me when any of --

1      A.     The factored percent is actually the
2   paid amount.  The agreed percent is the agreed
3   amount.  So there's a difference between the two
4   based on the policy form.
5      Q.     The agreed amount is the amount that
6   you, your company and the insured, agreed upon?
7      A.     The agreed amount --
8             MS. BUFKIN:  I object to the form.
9   If you know.
10     A.     The agreed amount is what the adjuster
11  found in their inspection.  That's what was in
12  the claim.
13     Q.     So you're saying to me that on this
14  form, agreed doesn't mean that the insured agreed
15  to that percentage?
16     A.     Correct.
17     Q.     Okay.  What's the factored percent
18  column then?
19     A.     It's the payable amount based on the
20  policy form.
21     Q.     Just give me one example of how the
22  policy form would dictate a payment that's
23  different from the amount the adjuster found.
24     A.     Okay.  A basic policy, the agreed and
25  the factored would be exactly the same.  If it's

1  a deductible or an increasing payment policy, it

2  could be more or less.

3      Q.    Thank you.  The question I was starting

4  to ask, then, was does Exhibit 8 anywhere tell me

5  when any of these claims was actually paid?

6      A.    No.

7      Q.    I'm going to 9.  These again are some of

8  your notes, I believe.

9      A.    Yes.

10     Q.    The first page deals with the December

11 18th meeting.  Why did you rewrite your notes

12 regarding the December 18th meeting?

13     A.    Just to try to put everything in

14 chronological order.

15     Q.    Did you write these at the request of

16 someone else?

17     A.    No.

18     Q.    Do you remember when you made these

19 notes?

20     A.    No, I don't know exactly.

21     Q.    Can I presume that all three pages of

22 these notes were made at the same time?

23     A.    I think so.

24     Q.    The reason I ask it that way, Larry, is

25 because on the next page, we have 1-25, two

1  paragraphs of 1-25.  Then on the third page --

2  and that may have just been internally here in my

3  office, because these are numbered --  No, no,

4  they're not.  Well, maybe your lawyers just mixed

5  these up when they were printing them for me.

6  But the third page is actually 1-24.  Do you

7  remember when you wrote these, you said,

8  chronologically?  Do you think you would have

9  written the notes about 1-18 and then 1-24 and

10  then 1-25?

11     A.    I think I wrote this all at one time.

12                    MR. PETERS:  Okay.  Off the record.

13                    (An off-the-record discussion was

14  held.)

15  BY MR. PETERS:

16     Q.    We're going to No. 12.  Let's start at

17  the very top of that page.  It says fact sheet.

18  Do you know who wrote this?

19     A.    Not without looking at the claim.  No, I

20  don't.

21     Q.    If we go down to the very bottom of the

22  page, Code No. 014483, is that an agent number?

23     A.    It's the adjuster code.

24     Q.    Adjuster code.  Do you happen to know,

25  is that Galen Sornson?

1      A.      I don't know.

2      Q.      You don't know.  And this was written on

3   April 30th of 2013.  Any idea why this document

4   was written?

5              MS. BUFKIN:  I object to the form.

6   Because it assumes that it was written, and I

7   don't know -- I think that's a print date.

8      Q.      Oh.

9              MS. BUFKIN:  I think.

10     Q.      Do you have any knowledge as to when

11  this document was actually written?

12     A.      Not without looking it up.

13     Q.      Do you think there might be some other

14  form of this document that would have the

15  original generation date?

16     A.      I'd have to look in the claim file.

17     Q.      Will you do that?

18     A.      Yeah.

19     Q.      Because it goes to another question.  It

20  says in the very last sentence, all previous

21  losses were worked by out-of-state adjusters, see

22  attachments.  So whoever did write this, there

23  were attachments to this, and I don't know if I

24  have those or not.

25     A.      Right.

1    Q.    Because the way I got this document was

2  just like this.  The next question about this is,

3  under comments, do you see how that sentence

4  seems to start out in the middle of a sentence?

