IN THE UNITED STATE DISTRICT COURT
FOR THE NOTHERN DISTRICT OF IOWA
WESTERN DIVISION

| | |
|---|---|
| BRUHN FARMS JOINT VENTURE,<br><br>    Plaintiff,<br><br>-vs-<br><br>FIREMAN'S FUND INSURANCE<br>COMPANY,<br><br>  Defendant. | No. _____13-CV-4106CJW_____<br><br><br>**PLAINTIFF'S DESIGNATION OF<br>DEPOSITION TRANSCRIPT OF LARRY<br>BURKHART (Second Depo –Taken<br>January 12, 2017)** |

COMES NOW, the Plaintiff Bruhn Farms Joint Venture and hereby designates the deposition transcript of Larry Burkhart (Second Deposition) as shown on the attached bracketed/marked portions of the said Deposition Transcript of Larry Burkhart taken on January 12, 2017 in this matter.

For the Court, the outlined/bracketed portion is Plaintiff's designation and the Defendant's objections are noted by the following notations:

A = Argumentative

F = Foundation

H = Hearsay

R = Relevance

S = Speculation

1

BEATTIE LAW FIRM, P.C.


By___/s/ _Donald G. Beattie_____
    Donald G. Beattie (AT0000736)
    Nile Hicks (AT0009391)
    4300 Grand Ave.
    Des Moines IA  50312
    Phone:  (515) 263-1000
    FAX:    (515) 263-1411
    don.beattie@beattielawfirm.com
    nile.hicks@beattielawfirm.com


SPAULDING, BERG & SCHMIDT, P.L.C.


    Nicholas L. Shaull (AT0010096)
    2423 Ingersoll Ave.
    Des Moines IA  50312
    Phone:  (515 277-6559
    Fax:  (515) 277-7536
    Email:  nick.shaull@sbsattorneys.com
Attorneys for Plaintiff


CERTIFICATE OF SERVICE

The undersigned hereby certifies that on February 21, 2017, a true and correct copy of the foregoing was served via email upon the following counsel of record:

Jeff Dilley
Elizabeth Bufkin
Henke Bufkin
Post Office Box 39
Clarksdale, MS 38614
ATTORNEYS FOR DEFENDANT


___/s/ Kelly L. Brandt Beattie_____

2

IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF IOWA

WESTERN DIVISION

- - - - - - - - - - - - - X

BRUHN FARMS JOINT VENTURE, :

           Plaintiff,    :

vs.                                      Case No. C13-4106

 FIREMAN'S FUND INSURANCE  :

COMPANY,              :


      Defendant.    :

- - - - - - - - - - - - - X

     VIDEOTAPE DEPOSITION OF LARRY BURKHART,

taken by the Plaintiff before Melissa A. Burns,
Certified Shorthand Reporter of the State of Iowa, at
the Hilton Garden Inn, 205 South 64th Street, West
Des Moines, Iowa, commencing at 10:14 a.m., Thursday,
January 12, 2017.


MELISSA A. BURNS - CERTIFIED SHORTHAND REPORTER

A = Argumentative
F = Foundation
H = Hearsay
R = Relevance
S = Speculation

1

APPEARANCES:

For the Plaintiff:      DONALD G. BEATTIE, ESQ.
                        NILE HICKS, ESQ.
                        Beattie Law Firm, PC
                        4300 Grand Avenue
                        Des Moines IA 50312
                        -and-
                        NICHOLAS L. SHAULL, ESQ.
                        Berg, Rouse, Spaulding &
                          Schmidt, PLC
                        2423 Ingersoll Avenue
                        Des Moines IA 50312-5233


For the Defendant:   ELIZABETH T. BUFKIN, ESQ.
                        JEFFREY S. DILLEY, ESQ.
                        Henke-Bufkin
                        Post Office Box 39
                        Clarksdale, MS 38614

Videographer:        JECQUE STOTTS

Also Present:        AL BRUHN

                     CARTER TREWET

2

INDEX

WITNESS: LARRY BURKHART                                          PAGE

By Mr. Beattie............................................................................................  4

EXHIBITS:                          MARKED

Exhibit 127 - Declaration of Larry Burkhart,

        2-27-15............................................................................................  8

Exhibit 128 - 2012 Crop Hail Insurance Policy

        Declaration Page.............................................................................  8

Exhibit 129 - Letter, Burkhart to Bruhn Farms

        Joint Venture, 1-25-13....................................................................... 17

Exhibit 130 - Declaration of Larry Burkhart,

        11-30-16............................................................................................ 21

Exhibit 131 - Screen shots of Quest field notes................................................. 60

Exhibit 132 - (This exhibit number was not used)

Exhibit 133 - Copy of a partial page from the 2012 Crop-Hail Loss Adjustment

        Manual................................................................................... 42

3

```
 1      P R O C E E D I N G S

 2           LARRY BURKHART,

 3  called as a witness by the Plaintiff, being first duly

 4  sworn by the Certified Shorthand Reporter, was

 5  examined and testified as follows:

 6           EXAMINATION

 7  BY MR. BEATTIE:

 8      Q.  Good morning, sir.

 9      A.  Good morning.

10      Q.  Would you please state your full name, your

11  age, and your address.

12      A.  Larry Burkhart, 66.  My address is

13  1890 Stafford Road, Ottawa, Kansas.

14         MS. BUFKIN:  And Don, just before we --

15  just to get on the record before we get too far in,

16  this is a second deposition that's being taken

17  pursuant to the order of the Court dated December 14,

18  and it is to be related to the matters of our field

19  notes and the affidavit as per your request.

20         And we also have now today, I believe,

21  given you some screen shots which are -- they're the

22  same pages from a claim file that we've previously

23  provided with an embedded piece of material that

24  wasn't printable now screen shotted, and we've now

25  given you those, and I think they're marked FFIC 1314
```

Def
R,A
By Counsel

4

1 through 1424, and we understand you may ask questions

2 about those today as they do relate to the field

3 notes. Just so there's some clarity on the record

4 about the matters we'll be discussing.

5      MR. BEATTIE: Sounds good.

6      MS. BUFKIN: Okay.

*Def R, A By Counsel*

7 BY MR. BEATTIE:

8   Q. Mr. Burkhart, who is your employer?

9   A. Rural Community -- well -- Rural Community

10 Insurance Services. Actually, Zurich North America.

11      MR. BEATTIE: Are you picking him up okay?

12      THE VIDEOGRAPHER: Uh-huh.

13 BY MR. BEATTIE:

14   Q. As I understand it, RCIS -- that's what you

15 commonly go by?

16   A. Correct.

17   Q. -- was the insurance company that did all

18 the handling of crop-hail insurance for Zurich. May

19 have been Wells Fargo at the time?

20   A. At that time it was Wells Fargo.

21   Q. But you issued the policy, it's adjusted,

22 and paid the claim.

23   A. Yes.

24   Q. Pursuant to an agreement between

25 RCIS and -- well, what's Fireman's Fund

*Def. R*

5

1    A. I'm not sure I can explain that. At that

2 time RCIS was acting as an MGA for Fireman's Fund.

3        THE WITNESS: Is that right?

4    A. I think that's right. And so it was -- the

5 policies were issued on Fireman's Fund paper.

6 BY MR. BEATTIE:

7    Q. You were working for Fireman's Fund, in

8 other words, at the time of the Bruhn hail loss claim

9 in the fall of 2012.

10    A. Well, I was working for Rural Community

11 Insurance Services.

12    Q. Who was working for Fireman's Fund.

13    A. They were working with Fireman's Fund.

14    Q. What is your job title and position

15 currently?

16    A. National crop-hail/named peril field claims

17 manager.

18    Q. You were that in 2012?

19    A. Yes.

20    Q. Would you tell the jury what that is. That

21 title.

22    A. I work with the local, regional, and -- at

23 that time it was the local and regional supervisors.

24 I worked strictly with hail, and they were working

25 with NPCI and hail.

6

1    Q.  And you were the national claims manager?

2    A.  Field claims.

3    Q.  Tell me what you mean by "field claims."

4    A.  Well, we have a -- our claims department --

5  our entire claims department has a claims manager.

6  And that person is manager of the entire department,

7  which is NPCI, hail.  And then we have various field

8  claims managers.

9    Q.  To whom did you report in 2012?

10   A.  Chuck Eldridge.  He's the claims manager.

11   Q.  Do you report to him today?

12   A.  No.

13   Q.  And MCPI (sic) is the multiperil?

14   A.  Yes.  NPCI.

15   Q.  As I understand it, the policy of insurance

16  Fireman's Fund issued to Bruhn Farms was for hail

17  only?

18   A.  Correct.

19   Q.  And the insurance, I believe, contained

20  certain provisions that would be necessary for you to

21  know to investigate the claim and take a look at the

22  field notes and the like.

23      Am I not correct?

24   A.  I'm not sure I understand what you mean.

25   Q.  Okay.  You gave a previous affidavit in

7

1  this case, I believe.

2     A.  Yes.

3     Q.  And in that previous affidavit -- I'm going

4  to mark it as 127.

5        (Deposition Exhibit 127 was marked for

6  identification.)

7  BY MR. BEATTIE:

8     Q.  Here's a copy of it.

9        MR. BEATTIE:  Do you need a copy, Ms. --

10       MS. BUFKIN:  Yeah, if you've got an extra.

11       MR. BEATTIE:  Here you go.

12       MS. BUFKIN:  Thank you.

13  BY MR. BEATTIE:

14    Q.  Okay.  You made reference in your affidavit

15  to the insurance policy, I believe.  And I just want

16  to go through that for a minute, because I think it's

17  the background -- the insurance policy sets forth how

18  you adjust claims, does it not?

19    A.  Yes.

20    Q.  I will mark as Exhibit 128 the insurance

21  policy --

22       (Deposition Exhibit 128 was marked for

23  identification.)

24    Q.  -- that was attached to your first

25  deposition.

8

1    MR. BEATTIE: I don't have an extra copy of

2  it.

3    MS. BUFKIN: That's okay.

4  BY MR. BEATTIE:

5    Q.  Would you confirm that to be true,

6  Mr. Burkhart?

7    A.  As far as I can tell, yes.

8    Q.  All right.  The first couple of pages, I

9  presume, are what the premium is for each line or

10  field of crops that Bruhn Farms insured with Fireman's

11  Fund; is that correct?

12    A.  Yes.

13    Q.  And it shows the amount of acres and

14  likewise it would show the premium for each field; is

15  that correct?

16    A.  For each line item, yes.

17    Q.  As we go through the field notes and the

18  Proof of Loss for the September 12 hail, would I be

19  correct in presuming that they correspond to the line

20  numbers that is in Exhibit 128?

21    A.  I'd have to look to be sure.  I think they

22  should, but I couldn't guarantee that they do.

23    Q.  Now, once you get past the dec page showing

24  the lines and the provisions is the general provision

25  of the policy itself; is that correct?  And I think

9

1   there's a handwritten number page 14 on there?

2       A.  Yes.

3       Q.  Now, if you go to Number 3, "Duties After

4   Loss," paragraph (c), "Adjustment Procedures" -- do

5   you have that in front of you?

6       A.  Yes.

7       Q.  And I will read it:  "Both you and we agree

8   that the percentage of loss will be determined using

9   the crop-hail adjustment procedures published by the

10  National Crop Insurance Services, or in the absence of

11  other -- or in the absence of such procedures, other

12  procedures as determined by us, for the particular

13  crop insured in the applicable year."

14          Did I read that correctly?

15      A.  Yes.

16      Q.  Now, does that mean that there was a

17  contractual agreement between you -- or Fireman's Fund

18  and Mr. Bruhn of Bruhn Farms that Exhibit 37 is what

19  has to be used to determine crop-hail loss adjustment?

20          MS. BUFKIN:  I'm going to object to the

21  form.  I don't think Mr. Burkhart has any contractual

22  relationship.

23  BY MR. BEATTIE:

24      Q.  Let me rephrase it.  The crop-hail loss

25  adjustment procedures that's listed in paragraph 3 of

10

1  the policy, is that referring to Exhibit 37, the

2  soybean loss instruction, at least for soybean fields?

3    A. Yes.

4    Q. And I assume, but I'm asking you, that

5  means "will be determined using." In other words, to

6  me that means it's mandatory that both sides agree and

7  utilize for adjustment what's listed in the loss

8  soybean adjustment which is Exhibit 37.

9    A. Yes. These procedures are used to

10  determine the loss.

11    Q. Could you hold that up?

12    A. (The witness complied.)

13    Q. That would be mandatory, would it not?

14    A. Yes. These are the procedures that are

15  used.

16    Q. Exhibit 37 would be considered the bible in

17  the industry?

18    A. Probably --

19      MS. BUFKIN: Object to the form.

20      But you can answer it if you can.

21    A. I guess that's what it's referred to by

22  some, yeah.

23  BY MR. BEATTIE:

24    Q. Now, the next provision in the policy that

25  I want to go through, which is listed in Exhibit 28

Def
— A,S

1  (sic), is "Loss Payment," paragraph 4.

2       Do you see that?

3    A.  Yes.

4    Q.  It says "The amount payable per acre will

5  be the limit of insurance applying on the date of loss

6  multiplied by the percentage of loss not to exceed the

7  actual cash value of the portion of the crop destroyed

8  by perils insured against."

9       Correct?

10   A.  Yes.

11   Q.  And that's the only way that you pay -- you

12  have to pay pursuant to paragraph 4 and according to

13  its terms.

14   A.  That's how we calculate the payable loss,

15  yes.

16   Q.  Now, as I understand, what you do then is

17  you send your adjusters out to the field to do

18  adjustments according to the soybean manual, which is

19  Exhibit 37, which is referred to in your insurance

20  policy; correct?

21   A.  Yes.

22   Q.  And then you take what they find, according

23  to their counts following the manual, and you have

24  some computer program that calculates a percentage of

25  the loss.

1    A.  Right.

2    Q.  Just cut and dried.

3    A.  Well, I don't know what you mean "cut and

4  dried."

5    Q.  I mean it's just that simple.  You go out

6  and do your adjustment pursuant to the manual, you

7  enter your findings into your Quest program, and you

8  come up with numbers.

9    A.  Yes.

10    Q.  Other factors that might affect on the

11  crop, or anything else, isn't really considered, is

12  it?  Because all you're doing is counting hail loss.

13    A.  Correct.  We're counting the hail damage.

14    Q.  Drought, other things like that, isn't

15  considered, is it?  Because your manual takes into

16  account how you determine whether there's a hail loss

17  and how you account for it.

18        MS. BUFKIN:  Object to the form.

19        But you can answer if you can.

20    A.  I'm not sure I can.

21  BY MR. BEATTIE:

22    Q.  What didn't you understand about it?

23    A.  Well, I -- I guess restate it.

24        MR. BEATTIE:  I'll have her read it back.

25        (The requested portion of the record was

Compound

13

1  read.)

2      A.  Yes.  Hail is the only peril, and the

3  procedures -- using the procedures determines the

4  amount of hail damage, yes.

5      Q.  And you just kind of put your blinders on

6  because the manual tells you how you do the

7  adjustment.  And once you come up with an adjustment,

8  whether it's right or wrong, you plug it into the

9  computer and that gives you a percent of plant damage

10  for hail and you pay that against the $500 for Al

11  Bruhn.

12      A.  The adjuster makes their determination of

13  what the damage is, and then they key that into Quest.      ——— Compound

14      Q.  Yeah.  And they're not looking to see if

15  it's reduced by drought or if it's reduced by insects

16  or whatever, they're looking at the hail damage.