5    A.    Uh-huh.

6    Q.    Do you assume from that, like I do, that

7  there would have been either another page in

8  front of this or that originally, these comments

9  were longer than just what we have here?

10   A.    No.  I think he just started the

11  sentence that way.

12   Q.    And with a small S rather than a capital

13  S?

14   A.    Sorry.  Yes.  The next time I shake my

15  head, kick me.

16   Q.    Trust me, it's very common.  Let me

17  address Liz's comment, going back down to the

18  very bottom, the April 30th date.  You have no

19  way of knowing as you sit here whether that was

20  the date that this was written or if that's just

21  a reprint date?

22   A.    I believe it's a reprint date, but I

23  couldn't say for sure.

24   Q.    I'm going to 15.  There's one question I

25  forgot.  Look on the right-hand side, right

1    opposite the bates stamp numbers.  Neg settlement

2    it appears.  What does that mean?

3    A.     (No response.)

4    Q.     Does that mean you folks at RCIS are

5    going to have to try to negotiate a settlement

6    with Al?

7    A.     I don't know.

8    Q.     The next page is 16.  This is that

9    e-mail that you and I referred to a number of

10    times earlier in the morning, where you were

11    requesting that the various adjusters provide you

12    with a briefing, so to speak.  You wrote that.

13    Am I correct so far?  This is an e-mail that you

14    wrote?

15    A.     Yes.

16    Q.     You wrote this Monday, December 17th,

17    the day before you went to meet with Al; correct?

18    A.     Yes.

19    Q.     Please take a few minutes and write back

20    with anything you can think of about the claims

21    with Bruhn.  I cannot get into Quest right now to

22    check the special report.  What special report?

23    A.     Fact sheet special report.  That's what

24    we were looking at a bit ago, the facts sheet, to

25    see if there were any.

1   Q.   See if there were any what?

2   A.   Any notes in the claim.

3   Q.   Oh, so, for example, the fact sheet

4   would be those --

5   A.   The one that we're not sure when it was

6   printed.

7   Q.   And I think you already said this to me

8   this morning, but just reading your e-mail, you

9   really knew nothing about this loss as of

10  December 17th.

11  A.   Correct.

12  Q.   Did you receive replies to this e-mail

13  from any of your folks before you went up to Al's

14  the next day?

15  A.   No.  I left on the 17th to go up there.

16  Q.   I see.  It looks like below, you were

17  just writing some directions.

18  A.   Exactly.

19  Q.   Cell phone number.  What's that in the

20  lower right, APH history?  What does that mean?

21  A.   Just a note to myself to get the APH

22  history.

23  Q.   I don't know what APH means.

24  A.   Actual production history, which is the

25  yield history.

```
 1    Q.    So you knew on the 17th that you needed

 2  to ask Al for his production history?

 3    A.    That's the first thing we ask for, if

 4  there's any dispute.

 5    Q.    Okay.

 6    A.    That's the first piece of what we try to

 7  put together.  So --

 8    Q.    And the other phone number there says

 9  Terry.  I presume that's Terry Nielsen?

10    A.    Yes.

11    Q.    Did you meet with Terry Nielsen on the

12  18th?

13    A.    Yes.

14    Q.    Do you have notes from that meeting?

15    A.    No.

16    Q.    Do you remember what you and Terry

17  discussed at that meeting?

18    A.    I think he talked to Al and got

19  permission to give me the production history, or

20  it would have been his APH history.  He printed

21  those off for me.

22    Q.    I see.  So if you met with Al for a

23  couple hours in the morning, by the time you got

24  to Nielsen's office, those production records

25  were already ready for you?
```

1    A.    No.  I called Terry, and he wasn't in

2    yet.  So I went to his office, met him there, and

3    then he printed them.

4    Q.    Got you.  The next page is No. 0061.  Is

5    that your writing on that page?