17  They're out there to count the hail damage.

18      A.  Yes.

19      Q.  So if somebody would say that Mr. Bruhn had

20  10 acres (sic) of soybean loss per acre, it doesn't

21  matter because you're looking at what the hail damage

22  is under procedures defined in the insurance policy,

23  and that is following Exhibit 37, isn't that correct?

24      MS. BUFKIN:  Object to the form.

25      A.  I didn't understand.

1  BY MR. BEATTIE:

2    Q.  You didn't understand that?

3    A.  No.

4    Q.  Well, according to --

5    A.  I don't understand what you're asking.

6    Q.  Under the policy you just follow

7  Exhibit 37, the Soybean Loss Instruction Manual.

8    A.  Those are the procedures, yes.

9    Q.  And those procedures ignore drought and

10  other things, don't they?

11    A.  The procedures only address hail.

12    Q.  But they ignore whether there's drought or

13  not, don't they?

14    A.  Well, again, they only address hail.

15  That's what we're adjusting.

16    Q.  Okay.  If somebody said that Mr. Bruhn had

17  suffered an average of 10 bushel loss per acre on his

18  farm in crop year 2012, it doesn't have an effect on

19  how you adjust your loss, your loss is adjusted on

20  hail and you come up with hail adjustment loss, isn't

21  that correct?

22    A.  Well, I don't understand the "10 bushel."

23  I don't know what you mean.  When we adjust the loss,

24  we adjust the hail damage, yes.

25    Q.  What I'm saying is this, Mr. Burkhart.  You

1  had written a letter to Mr. Bruhn and said, "We're not

2  paying because your loss is attributable to drought."

3      A.   Okay.

4      Q.   That doesn't comply with the procedures

5  that you follow in Exhibit 37, does it?

6          MS. BUFKIN:  Object to the form.

7          THE WITNESS:  Can you read that back?

8          (The requested portion of the record was

9  read.)

10         THE WITNESS:  I'm sorry, back up farther.

11  Referring to the letter that I wrote.

12         MS. BUFKIN:  Do we have that as an exhibit?

13         MR. BEATTIE:  That's a good question.

14         MS. BUFKIN:  And I'd also note we may be

15  getting a little bit off our field note --

16         MR. BEATTIE:  Well, I don't think so,

17  because I'm trying to --

18         MS. BUFKIN:  Well, I don't know that the

19  field notes address drought in any form.  Or assess

20  anything about drought.

21         MR. SHAULL:  That's a good point.  A

22  wonderful point.

23         MS. BUFKIN:  And that's the sole matter

24  we're talking about are the field notes.

25

                          16

1        (Deposition Exhibit 129 was marked for

2    identification.)

3    BY MR. BEATTIE:

4        Q.  There is Exhibit 129.

5            Did you write that letter?

6        A.  Yes.

7        Q.  And I think you indicated -- you did an

8    investigation in this case, didn't you.  Into

9    Mr. Bruhn's claim.

10       A.  Yes -- excuse me.  Yes.

11       Q.  And you determined that the adjusters had

12   done everything properly.

13       A.  Correct.

14       Q.  And so you were denying his claim for

15   additional damages.

16       A.  Yes.

17       Q.  Was drought considered by you in your

18   denial of Mr. Bruhn's claim of additional damages?

19           MS. BUFKIN:  Okay.  I'm going to have to

20   object on this line of questioning because the issue

21   of drought is not in any way contemplated by the

22   additional documents Galen produced or the documents

23   we produced as the screen shots and nor is it included

24   in the affidavit.

25           MR. BEATTIE:  I think it's inherent in his

17

1  affidavit --

2      MS. BUFKIN:  We're just going to object and

3  instruct him not to answer.  Because we're not going

4  to rehash this entire claim.  Everything could be

5  connected back to the policy.  And the judge said the

6  field notes that Galen produced.

7      MR. BEATTIE:  As well as the affidavit.

8      MS. BUFKIN:  To the extent it pertains to

9  the field notes.  We're not going to do a second

10  deposition.  And drought and this letter were fully

11  available during the first deposition as issues to

12  discuss and we're not going to do that.  That's a

13  second deposition.

14      MR. BEATTIE:  Are you directing him not to

15  answer?

16      MS. BUFKIN:  I'm directing him not to

17  answer because it is not consistent with the Court's

18  order.

19      MR. BEATTIE:  Well, I think it very much

20  is.

21  BY MR. BEATTIE:

22      Q.  You investigated this claim fully and

23  completely; is that correct?

24      A.  I went through the claim file.

25      Q.  Well, did you do a complete investigation,

18

1   Mr. Burkhart?

2       A.  I don't know what "a complete

3   investigation" would entail.

4       Q.  Well, I'll get into that.  That's a good

5   question.

6           Did you personally talk to Mr. Sornson?

7       A.  I don't remember if I did or not.

8       Q.  Did you personally --

9       A.  Before that time.

10      Q.  Did you personally talk to any adjuster

11  that went into the field?

12      A.  I don't remember.  It was four years ago.

13      Q.  Did you look to see whether those

14  adjusters, in their field notes or otherwise, took

15  drought into consideration in adjusting the claim?

16      A.  Again, we were adjusting the hail damage.

17      Q.  So the answer to my question is what,

18  Mr. Burkhart?  Did the adjusters take into account

19  drought or not?

20          MS. BUFKIN:  I'm going to object and I'm

21  going to instruct him not to answer.  We'll talk about

22  the field notes and all these (indicating) documents,

23  that's the issue here.

24  BY MR. BEATTIE:

25      Q.  You have a manual --

Def.
R,A
by Counsel

1       MR. BEATTIE:  Are you telling him not to

2   answer that question?

3       MS. BUFKIN:  Well, unless you're asking

4   about the field notes -- reread the question.

5   BY MR. BEATTIE:

6       Q.  Did the field notes, which were ultimately

7   entered into Quest, in any fashion indicate drought in

8   your investigation?

9       A.  The field notes are designed to collect

10  hail damage information.

11      MS. BUFKIN:  And can we get on the

12  record what field notes we're talking about?  Do we

13  have those as an exhibit, Don?

14      MR. BEATTIE:  Well, as far as I know,

15  there's only one field notes.  They're Exhibit 59.

16      MS. BUFKIN:  Okay.  Let's just reference

17  we're talking about the notes produced by Galen

18  Sornson.

19      MR. BEATTIE:  I'm talking about the field

20  notes as well as the Quest program.  You get into the

21  Quest program too.  So...

22  BY MR. BEATTIE:

23      Q.  Did you -- first off, Mr. Burkhart, when

24  you did your investigation and -- let's see here.

25  I'll mark as Exhibit 130 your affidavit.

*Def R,A By Counsel*

*Def F,R*

20

1     (Deposition Exhibit 130 was marked for

2  identification.)

3     Q. Do you remember giving that affidavit?

4     A. Yes.

*Def F,R*

5        MS. BUFKIN: I thought we marked this as

6  127.

7        Did we mark this wrong, Jeff?

8        MR. DILLEY: Is that a different affidavit?

9        MR. BEATTIE: It's a different affidavit.

10       MS. BUFKIN: Oh. Okay.

11       Do you have an additional copy of that,

12  Don?

13       MR. BEATTIE: I don't.

14       MS. BUFKIN: Okay. Do you mind if I look

15  at it?

16  BY MR. BEATTIE:

*Def F,R*

17       Q. I want to ask some preparatory questions,

18  Mr. Burkhart.

19       You wrote an affidavit when we filed a

20  motion on spoliation for lack of production of the

21  field notes.

22       Do you remember doing that over the last

23  few months?

24       A. Yes.

25       MS. BUFKIN: Wait. I'm a little bit

21

1 confused. We think this is 127? This is the same

2 affidavit.

3      MR. BEATTIE: Let me see that. Go to the

4 last page.

5      MS. BUFKIN: I mean didn't we just mark it

6 in this deposition?

7      MR. DILLEY: I thought we did.

8      MR. BEATTIE: I guess you're right. Okay.

9 I'll withdraw 130 right now.

10      MS. BUFKIN: Okay. We just --

11      MR. BEATTIE: And make reference to 127.

12      MS. BUFKIN: Okay.

13      MR. BEATTIE: Let me see that. No, 127 is

14 his first affidavit. In 2015. That's what I thought.

15      Exhibit 30 -- or 130 is your 2016

16 affidavit.

*Def F,R*

17      MS. BUFKIN: Okay. So this is -- I'm still

18 confused, Don. The one I'm looking at here is this

19 (indicating).

20      Am I messed up, Jeff? I mean...

21      MR. DILLEY: I think when he gave us the

22 copy earlier of what was 127, you gave us a copy of

23 this exhibit (indicating).

24      MR. BEATTIE: I may have done that.

25      MR. DILLEY: Yeah. Let's see what the

22

1 actual exhibit is.

2      MS. BUFKIN: Okay. Because these match up

3 (indicating). So...

4      MR. DILLEY: 127 is the affidavit that was

5 filed with the Motion for Summary Judgment, I believe.

6      MR. BEATTIE: That's correct.

7      MS. BUFKIN: All right. Well, that is some

8 confusion, because what you handed me earlier that I

9 thought you were questioning him about was a different

10 affidavit.

Def
FR.

11      So just for the record so we're clear, 127

12 is an affidavit dated February 27, 2015, and is not

13 contemplated by the judge's order. What's marked as

14 Exhibit 130 and dated November 30, 2016, is what was

15 contemplated in my comments earlier about an

16 affidavit. Just so we know what we're talking about,

17 which affidavit is which. For the record.

18      MR. BEATTIE: And for the record, I would

19 say that the judge's order, as it is ordered, places

20 no limits on the deposition. I know what the judge

21 said, but what the judge wrote in his order is a

22 different -- is not contrary to what you're saying

23 too.

24      MS. BUFKIN: Well, I think what the judge

23

Def
F, R

1   parties understood, and that's the position we're

2   taking.

3          MR. BEATTIE: Let's go off the record for a

4   second.

5          THE VIDEOGRAPHER: Off the record at 1043.

6          (Recess taken.)

7          MS. BUFKIN: So he's looking at 130 now;

8   right?

9          THE VIDEOGRAPHER: On the record at 1043.

10         MR. BEATTIE: The order of the judge is

11   "Plaintiff is authorized, however, to take the

12   deposition of Larry Burkhart."

13         MS. BUFKIN: Okay. Well, we would

14   contemplate that with the discussions with the Court,

15   the additional deposition was to pertain to his

16   affidavit submitted in response to your motion and the

17   field notes recently produced. That was your request

18   in your pleading and that's what was discussed with

19   the Court.

20         MR. BEATTIE: Well, the Court's order is

21   what the Court's order is.

22         MS. BUFKIN: Well --

23         MR. BEATTIE: There are no limitations on

24   it.

25         MS. BUFKIN: Well, we're taking the

24

1  position it is and it's in line with what you asked

2  for and what was discussed with the Court.

3        MR. BEATTIE: Okay. And I reserve the

4  right for any question you tell him not to answer to

5  seek -- to renew his deposition and to seek sanctions.

6  I don't think any of my questions even violate what

7  restrictions you're trying to place upon them,

8  including the questions about drought. And I do want

9  to make that clear.

10        MS. BUFKIN: And I do think he's answered a

11  number of questions about drought as the same pertain

12  to the field notes and his affidavit.

13  BY MR. BEATTIE:

14      Q. Now, back to your last affidavit, the one

15  that you signed a couple of months ago, Exhibit 130,

16  Mr. Burkhart.

17          How did you come to sign that affidavit?

18      A. I guess I don't understand the question.

19      Q. What don't you understand about it?

20      A. What do you mean how did I come to sign it?

21      Q. I don't know how to make it any more

22  simple, sir. How did you come about to sign it? It

23  came to your -- something came to your attention that

24  you needed an affidavit.

25      A. Yes. And it was prepared and I signed it.

Def
F₁R

1    Q.  Did you prepare it?

2    A.  No.

3    Q.  Who prepared it?

4    A.  I don't know.

5    Q.  You don't know who prepared it?

6    A.  I did not write it.

7    Q.  Well, how do you know anything you said in

8  that affidavit is true and factual?

9    A.  Because I read it.  I didn't need to write

10  it to know that it was true.

11    Q.  Who did you instruct to write it?

12    A.  I don't know that I instructed anybody to

13  write it.

14    Q.  Well, it didn't come out of thin air, sir.

15  Somebody --

16    A.  I don't know who wrote it, I guess, is what

17  I'm saying.

18    Q.  If you didn't know who wrote it, then you

19  didn't know what it would contain, would you?  Before

20  you saw it.

21    A.  No, not before it was written.

22    Q.  Well --

23    A.  I wouldn't have.

24    Q.  -- besides you, who knew what was in your

25  mind in order to compile the affidavit?

26

1    A.  I discussed it with my attorneys.

2    Q.  Anybody else?

3    A.  No.

4    Q.  What records, if any, did you review before

5  signing the November 30, 2016, affidavit, Exhibit 130?

6    A.  Well, verified that he had a policy, which

7  was known.  The dates of the loss and the dates he

8  reported it.  Or the date that it was reported to us.

9    Q.  So you reviewed the policy.  What other

10  records did you review?

11    A.  Most of -- excuse me.  Most of this had

12  been reviewed prior to this affidavit.  Like the check

13  strips, the reference to Quest.

14    Q.  I want to know what you actually reviewed

15  at the time that you're signing this affidavit,

16  Exhibit 130.  Maybe not at the exact time but in that

17  time frame.  Besides the insurance policy.

18    A.  Other than the reference to the loss date

19  and the date reported, other than that I verified that

20  what was in here was accurate.

21    Q.  Sir, I'm asking how did you verify it?  And

22  the first question of verification --

23    A.  Which part, I guess?

24    Q.  I want to know -- I asked you the question

25  what records did you review preparatory to signing

1  this affidavit. You mentioned the insurance policy.

2  Anything else?

3      A.  I verified that the policy information was

4  correct. The policy number.

5      Q.  Okay.

6      A.  I didn't review the insurance policy before

7  I signed this.

Def F,R

8      Q.  So what other records besides the insurance

9  policy did you review?

10      A.  What I reviewed was to make sure that the

11  policy number information was correct.

12          MR. BEATTIE: Sir, move to strike.

13  BY MR. BEATTIE:

14      Q.  I'm asking document. Tell me the document

15  that you reviewed besides the insurance policy.

16          And I'll give you -- did you review claim

17  notes? Did you review adjuster statements? What else

18  did you review besides the insurance policy? And I'm

19  talking about you yourself.

20      A.  I -- I don't know of any other documents I

21  reviewed. Everything else in here references back to

22  what had been reviewed in the last three or four

23  years. So at the time this was written, I didn't

24  specifically review any documents.

25      Q.  When was the first time -- well, let me ask

Def F,R

28

1  you this: Have you ever laid eyes on the actual field

2  notes? It's Exhibit 59.

3        MS. BUFKIN: I don't think we have it here.

4        MR. BEATTIE: Pardon me?

5        MS. BUFKIN: He was -- you don't have it

6  here.

7  BY MR. BEATTIE:

8     Q.  Do you know what I mean by the "field

9  notes"? That's what your whole affidavit was about.

10    A.  Which field notes?

11    Q.  Which field notes, sir, do you think I'm

12  talking about?

13        MS. BUFKIN: Object to the form.

14    A.  Well, which field notes are you talking

15  about?

16  BY MR. BEATTIE:

17    Q.  We're here -- you know we're here on a

18  lawsuit that Al Bruhn has filed against Fireman's Fund

19  for improper adjustment, done in bad faith I might

20  add, on his soybean hail claim.

21        MS. BUFKIN: Object to the form.

22  BY MR. BEATTIE:

23    Q.  That occurred in the fall of 2012.

24        Those field notes that the adjusters

25  generated, have you ever reviewed those?