6    A.    Yes.

7    Q.    My first question is, look right there

8    in the middle.  Can we get 2012.  That looks to

9    me like a sticky note that was taped over the

10   underlying page.

11   A.    Yeah, I think so.

12   Q.    If you look at the next page, 62.

13   A.    Okay.

14   Q.    Do you know why you would have put that

15   sticky note on there or when?

16   A.    It was just a note to myself for

17   something else to ask for.

18   Q.    So let's go on to 62, and then we'll

19   come back.  What day were these notes written?

20   A.    I don't -- I don't know.

21   Q.    Would this have been before you met with

22   Al Bruhn on the 18th?

23   A.    No.

24   Q.    This would have been after?

25   A.    Yeah.

1    Q.    Was it the same day?

2    A.    It wasn't the 18th, no.

3    Q.    Is this something you would have done

4    when you got back to your office?

5    A.    Yes.

6    Q.    The numbers at the top, are these claim

7    numbers, if you know?

8    A.    I believe so.  I'd have to check for

9    sure, but I think they're claim numbers, yeah.

10    Q.    Does the artwork have any meaning?

11    A.    No.

12    Q.    It's not crop fields or anything?

13    A.    It's called doodles.

14    Q.    Did you still at that point -- Look at

15    the middle of the page.  You still had some

16    question as to whether Fireman's had been given

17    notice of the September 11th loss?

18    A.    Yes.  Not if.  When.

19    Q.    Got you.  Well, it says was notice

20    turned in, in September.  That's why I asked the

21    question that way.  So you wrote was, but you

22    meant when?

23    A.    Yes.

24    Q.    Let's go back to the first page then.

25    So after you made those notes, you stuck a sticky

1   note on that says, can we get 2012 actual

2   reported production.  Didn't you tell me that

3   you'd already received that from Terry Nielsen on

4   the 18th?

5       A.    I did get that on the 18th.

6       Q.    So why would you have then later put on

7   a sticky note that asked can we get it?

8       A.    I don't know.

9       Q.    Okay.  What does the next phrase say,

10  copy of RMA reporting form?

11      A.    Well, the RMA reporting form is the

12  production reporting form.  An RMA is the

13  government form.

14      Q.    That's the big fat exhibit that we

15  looked at earlier from Ag Pro?

16      A.    No.  Those were production worksheets.

17      Q.    Okay.  All right.  Did you ever get the

18  RMA reporting form?

19      A.    I think it's what Terry gave me.  It's

20  the APH history.  But it's reported to RMA.

21  That's why it would be.

22      Q.    I'm all the way up to 18.  You've

23  already told me you didn't write these.  Do you

24  have any idea who did?

25      A.    I'm not sure who did.  I think Terry

1   did.

2     Q.    Terry Nielsen?

3     A.    Yes.

4     Q.    Did he share these calculations with you

5   when you met with him at his office?

6     A.    I don't remember if he did or not.,

7     Q.    Let's look at 19.  This is something you

.8   and I already discussed.  You say there in the

9   second part of it, can you get me the hail claim

10   numbers for those MP -- that means multi-peril?

11     A.    Uh-huh.

12     Q.    Yes?

13     A.    Yes.  I'm sorry.

14     Q.    That's all right.  -- for those MP

15   policies so I can look up what we paid for hail.

16   And then Dennis writes back, again, about only

17   one of them had a hail policy, and that was just

18   pumpkins and sweet corn.  Right?

19     A.    Yes.

20     Q.    Did you ever subsequently receive any

21   other information about hail loss claims that

22   would have occurred in -- this says Monona, so

23   let's just stay with in Monona during September?

24   And why I'm asking that question is, you said a

25   couple hours ago to me you thought there were

1  16.

2  A.  18, I think.  But --

3  Q.  All right.  Would those 18 all be

4  included in a summary document that we already

5  looked at, Exhibit 8?

6  A.  Okay.  Sorry.  What was that?  Exhibit

7  8?