Def.
A,R

1    A.  Are you -- are you talking about the field

2  notes that Galen Sornson provided?  Is that the ones

3  you're talking about?

4    Q.  What do you call "field notes"?

5    A.  Well, that's part of the problem.  Within

6  Quest there's a section for field notes.  And it's

7  labeled "Field Notes."  And you have copies of those

8  so --

9    Q.  The handwritten field notes.

10    A.  Okay.  No, I did not know they existed.

11    Q.  Have you ever reviewed them?

12    A.  I have looked through them, yes.  I

13  reviewed them, yes.

14    Q.  When did you do that the first time?

15    A.  It was after Galen provided them, but I

16  don't know when.  I mean I don't remember exactly when

17  that was.

18    Q.  Well, let's put it in this time frame.  Did

19  you review them before November of 2016?  Exhibit 59.

20    A.  Galen's field notes?

21    Q.  Yes, sir.  Not Galen's, the adjusters'

22  handwritten field notes.

23    A.  Okay.  The ones Galen provided.

24    Q.  Yes, sir.

25    A.  Okay.  Did I review them when?

30

1    Q.  Prior to November of 2016, four years after

2  the fact.

3    A.  No.  I don't remember exactly when I was

4  made aware of them, so -- but it was after November, I

5  think.

6    Q.  Well, sir, I can tell you that we never saw

7  them until about two months ago.  It was right

8  around the -- sometime between the 1st and 15th of

9  November of 2016.

10    A.  And that's -- that would have been the same

11  time period I found out about them too.

12    Q.  Did you get them from Mr. Sornson?

13    A.  No.

14    Q.  You've known Mr. Sornson for quite a while,

15  I presume.

16    A.  I don't know him personally.  I mean --

17    Q.  You never --

18    A.  We're not friends.  I know who he is.

19    Q.  Did you ever meet him?

20    A.  Yes.

21    Q.  Okay.  Then, Mr. Burkhart, going to your

22  affidavit, Exhibit 130, you state that "The process of

23  adjusting a crop-hail claim entails conducting a

24  field-by-field inspection of the crop at issue to

25  determine if there's any damage and, if so, assess the

*Def.*
*A, No Question*

31

1  percentage of loss."

2       Correct?

3     A.  Yes.

*Def*
*F, R*

4     Q.  And I presume if you sign an affidavit that

5  that is true, then that's what the adjusters are

6  supposed to do, go field by field.

7     A.  Well, they wouldn't typically.  They

8  wouldn't necessarily check every field on a policy.

9  We usually -- the adjuster will -- if the

10  policyholder, or someone, isn't with them, they get

11  the information on which fields were hit, which ones

12  do we need to look at, and they go check those fields.

13     Q.  This would be a true statement:  The

14  adjusters are required to adjust every field that's

15  reported as being a hail loss field.

16     A.  If it's indicated to them that they have --

17  or they think they have -- the policyholder I mean.

18  If they think they have damage on a given field, they

19  go adjust that field, yes.

20     Q.  Exhibit 39 is the September hail loss

*Def – A, Compound*

*Def – F, R*

21  sustained by Mr. Bruhn of Bruhn Farms.  There are some

22  55 lines of loss reported on there.

23       Now, by looking at that, is there a

24  representation that the adjusters went to every field

25  to look at a loss?

32

1        MS. BUFKIN: Object to the form.

2        A. No.

*Def.*
*A, Compound*

3    BY MR. BEATTIE:

4        Q. There are 55 lines listed, are there not?

5        A. Yes.

6        Q. And we're not to take it that they were

7    to -- they adjusted every field?

8        A. No.

9        Q. Tell me why.

10       A. Well, like I said, if -- if the

11   policyholder doesn't think there was any damage in a

12   field, we don't go look at it. If they think there

13   was any field they feel they had damage in, we look

14   at. And we adjust it.

15       Q. Here's what confuses me, Mr. Burkhart.

16   Explain it to me. If there's 55 lines listed,

17   wouldn't you presume that Bruhn Farms reported hail

18   loss in 55 different farm tracts represented by the 55

19   lines?

20       A. No.

21       Q. You wouldn't.

22       A. There's no reason to think every line was

23   hit, no.

24       Q. Why is there no reason?

25       A. Because hail -- we don't know where the

33

1  locations were.  Even on a four-line policy, that

2  doesn't mean all lines were hit.

3      Q.  If the insured reports four lines, are you

4  required to inspect the fields in the four lines?

5      A.  Well, when they report a claim, they report

6  it on the entire policy.  They don't just report a

7  claim on specific lines.  So when they turn in a

8  notice, it's for the entire policy.  But that doesn't

9  indicate that they feel that all the lines were hit.

10     Q.  Who is "they"?

11     A.  The policyholder.

12     Q.  The policyholder.  So how do we know by

13  looking at Exhibit 39 what the policyholder reported

14  as actual losses or not in what fields?

15     A.  Well, as I understand it, Mr. Bruhn left

16  samples in all of the fields that he felt he had hail

17  damage.

18     Q.  Who told you that?

19     A.  I don't know exactly who told me.

20     Q.  Did you --

21     A.  But there were samples left, and his

22  representative took our adjusters, I'm assuming, to

23  all of those fields.  Or at least gave them directions

24  to where the fields were that had the samples.

25     Q.  When you were reviewing the file, did you

34

1  ask for the Sornson handwritten field notes?

2      A.  I didn't know they existed.  It's not

3  typical for the adjuster to keep those paper notes.

4  So I had -- I had no reason to think Galen had any

5  paper notes.

6      MS. BUFKIN:  Hey.  Can we take just a short

7  break?  It's 11.  I need to do about two minutes, step

8  out.  Can we take a quick -- maybe a five-minute break

9  right here?

10     MR. BEATTIE:  Yep.

11     THE VIDEOGRAPHER:  Off the record at 1102.

12     (Recess taken.)

13     THE VIDEOGRAPHER:  You can go ahead.

14  BY MR. BEATTIE:

15     Q.  Mr. Burkhart, go to paragraph 6 of your

16  2016 affidavit.  Which is Exhibit 130.

17         Did you make this statement:  "Other

18  adjusters make notes while in the field and then

19  record the information into Quest at a later date.  It

20  is my understanding that Mr. Sornson and his team did

21  the latter."

22     A.  Yes.

23     Q.  You signed that under oath.

24     A.  Yes.

25     Q.  So you knew as national claims manager that

Def.
F,R

35

1  some adjusters might record directly into the computer

2  and others take notes.

3      A.  Some adjusters generally, yes.

4      Q.  Well, what I said is true.  You knew that

5  some adjusters record directly into the computers

6  while others make field notes.

7      A.  Yes.

8      Q.  And we're not talking about one adjuster in

9  this case.  We're talking about six adjusters went

10  into the fields, didn't they?

11      A.  Yes, but that statement doesn't refer to

12  the adjusters -- only the adjusters who worked this

13  claim.  That's adjusters across the nation.

14      Q.  And if you had six different adjusters

15  entering into Quest, that could create some confusion,

16  couldn't it?  At the same time.  Instead of making

17  handwritten notes.

18      MS. BUFKIN:  Object to the form.

19      A.  I'm not sure I understand what you mean.

20  BY MR. BEATTIE:

21      Q.  Well, let me ask you this:  When you were

22  investigating this claim, did you ask any of those six

23  adjusters, "Were there any handwritten notes that I

24  have to review"?

25      A.  No.  I didn't anticipate there would be

36

1   any.

2       Q.  Well, you were wrong, weren't you?

3       A.  Yes.  I didn't know Galen Sornson had

4   paper.

5       Q.  But had you asked, you would have learned.

6       A.  I guess, but it's a question I would --

7       Q.  What's funny about that?

8       A.  It's a question I would never ask because

9   we typically do not have any paper retained.

10      Q.  Mr. Sornson did a -- or Mr. Larry Grieme

11  did a high-dollar review, didn't he.

12      A.  Yes.

13      Q.  You -- I presume you've done that.  And

14  from the high-dollar review, it said that -- I'll give

15  you -- it's on my iPad, Exhibit 46.

16          Mr. Grieme reported doing the high-dollar

17  review and that there were adequate strips for all the

18  fields except for one.  Exhibit 72 -- or not

19  Exhibit 72.  It was --

20          MS. BUFKIN:  Can I see whatever you're

21  looking at?

22          THE WITNESS:  (The witness complied.)

23  BY MR. BEATTIE:

24      Q.  Yeah, a 77-acre field.

25      A.  Okay.  Here it is.

37

1    Q.  Do you have that in front of you?  And

2  that's what Mr. Grieme certified, wasn't it?

3    A.  Okay.  I had to find what you were

4  referring to.

5    Q.  What I said was the truth, wasn't it?

6    A.  He references a 77-acre field where --

7  "where no samples were left.  No loss for this one."

8  Yes.

9    Q.  He said "There were 6,500 acres of shatter

10  to count.  Finished on October 23" -- which we now

11  know is not accurate.  "There are very good samples

12  left to look at in all of these fields except one

13  77-acre field where no samples were left."

14      Correct?

15      MS. BUFKIN:  Object to the form.

16    A.  "No samples were left" and "No loss for

17  this one."

18  BY MR. BEATTIE:

19    Q.  On one field.

20    A.  I don't know what field that is.

21    Q.  But he said it was just one field, didn't

22  he.

23    A.  He was referring to one field there, yes.

24    Q.  Did you go back and look at your field

25  notes to see whether the adjusters went to all of the

Def.
A, Compound

38

1  fields that were reported by Bruhn Farms?

2      A.  I had no way of knowing what fields he sent

3  them to or -- they looked at all of the fields that

4  had samples.

5      Q.  He said 6,500 acres.  Did you look to see

6  whether your adjusters adjusted 6,500 acres of

7  soybeans?

8      A.  I didn't add up all of the survey sheets

9  and the acreages to see if it was 6,500, no.

10     Q.  Do those field notes support adjusting

11 6,500 acres?  The field notes being Exhibit 59.

12     A.  They account for, I think, most of the line

13 items in Quest.

14     Q.  Would it surprise you that there were no

15 field notes for lines 26, 27, 33, 35, 36, 45 through

16 53, and line 55 from the field notes?  And also no

17 field notes for 25, 29, 30, 40, and 42?

18     A.  No.

19     Q.  Did you -- did you ever take the field

20 notes, Exhibit 59, and compare them to what was

21 presented to Mr. Bruhn as a proper adjustment, which

22 was Exhibit 39, the field notes (sic)?

23        MS. BUFKIN:  Object --

24     A.  I didn't know there were any --

25        MS. BUFKIN:  Object.

Def.
F, A

39

1    A. -- field notes.

2  BY MR. BEATTIE:

3    Q.  Because you didn't ask.

4    A.  No, I did not ask.

5    Q.  And you were requested by Mr. Eldridge to

6  personally take over reviewing the file of Bruhn and

7  conducting your own investigation?

8        MS. BUFKIN:  Object to the form.

9    A.  I was asked by Mr. Eldridge to meet with

10  Mr. Bruhn.

11  BY MR. BEATTIE:

12    Q.  Well, who was in charge of the

13  investigation?

14    A.  I was.

15    Q.  All right.  You didn't ask for the field

16  notes.

17    A.  Because I had no reason to think they

18  existed.

19    Q.  Whatever the reason is, you didn't ask for

20  field notes.

21    A.  No.  I did not.

22    Q.  You didn't talk to the lead adjuster.

23  Mr. Sornson.

24    A.  I don't remember if I did or when I did.  I

25  don't -- I just don't remember.

*Def.*
*Asked & Answered*

1    Q.  If I represent to you there's nothing
2  recorded in any of the documents provided to us that
3  you had a personal conversation with any of the
4  adjusters, would you take exception to that?
5      MS. BUFKIN:  Object to the form.
6    A.  I can't dispute it because I don't -- I
7  don't know what's in there.  Or what may not be in
8  there.

Def F, A

9  BY MR. BEATTIE:
10    Q.  You never asked them whether -- if you
11  never talked to any of them, the adjusters, at any
12  time, then you don't know what conversations, if any,
13  the adjusters had with Mr. Bruhn other than what they
14  may have put in statements to you; correct?
15      MS. BUFKIN:  Okay, I'm going to object
16  again, because we're losing our focus here on the
17  field notes.
18      MR. BEATTIE:  I'm not losing my focus.
19      MS. BUFKIN:  Well, I think we are.  If we
20  can tie this into information or inquiries about field
21  notes.  But his broader interaction with the claim is
22  not something we're going to get into unless it's
23  connected to the field notes.
24      MR. BEATTIE:  And the affidavit.
25      MS. BUFKIN:  And the affidavit, yes.

Def R, A by Counsel

41

1  BY MR. BEATTIE:

2      Q.  And I think you said your affidavit that

3  you signed in 2016 was based on your entire history

4  with this file?

5      A.  The facts of the affidavit, yes.

6      Q.  You're familiar with Exhibit No. 40?  Which

7  is the Crop-Hail Loss Adjustment Manual?

8      A.  Yes.

9      Q.  Are your adjusters required to follow it

10  without fail?

11      MS. BUFKIN:  I'm going to object to the

12  form unless you can pertain this to the field notes.

13      MR. BEATTIE:  Oh, I will.  For sure.

14  BY MR. BEATTIE:

15      Q.  Go ahead and answer it.

16      A.  Are they required to -- basically, yes,

17  that's what it's for.

18      (Deposition Exhibit 133 was marked for

19  identification.)

20      Q.  I copied out of Exhibit No. 40 a portion of

21  page 748.  And it's Exhibit 133.  It says "Anytime you

22  step into a field, you must indicate percentage

23  determined.  If zero, put zero on the survey sheet and

24  enter notes as to how this decision is made."

25      Is that correct?  You can check this, if

1  you like, against Exhibit 40.

2      A.  No, I know basically what it says.

3      Q.  Is that a true statement?

4      A.  Yes.

5      Q.  Did you check your field notes to determine

6  the reason that the adjusters entered zero on the

7  lines that are listed in the Proof of Loss,

8  Exhibit 39?

9      A.  If they didn't take a count there, there

10  wouldn't have been any recording anywhere.

11      Q.  I'm asking you did you check the field

12  notes to see why the adjusters entered zero on the

13  lines listed in the Proof of Loss, Exhibit 39?

14          MS. BUFKIN:  Object to the form, and when

15  you say "field notes," are you referring to

16  Exhibit 59?

17          MR. BEATTIE:  59.

18  BY MR. BEATTIE:

19      Q.  Yes, sir.  Written field notes.  Field

20  notes -- I only know of one set of field notes.

21      A.  So "field notes" to you is Galen Sornson's

22  field notes.

23      Q.  The written field notes --

24      A.  Correct.

25      Q.  -- yes, sir.

43

1    A.  Okay.

2    Q.  If we can have that terminology --

3    A.  Okay.  All right.

4    Q.  If I'm talking about the computer-generated

5  stuff, I'll talk about Quest.

6    A.  Okay.  Because within Quest there's a

7  section of "Field Notes" so --

8    Q.  I understand that.

9    A.  Okay.  So you're talking about the paper

10  notes.

11    Q.  Your adjusters can either use written field

12  notes or they can enter it into Quest.  It's their

13  choice.

14      Isn't that correct?

15    A.  They can record what they find in the field

16  any way they want to.

17    Q.  Okay.

18    A.  And then they put that into Quest.

19    Q.  That's their discretion.

20    A.  Yes.

21    Q.  So did you look in the field notes, the

22  Sornson field notes, to see why zero was entered on

23  all those lines?

24    A.  No.

25    Q.  Are there any field notes to explain why

44

1  zeros were entered?