8  Q.  8.

9  A.  8.  I imagine they would.  Without

10  checking, I don't know if there's 18 here, but --

11  Q.  Fine.  Thank you.  That takes us to No.

12  20.  And you do, in fact, make a note in the

13  middle, cross check the 18 hail losses with their

14  MP.

15  A.  Okay.

16  Q.  So at least whenever this was written,

17  you had reason to think there were 18 hail losses

18  in Monona?

19  A.  In Monona County, yes.

20  Q.  And you believe those were all hail

21  losses that Fireman's insured?

22  A.  They were, yes.

23  Q.  Thank you.  I'm on to 22, the second

24  page.

25  A.  Okay.

```
1      Q.     FFIC 0107, you write on November the

2   19th to Ed Longman.  Who is Ed Longman?

3      A.     Ed Longman at the time was the east

4   regional claims manager.

5      Q.     Where would you --

6      A.     East district regional claims manager.

7      Q.     Where would you and he be within the

8   relative chain of command then?

9      A.     I had hail responsibility.  He had

10   primarily -- I have hail responsibility for the

11   nation.  He has -- had at that time MPCI

12   responsibility for the eastern half of the

13   nation.

14      Q.     So then why would you have been writing

15   to him about this hail claim?

16      A.     Just to keep him informed on what was

17   going on.

18      Q.     Does that mean that he is in some sense

19   above you in the chain of command?

20      A.     No.

21      Q.     All right.  And why was Ed Cerven

22   copied?

23      A.     Ed Cerven was the regional claims

24   manager.

25      Q.     And so where would he be relative to you
```

1   in the chain of command?

2       A.      Ed Cerven reported to Ed Longman.

3       Q.      Did you report to Ed Cerven?

4       A.      No.

5       Q.      You were in a separate --

6       A.      I didn't have a reporting relationship

7   with Ed Cerven.

8       Q.      Thank you.  Why are you writing to

9   Longman and asking any idea why the insured has

10  not been available to sign a half million dollar

11  check?

12      A.      Well, I was just trying to collect --

13  find out what they knew about it, whether it be

14  either one of the Eds.

15      Q.      And why did you go on to say, any

16  possible reason he has something to argue about,

17  be pretty gutsy if he does?

18      A.      Well, it kind of started in the spring,

19  there was some question as to coverage, effective

20  dates on some corn and beans.  And underwriting

21  made the decision to make -- to go ahead and

22  offer that coverage, which in my opinion was an

23  accommodation.  And we had -- throughout the

24  summer, we had different losses, and we had

25  done everything we possibly could to get on them

```
 1   as fast as we could.  So I was surprised, I

 2   guess, that after we had done everything we could

 3   as far as customer service, that anyone would

 4   come back and argue about how we handled this.

 5   So

 6        Q.    But you --

 7        A.    I'm just a little surprised, I guess.

 8        Q.    But you've already told me as of

 9   November 19th, you really knew nothing about this

10   hail loss claim or how it had been handled or

11   mishandled; correct?

12                  MS. BUFKIN:  I object to the form.

13        A.    I'm not sure I understand.

14        Q.    Well, I thought you told me that prior

15   to December 17th, you really had no knowledge

16   about what had happened in this claim between

17   September 11th and December the 17th.

18        A.    I knew that he had not agreed to the

19   percentage of loss.

20        Q.    How did you know that?

21        A.    It was through e-mail.  I'm not sure

22   who -- I'm not sure who it came from.

23        Q.    If somebody has a million-plus dollar

24   claim and they're only being offered 400,000,

25   does that affect your statement he'd be pretty
```

Def.
A

Def.
S, A

1   gutsy if he does turn it down?

2           MS. BUFKIN:   I object to the form,

3   again.  Answer if you can.

4       A.    I'm not sure if the amount really has

5   much to do with it.

6       Q.    Oh.  The next e-mail down is from

7   Longman -- I guess that's him.  Let's go down to

8   the bottom of the page.  This is the same date,

9   earlier in the day at 2:30 p.m., from Cerven to

10  Kevorkian.  Have you seen this e-mail before

11  today?