2      A.  Whatever Galen provided.  As far as I know,

3  no, there wouldn't be.

4      Q.  Have you done anything to --

5      A.  Actually, just to clarify, no one entered

6  zero.  They're automatically zero.  So if an adjuster

7  does nothing, it will show zero.

8      Q.  What did you do in reviewing the field

9  notes, and including in your investigation, to find

10  out whether your adjusters actually conducted an

11  adjustment in the fields Mr. Bruhn reported?

12      A.  I didn't have the field notes until just

13  recently.

14      Q.  We know.  Because you didn't ask for them.

15      A.  Right.

16      Q.  Have you since done your investigation into

17  finding out why -- whether your adjusters did or did

18  not inspect all the fields that Mr. Bruhn had

19  requested?

20      MS. BUFKIN:  Object to the form.

21      A.  Well, like I said, the -- the field notes

22  aren't required.  So there could be field notes for

23  every field, there may be field notes for part of the

24  fields.  It's just whatever Galen kept in this case.

25      MR. BEATTIE:  Move to strike, sir.  I don't

Def.
A, Asked &
Answered

45

1   believe that was responsive.

2        I'll ask the question to be reread again.

3        (The requested portion of the record was

4   read.)

5        MS. BUFKIN: I'll renew my objection.

6        A.  The only thing I have to go by as to what

7   fields they inspected are the lines in Quest.  I

8   should say those are the only fields that I know they

9   inspected and took counts in.  Are the lines that are

10  in Quest.

11  BY MR. BEATTIE:

12       Q.  Did you do your investigation to find out

13  whether what was listed was the only fields that

14  Mr. Bruhn requested to be adjusted?

15       A.  Those were the only fields with samples,

16  so --

17       Q.  How --

18       A.  And those were the only fields that his

19  representative took our adjusters to.  So I guess I

20  don't know what I could investigate to see whether he

21  had more fields.

22       Q.  Where did you get that information?

23       A.  Which?

24       Q.  That your adjusters went to all the fields

25  that Mr. Bruhn wanted.  And adjusted --

46

1    A.  Well, it's my understanding that --

2    Q.  From where?

3    A.  I'm not sure where it came from.

4    Q.  How is that compatible with Exhibit 46, the

5  high-dollar review, that Mr. Grieme certified that

6  there were test strips left in all the fields?

7    A.  There were test strips left in all the

8  fields that they looked at.

9    Q.  It doesn't say that, does it?

10    A.  Well --

11    Q.  Does it?

12    A.  I'm not sure.

13    Q.  Read exactly what Mr. Grieme said about

14  test strips.

15    A.  "There were good -- there were very good

16  samples left to look at in all of these fields."  The

17  6,500 acres worth.

18    Q.  And then go on.

19    A.  "Except one 77-acre field where no samples

20  were left.  No loss for this one."

21    Q.  So you would have to agree they went to

22  6,500 acres then; right?

23    A.  That's what Larry put down.  I'm not sure

24  how many acres they went to.

25    Q.  Well, that's my point.  Did you look at

47

1   your field notes to compare whether he was being

2   truthful in his affidavit -- or his statement in the

3   hail review to find out whether your adjusters did go

4   to 6,500 acres?

5       A.  Well, I'm sure he was truthful to his --

6   whether that was an estimate of the acres or not, I

7   don't know.  I'm sure in his mind he thought they

8   looked at 6,500 acres.

9       Q.  Pull the first exhibit I handed you this

10  morning.

11      A.  Which one was it?

12      Q.  Yeah, that one there (indicating).

13  Exhibit 128.

14          And if I'm not mistaken, that lists the

15  acres for each field, doesn't it?

16      A.  Okay.  Yeah.  Yes.

17      Q.  And you would have the capability to look

18  at your field notes and compare them to the acres of

19  each line where it shows there's a loss, as opposed to

20  each line that shows a zero, to determine whether your

21  adjusters actually went into 6,500 acres of field,

22  wouldn't you?

23      A.  I could go into Quest and on each line item

24  get the acres, add those acres up, and find out

25  exactly how many acres they adjusted, yes.

48

1    Q.  You never did that though.

2    A.  No.

3    Q.  And you never looked at the field notes to

4  find out.

5        MS. BUFKIN:  Asked and answered.

6    A.  I didn't have the field notes.

7  BY MR. BEATTIE:

8    Q.  Again, we know why.

9    A.  Because I didn't ask for them.

10       MS. BUFKIN:  Object to the form.  If that

11  was a question.

12  BY MR. BEATTIE:

13    Q.  Do the field notes tell you whether your

14  adjusters followed the manual, which is exhibit, I

15  believe -- is it 37, that they are required to follow

16  pursuant to the policy?

17    A.  The paper field notes just show the counts

18  that they took.

19    Q.  Well, does that tell you how they staged

20  it?

21    A.  No.

22    Q.  It doesn't?

23    A.  The paper field notes do not.

24    Q.  Do the paper field notes reflect what stage

25  they adjusted at?

*Def*
*A, Asked &*
*Answered*

49

1    A.  No.

2        Q.  Well, what was your presumption when you

3    looked at the field notes as to what stage they put

4    that at?

5        MS. BUFKIN:  Object to the form.

6        A.  The paper field notes record only shatter.

7    BY MR. BEATTIE:

8        Q.  So then you presume that they did a

9    shatter-only loss.

10        MS. BUFKIN:  Object to the form.

11        A.  It -- these questions are hard to answer

12    because I didn't know of the forms until recently.  So

13    since I have found out that those paper forms even

14    existed, no, I did not do that.

15    BY MR. BEATTIE:

16        Q.  Well, Exhibit 39 -- you're saying the field

17    notes were entered into Exhibit 39, the Proof of Loss

18    for the September storm; correct?

19        A.  The numbers from the paper field notes were

20    entered into Quest, yes.

21        Q.  Were they entered in inaccurately?  Are

22    they all consistent?

23        A.  I don't know.

24        Q.  You don't have any way of knowing.

25        A.  I'd have to check each -- each of the -- I

50

1  don't know how many numbers that were keyed in.

2     Q.  Have you done --

3     A.  And I have not done that, no.

4     Q.  If I were to tell you that there were

5  significant discrepancies, what would you say to that?

6  Between what was recorded on the field notes,

7  Exhibit 59, versus what actually was given to

8  Mr. Bruhn, which is Exhibit 39.

9        MS. BUFKIN:  Object to the form.

10  BY MR. BEATTIE:

11     Q.  The Proof of Loss.

12     A.  I guess I'd have to see the field notes and

13  do a comparison.  I don't know.

14     Q.  You never bothered to do that?

15     A.  I only had the field notes recently.  So,

16  no, I haven't.

17     Q.  Do the field -- or the information from the

18  field notes is supposed to be recorded accurately and

19  reflected into Exhibit 39, which is the Proof of Loss,

20  which would be given to Mr. Bruhn?

21     A.  Yes.  The numbers from the field notes

22  would be keyed into Quest, and of course it should be

23  accurate.

24     Q.  During the course of your investigation,

25  you never asked to see if there were handwritten field

Def,
A, Asked &
Answered

1  notes?

2      MS. BUFKIN:  Asked and answered.

3      A.  No.

4  BY MR. BEATTIE:

5      Q.  Do -- or does the Proof of Loss,

6  Exhibit 39, Mr. Burkhart, show how your adjusters

7  staged the loss?  At what stage they found it in at

8  the time of the hail?

9      MS. BUFKIN:  I'm going to object to this

10  line of questioning and instruct him not to answer.

11  He said the field notes have nothing to do with

12  staging.

13  BY MR. BEATTIE:

14      Q.  Did I give you the copy of the field notes?

15      A.  No.

16      Q.  I do have them here.  I've got them right

17  here.

18      Exhibit 59 are the field notes.  Could you

19  verify that?

20      A.  Apparently, yes.

21      Q.  And you say nowhere on there can you look

22  to see what stage they put them in?

23      A.  Not unless they specifically wrote it on

24  there.  I don't see any that did.

25      Q.  How is somebody to determine from looking

*Def.*
*A.*
*Asked & Answered*

*Def.*
*Asked & Answered*

52

1  at Exhibit 59 or Exhibit 39 what stage that the

2  adjusters found the beans in at the time of the

3  hailstorm?

4      A.  From 59 and 39?

5      Q.  Yes, sir.

6      A.  There's no way to tell what stage it is

7  from those.

8      Q.  Well, did you do your investigation in

9  preparing your affidavit to find out how they staged

10  them?  How they staged the soybean loss for Mr. Bruhn?

11      A.  Not at that time, no.

12      Q.  At any time?

13      A.  How they staged it?  No.

14      Q.  Did you presume in looking at the field

15  notes, or 39, that they followed Exhibit 37, the

16  soybean loss manual, that's required to be followed

17  pursuant to the insurance contract between Mr. Bruhn

18  and Fireman's Fund?

19      A.  Yes.

20      Q.  That would be mandatory.

21      A.  Yes.

22      Q.  And you staged the loss --

23          MS. BUFKIN:  Object to any further

24  questioning on stage.  I'm instructing him not to

25  answer.  He's testified the field notes, which we're

53

Def.
R, A: by counsel

1 here today to discuss, gave him absolutely no

2 information about stage.

3 BY MR. BEATTIE:

Def,
R, A by counsel

4    Q.  Does it matter to you how they staged the

5 loss?

6        MS. BUFKIN:  Same objection.  Instruct him

7 not to answer.

8        MR. BEATTIE:  On what basis?

9        MS. BUFKIN:  That we're here solely to talk

10 about the field notes as to the Court's order, and the

11 affidavit, and nothing contained in any of these has

12 to do with staging.

13        All information about the staging of the

14 soybeans was made available to the plaintiff in the

15 documents you're even referring to now earlier, and he

16 was made available for his deposition and any

17 questions about staging should have been presented at

18 that time.

19 BY MR. BEATTIE:

20    Q.  Mr. Burkhart, for these adjusters to adjust

21 the loss which is reflected in Exhibit 59, the field

22 notes, they would have to arrive at a stage, would

23 they not?  At what the soybeans were in at the time of

24 the loss?

25    A.  These field notes reflect the shatter that

54

1   they counted.

2       Q.   Where does it say "shatter" on Exhibit 59?

3       A.   It doesn't.

4       Q.   So you tell me --

5       A.   But that's what's recorded, that's what

6   this form is designed for, is to record shatter.

7       Q.   Can you record defoliation on Exhibit 59

8   anywhere?

9       A.   No.

10      Q.   Well, knowing that from looking at the

11  field notes, did you talk to anybody about how they

12  reached shatter loss staging in your investigation?

13      A.   Since I found out about the field notes,

14  no.

15      Q.   Is there anything reflected on the field

16  notes where they discussed anything with Mr. Bruhn

17  about how they were staging?

18      A.   No.

19      Q.   Anything on the field notes about what

20  Mr. Bruhn thought whether his plants were growing

21  crops or not?

22      A.   No.

23      Q.   Is there any indication that -- in the

24  field notes, that the adjusters told Mr. Bruhn they

25  were going to stage it at an R8 stage?

55

1    A.  No.

2      Q.  Any indication in the field notes that the

3  adjusters told Mr. Bruhn that "If we adjust it at R8,

4  we don't take in defoliation, which means that if

5  there is defoliation, it won't be counted" --

6        MS. BUFKIN:  Objection to form.

7  BY MR. BEATTIE:

8      Q.  -- "towards the percent of loss"?

9        MS. BUFKIN:  Object to the form.

10    A.  No.

11  BY MR. BEATTIE:

12      Q.  I mean the adjusters are supposed to have

13  that kind of a conversation with the insured, aren't

14  they?

15        MS. BUFKIN:  Object to the form.

16    A.  Well, I'm not sure what that has to do with

17  the field notes, but what was your question again?

18        MR. BEATTIE:  You can read it back.

19        (The requested portion of the record was

20  read.)

21        MS. BUFKIN:  I'm going to object and

22  instruct him not to answer because, again, it relates

23  to nothing concerning the field notes.

24        MR. BEATTIE:  I asked him about whether it

25  was on the field notes.

56

*Handwritten annotations:* Def. F,A.   Def R,A by Counsel

Def
R, A by counsel

1      MS. BUFKIN: He said it wasn't.

2  BY MR. BEATTIE:

3      Q. Are the field notes supposed to reflect

4  what the adjusters did?

5      A. These field notes reflect their shatter

6  counts.

7      Q. That isn't what I asked you, Mr. Burkhart.

8         Are the field notes supposed to reflect

9  what the adjusters did?

10      A. As far as counting shatter, yes.

11      Q. Only shatter.

12      A. That's what the field notes are for.

13      Q. So you don't -- the field notes wouldn't

14  reflect anything else that they did; any decisions,

15  any conversations, anything else.

16      A. These field notes do not.

17      Q. And that the -- Exhibit 39 is based only

18  upon what is entered in the field notes.

19      A. Well, what's -- the numbers from the field

20  notes go into Quest. Quest does the calculations and

21  determines the percentages on -- in 39.

22      Q. My question is, what Exhibit 39, the Proof

23  of Loss is, is based entirely upon what Exhibit 59

24  shows.

25      A. It's based on these numbers (indicating)

57

1  being entered into Quest, yes.  And then Quest does

2  the loss calculation.

3      Q.  And that's it.  You don't know anything

4  more or less about the adjustment of the file than

5  what is on Exhibit 59, do you?

6      A.  Whatever is here (indicating) plus what's

7  in Quest.

8      Q.  Well, Quest is just taking the numbers and

9  applying a mathematical formula, isn't that true?

10      A.  Quest is where everything is recorded,

11  whatever it might be.

12      Q.  You -- I think you're getting circular

13  on me, sir.

14          What is recorded in Quest comes from

15  Exhibit 59, the field notes.

16          MS. BUFKIN:  Object to the form.

17  BY MR. BEATTIE:

18      Q.  Correct?

19      A.  What's recorded in Quest -- what Quest

20  produces is all of the information on the claim that

21  went into the percentage calculation.

22      Q.  Well, then tell me what in Exhibit 39, the

23  Proof of Loss, is shown that wasn't obtained from the

24  field notes, Exhibit 59.

25      A.  What's in 39 came from --

58

1    Q.  The Proof of Loss.

2    A.  Correct.  Came from the field notes.

3    Q.  And only from the field notes.

4    A.  In the case of the shatter, that would be

5 true.

6    Q.  I'm not -- I didn't limit it to shatter.

7 My question was way broader than that, Mr. Burkhart,

8 and that is, what is shown in Exhibit 39 that doesn't

9 come from the field notes, Exhibit 59?

10    A.  Since only shatter was considered, that's

11 the only number that will be on the Proof.

12    Q.  And because Exhibit 59 doesn't document or

13 show anything about any conversations with Mr. Bruhn,

14 that wouldn't be entered, would it?

15      MS. BUFKIN:  Object to the form.

16    A.  That would not be entered into Quest.

17 BY MR. BEATTIE:

18    Q.  There's nothing on the field notes,

19 Exhibit 59, that Mr. Bruhn said don't go to thousands

20 of acres of fields that he had previously reported as

21 having hail damage.  That's not --

22      MS. BUFKIN:  Object to the form.

23    Q.  -- reflected on 59, is it?

24      MS. BUFKIN:  Same objection.

25    A.  No.

*Def R, A* (handwritten annotation)

59

1  BY MR. BEATTIE:

2      Q.  And there's nothing in Exhibit 59 that

3  there are no field strips in certain fields except for

4  one field, isn't that true?

5      A.  I -- I'd have to look at all of them.  I

6  don't know.