12      A.    Yes.

13      Q.    Cerven says, as I stated, Larry Grieme

14  and five adjusters worked this policy about four

15  weeks ago.  Larry, is that you or is that Larry

16  Grieme?

17      A.    It wasn't me.

18      Q.    Okay.  Go to the next one up, which is

19  from Cerven to Longman.  He says, normally, I

20  would say send it up without signature.  That

21  means send it to have a check cut without having

22  the insured's signature on the proof of loss?

23      A.    Yes.

24      Q.    This is the policy which had rye on it

25  with big loss.  How does that have any relevance

Def. S,H

1    to the bean claim?

2        A.     I don't know that it does.

3        Q.     Okay.  And then he says, the insured was

4    one that kicked Grieme off the farm about three

5    years ago.  Did you have any knowledge about that

6    at all, before you read this?

7        A.     I knew that Al wasn't satisfied with

8    Larry's work in the past.  I didn't know

9    specifically three years, but --

10       Q.     All right.  And then the next sentence

11   says, the one that Nelson -- that's Rod Nelson?

12       A.     Yes.

13       Q.     -- that Nelson took liability for corn

14   and soybeans when effective date was

15   questionable.  What do you know about that?

16       A.     I just know that there was an

17   underwriting decision made in June whether to

18   accept or not.

19       Q.     Did you have any part of that?

20       A.     No.

21       Q.     Do you know whether anyone from

22   Fireman's Fund ever expressed displeasure or

23   disapproval to Al about that underwriting loss,

24   the earlier one that we just talked about with

25   Rod Nelson?

1    A.    Well, first, we need to clear up the

2  difference between Fireman's Fund and RCIS.

3    Q.    Should I have just said RCIS?

4    A.    Yes.

5    Q.    Sorry.  Change that question to RCIS.

6    A.    Okay.  Now, sorry.  Ask it again.  I got

7  stuck on the Fireman's Fund.

8              (Requested portion of the record

9  was read.)

10    A.    I don't know.

11    Q.    I'm now on the next page, 109.  This is

12  from you to Ed Cerven; correct?  At the very top?

13    A.    Which one?  The top?

14    Q.    Very top.

15    A.    Yes.

16    Q.    Go to the end of the sentence, after the

17  dashes.  Hate to give this guy anything to

18  complain about, like no signature.  What do you

19  mean by that?

20    A.    Well, we prefer to have a signature on

21  the proof agreeing to the percentage of loss.

22  So --

23    Q.    What does the last line mean -- last

24  sentence, don't know what his angle might be?

25    A.    I didn't know what his complaint was.  I

1    didn't know what he thought we missed, where we

2    were wrong.

3        Q.    Were you suspicious of Al Bruhn, his

4    motives, his intent, his honesty?

5        A.    Suspicious?  No, no.

6        Q.    I mean, at that point on November 19th?

7        A.    No.

8        Q.    I'm on Page 111.  Again, November 19th,

9    in that 3:30 p.m. time frame, you to Cerven.

10   One-half M. Million, yes?

11       A.    Yes.

12       Q.    Must not mean as much to him as it would

13   to the rest of us.  Isn't that again relative?  I

14   mean, if it's a million and a half claim and

15   you're offering him half a million, isn't what it

16   means irrelevant?

17               MS. BUFKIN:  I object to the form.

18   You can answer, if you know.

19       A.    Half a million is a pretty big deal for

20   me.  And the time gap, if I was -- if I was not

21   satisfied with an offer of a half a million, I

22   would have had it straightened out the next day.

23   And at that point, we had some trouble having --

24   getting meetings set with Al, and it drug on and

25   on.  The time frame is what surprised me for that

1    much money.

2        Q.    Now, you had not had any trouble setting

3    meetings?

4        A.    No, I had not.

5        Q.    So what you're relating is what other

6    people may have told you; correct?