7      Q.  Go ahead and look.

8          You never looked for that before?

9          MS. BUFKIN:  Object to the form.

10         THE WITNESS:  Can you read that question

11  again, please?  I want to make sure what I'm looking

12  for here.

13         (The requested portion of the record was

14  read.)

15     A.  Yes.

16  BY MR. BEATTIE:

17     Q.  What line is that?

18     A.  44.

19     Q.  Hand that back to me, please.

20     A.  (The witness complied.)

21     Q.  Now, if I were to tell you that comparing

22  Exhibit 59, the field notes, with --

23         (Deposition Exhibit 131 was marked for

24  identification.)

25     Q.  Do you know what Exhibit 131 is?

Def.
R,A

60

1    A.  Yes.  It's a screen shot of the field notes

2  that I talked about earlier in Quest along with the

3  pod count calculation box.

4    Q.  If I told you that there were significant

5  discovery -- or discrepancies between what the screen

6  shots show and what the field notes show, what would

7  your explanation be why there is a discrepancy?

8       MS. BUFKIN:  Object to the form.

9    A.  If there's a discrepancy between the paper

10  field notes and what's recorded here?

11  BY MR. BEATTIE:

12    Q.  Yes, sir.

13    A.  It would just be a keying error.

14    Q.  A mistake that was entered?

15    A.  If the adjuster made a keying error, yes.

16  Transposed a number.

17    Q.  Go to field 28 on Exhibit 131, the

18  snapshots.

19       That's line 28.  I'm sorry.

20    A.  Okay.

21    Q.  I would tell you that the numbers listed on

22  every screen shot on line 28 does not coincide with

23  the field notes.

24       You can check them if you like, but --

25    A.  I'd have to look at the field notes for

Def
F, A, S

61

1  line 28.

2    Q.  There they are (indicating).

3    A.  I don't know if these are the field notes

4  for 28.

5    Q.  They're purported --

6    A.  Because they don't seem to match.

7    Q.  Well, how would I know?  How would a jury

8  know?  Whether the field notes for line 28 are the

9  actual counts or what you got entered in Quest on the

10  screen shots, Exhibit 131?

11    A.  Well, from the field notes, there's two

12  that aren't labeled, so I don't -- I have no idea what

13  they belong to.

14    Q.  Do you have any explanation to give to the

15  jury?

16    A.  I don't think these are the field notes for

17  28.

18    Q.  So what do you think -- when it says

19  "Line 28," what do you think lines -- those are in the

20  field notes then, Exhibit 59?

21    A.  I don't -- I don't know where the 28 and

22  the 620 came from.  The line item 28 and the 620

23  acres, I guess, are right for line 28, but these field

24  maps are -- or I'm sorry, these field notes, this

25  first page of the field notes, has four counts on it,

Def.
8

62

1   the map has three. It -- it -- nothing matches up

2   with anything. So I don't know what field these

3   really go to.

4       Q.  Okay. Go to the screen shot for field

5   notes line 25. The screen shots. Which is

6   Exhibit 131, the screen shots.

7           And would you tell the jury what you mean

8   by "screen shot"?

9       A.  When the claim file is printed, everything

10  prints except this page (indicating) with the screen

11  shot. The little -- the box that calculates the

12  shatter does not print. So what we had to do was go

13  into Quest, you can see it in there, but it doesn't

14  print.

15      Q.  Can you explain to me, sir, why here we are

16  on January 12, 2017, discovery closing in two weeks,

17  why we're just getting those documents today just

18  before the start of your deposition? The screen

19  shots.

20      A.  Because we just found out yesterday that

21  they didn't print. And so that they weren't part of

22  what we had already done.

23      Q.  How did you discover that?

24      A.  I don't know exactly. I was using Quest,

25  looking at some of the field notes, the paper field --

Def
F,R

63

1  or copies of the paper field notes, and I think Liz

2  saw that -- or noticed this looked different than what

3  we had done, and then that's how we found out that

4  what we printed didn't include that box.

5      Q.  Well, you know, this last year when

6  Mr. Shaull and I got onto the case, we had requested

7  field notes, for any of the field notes.

8          Let me find the -- it was Request No. 8

9  that we filed -- I think it was in July of last year,

10  it wasn't responded to until September, and it said

11  "Please provide the field sheets documenting the

12  actual counts of the field strips made by Defendant

13  concerning any and all claims made by Bruhn in 2012."

14          And the response that we got in September

15  was "All documentation regarding the adjustment

16  process has already been produced."

17          Now, that wasn't accurate, was it?

18      A.  We found out it wasn't accurate.  We

19  thought we had printed the entire claim file.  But

20  then we found out this box (indicating) doesn't show

21  up on the printed material.

22      Q.  I'm talking about the field notes

23  themselves, Exhibit 59, Mr. Burkhart.

24      A.  Nobody knew they existed.

25      Q.  Apparently nobody asked even when we made a

Def.
R, A

Def.
F, RA

64

1  specific request.

2       MS. BUFKIN:  Object to the form.

3  BY MR. BEATTIE:

4     Q.  Wouldn't that be true?

5       MS. BUFKIN:  Object to the form.

6       Answer if you know.

7  BY MR. BEATTIE:

8     Q.  Let me ask you this -- I'll withdraw that

9  question.

10      When we asked in -- about seven months ago

11  in July of 2016 for you, meaning the defendant,

12  Fireman's Fund, to produce the field notes documenting

13  the actual count of field strips, your response was

14  all documentation regarding the adjustment process has

15  already been pulled.

16      MS. BUFKIN:  And I'll note for the record

17  that Mr. Burkhart is not here as a 30(b)(6)

18  representative.  Nor did he, to my knowledge, sign the

19  discovery responses that you're referencing.

20      So I don't know if it's proper to ask him

21  about responses he may have not had a role in.  Or if

22  he did, he didn't sign them.

23  BY MR. BEATTIE:

24     Q.  You're in charge of the claim department

25  for crop-hail, aren't you?

Def
FRA

65

1    A.  Field claims.

2    Q.  Yeah.

3        Why weren't the field notes produced when

4  initially requested specifically by Mr. Bruhn?

5    A.  As far as I knew, the entire claim file had

6  been printed.

7    Q.  Why didn't -- why weren't the field notes

8  produced?

9    A.  Because we didn't know they existed.

10    Q.  You didn't ask at that time either, did

11  you?

12        MS. BUFKIN:  Object to the form.

13    A.  It's not typical for an adjuster to retain

14  paper notes that they take in the field.

15  BY MR. BEATTIE:

16    Q.  Well, we've already gone over that.  You

17  didn't ask -- when you were specifically requested by

18  us, as is our right under federal law, for those field

19  notes, you didn't even attempt to go and get them at

20  that time, did you, Mr. Burkhart?

21        MS. BUFKIN:  Object to the form.  Note for

22  the record Mr. Burkhart is not here as a

23  representative of the company and this discovery was

24  not propounded to him individually.

25        MR. BEATTIE:  We're talking to the person

Def
FIR, A

66

1   that's in charge of the entire operation, and it is

2   entirely proper to find out why his department did not

3   comply with that request back in July. And I want to

4   know why.

5         MS. BUFKIN: Again, Mr. Burkhart is here

6   for field claims. He is not in charge of the entire

7   operation of Rural Community Insurance Services.

8         MR. BEATTIE: He's in charge of crop-hail

9   as he said.

10        MS. BUFKIN: Exactly.

11   BY MR. BEATTIE:

12     Q. So tell me why these field notes weren't

13   produced when specifically requested of you back in

14   July. And then you responded they didn't exist and it

15   turns out that they existed. I would like to know

16   why.

17        MS. BUFKIN: I'll object to the question.

18        If you have any information and can answer

19   it based upon your individual knowledge, you can

20   respond. If you don't, I assume you have no response.

21   BY MR. BEATTIE:

22     Q. And I'm asking for your knowledge. Whether

23   it's individual, corporate, or whatever.

24     A. Okay. For me, the field notes, if you have

25   that handy, that's what this form is (indicating).

Def.
FR,A

1      And we did print the field notes and they

2  were provided.

3      Q.  You call Exhibit 131 a field note?

4      A.  That's what it's labeled.

5      Q.  Where?  Tell me -- we've already documented

6  Exhibit 131 wasn't given to us until today,

7  January 12, of 2017.

8      So why didn't you turn those over in July

9  then?

10      MS. BUFKIN:  On the record, I think I

11  explained early on that the document -- the background

12  document was produced, the field note.  When printing,

13  the box with the calculation numbers in there did not

14  print.

15      So just so the record is clear, we found

16  out that is embedded and can be seen and has to be

17  screen shotted.  And as soon as we were aware that

18  wasn't -- that wasn't on the original field notes

19  produced and it was available, we produced it.

20      MR. BEATTIE:  With all due respect,

21  Ms. Bufkin, I know you're the attorney of record, but

22  you're saying you didn't know about the existence of

23  131?  Because if you did, then you would have known

24  they wouldn't have been produced.

25      MS. BUFKIN:  I knew that the field notes

68

1 were produced. We produced those.

2     MR. BEATTIE: You didn't produce

3 Exhibit 131. And if you would have -- if you knew of

4 their existence back in July, then Fireman's Fund was

5 required to produce those and they didn't do it.

6     MS. BUFKIN: I made it clear we produced

7 the document that's in the background that's labeled

8 "Field Notes." And you have that in your file.

9     We did not realize this box (indicating)

10 was not a printable field and was available to us.

11     When we became aware --

12     MR. BEATTIE: You. You're talking about

13 you as the lawyer?

14     MS. BUFKIN: I'm talking about me as the

15 person --

16     MR. BEATTIE: See, and I'm asking

17 Mr. Burkhart.

18     MS. BUFKIN: Well, let me finish talking.

19 Because Mr. Burkhart is not here as a 30(b)(6)

20 representative. He did not sign the discovery you're

21 asking about. He can tell you what this is, he can

22 tell you that he assisted me in producing it. But he

23 had no responsibility for the discovery and he's not

24 here to speak for the company. And if you're asking

25 him to speak on behalf of RCIS, that's not what he's

69

1  designated here to do.

2      MR. BEATTIE:  He signed an affidavit on

3  behalf of the company.  So don't tell me he's not here

4  on behalf of the company --

5      MS. BUFKIN:  And you can ask him --

6      MR. BEATTIE:  -- and I have every right to

7  ask him why Exhibit 131, let alone Exhibit 59, wasn't

8  produced when it was requested.

9      MS. BUFKIN:  And he's told you that at

10  least three times.  Now --

11      MR. BEATTIE:  He never asked.

12      MS. BUFKIN:  You have asked him.  And he

13  made a full explanation.

14      MR. BEATTIE:  No, no, no.  He said he never

15  asked anybody.

16      MS. BUFKIN:  Well, he told you, he didn't

17  know anything about it.  So I don't know what else he

18  can tell you.

19      MR. BEATTIE:  Well, I'm not going to

20  comment on that.

21      MS. BUFKIN:  Well, this is the point:

22  We've done the best we could producing this today --

23      MR. BEATTIE:  I don't think so.  Don't tell

24  me you did the best you could, Ms. Bufkin.  I don't

25  accept that.  We're getting documents just before the

70

1  start of his deposition.  And the field notes, we had

2  to file a motion for sanctions before we ever got

3  those.

4      MS. BUFKIN:  That's your position.

5      MR. BEATTIE:  That is my position.  And I

6  am asking him --

7      MS. BUFKIN:  And I'm just --

8      MR. BEATTIE:  -- why Fireman's Fund didn't

9  produce Exhibit 131 and Exhibit 59 when a specific

10  request was made to do so.

11      MS. BUFKIN:  If he has knowledge of any of

12  that, he can respond, but for the record, we advised

13  you yesterday that we had located this calculation box

14  and were going to print it and bring it today and gave

15  you the option of postponing this deposition if you so

16  desired.

17      So I understand you just got them today,

18  but --

19      MR. BEATTIE:  Nobody -- Jeff never

20  mentioned we could postpone the deposition.  That was

21  never mentioned.

22      MS. BUFKIN:  Okay.  Well, if you'd like to

23  postpone it for further review of those, we don't have

24  any problem recessing and coming back.

25      MR. BEATTIE:  I think -- I think I may want

1  to do that. Let's take a break.

2      THE VIDEOGRAPHER: Off the record at 1209.

3      (Recess taken.)

4      THE VIDEOGRAPHER: On the record.

5  BY MR. BEATTIE:

6    Q. Mr. Burkhart, I had asked you about line 28

7  and comparing it to the screen shots in Exhibit 131,

8  and --

9    A. Oh. Right.

10    Q. -- I think you said something that it has

11  to be a different field?

12    A. It looks like it is. I don't know.

13    Q. Okay. Would you look on Exhibit 39 and --

14  here it is here (indicating) --

15    A. Oh.

16    Q. -- and tell me whether the number of acres

17  corresponds to the number of acres shown on the actual

18  field notes, Exhibit 59.

19      MS. BUFKIN: We don't have a page number on

20  these, do we? Or do we have a copy with a number? Do

21  you have a Bates number?

22      MR. BEATTIE: No. But it shows the lines

23  on the exhibit.

24      MR. SHAULL: And the acres.

25  BY MR. BEATTIE:

72

1    Q.  Here -- let me start over again.

2        MS. BUFKIN:  Just for the record, it would

3  be clearer if we had -- we don't have the Bates

4  numbered ones, do we, Jeff?

5        MR. BEATTIE:  Let's go off the record.

6        MS. BUFKIN:  Yeah.

7        MR. BEATTIE:  I'm trying to keep a clean

8  record.

9        THE VIDEOGRAPHER:  Off the record at 1233.

10       (Discussion was held off the record.)

11       THE VIDEOGRAPHER:  On the record at 1234.

12  BY MR. BEATTIE:

13    Q.  Exhibit 59 are the field notes.  And they

14  were produced at the date of Larry (sic) Sornson's

15  deposition in November of 2016, mid-November.  And

16  they clearly show what line numbers on the various

17  exhibits.

18       You would agree with that; right,

19  Mr. Burkhart?

20    A.  Some do and some don't it looks like.

21    Q.  Well, the ones that don't, I think, are

22  continuations of the same line.  I would represent

23  that to you.  Even though I'm not an employee of

24  Fireman's Fund.

25    A.  Here's one that doesn't.

73

1        Generally they do, but some don't have line

2    numbers.

3       Q.  All right.  Let's go to on Exhibit 59 where

4    it says line 28.  That's the one that I questioned you

5    about.

6       A.  Yes.

7       Q.  And it says line 28.  How many acres?

8       A.  620.

9       Q.  All right.  These field notes to your

10   understanding that the adjusters took, these field

11   notes in Exhibit 59, they were supposed to have

12   uploaded them into the Quest system to produce the

13   Proof of Loss which is Exhibit 39.

14       Am I correct on that, sir?

15       A.  Yes.

16       Q.  All right.  On Exhibit 39 then -- and so

17   the jury knows, Exhibit 131 are the screen shots of

18   each line and they are part of the program that

19   produced Exhibit 39, the Proof of Loss.

20       A.  Yes.

21       Q.  Now, go to line 28 on the Proof of Loss,

22   Exhibit 39, and how many acres does it show?

23       A.  620.

24       Q.  And on the field notes it shows 620 acres.

25       A.  Yes.

74

1    Q.  But when you go to the screen shot,

2  Exhibit 131 for line 28, those numbers are completely

3  at variance with the numbers on the field notes for

4  line 28, aren't they?

5    A.  I think that's right.

6    Q.  And you have no explanation for that, do

7  you?

8    A.  No.

9    Q.  Now, I want you to go to the screen shots

10  for line 25.