7        A.    Yes.  Correct.

8        Q.    Now, the next sentence, again, there at

9    the top, you're saying to Cerven, please let me

10   know if you talk to him or leave a message.  Was

11   it your understanding that Cerven was going to

12   try to get in touch with Al?

13       A.    I don't know if I meant you or somebody

14   else particularly.  I wanted to know if anyone

15   was making contact with him.

16       Q.    Because at that point, you didn't know

17   whether anyone was making contact with Al or not?

18       A.    I didn't know if anyone had been able to

19   make contact with Al.

20       Q.    0112, the next page, the very top.  It's

21   the same day, 7:51 p.m., you to Grieme --

22   Sorry.  You to Grieme at the top, but then

23   November 19th, 7:39 -- is that Grieme to you?  I

24   talked with Galen Sornson, that paragraph?

25       A.    I'm sure it's part of the chain.

1    Q.    Okay.  Down at the very bottom of that

2  paragraph, he says, we got rid of this guy ten

3  years ago because of things just like this.  Did

4  you understand what he was talking about when he

5  wrote that?

6    A.    I know what it says.  I don't know

7  anything about ten years ago.

8    Q.    I meant the underlying facts.  Did you

9  know what happened ten years ago?

10   A.    No.

11   Q.    Did you know what he meant by things

12  like this?

13   A.    No.  I didn't know what happened ten

14  years ago.

15   Q.    Have you come to learn that since then?

16  Do you know the answer to those today?

17   A.    No.

18   Q.    And on November 19th, when this e-mail

19  chain was taking place, were you assuming in your

20  own mind that it was Al Bruhn's fault that RCIS

21  adjusters took so long to get out and adjust his

22  claim?

23              MS. BUFKIN:  I object to the form

24  about what he was assuming.

25   A.    Can you reask that?

Def.
5

```
 1              (Requested portion of the record
 2    was read.)
 3       A.    No.
 4       Q.    Do you believe that that's the case as
 5    you sit here today?
 6       A.    No.
 7       Q.    Would you go to Exhibit 23, which is
 8    this one (Indicating).
 9       A.    Okay.
10       Q.    Is that your handwriting?
11       A.    Where at?
12       Q.    (Indicating)?
13       A.    No.
14       Q.    No.  Do you know whose it is?
15       A.    Not without looking at the claim.
16       Q.    Do you know what the numbers mean?
17       A.    Those are locations where tests were
18    made.
19       Q.    And does that mean that the tests were
20    taken consecutively by numbers?  So in other
21    words, on the left-hand box, No. 1 sample would
22    have been taken first, and No. 2 sample taken
23    second?
24       A.    I assume so, but I can't say for sure.
25    That's how I would do it, but I don't know how
```

108

1   that person did it.

2       Q.      If you page through 23 a little bit,

3   there are more of those hand drawn maps, if I can

4   use that phrase; but all of the documents say

5   soybeans survey sheet.  Are the handwritten

6   documents something that would be completed by

7   the adjusters in the field?

8       A.      Yes.

9       Q.      And then the typed documents such as the

10  next page, 0119, that would be completed after

11  they got back to the office?  Or maybe in this

12  case, there's some indication that they may have

13  gone to a steakhouse in Mapleton and pulled the

14  computers out.  Is this something they could have

15  done then, if you know?

16      A.      I doubt if anybody pulled out a computer

17  at the steakhouse.  However, this could have been

18  done in the field.  It could have been done in

19  the pickup.  It could have been done in the hotel

20  room or their house.

21      Q.      Even the typed documents such as 119?

22      A.      Yes, it's part of the program.

23      Q.      I'm at -- you are too -- 24.  Is that

24  your handwriting?