11    A.  Okay.

12    Q.  Are there Bates numbers on Exhibit 131?

13        MS. BUFKIN:  Yes.

14    A.  I don't know what that is.

15        MS. BUFKIN:  He's referencing that number

16  (indicating).

17        THE WITNESS:  Oh.  Okay.

18  BY MR. BEATTIE:

19    Q.  Okay.  Read all of the Bates numbers for

20  line 25 that's part of the screen shots which is

21  Exhibit 131.

22    A.  FFIC 1319 -- that's what you mean?

23    Q.  Sure.  And what's the end one?  The last

24  page.

25    A.  1329.

1     Q.  All right.  Now, go to Exhibit 59, the

2   actual field notes, and pull up the -- turn to the

3   pages that list line 25.

4     A.  It must be the last page.

5         I don't find 25.

6     Q.  How does there get to be numbers for

7   line 25 in the Proof of Loss and there's no field

8   notes for them?

9     A.  I can't -- I have no idea.

10     Q.  Okay.  Let's go to line 29.  And pull up on

11   the screen shots and read to me the Bates numbers for

12   line 29.

13     A.  1341, 1342, 1343, 1344.

14     Q.  And what I would like for you to do is go

15   to the field notes, which we now know as Exhibit 59,

16   and pull up the sheets for line 29.

17     A.  It's not here.

18     Q.  Do you know how it came to be that there's

19   no field notes for line 29 but there's something

20   entered in Quest?

21     A.  They evidently weren't retained by whoever

22   developed them.  I don't know.

23     Q.  Have you read the deposition of

24   Mr. Grieme -- or Mr. Sornson?

25     A.  I don't think I read the whole thing.

76

Def F,R

1    Q.  Well, did you read the portion where he

2  said he retained all the field notes?

3    A.  I don't remember.

4    Q.  Would you argue with me if I said that

5  that's what he testified to?

6        MS. BUFKIN:  Object to the form.

7    A.  I wouldn't argue it.  No, I don't know.

8  Frankly, I was surprised that he had any field notes,

9  so...

10  BY MR. BEATTIE:

11    Q.  Let's go to line -- excuse me.  And there

12  was losses reported on both lines 25 and 29, were

13  there not?  The Proof of Loss.  Which is Exhibit 39.

14    A.  Line 25?

15    Q.  Shows a loss, does it not?

16    A.  Yes.

17    Q.  Line 29, does it show a loss?

18    A.  Yes.

19    Q.  Okay.  Go to Exhibit 1 -- excuse me,

20  Exhibit 30 -- I'm sorry.  Let me start over again.

21        Go to Exhibit 131, the screen shots.

22    A.  Okay.

23    Q.  For line 30.

24    A.  Okay.

25    Q.  Do you have that?  And I would like for you

77

1   to read what Bates numbers line 30 represents.

2       A.  1345, 46 -- 1346, 1347, 1348, 1349.  That's

3   all.

4       Q.  Okay.  Go to the actual field notes and

5   pull up for line 30 from the actual field notes.

6   Which are Exhibit 59.

7       A.  They're not here.

8       Q.  Do you, sir, have an explanation as to why

9   there are no field notes for line 30 but there's data

10  from the screen shots, Exhibit 131, entered?

11      A.  No.  They weren't -- evidently they weren't

12  retained or Galen didn't find them.  I don't know.

13      Q.  You don't know what happened.

14      A.  No.

15      Q.  There's no answer you can give the jury

16  other than "I don't know."

17      A.  Correct.  I don't know why they're not

18  here.

19      Q.  Is there loss shown on the Proof of Loss

20  for line 30?

21      A.  Yes.

22      Q.  Go to line number 40 on your screen shots,

23  Exhibit 131.  And read the Bates numbers for line 40.

24      A.  1395, 1396, 1397, 1398, 1399, 1400.  That's

25  all.

78

1    Q.  Look to the field notes, sir, Exhibit 59,

2  and pull up line 40, please.

3    A.  They're not here.  At least I don't see it.

4    Q.  Any explanation on the missing field notes?

5    A.  No.

6    Q.  Any explanation on how the data got entered

7  for line 40?

8    A.  I don't know why the field notes are

9  missing.

10    Q.  And if you pull up the Proof of Loss which

11  was given to Mr. Bruhn, Exhibit No. 39, what does --

12  does line 40 show any loss?

13    A.  Yes.

14    Q.  And it would be, what, a 34 percent loss?

15    A.  34.2, I think.

16    Q.  And the number of acres is 152.2 acres?

17    A.  Yes.

18    Q.  For line number 30, which are missing field

19  notes, if you go to the Proof of Loss for that, are we

20  talking about 150 acres and 5.6 percent loss?

21    A.  Yes.  150.3 acres.

22    Q.  And for line 29 are we talking about

23  230 acres with 4.4 percent loss?

24    A.  Yes.

25    Q.  For line 25 are we talking about 475 acres?

1    A.  I might need to use somebody's glasses.

2  For line 25?

3    Q.  I believe that's the first line we read.

4    A.  25 shows 260 acres.

5    Q.  260.  Okay.  You're right.

6    A.  Okay.

7    Q.  And 52.2 percent loss; is that correct?

8    A.  Yes.

9    Q.  And all of those numbers, we don't know how

10  they got there or how you reconcile them or whatever?

11      MS. BUFKIN:  Object to the form.

12      You can answer if you can.

13    A.  I don't know where the -- I don't know

14  where the field notes are that developed those

15  numbers.

DeF
A1S

16  BY MR. BEATTIE:

17    Q.  Go to your screen shot, Exhibit 131, for

18  line 42, if you would, please.

19    A.  Okay.

20    Q.  Read in the Bates numbers for that, if you

21  would, please.

22    A.  1407, 1408, 1409, 1410, 1411, 1412, 1413,

23  1414.  That's it.  1414 is the last one.

24    Q.  Now go to the field notes, Exhibit 59, and

25  go to the line 42.

80

1    A.  In the field notes?

2    Q.  Yes, sir.

3    A.  Okay.

4    Q.  Do you have it there?

5    A.  Yes.

6    Q.  Okay.  And what does it show?

7    A.  I'm sorry.  What --

8    Q.  Can I see it, please?

9        There's no breakdown on that, is there?  It

10   shows you total counts; is that correct?

11   A.  Correct.

12   Q.  Hand me the first page of line 42.

13   A.  (The witness complied.)

14   Q.  That would be "Test 1."  Correct?  It says

15   "Test 1" on -- Mr. Burkhart, look at me, sir.

16   A.  I assume it is.

17   Q.  It says "Test 1" on Exhibit 131.

18   A.  Yes.

19   Q.  The screen shot.

20   A.  Right.

21   Q.  And it shows individual counts for

22   individual plants, does it not?

23   A.  Yes.

24   Q.  Now, show me on the field notes,

25   Exhibit 59, the individual count for individual plants

81

1  for Test 1.

2      A.  The individual counts?

3      Q.  Yes, sir.

4      A.  They aren't here for any of the tests.

5      Q.  For none of them, are there?

6      A.  No.

7      Q.  And how many tests were there?  Your screen

8  shot would --

9      A.  I think eight.

10     Q.  -- purport something.

11     A.  I think eight.

12     Q.  Eight.  And none of the eight tests shows

13  the breakdown of the plants, does it?

14     A.  No.

15     Q.  Do you have an explanation how somebody

16  could enter individual plant count when it doesn't

17  show on the field notes?

18     A.  They were entered from other field notes or

19  from somewhere else.  They're not on here

20  (indicating).

21     Q.  A presumption on your part.

22     A.  They had to come from somewhere, yes.

23     Q.  They weren't made up.

24     A.  No.

25     Q.  None of them are made up.

Def A.

82

1    A.  No.

2    Q.  But we have discrepancies here that you

3  can't sit here and explain today.

4        MS. BUFKIN:  Object to the form.

5    A.  We're missing some paper field note copies

6  that we don't ordinarily even have.

7  BY MR. BEATTIE:

8    Q.  "Ordinarily."  We've been down that road.

9    A.  We don't retain those is what I'm saying.

*Def.*
*A, no question*

10    Q.  You said in your affidavit that the

11  adjusters have the right to use the computer or do

12  field notes.

13        Now, do you want to go over that again?

14    A.  I don't remember saying that.  So yes.

15    Q.  Oh, okay.  Well, let me refresh your memory

16  of what you stated under oath.

17        Paragraph 6, "Some RCIS adjusters record

18  the data into Quest directly from the field.  Other

19  adjusters make notes while in the field, then record

20  the information into Quest at a later time.  It is my

21  understanding that Mr. Sornson and his team did the

22  latter."

23    A.  Right.

24    Q.  That's what you swore to under oath, sir.

25    A.  That's what Galen did, yes.

1    Q.  And yet we're missing field notes, aren't

2  we?

3    A.  Actually, I don't know what Galen did.  I

4  don't know who developed the field notes.

5    Q.  Did you or did you not swear under oath

6  that "It is my understanding that Mr. Sornson and his

7  team made notes while in the field, then recorded the

8  information into Quest at a later time."

9    A.  That's correct.

10    Q.  You swore that under oath.

11    A.  Yes.

12    Q.  But you don't know that to be true?

13    A.  That was my understanding.  That everybody

14  worked their claim and gave the field notes to Galen.

15    Q.  Yet we're missing notes, aren't we?

16    A.  Yes.

17    Q.  And we have notes, field notes, that don't

18  correspond to what actually was entered into the Quest

19  system, don't we?

20    A.  Yes.  I don't know what field that might

21  belong to.

22    Q.  And in your investigation, you didn't know

23  any of that.

24    A.  I didn't know the field notes -- I didn't

25  even know we had the field notes.

84

1     Q.  And you came into court and -- or into

2  deposition here today and you still don't know it.

3     A.  Still don't know what?

4     Q.  The missing field notes, how to explain the

5  discrepancy between what's written on the field notes

6  as to what's punched into Quest, any of that

7  information, do you.

8     A.  On the missing field notes, no, I don't

9  know where they are.

*Def A*

10     Q.  Let's see.  Are there -- go to Exhibit 59,

11  the field notes.  Do we have field notes for line 26?

12           And in order so you don't have to shuffle

13  through every time, Mr. Burkhart, I will represent to

14  you, sir, that they're listed in order.

15     A.  Oh.

16     Q.  So if it goes 25, 26, 27, and a number is

17  missing, the number is not there.

18     A.  Very good then.  If they're listed in

19  order, they're not here.

20     Q.  They are listed in order, sir.

21     A.  Then 26 is not here.

22     Q.  What about 27?

23     A.  No.

24     Q.  33.  Is the field note for line 33 there?

25     A.  No.

```
 1     Q.  Line 35.  Is that in the field notes,

 2  Exhibit 57 (sic)?

 3     A.  No.

 4     Q.  Is line 36 in the field notes, Exhibit --

 5     A.  No.

 6     Q.  -- 59?

 7         Is line 45 in the field notes, Exhibit 59?

 8     A.  You said 45?

 9     Q.  Yes, sir.

10     A.  No.

11     Q.  Is line 46 in the field notes, Exhibit 59?

12     A.  No.

13     Q.  Is line 47 in the field notes, Exhibit 59?

14     A.  No.

15     Q.  Is line 48 in the field notes, Exhibit 59?

16     A.  No.

17     Q.  Is line 49 in the field notes, Exhibit 59?

18     A.  No.

19     Q.  Is line 50 in the field notes, Exhibit 59?

20     A.  No.

21     Q.  Is line 51 in the field notes, Exhibit 59?

22     A.  No.

23     Q.  Is line 52 in the field notes, Exhibit 59?

24     A.  No.

25     Q.  Is line 53 in the field notes, Exhibit 59?
```

1    A.  No.

2    Q.  Is line 55 in Exhibit 59, the field notes?

3    A.  No.  54 is the last.

4         THE VIDEOGRAPHER:  Off the record at 1300.

5         (Noon recess taken at 1:00 p.m.)

6         (Deposition resumed at 1:54 p.m.)

7         THE VIDEOGRAPHER:  On the record at 1354.

8  BY MR. BEATTIE:

9    Q.  Mr. Burkhart, would you please go to page 5

10  of your affidavit.  Which is Exhibit 130.

11   A.  There isn't a page 5.

12   Q.  I'm sorry.  Paragraph 5.

13   A.  Oh.  Okay.

14   Q.  Did you in that paragraph swear under oath

15  that with respect to the Bruhn claim "the RCIS

16  adjusters utilized check strips that had been left in

17  the fields and reported that sufficient check strips

18  were left in each field to complete the adjustment

19  process"?

20   A.  Yes.  Each field that they looked at, there

21  were adequate test strips.

22   Q.  Well, you didn't say "each field that they

23  looked at."  It said -- you swore under oath, did you

24  not, Mr. Burkhart, that "sufficient check strips were

25  left in each field to complete the adjustment

87

1   process."

2        Is that what you said?

3        A.   The fields that had test strips, there were

4   adequate test strips.

5        MR. BEATTIE:  Move to strike.

6   BY MR. BEATTIE:

7        Q.   Did you or did you not swear under oath

8   these exact words:  "Sufficient check strips were left

9   in each field to complete the adjustment process"?  Is

10  that what you reported in your affidavit?

11       A.   "Sufficient check strips were left in each

12  field to complete the adjustment process," yes.

13       Q.   Now, would you go to Exhibit 46.  Which is

14  the high-dollar review.

15       I think I had a copy of that out, didn't I?

16       MS. BUFKIN:  At one time you had it on your

17  Pad.

18       MR. BEATTIE:  Okay.

19       MS. BUFKIN:  I don't know if we got a

20  written copy though.

21       THE WITNESS:  I saw it somewhere.

22       MR. SHAULL:  You had it up in front of him

23  earlier.

24  BY MR. BEATTIE:

25       Q.   Here it is right here (indicating).

88

1    A.  Here it is.  I have a paper copy.

2    Q.  Okay.  And that -- is that a part of what

3  exhibit?

4        MS. BUFKIN:  What exhibit are you looking

5  at?

6        THE WITNESS:  39.

7  BY MR. BEATTIE:

8    Q.  39.  All right.

9        Mr. Burkhart, we had discussed earlier that

10  Larry Grieme, one of your adjusters, in the

11  high-dollar review stated that there were 6,500 acres

12  of shatter to count; correct?

13    A.  Yes.

14    Q.  You rely upon the hail -- the field review;

15  correct?

16    A.  Yes.

17        MS. BUFKIN:  What --

18        MR. BEATTIE:  Rely upon it.

19        MS. BUFKIN:  Okay.  I couldn't -- I didn't

20  catch that.  Thank you very much.

21  BY MR. BEATTIE:

22    Q.  If you accept Mr. Grieme's statement that

23  there is 6,500 acres to count, you would demand that

24  there would be field notes and/or screen shots to

25  support the counts for all 6,500 acres; correct?

Def
F, A

1     A.  Not field notes, no.

2     Q.  You would demand documentation, whatever

3  you want to call it, from some source, that would

4  support the counts for all 6,500 acres, wouldn't you?

5     A.  The counts in Quest would be the only

6  documentation.  That would be required.

7     Q.  I don't care where it is.  You want

8  supporting information somewhere within the confines

9  of Fireman's Fund to support the counts for 6,500

10  acres, wouldn't you?

11        MS. BUFKIN:  Object to the form.

12        Answer if you can.

13     A.  No.

14  BY MR. BEATTIE:

15     Q.  You would not?

16     A.  We do not require retention of field notes

17  or --

18     Q.  That isn't what I asked you, sir.

19     A.  That's the way I understood it.  So I'm

20  sorry.