25      A.      Yes.

```
 1      Q.     Tell me what we're seeing here.

 2      A.     It's another piece of the research that

 3   I did to try to come up with, did we miss

 4   something?  And these are -- it's from a Noah

 5   website that shows the storm date and then

 6   reported hail, wind and tornado losses.

 7                    (An off-the-record discussion was

 8   held.)

 9      Q.     Any clue when you would have written

10   this page?

11      A.     No.  Like I said, it was just part of

12   what I was looking into.

13      Q.     Sometime after the December 18th meeting

14   with Al?

15      A.     Yes.

16      Q.     What about Exhibit No. 25?  Is that your

17   handwriting at the bottom?

18      A.     Yes.  All of those scribbles are.

19      Q.     When was this page written?

20      A.     I don't know.  Again, it was in the

21   course of trying to figure out how much Al

22   thought we were off.

23      Q.     So this again would have been after the

24   December 18th meeting?

25      A.     Yes.
```

1    Q.    On the left-hand side, there's a list of
2    people that starts with me.  Does that mean you?
3    A.    Yes.
4    Q.    Rod is Rod Nelson?
5    A.    Yes.
6    Q.    Rick is --
7    A.    Rick Poberud.
8    Q.    Can you spell it for Stephanie?
9    A.    P-O-B-E-R-U-D.
10   Q.    Chuck is?
11   A.    Chuck Eldridge.
12   Q.    And then what's legal person?
13   A.    I don't know.
14   Q.    Did you write that?
15   A.    It's -- yes, I did.
16   Q.    Was this a meeting of some kind between
17   you four?
18   A.    I don't know.  It's -- I just don't know
19   for sure.
20   Q.    Can you tell me the meaning of any of
21   the other numbers on that left-hand side?
22   A.    The left-hand side?
23   Q.    Yes.  For example, 174 divided by
24   5,000?
25   A.    No.

1    Q.    The numbers on the far left, 717, 256,

2  973, any clue?

3    A.    No.

4    Q.    Then go over to the right-hand side.

5  There's a line that goes up to three fields, and

6  it says 256, and then what does it say below

7  that?

8    A.    Uninsurable for MP.

9    Q.    And is that information relevant to this

10  lawsuit?

11    A.    No.  Not to the lawsuit, no.

12    Q.    And then what's the one below that,

13  1-20 for Dan?

14    A.    That's -- we were going to have a

15  meeting with Dan Bird on 1-20.

16    Q.    Who is Dan?  On 1-20 or at 1:20?

17    A.    On 1-20.

18    Q.    You don't remember what date that was?

19    A.    What day of the week?

20    Q.    Or day of the month?

21    A.    January 20th.

22    Q.    Oh, I thought you meant 1:20 p.m., as

23  opposed to 1 slash --

24    A.    Oh, no.  January 20th.  Sorry.

25    Q.    All right.  The very last page, 0143, is

1    this part -- did these two get done together, do

2    you think, if you know?

3        A.    I don't know that they got completed

4    together.  They were connected.

5        Q.    The reason I say that is because on the

6    far left, it says dates.  So I'm presuming that

7    when you wrote this, you were still unsure about

8    the dates of loss or adjustment days or

9    something.

10       A.    I don't know.

·11       Q.    You don't know?

12       A.    No.

13       Q.    Right in the middle of the page, you've

14   written documentation for contacts, and then

15   you've underlined it twice.  Were you talking

16   there about trying to document the contacts that

17   were made by RCIS and the insured regarding this

18   claim?

19       A.    Yes.

20       Q.    Yes?

21       A.    Yes.

22       Q.    And then to the right of that, there are

23   some letters.  Do those have any meaning?

24       A.    No.  Absolutely none.

25             MR. PETERS:  I'm not going to

1  bother you guys.  I seem to be missing a

2  document.  Do you mind if we take ten minutes?

3                    MS. BUFKIN:  That's perfect.

4                    (A recess was taken.)

5  BY MR. PETERS:

6      Q.     Larry, I put in front of you Exhibit 3,

7  and let's start up at the very top.  There is a

8  column about five over that says contact details.

9  Do you see that column?

10     A.     Yes.

11     Q.     And then there's a little pop-up or tab

12  there that says view.  If we had this on my

13  computer screen right now and I clicked on view,

14  what would I see there?