21     Q.  Please listen to me.  If Larry Grieme did a

22  high-dollar review, presumably at your request, and

23  said there was 6,500 acres to count, you expect to go

24  into whatever records you want to review at at

25  Fireman's Fund to support the counts for 6,500 acres,

*Def
F,A*

*Def
F,A*

1  wouldn't you?

2      A.  I could go look in Quest and see how many

3  acres there were actually counts for.

4      Q.  That isn't my -- that isn't my question.

5  My question is, if you take what he said as the truth,

6  6,500 acres to adjust, you would expect that you could

7  go and look wherever you wanted to look and see that

8  6,500 acres were, in fact, adjusted; correct?

9      A.  I would expect that roughly that number

10  would be adjusted.  Not necessarily exactly that

11  number.

12      Q.  Well, rough would be maybe off an acre or

13  two?

14      A.  No.  It could be off 50 or 100 or --

15      Q.  Okay.

16      A.  I mean I would take that as we went out and

17  worked 6,500 acres.

18      Q.  All right.  100 or -- let's say 500 acres

19  you could be off.

20          That would be a lot, wouldn't it?

21      A.  I don't know.  I --

22      Q.  Well, you're the manager.

23      A.  This is an estimate --

24      Q.  You're the manager.

25      A.  -- of what Larry -- this is what he had in

Def
F-A

91

1 his head as to how many acres we looked at. I'm quite

2 sure he did not add them all up either.

3     Q. You're the head of it, so...

4        Go to Exhibit 59, and I would ask you,

5 would you agree with me that the adjusters support

6 adjusting only approximately 3,175 acres, according to

7 the field notes, Exhibit 59?

8     A. I -- I haven't added them up, so I don't

9 have any idea. I know there are some that we don't

10 have field notes for. Whether those were entered in

11 the field or some other place, I don't know.

12     Q. You don't know.

13     A. The field notes don't add up to 6,500

14 acres.

15     Q. But it would be -- would you accept my

16 word, if I've added them up, that it would be less

17 than half of the 6,500?

18     A. I'm not -- I won't dispute what you added

19 up. I don't have any idea how many are there.

20     Q. If you go to your screen shots, which is

21 Exhibit 131, would you dispute if I told you we added

22 them up and it would only support about two-thirds of

23 what Mr. Grieme represented of the 6,500 acres, which

24 would be about 4,400 acres?

25     A. I think -- we have a screen shot for every

Def
F, A

1   test and every line. So if that's what the screen

2   shots add up to, it's probably -- it would be the same

3   thing that the Proof adds up to.

4      Q. Well, how do you explain Mr. Grieme saying

5   we looked at 6,500 acres to adjust, but at the most

6   you only have 4,400 acres and the field notes only

7   support less than half of the 6,500?

8      A. I don't --

9      Q. How do you explain that?

10      A. I don't know where he came up with the

11   6,500 acres.

12      Q. There's numbers that are really askew in

13   this file, aren't there?

14      MS. BUFKIN: Object to the form.

15      A. Well, I don't know where he came up with

16   6,500.

17   BY MR. BEATTIE:

18      Q. Would you agree with me that the numbers

19   don't support what you say about the loss?

20      MS. BUFKIN: Object to the form.

21      A. I would agree that the screen shots, and

22   more than likely the Proof total acres with

23   adjustments, do not correspond to his 6,500 acre

24   average -- or estimate.

25   BY MR. BEATTIE:

Def
S

Def
A

1    Q.  Where does all this ground go?  All this

2  loss go?

3    A.  Like I said, I don't know where he came up

4  with 6,500 acres.

5    Q.  Who benefits by having half of what the

6  acres that he says was adjusted only showing up in

7  your records?  It's the insurance company, not

8  Mr. Bruhn, isn't it?

9        MS. BUFKIN:  Object to the form.

10    A.  All of the acres that were adjusted have

11  screen shot pages.

12  BY MR. BEATTIE:

13    Q.  Well, not according to what your employee

14  who did a review at your direction said.

15    A.  There was --

16    Q.  Isn't that true?

17    A.  There was some -- I can't remember where --

18  who came up with it, but I think I recall an email

19  somewhere from somebody that referenced 6,500 acres in

20  the very beginning.  And the fact that it would be

21  high dollar or -- I can't remember for sure.  I

22  don't -- maybe that's where Larry got it.  I don't

23  know.

24        And Larry didn't look at every acre when he

25  was adjusting and he didn't look at every acre when he

Def
A

Def
A

Def.
S


Def.
S

1  did the high-dollar review.

2      Q.  We took his deposition.  He said he went

3  out to the fields to do the high-dollar review.

4      A.  He did.

5      Q.  And you're telling me he wouldn't know what

6  fields were adjusted and what fields were not

7  adjusted?

8      A.  Yes.  From Quest.  Every adjusted field was

9  in Quest.

10     Q.  Well, if he looked at them, he would know

11  firsthand, wouldn't he?

12         MS. BUFKIN:  Object to the form.

13     A.  I don't understand.

14  BY MR. BEATTIE:

15     Q.  If he looked at the fields -- went back out

16  to the Bruhn farm and looked at the fields, he would

17  know what fields were adjusted and what were not.

18  That was part of what he was supposed to do, wasn't

19  it?

20     A.  He would have -- he would have looked at

21  the fields that were adjusted --

22     Q.  Yeah.

23     A.  -- that had the samples, yes.

24     Q.  And you're telling me Larry Grieme wouldn't

25  know whether they adjusted 6,500 acres as opposed to

Def
S

1   3,000 acres?

2       A.  I don't know where he came up with 6,500.

3       Q.  Well, I mean, if one of your adjusters

4   didn't know the difference between adjusting 6,000 and

5   3,000, you'd fire them, wouldn't you?

6           MS. BUFKIN:  Object to the form.

7       A.  I don't know where he got that number.

8   BY MR. BEATTIE:

9       Q.  No.  Well, maybe he doesn't know where you

10  get adjusting documentation or records of half that

11  number, 3,175.

12          Do you know where the missing records are?

13      A.  Which missing records?

14      Q.  Of the fields that are never listed, never

15  reported on.

16      A.  You mean the difference between what we

17  have sheets here and 6,500?

18      Q.  Yes, sir.

19      A.  They were not adjusted or we would have the

20  sheets for those.

21      Q.  So then we'd presume that the gentleman

22  that did the high-dollar review was not telling the

23  truth?

24          MS. BUFKIN:  Object to the form.

25      A.  I would say the 6,500 is inaccurate.  I

Def A

Def A, S

Def. A, Asked & Answered

1   wouldn't say he wasn't telling the truth.

2   BY MR. BEATTIE:

3       Q.  Why wouldn't Mr. Grieme say, "Well, maybe

4   you guys didn't get it right when you entered

5   information, when you did your calculations, when you

6   reviewed the file."

7       A.  I'm sorry? I --

8       Q.  Maybe Mr. Grieme would say, "You,

9   Mr. Burkhart, aren't getting it right."

10          MS. BUFKIN:  I'm not sure of the question.

11      A.  I don't understand.

12  BY MR. BEATTIE:

13      Q.  Well, you're trying to justify adjusting

14  3,100 acres when Mr. Grieme said there was 6,500 acres

15  adjusted.

16      A.  Well, like I said, I don't know where that

17  6,500 came from.

18      Q.  Well, did you --

19      A.  Part of the review is not to add up every

20  acre and put down there "This is how many acres we

21  adjusted."  He had the 6,500 in his head.  I don't

22  know where it came from.

23      Q.  You don't know where it came from.

24      A.  We didn't adjust 6,500 acres or we'd have

25  the sheets for it.

1    Q. When you got your field notes, did you go

2  ask him? Did you go talk to him?

3    A. When we got -- when I got what?

4    Q. When you got your -- the field notes,

5  Exhibit 59, did you go talk to him?

6    A. No.

7    Q. Did you go talk to him at all about the

8  discrepancy?

9    A. No.

10    Q. Did you ask him about why there are missing

11  field notes? And I'm talking about Exhibit 59.

12    A. I've never asked anyone why we didn't have

13  all the field notes.

14    Q. Did you ask Mr. Grieme, or anybody, about

15  why is there a discrepancy between the entry of the

16  data on whatever field notes there are in Exhibit 59

17  and what shows in your screen shots?

18      We've already gone over that a lot of those

19  notes, even the data is wrong from Exhibit 59.

*Def A, no question*

20      MS. BUFKIN: Object to the form.

21    A. Okay. I need you to reask, I guess. I

22  don't understand your question.

23  BY MR. BEATTIE:

24    Q. Well, we've been through it this morning

25  that the data taken from the field notes, Exhibit 59,

98

1  in a lot of cases don't match the screen shots,

2  Exhibit 131. We've discussed that.

3        Did you ask Mr. Grieme or Mr. Sornson

4  why -- what the discrepancy is?

5        MS. BUFKIN: Same objection.

6    A.  No.

7  BY MR. BEATTIE:

8    Q.  Look at Exhibit 59, line 44. Exhibit 59

9  being the field notes.

10   A.  44?

11   Q.  And line 44.

12   A.  Okay.

13   Q.  Doesn't -- isn't that the field that

14  Mr. Grieme was referencing in his high-dollar review,

15  Exhibit 46?

16   A.  Probably. I think he references 77 acres

17  and this is 75. But it probably is.

18   Q.  So we can presume that Mr. Grieme took the

19  field notes and compared and went through and looked

20  at all of them.

21       MS. BUFKIN: Object to the form.

22  BY MR. BEATTIE:

23   Q.  Couldn't we?

24   A.  That he would do what?

25   Q.  In his high-dollar review, he checked to

99

Def
S

1 make sure that the counts were taken down and that

2 they're listed in the field notes, Exhibit 59, and

3 that they're going to be entered into the Quest system

4 to produce the Proof of Loss which is Exhibit 59 -- or

5 39.

6     A.  No, he didn't have the field notes.

7     Q.  Well, then how did he know that line 44

8 didn't have field strips?  If he didn't know.

9     A.  I don't know who wrote this.  I don't know

10 if Larry Grieme personally looked at that field or

11 not.

12     Q.  You just don't know, do you?

13     A.  I don't know who wrote this field note.

14     Q.  Tell me why Larry Grieme would write no

15 field strips on line 44 in his high-dollar review but

16 not all other fields where zero was entered?

17     A.  I don't understand.

18     Q.  What is it you don't understand,

19 Mr. Burkhart?  Seriously.

20     A.  Why there aren't field notes for zero?

21     Q.  You already said this morning that zero

22 meant fields weren't inspected.

23     A.  Correct.

24         MS. BUFKIN:  Okay --

25 BY MR. BEATTIE:

100

1     Q.  So tell me why Mr. Grieme would note no

2  strips on line 44 but he would not make reference to

3  all the other fields where you contend there were no

4  field strips?

5         Do you have an answer for that?

6     A.  I think -- the note was put on "No loss, no

7  strips."  "No loss" meaning no loss from the September

8  storm.  This line item had a prior loss.

9         In Quest you can only have one loss open on

10  a claim at one time.  So the damage from the prior

11  loss on this 75 acres on line 44, whatever damage had

12  been established prior to 9-26, that prior claim had

13  to be withdrawn and the damage recorded in it moved

14  into the current last open claim.

15     Q.  Now, how do you know line 44 was from a

16  prior claim?

17     A.  Oh, where was it -- I looked at the

18  claim --

19     Q.  When did you do that?

20     A.  -- to see where it came from.

21     Q.  When did you --

22     A.  Yesterday.

23     Q.  Yesterday.  And the adjuster would have to

24  know about the prior claim for staging purposes and

25  everything else, wouldn't they?



101

1      MS. BUFKIN:  Object to the form.

2      A.  The purpose for this was to simply move in

3   the damage from the prior storm.

4   BY MR. BEATTIE:

5      Q.  Is there --

6      A.  It had to be moved into the last one.

7      Q.  Is there any other lines that fit that

8   category?

9      A.  I think there's a corn line.  That had to

10  be moved in.

11      Q.  Show me on Exhibit 39 where it says the

12  loss is from a prior hailstorm.  Prior to the

13  September hailstorm.

14      A.  It won't show that in 39.

15      Q.  How would Mr. Bruhn know?

16      A.  The percentage that was brought forward

17  would show in 39.

18      Q.  How would the insured know that's what you

19  allegedly did?

20      A.  I don't know exactly how he would know

21  other than whatever the percentage was we moved into

22  the current claim.

23      Q.  Well --

24      A.  So that -- assuming he knew that we

25  adjusted those fields earlier, this (indicating) would

Def
S

102

1   account for what we found.

2       Q. So, Mr. Burkhart, you're saying that Larry

3   Grieme knew that line 44 was from a prior loss.

4       A. I don't know if he knew. I don't know who

5   wrote this. I did ask Larry Grieme -- because I knew

6   there was at least one open claim already. So I did

7   ask him to make sure that we had counted for any of

8   that prior stuff in this claim. And that would

9   include the one field of corn.

10          I think the prior claim had one line of

11  corn and line 44 of the soybeans.

12      Q. Mr. Grieme said in Exhibit 46 "There were

13  very good samples left to look at in all of these

14  fields except one, a 77-acre field where no samples

15  were left. No loss for this one."

16          Does that mean exactly what it says? Good

17  samples in all of the fields except for one? How

18  could -- because it looks to me like it's very simple

19  in what he's saying. There were good strips left in

20  all the fields except one.

21          MS. BUFKIN: Okay. I think we have two

22  straight questions. So can we read back the first one

23  and let him answer it --

24          MR. BEATTIE: I'll withdraw it. I'll

25  withdraw it.

Def.
S

103

1     MS. BUFKIN: Okay. Because that got

2  confusing.

3  BY MR. BEATTIE:

4      Q.  Did you accept Mr. Grieme's findings that

5  there were "very good samples left to look at in all

6  of these fields except one 77-acre field where no

7  samples were left. No loss for this one"? Did you

8  accept that as being true?

9      A.  All of the fields that we adjusted, yes.

10     Q.  I don't see that statement in there at all.

11  He said "to look at in all of these fields."

12        He didn't put a limitation on it, did he?

13     A.  He wouldn't have been reviewing fields that

14  we didn't adjust.

15     Q.  If he testified he looked at 6,500 acres to

16  count, then you would have to assume there were 6,500

17  acres that had representative strips except for one

18  77-acre field, wouldn't you?

19     A.  No. I would not assume that he looked at

20  6,500 acres.

21     Q.  So he just made a misrepresentation to you?

22        MS. BUFKIN: Object to the form.

23     A.  I don't know where the 6,500 acre number

24  came from.

25  BY MR. BEATTIE:

Def.

F, A, S

104

1    Q.  What's the total number of acres that Al

2  Bruhn had insured for soybeans?  I think it's on the

3  insurance policy.

4        I asked you to go to the insurance policy.

5  The dec page of the insurance policy.

6        What number is that?  Exhibit number?

7    A.  128.

8    Q.  Okay.

9    A.  I don't -- I don't know -- I don't see

10  where it shows the acres by crop.  Oh, wait.  Wait,

11  wait, wait, wait.  I think I found it.

12   ' Q.  I think it does.

13    A.  Well, it has three entries for acres.  For

14  soybeans.  There's seventy-eight hundred -- and maybe

15  sixty-three?  Seventy-eight hundred and some acres of

16  soybeans.

17    Q.  Okay.  And apparently Mr. Bruhn, you could

18  presume, reported 6,500 acres then; correct?

19    A.  No.  He reported a -- he reported a notice

20  of loss on his policy.  It's up to them to tell us

21  what acres we need to go look at --

22    Q.  Okay --

23    A.  -- what acres were hailed on.

24    Q.  -- let's go down that road then.

25        So if that's true, Mr. Bruhn didn't report

1  1,400 acres of beans that hadn't -- let me start over

2  again.