15     A.     This is an agent -- this is something

16  the agents use, claim status inquiry.

17     Q.     Oh, so are you saying that this Exhibit

18  3 would have been prepared by Terry Nielsen?

19     A.     Yes.

20     Q.     Oh.

21     A.     Well, I guess anybody with access to

22  claim status inquiry could have provided it.  So

23  I can't say for sure where it came from, but this

24  is an agent tool.

25     Q.     This could have been done by somebody

1  within RCIS?

2      A.    Could have been.

3      Q.    My only other question, look at the

4  bottom of that first page, and you see that

5  fairly lengthy claim history.  That all seems to

6  relate only to the June corn claim.  Would this

7  document -- in other words, again, if we were to

8  go into the RCIS computer today, would we be able

9  to find that same claim history box for the

10  September 11th claim?

11      A.    I guess I'm not familiar enough with how

12  this works.  I'm not sure what -- I'm not sure

13  what was put in to get this information.  So I

14  can't tell you how to do it.

15                  MR. PETERS:  So let's just -- on

16  the record, you guys could look into that and see

17  if there's a way to expand this document to

18  include a complete claim history for the

19  September 11th claim as well.  And maybe --

20                  MS. BUFKIN:  Yeah.

21                  MR. PETERS:  Maybe there's some IT

22  person at RCIS.

23                  MS. BUFKIN:  I can check and see if

24  this is claim specific; and if it is, and we put

25  in the claim number for the other claim, we could

1    create one. I'll check.

2                    MR. PETERS: Perfect. That's all

3    the questions I have.

4                    MS. BUFKIN: Okay. I just have one

5    question, just to clarify.

6                    CROSS-EXAMINATION

7    BY MS. BUFKIN:

8        Q.    Mr. Burkhart, earlier today, you were

9    asked about a neighbor's claim, Leo Erlemeier.

10       A.    Leo. I remember Leo.

11       Q.    And I believe when you were answering

12   a question about some plots that were drawn,

13   you stated that a plot was identified for

14   Mr. Erlemeier's claim that was adjusted on

15   September 26th, 2012.

16       A.    Okay.

17       Q.    Do you know if that's the date that

18   claim was adjusted?

19       A.    I don't know if that's the exact date,

20   no.

21       Q.    That's all I have.

22       A.    That was off the plat map; right?

23       Q.    Yes.

24       A.    Yeah.

25                    MS. BUFKIN: That's it.

1          MR. PETERS:  That's all.

2          (An off-the-record discussion was

3  held.)

4          MS. BUFKIN:  We'll read and sign.

5          THE DEPOSITION OF LARRY BURKHART is

6  now complete.  When transcribed, the original of

7  the deposition shall be given to Mr. Scott H.

8  Peters.  The original exhibits shall be

9  distributed as follows:  Exhibits 1 through 25

10  will be enclosed in the original transcript.

11          (Deposition concluded at 1:18 p.m.)

12          (UNLESS OTHERWISE DIRECTED BY

13  COUNSEL OR THE PARTIES HERETO, THE STENOGRAPHIC

14  NOTES FOR THE FOREGOING DEPOSITION SHALL BE

15  DESTROYED AFTER A PERIOD OF 3 YEARS FROM THE DATE

16  OF TAKING OF SAID DEPOSITION.)

17

18

19

20

21

22

23

24

25

1               SIGNATURE PAGE

2          I, LARRY BURKHART, the witness in

3 the foregoing deposition, do hereby certify that

4 I have read the foregoing 116 pages of

5 typewritten material and that the same is, with

6 the corrections noted on the attached page, if

7 any, a true and correct transcription of my

8 deposition upon oral examination given at the

9 time and place herein stated.

10

11

12

13            LARRY BURKHART

14

15

16

17

18         Subscribed and sworn to before me

this _____ day of _____, 20_____.

19

20

21           Notary Public

22

23

24

25