3       If Mr. Bruhn insured 7,800 or 7,900 acres

4  of beans and Mr. Grieme said there were 6,500 acres of

5  shatter to count, that's what he said in his

6  statement, that would leave 1,400 acres that Mr. Bruhn

7  would have thought there was no hail loss.

8       That would be a logical presumption,

9  wouldn't it?

10      MS. BUFKIN:  Object to the form.

11   A.  No.

12 BY MR. BEATTIE:

13   Q.  There wouldn't?  How is my thinking

14 illogical then?

15   A.  I don't think you can logically assume that

16 every line on the policy has a loss.

17   Q.  Well, apparently he didn't take every line

18 in the policy.  If he had 7,800, there's no 1,400-acre

19 fields that I know of.

20   A.  Again, we're going back to the 6,500 number

21 that I don't know where that came from.  It's not a

22 hard -- I don't know where it came from.

23   Q.  Well, maybe Mr. Bruhn will testify where it

24 came from.

25   A.  Maybe somebody glanced at it and did a

*Def S*

*Def A1S*

1  quick calculation in their head and thought there were

2  6,500 acres on the policy. I don't know.

3      Q. How does one of your adjusters screw up a

4  6,500-acre loss and say it's 3,300 acres? I mean

5  that's too big to be a math error.

6      MS. BUFKIN: Object to the form.

7      A. Larry didn't testify or write that we -- I

8  guess we're still going back to that 6,500. And I

9  don't know where that number came from.

10        Part of his review is not to enter exactly

11  how many acres were adjusted.

12 BY MR. BEATTIE:

13      Q. Well, you've said that --

14      A. That wouldn't be part of the review.

15      Q. And you said 100 acres being off might be

16  fine.

17        Let me ask you this --

18        MS. BUFKIN: Object to form.

19 BY MR. BEATTIE:

20      Q. -- in reviewing your field notes,

21  Exhibit 59, if there were only 3,000 acres or so that

22  were actually adjusted, why would it -- why would you

23  have to use six adjusters then to adjust? And why

24  delay seven weeks to do the adjustment?

25      A. When we started, we didn't know how many

*Def.*
*A, S*

*Def*
*F, A*

107

1  acres were hit.  So we sent six people in to get it

2  done as fast as we could.

3      Q.  Seven weeks is as fast as you could.

4          MS. BUFKIN:  Object to the form.

5  BY MR. BEATTIE:

6      Q.  Is that right?

7      A.  The reason we sent six people was to get it

8  done as fast as we could.

9      Q.  I'm saying a seven-week delay is as fast as

10  you could do it, huh?

11      A.  There were a lot of things that led up to

12  that.  One is his claim was reported two weeks after a

13  lot of the other claims in the area.  So that moves

14  him down the line to some extent.

15          Then they realized how many acres were

16  involved.  And I think that's where the 6,500 came

17  from.  I don't know.

18          They realized it was a lot of acres

19  potentially so it took some time, because the

20  adjusters were busy elsewhere, to get together this

21  group rather than send two people in and spend two

22  weeks.

23      Q.  You must have had a lot of hail losses

24  going on; is that right?

25      A.  We had quite a few losses.

108

1    Q.  Well --

2    A.  Not right in that area, but --

3    Q.  A lot of hail losses.

4    A.  We had a lot of hail losses open at that

5  time, yes.

6    Q.  How many men does it take then to adjust

7  3,000 acres?

*Def FA*

8        MS. BUFKIN:  I'd make another objection.  I

9  think we're getting off the field note focus here a

10  little bit.  I'm going to let him ask (sic) this if we

11  can tie it to the field notes, but if we're going to

12  get into just general adjustment, then I'm going to

13  instruct him not to answer.

14        But I'll let you answer that one if you can

15  if that's related to the field notes.

16    A.  I don't think I can -- I can't answer that

17  question.  It depends on the crop, the type of loss,

18  the time of the year, where the acres are.  I can't

19  answer that question.

*Def FA*

20  BY MR. BEATTIE:

21    Q.  Do the field notes reflect Mr. Bruhn

22  telling the adjusters that they don't need to adjust

23  certain fields?

24    A.  As far as I know, we adjusted every field

25  that either had a sample or that we were taken to.

*Def Asked & Answered*

109

1      MR. BEATTIE:  I move to strike.

2  Nonresponsive.

3  BY MR. BEATTIE:

4      Q.  If you don't understand my question, I will

5  repeat it.

6      A.  Okay.

*Def Asked & Answered*

7      MS. BUFKIN:  I think the answer was

8  responsive.  So I think his answer should stand.

9      MR. BEATTIE:  It was not responsive.

10  BY MR. BEATTIE:

11      Q.  I'm going to ask you again.  Do the field

12  notes, Exhibit 59, reflect, to any degree whatsoever,

13  that Mr. Bruhn did not want or need to have certain

14  fields adjusted?

15      A.  The field notes don't reflect that.

16      Q.  Is there anywhere in your claim file, taken

17  from the field notes or even otherwise, that Mr. Bruhn

18  told your adjusters, "You don't need to inspect

19  certain fields"?

*Def Asked & Answered*

20      MS. BUFKIN:  Let's stop.

21      Can you reread that question for me.

22      (The requested portion of the record was

23  read.)

24      MS. BUFKIN:  I'll object to that question

25  to the extent it asks for anything other than the

110

1  field notes.

2        THE VIDEOGRAPHER:  Off the record at 1425.

3        MR. BEATTIE:  She's got to change the tape

4  real quick.

5        (Recess taken.)

6        THE VIDEOGRAPHER:  On the record at 1435.

7  BY MR. BEATTIE:

8        Q.  Mr. Burkhart, in both Exhibit 59, which are

9  the field notes of adjusters out in the field, and

10  Exhibit 131, the screen shot, we went through the

11  lines that had no data at all.  Do you recall that?

12  26, 27, 28, 33, 35, 36, 45 through 53, and I believe

13  55.

14        A.  The lines that there were no field notes

15  for.

16        Q.  Correct.

17        A.  Okay.  Yes.

18        Q.  And I think, according to Exhibit 39, there

19  are zeros.

20            Doesn't your hail loss adjustment manual

21  require if you enter zero --

22        A.  No.

23        Q.  -- that you're required to state why?

24        A.  No.  Not to my knowledge, unless there's

25  something I'm missing.

111

1    Q.  Did any of your supervisors; Mr. Eldridge,

2  request to review the field notes, Exhibit 59?

3    A.  No.

4    Q.  What about any of your subordinates.  Did

5  they request to review the field notes, Exhibit 59?

6        MS. BUFKIN:  Are we talking about -- is 59

7  Galen's --

8        MR. BEATTIE:  Any of his subordinates.

9  That would include Galen and anybody else --

10        MS. BUFKIN:  No, I mean are we talking

11  about Galen's records?

12        MR. BEATTIE:  Exhibit 59, yeah.

13        MS. BUFKIN:  So what time period are we

14  talking about?  After he has been aware of them?

15        MR. BEATTIE:  Yeah, or before.

16    A.  No one was aware of them so no one asked to

17  see them.

18  BY MR. BEATTIE:

19    Q.  Let me rephrase it.  Did anybody ask

20  whether the field notes, Exhibit 59, existed, and if

21  they did, to review them?

22    A.  No.

23    Q.  Everybody else at the insurance company was

24  like you, they just didn't ask for the notes.

25        MS. BUFKIN:  Object to the form.

112

Def,
F,R,A

1       A.  It's not routine to keep them.  So no.

2  BY MR. BEATTIE:

3       Q.  Well, we've been down that road where

4  you've already sworn in your affidavit that adjusters

5  can use the handwritten notes in the field or enter

6  them into a computer, it's up to them; correct?

7       A.  Right.

8       Q.  It would be true, wouldn't it,

9  Mr. Burkhart, if you didn't want to know something,

10  then you don't ask for it?

11          MS. BUFKIN:  Object to the form.

12       A.  I'm not sure I understand the question.

13  BY MR. BEATTIE:

14       Q.  Does the term "plausible deniability" mean

15  anything?

16          MS. BUFKIN:  Object to the form.

17       A.  If I didn't expect something to exist, I

18  would not ask for it.

19  BY MR. BEATTIE:

20       Q.  So you could plausibly deny looking at

21  them.

22          MS. BUFKIN:  Object to the form.

23       A.  I don't know how to answer the question.  I

24  didn't -- I didn't even know these existed.  I didn't

25  expect them to.

Def
F, R, A

113

1   BY MR. BEATTIE:

2      Q.  Notwithstanding your affidavit.

3         MS. BUFKIN:  Object to the form.

4         Is there a question?

5         MR. BEATTIE: Yeah.

6   BY MR. BEATTIE:

7      Q.  Notwithstanding your affidavit, you're

8   saying you didn't expect the field notes to exist.

9   59.

10     A.  I -- I don't know where in my affidavit it

11  says that I expected field notes to exist.

12     Q.  Well, let me ask you this, Mr. Burkhart:

13  Would a competent manager of claims who really wanted

14  to be fair and get to the bottom of one of their

15  insured's claims, would they want to conduct a

16  thorough investigation and try to find out every

17  document that exists, including whether there was any

18  documents in the field notes or anything like that?

19        Would somebody that really wanted to be

20  fair, is that what they would do?

21     A.  As far as I knew --

22        MS. BUFKIN:  Object to form.

23     A.  -- we had all the documents.

24  BY MR. BEATTIE:

25     Q.  Is that what they would do, sir?

Def
FR

1        MS. BUFKIN:  Same objection.

2        A.   Like -- as far as I knew, everything was --

3   we had everything.

4   BY MR. BEATTIE:

5        Q.   Mr. Burkhart, as far as you knew.  That

6   means if you don't ask, then you can say, "I didn't

7   know."

8            I'm asking you, sir, wouldn't somebody that

9   was trying to be fair with their insured and get to

10   the bottom of what was going on ask anybody that was

11   involved, "Do you have field notes, do you have

12   records, what went on out there"?

13            Did you do that, sir?

14        A.   No, because I didn't expect those to even

15   exist.

16        Q.   You didn't do it.

17        A.   No.

18        Q.   And instead you took the position "I'm

19   writing off Al Bruhn and I'm not doing anything."

20   That was your ultimate position after you did your

21   investigation.

22            MS. BUFKIN:  Object to the form.

23        A.   Well, I guess the letter I wrote speaks for

24   itself.

25   BY MR. BEATTIE:

Def

FR

115

1    Q.  Yes, it does.  That we can agree on.

2        Let me ask you this:  If you would have

3  done a complete, thorough investigation to find out

4  whether those field notes existed at the time of your

5  investigation back in 2012 instead of November of

6  2016, four years later, and found out that they do not

7  match up and there's discrepancies there, what would

8  you have done?

9        MS. BUFKIN:  Object to the form.

10       A.  If I had a reason to ask for them back

11  then, and if they didn't match up back then, I would

12  have tried to find out why.

13  BY MR. BEATTIE:

14       Q.  Let me ask you this, Mr. Burkhart:  An

15  insurance company owes its insured the duty of good

16  faith and fair dealing; right?

17       A.  Yes.

18       Q.  And that duty is ever continuing, isn't it?

19       MS. BUFKIN:  Object to the form.

20       A.  What do you mean "ever continuing"?

21  BY MR. BEATTIE:

22       Q.  Does that duty of good faith and fair

23  dealing to your insured ever end?

24       MS. BUFKIN:  Object to the form.

25       If you can answer this --

116

1    Are we going to tie this to the field notes

2  or is this in just general?

3      MR. BEATTIE:  No, we can tie it to it.

4      MS. BUFKIN:  Okay.  Let's.

5    A.  Does it ever end?

6  BY MR. BEATTIE:

7    Q.  Yeah, at the time that you were finally

8  thrust the field notes, Exhibit 59, in front of you,

9  did you still have, "you" meaning the insurance

10  company, a duty of good faith and fair dealing to

11  Mr. Bruhn?

12      MS. BUFKIN:  Object to the form.

13      If you can answer, answer.  If you can't,

14  don't answer.

15    A.  I guess I don't know how to answer the

16  question.  We've tried to be fair all along.  So

17  it's -- I don't know where we stopped being fair.

18  BY MR. BEATTIE:

19    Q.  You know, I really want to comment on that

20  but I can't.

21      I want to ask you this:  When you had those

22  field notes, Exhibit 59, placed in front of you,

23  Mr. Burkhart, four years after the fact --

24    A.  Uh-huh.

25    Q.  -- did you then go back and re-look at

*Def F/A*

*Def A*

*Def F/A Asked & Answered*

1 everything you did?  Did you go talk to the people

2 about these field notes to get to the bottom of all

3 this discrepancy in order to try and be fair to

4 Mr. Bruhn or did you do nothing?

5     MS. BUFKIN:  Object to the form.

6     A.  I took the numbers that were in Quest for

7 what they were.

8 BY MR. BEATTIE:

9     Q.  So you did nothing even when you got

10 Exhibit 59 on any further or continuing investigation.

11     A.  Correct.

12     Q.  What reserves did you have set?

13     MS. BUFKIN:  This is outside the scope of

14 the field notes.  I'm going to instruct him not to

15 answer.

16     MR. BEATTIE:  We don't have your reserves

17 and you said you were going to supply them.

18     MS. BUFKIN:  Well, Mr. Burkhart is not

19 going to testify about them today.

20     MR. BEATTIE:  Then when are we going to get

21 the reserves?

22     MR. DILLEY:  Well, I told you we would

23 supplement our discovery.  We've been on the road

24 doing depositions for -- it seems forever, but we'll

25 discuss that before we leave today and let you know

118

Def
F, A, Asked &
Answered

1   when we can get that to you.

2   BY MR. BEATTIE:

3       Q.  One last question, Mr. Burkhart.  In spite

4   of whatever investigation you did in 2012 and failing

5   to find out about the field notes, did you still get a

6   bonus?

7       MS. BUFKIN:  Object to the form.  I

8   instruct him not to answer.

9   BY MR. BEATTIE:

10      Q.  You do get bonuses; right?

11      MS. BUFKIN:  Same objection.  Same

12  instruction.

13  BY MR. BEATTIE:

14      Q.  Are you going to follow your lawyer's

15  advice and not answer?

16      A.  Absolutely.

17      MR. BEATTIE:  Thank you.  I have nothing

18  else.

*Def FjR, Aby Counsel*

19      Liz, Jeff said last Friday that we'd be

20  getting the reserves this week -- we're off.

21      THE VIDEOGRAPHER:  Off the record ending

22  the deposition at 1447.

23      (Deposition concluded at 2:47 p.m.,

24  January 12, 2017.)

25

119

```
1          C E R T I F I C A T E

2          I, the undersigned, a Certified Shorthand

3   Reporter of the State of Iowa, do hereby certify that

4   there came before me at the time, date, and place

5   hereinbefore indicated, the witness named on the

6   caption sheet hereof, who was by me duly sworn to

7   testify to the truth of said witness's knowledge, that

8   the witness was thereupon examined under oath, the

9   examination taken down by me in shorthand and later

10  reduced to a transcript through the use of a

11  computer-aided transcript device under my supervision

12  and direction, and that the deposition is a true

13  record of the testimony given and of all objections

14  interposed.

15          I further certify that I am neither

16  attorney or counsel for, nor related to or employed by

17  any of the parties to the action in which this

18  deposition is taken, and further that I am not a

19  relative or employee of any attorney or counsel

20  employed by the parties hereto, or financially

21  interested in the action.

22          Dated this 18th day of January, 2017.

23

24

25          CERTIFIED SHORTHAND REPORTER
```

120