IN THE UNITED STATE DISTRICT COURT
FOR THE NOTHERN DISTRICT OF IOWA
WESTERN DIVISION

| | |
|---|---|
| BRUHN FARMS JOINT VENTURE,<br><br>     Plaintiff,<br><br>-vs-<br><br>FIREMAN'S FUND INSURANCE<br>COMPANY,<br><br>  Defendant. | No. ____13-CV-4106CJW_____<br><br><br>**PLAINTIFF'S DESIGNATION OF<br>DEPOSITION TRANSCRIPT OF<br>EDWARD CERVEN** |

COMES NOW, the Plaintiff Bruhn Farms Joint Venture and hereby designates the deposition transcript of Edward Cerven as shown on the attached bracketed/marked portions of the said Deposition Transcript of Edward Cerven taken on September 28, 2016 in this matter.

For the Court, the outlined/bracketed portion is Plaintiff's designation and the Defendant's objections are noted by the following notations:

A = Argumentative

F = Foundation

H = Hearsay

R = Relevance

S = Speculation

1

BEATTIE LAW FIRM, P.C.


By___/s/ _Donald G. Beattie_____
    Donald G. Beattie (AT0000736)
    Nile Hicks (AT0009391)
    4300 Grand Ave.
    Des Moines IA  50312
    Phone:  (515) 263-1000
    FAX:    (515) 263-1411
    don.beattie@beattielawfirm.com
    nile.hicks@beattielawfirm.com


SPAULDING, BERG & SCHMIDT, P.L.C.


    Nicholas L. Shaull (AT0010096)
    2423 Ingersoll Ave.
    Des Moines IA  50312
    Phone:  (515 277-6559
    Fax:  (515) 277-7536
    Email:  nick.shaull@sbsattorneys.com
Attorneys for Plaintiff


CERTIFICATE OF SERVICE

The undersigned hereby certifies that on February 21, 2017, a true and correct copy of the foregoing was served via email upon the following counsel of record:

Jeff Dilley
Elizabeth Bufkin
Henke Bufkin
Post Office Box 39
Clarksdale, MS 38614
ATTORNEYS FOR DEFENDANT


___/s/ Kelly L. Brandt Beattie_____

2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION

- - - - - - - - - - - - - - X
BRUHN FARMS JOINT VENTURE,  )
  )
      Plaintiff,  ) CASE NO. C13-4106
  )
vs.  ) COPY
  )
FIREMAN'S FUND INSURANCE  )
COMPANY,  )
  )
      Defendant.  )
- - - - - - - - - - - - - X

DEPOSITION OF EDWARD DALE CERVEN,

taken by the Plaintiff before Keriann E. Hansen,
Certified Shorthand Reporter of the State of Iowa,
at 125 South 68th Street, West Des Moines, Iowa,
commencing at 2:15 p.m., Wednesday, September 28,
2016.

APPEARANCES:

For the Plaintiff:    DONALD G. BEATTIE, ESQ.
        NILE HICKS, ESQ.
        Beattie Law Firm, P.C.
        4300 Grand Avenue
        Des Moines, IA 50312

        NICHOLAS L. SHAULL, ESQ.
        Spaulding, Berg & Schmidt
        2423 Ingersoll Avenue
        Des Moines, IA 50312

For the Defendant:    JEFFREY S. DILLEY, ESQ.
        ELIZABETH T. BUFKIN, ESQ.
        Henke-Bufkin
        408 Hopson Street
        PO Box 39
        Clarksdale, MI 38614

Case 5:13-cv-04106-CJW  Document 116  Filed 02/21/17  Page 3 of 70

103969_092816EC (2)

Also Present:        Alan Bruhn


KERIANN E. HANSEN - CERTIFIED SHORTHAND REPORTER
                                                    2


I N D E X

WITNESS:  EDWARD DALE CERVEN              PAGE

        Examination by Mr. Beattie          3



PREVIOUSLY MARKED EXHIBITS:              PAGE

Exhibit 37   Soybean Loss Instruction Manual 14

Exhibit 39   RCIS Loss #5                    25

Exhibit 40   RCIS 2012 Crop - Hail Loss      13
             Adjustment Manual

Exhibit 41   Quest Document                  40

Exhibit 43   Burkhart/Longman/Cerven         40
             11-19-12 E-mails

Exhibit 44   Burkhart/Grieme/Cerven/         49
             Kevorkian 11-19-12 E-mails

Exhibit 45   Burkhart/Kevorkian 11-26-12     52
             E-mails

Exhibit 46   High Dollar Review Form         45

Exhibit 47   Burkhart/Grieme 12-17-12        53
             E-mail

Exhibit 51   Burkhart/Eldredge 12-20-12      54
             E-mail

Case 5:13-cv-04106-CJW   Document 116   Filed 02/21/17   Page 4 of 70

```
1              P R O C E E D I N G S

2              EDWARD DALE CERVEN,

3   called as a witness by the Plaintiff, being first

4   duly sworn by the Certified Shorthand Reporter, was

5   examined and testified as follows:

6                    EXAMINATION

7   BY MR. BEATTIE:

8        Q    Good afternoon, sir.

9        A    Good afternoon.

10       Q    Would you please state your full name?

11       A    Edward Dale Cerven.

12       Q    How old are you?

13       A    Fifty-eight.

14       Q    Where do you live?

15       A    Ankeny, Iowa.

16       Q    What is your address?

17       A    2310 Southeast Delaware, G241.

18       Q    How old have you lived there?

19       A    Since '98, 1998.
```

Page 3

20    Q    Where were you born and raised?

21    A    Corning, Iowa.

22    Q    What is your education?

23    A    Formal education?

24    Q    Yes, sir.

25    A    Graduated from Iowa State in 1980.

                                                              4

1    Q    With a degree in what?

2    A    Bachelor of science in agriculture.

3    Q    Why don't you give me your work history,

4 please?

5    A    Total work history since college?

6    Q    (No verbal response.)

7    A    Want me to start from college?

8    Q    From College, yeah.  I presume you --

9 were you born and raised on a farm?

10    A    Yes, I was.

11    Q    And does your family still farm?

12    A    My mother owns the farm still.

13    Q    Are you engaged?

14    A    No, I'm not.

15    Q    So after you graduated from Iowa State

16 forward then.

17    A    Okay.  I returned to the home farm,

                        Page 4

18  farmed for a while with my father.  Also started

19  adjusting crop insurance.  Then I moved to

20  northeast Missouri for three years, farmed there,

21  also adjusted as well.  In 1992 I accepted a

22  full-time position with a crop insurance company.

23  I went full time with them in 1992.

24      Q    When you adjusted before 1992, what

25  company was it?                                    5


1       A    I was a contractor.  I was contract with

2  Rain and Hail, Great American, Columbia Mutual

3  Insurance Company, small regional insurance company

4  based out of Columbia, Missouri.

5       Q    Did you adjust hail loss?

6       A    Mainly multi-peril.

7       Q    Mainly multi.  In 1992 when you were on

8  board as a full-time employee, was that for RCIS or

9  its predecessors?

10      A    No, it was not.

11      Q    Who was that through?

12      A    Rain and Hail Insurance.

13      Q    What was your position with them?

14      A    It was claims and -- claims and marketing

15  supervisor.

Page 5

16    Q   How long did that position last?

17    A   That lasted until 1998.  I was still with

18 Rain and Hail.  I moved to the corporate office as

19 internal auditor.

20    Q   Where is the corporate office?

21    A   Johnston, Iowa.

22    Q   Go ahead.

23    A   I was in the capacity of internal auditor

24 from '98 to -- must have been 2002.  Then I assumed

25 the duties of special investigative branch manager.

6

1    Q   For Rain and Hail?

2    A   For Rain and Hail.  That lasted until

3 December of 2004.  Then I started working for John

4 Deere Crop Insurance in January of 2005.

5    Q   What do you do for John Deere?

6    A   I was a compliance manager there.

7    Q   What does compliance manager do?

8    A   Handled RMA cases, oversaw the quality

9 control.

10    Q   What is RMA?

11    A   Risk Management Agency.

12    Q   Okay.  Go ahead.

13    A   I was from -- I worked there until

Page 6

14  December of 2009.  Then in January 2010, I started

15  with RCIS.

16       Q    In what position?

17       A    Regional claims manager.

18       Q    Are you still regional claims manager?

19       A    Correct.

20       Q    What region?

21       A    Currently or?

22       Q    Back in 2012.

23       A    2012, I had responsibilities for the

24  state of Iowa, Illinois, Indiana, and Michigan.

25       Q    How about currently?

                                              7

 1       A    Currently, I have the states of Iowa,

 2  Missouri, and Wisconsin.

 3       Q    What does a regional claims manager do?

 4       A    Regional claims manager oversees claims

 5  within the region.  I have supervisors underneath

 6  me in various regions of my territory, making sure

 7  claims are getting assigned, worked properly,

 8  dealing with escalated claims, more complex claims.

 9       Q    To whom do you report currently?

10       A    Rick Poverud.

11       Q    Did you report to him in 2012?

                    Page 7

12    A    No, I did not.

13    Q    To whom did you report?

14    A    Edward Longman.

15    Q    Does he live down in Centerville or

16  southern Iowa?

17    A    Longman?

18    Q    Yes, sir.

19    A    No, he lives north of Bloomington,

20  Illinois.

21    Q    Okay.

22    A    Small down called Minonk.

23    Q    I'm just curious, do you work out of your

24  home?

25    A    Yes, I do.

                                                    8

1    Q    Do regional claims managers work out of

2  their home?

3    A    Yes.  They're based out of their home.

4    Q    So I would assume there's a lot of

5  computer interaction between you and everybody

6  connected with RCIS?

7    A    Correct.

8    Q    Does RCIS -- in 2012, did RCIS only write

9  hail loss?

                          Page 8

10      A      Only write hail loss?

11      Q      Did it sell other forms of insurance

12  besides hail?

13      A      Yes, multi-peril.  It's administered by

14  the federal government or the risk management

15  agency.

16      Q      Where did Larry Grieme and Galen Sornson

17  and the adjusters that worked this file fall under

18  the chain of command to you?

19      A      They reported to the area claims

20  supervisor for northwest Iowa.

21      Q      Who would that have been?

22      A      Steve Kevorkian.

23      Q      And he reported to you?

24      A      Yes, he did.

25      Q      Before 2012, were you aware one way or

9

1  another that Al Bruhn or Bruhn Farms was an RCIS

2  insured?

3      A      Before 2012?

4      Q      Yes, sir.

5      A      No, I was not.

6      Q      Let me ask you this:  With respect to

7  making the ultimate decision on payment of the

Page 9

8  claim that's involved in this lawsuit -- and we

9  know a denial letter went out in late January or

10  early February of 2013 saying we're not reassessing

11  the original amount we came up with -- were you the

12  one that made the decision?

13      A    No.

14      Q    Who made that decision?

15      A    I believe it was Larry Burkhart.

16      Q    Larry Burkhart is a step above you?

17      A    Larry Burkhart would've been -- he

18  handles responsibilities of the crop-hail program

19  nationwide.

20      Q    Okay.  Did you make any recommendations

21  about what should be done with the Bruhn hail loss

22  claim in September 2012?

23      A    No, I did not.

24      Q    ,Were you asked to give any

25  recommendations?

                                    10


1       A    No, I was not.

2       Q    Did Mr. Burkhart talk to you about it at

3  all?  I have documents I'll show you later, but I'm

4  asking off -- trying to generally ask you off the

5  top of your head.

                    Page 10

6    A    As far as a phone call or e-mail?

7    Q    Meeting?

8    A    He never solicited my advice because the

9 ultimate decision was his.  He might have kept me

10 aware of the situation, but crop-hail was Larry's

11 responsibility and the people underneath him.

12    Q    What was Rick Poverud's position?

13    A    In 2012?

14    Q    Yes, sir.

15    A    My immediate supervisor in 2012 would've

16 reported up to him.  Longman would've reported to

17 Poverud.

18    Q    Seems like there's a lot of layers here.

19    A    There's several.

20    Q    The headquarters of RCIS, as I understand

21 it in 2012, was in Anoka, Minnesota.

22    A    Correct.

23    Q    Is that still the headquarters?

24    A    Yes.

25    Q    How often do you get up there?

                                              11

1    A    Average year, maybe two to three times a

2 year, maybe four.

3    Q    What do you do day by day today that's

4  different than what you did day by day in 2012?

5      A    About the same responsibilities.

6      Q    Just kind of give me a typical day of

7  what you do.

8      A    Typical day is hard to define.  But make

9  contact with my supervisors usually on a daily

10  basis by phone call, e-mail, see how claims are

11  going.  Watching the system see how claims are

12  coming in, if we get any assigned, what type of

13  claims they are.  I may field phone calls from

14  agents from time to time on claims.  Usually the

15  agents go to the supervisors first, and if it

16  escalates or they can't get ahold of them, they

17  call me with questions about claim procedure or how

18  a certain claim is going.

19      Q    It would be a lot of computer and phone

20  calls?

21      A    Correct.

22      Q    How often do you get outside of your

23  house and get out into the field?

24      A    Quite a bit.  I'm usually on the road,

25  average, probably three days a week.

                                              12

♀

1      Q    Going to meet with adjusters or --

                    Page 12

2     A     Not so much adjusters.  Supervisors,

3  agents.  I do attend adjusters whenever the

4  supervisors have a trainer for the adjusters.

5     Q     We'll get into that.  What do you do in

6  the wintertime when the crops are out of the

7  ground?

8     A     We've still got responsibilities.  The

9  federal program's pretty much a year-round workload

10  anymore.  It's not like it was 20 years ago when

11  once harvest claims got settled, there wasn't much

12  going on until about June.  There's audits going

13  on.  And first part of the year, there's usually

14  agent training meetings, keeping the agents up to

15  date on the changes in the program.

16     Q     Now, I got into that with a little bit

17  with Mr. Grieme.  I presume you knew him in 2012?

18     A     Yes, I did.

19     Q     You know all of the adjusters, I presume,

20  in your area?

21     A     I wouldn't know all of them by name and

22  face, but most of them, yes.

23     Q     Galen Sornson, did you know fairly well?

24     A     I knew of him.  I didn't -- I wouldn't

25  say well at the time.

1    Q    Well, I asked Mr. Grieme about training,

2  and he said that there would be training, I think,

3  every spring?

4    A    Yes.  Every spring we have an adjusters

5  school usually in a central location for a certain

6  region or area.

7    Q    Let's talk about your region.  Normally

8  where would the schools be?

9    A    I'm trying to think where they were in

10  2012.  I can't tell you for sure what city it is

11  located.  It might have been Des Moines or it may

12  have been Peoria, Illinois.

13    Q    I assume you're intimately familiar with

14  Exhibit 40, the crop loss hail manual?

15    A    I wouldn't say intimate, but I am

16  familiar with it.

17    Q    Bates 743, it talks about an updated

18  company adjuster training manual.  Is that

19  something that you prepare?

20    A    No.

21    Q    Who prepares that?

22    A    It's my understanding that Larry Burkhart

23  and a couple others prepare that.

Page 14

24     Q   Do you keep copies of every -- since

25 you've been on board in about 2010 of all the

1 adjuster training manuals?

2     A   Probably not.  I usually after a couple

3 years dispose of them.

4     Q   How do they vary from what might be

5 Exhibit 40 to hail loss adjuster manual or the NCIS

6 manual, which is Exhibit 37?

7     A   The soybean loss adjustment manual issued

8 by NCIS, they're usually crop specific, more

9 detailed to the specific crop involved as far as

10 loss adjustment procedures.  The RCIS crop-hail

11 lamb is more general in nature.

12     Q   Have you put on any of the training

13 sessions?

14     A   For crop-hail, no, I have not.  Our

15 spring training usually is composed mainly of

16 multi-peril training.  There could be -- depending

17 on the year, there could've been crop-hail tacked

18 on for a day, day and a half.

19     Q   How long does your school last?

20     A   It usually starts on a Tuesday and then

21 is either done by Thursday or Friday of that same

Page 15

22   week.

23       Q    So it's pretty intensive?

24       A    Yes.

25       Q    Are you paid a salary?
                                                        15

Relevance
403

1        A    Yes, I am.

2        Q    And to your knowledge, are all of the

3    upper-level management employees salaried people?

4        A    Correct.

5        Q    Are there any bonuses dependent on claims

6    or profitability or anything like that?

7        A    Not as far as claims.  But overall

8    profitability of the company, the bonuses could be

9    tied to that.  It's various from year to year.

10       Q    Who decides on that, what the bonuses

11   would be?

12       A    At that time, it would've been decided by

13   Wells Fargo which owns RCIS at that time.

14       Q    And I understand Allianz owns it today?

15       A    No, Zurich does.

16       Q    Zurich does?  When did that happen?

17       A    April 1.

18       Q    Of this year?

19       A    Correct, of 2016.

                        Page 16

Relevance
403

Argumentative

20      Q      Your company gets bought and sold a lot,

21  doesn't it?  Is it generally a profitable company?

22      A      To my understanding it is.  There's ups

23  and downs every year with just the RCIS portion

24  depending on how loses go as far as whether we have

25  a lot of losses or do not have a lot of paid

                                                      16

1  losses.

2      Q      Of course, obviously losses affect

3  profitability; right?

4      A      Correct.

5      Q      Are only the managers paid bonuses?

6      A      Are we talking currently or --

7      Q      Back in 2012.

8      A      To my understanding they were because the

9  adjusters were hourly employees.  They were not

10  bonus eligible at that time in 2012.

11      Q      Are they today?

12      A      No.

13      Q      Do you remember if you were paid a bonus

14  in 2012, for the year 2012?

15      A      For the 2012 calendar year?

16             I'm not sure whether I was or not.

17      Q      Do you recall on 2013?

                        Page 17

18    A    I couldn't say in '13 either for sure.

19    Q    Are all of your adjusters -- strike that.

20         I'm really more concerned about 2012 and

21    before than after.  And can I have an understanding

22    with you about if I ask you a question, I'm

23    referring to 2012?  It will shorten it up a little

24    bit.

25    A    I'll try to refer to 2012.

                                                17

1     Q    Back then in 2012, were all of your

2     adjusters trained to adjust both multi-peril and

3     hail?

      A    Not all, but most of them were.

5     Q    What does it take to be trained for

6     multi-peril adjustment?

7     A    There's certain requirements set forth by

8     the federal government also in conjunction with

9     National Crop Insurance Services.  Before an

10    adjuster can ever be assigned on the multi-peril

11    side, they have to go through at least 60 hours of

12    training, which is comprised of 24 classroom.  The

13    balance can be ride-along training.  Then they have

14    to sit for a test that's -- online test that goes

15    through the trade association, and National Crop

Page 18

16   Insurance Services.  It's a three-part test.  They

17   have to pass all three tests with an 80 percent

18   passing score.

19        Q    Kind of the bottom line is if you're a

20   multi-peril adjuster, when you go out and look at a

21   crop, better be able to recognize further the

22   damages hail, drought, heat, or whatever it might

23   be for multi-peril.  Would you agree with that?

24        A    Yes.  Because the adjuster has to

25   determine the cause of loss and record it on his

                                              18

1    forms which is ultimately transmitted to RMA, Risk

2    Management Agency.

3         Q    And I presume that your crop-hail

4    adjusters that are multi-peril, if they go out and

5    adjust to hail loss, they're supposed to look and

6    see whether any of the loss is attributable to

7    anything other than hail; correct?

8         A    They're supposed to be -- the crop-hail

9    policy just covers a direct peril of hail.  It does

10   not take into account other perils.

11        Q    I don't know if that answered my question

12   or not.  What I'm trying to get at, you're not

13   going to pay on a hail loss for crop damage that

                        Page 19

14 isn't due to hail?

15     A    That is correct because a crop-hail

16 policy just covers the peril of hail to that

17 growing crop.

18     Q    So if a crop-hail adjuster is also

19 trained in multi-peril goes out there and it's been

20 reported as a hail loss and they look and say this

21 isn't a hail loss, it's a drought, heat, or some

22 other loss, they're required to report that?

23     A    Correct.  If there was not any crop-hail

24 loss to that plant, then there wouldn't be anything

25 payable under the crop-hail policy.
                                        19

1     Q    That's kind of the basic knowledge, isn't

2 it?  Common sense?

3     A    Yes.  As long as you understand the

4 crop-hail policy just covers damage directly

5 attributable to hail.

6     Q    Mr. Cerven, Exhibit 40, the crop-hail

7 loss adjustment manual, do you have a different

8 manual for multi-peril?

9     A    Yes, there is.

10     Q    Does that differ in any way from the hail

11 loss adjustment manual?

Page 20

12    A    Quite a bit.

13    Q    How does it differ?

14    A    The multi-peril manual is issued by the

15 federal government each year.  The crop-hail manual

16 is a document developed by RCIS itself.

17    Q    So I could go online and get the federal

18 multi-peril crop-hail manual?

19    A    Not crop-hail.  Multi-peril.

20    Q    Multi-peril.  Thank you.

21    A    Be located out on the Risk Management

22 Agency web site.

23    Q    For crop-hail loss manuals you got the

24 soybean loss manual specific and crop-hail loss

25 manual general for hail loss; correct?
                                              20

1    A    Correct.

2    Q    Because you could have -- I assume you've

3 got a loss instruction manual for corn and rye and

4 others?

5    A    Correct.

6    Q    How do the two interact, 37 and 40, the

7 two manuals?  They're compliment to one --

8    A    Complimentary.

9    Q    So let's take Mr. Grieme because we just

Page 21

10    deposed him.  He said he was multi-peril qualified.

11    He would have the soybean loss instruction manual

12    and the crop-hail loss manual; correct?

13         A    Correct.

14         Q    And in hail loss, he would also have the

15    corn manual, rye and other grains that he would

16    adjust?

17         A    Correct.

18         Q    And then he would have a multi-peril

19    manual that was put out by the federal government?

20         A    Yes.  The federal government puts out a

21    general loss adjustment manual.  Then they also

22    have crop specific manuals just like on the

23    crop-hail side.

24         Q    So he would have a lot of manuals?

25         A    He could depending on the number of crops

                                              21

1    that he works.

2         Q    What are the primary crops here in Iowa

3    besides corn, soybeans, and rye?  Wheat?

4         A    Very, very little wheat.  Primary crops

5    in Iowa are corn, soybeans.  They're the bulk of

6    the policies that's written in the state of Iowa.

7         Q    Can you tell me generally what role you

Page 22

8  had or what you did in this matter involving Bruhn

9  Farms?

10      A    I very little involvement because I was

11  handling the crop-hail side.  They kept me informed

12  a certain degree because the agent also wrote

13  multi-peril insurance.  That was my primary

14  responsibility was the multi-peril.

15      Q    So once the dispute arose, which was

16  almost immediately after it was adjusted, it really

17  went through more hail loss personnel than

18  yourself?

19      A    Correct.  I was not aware until a while

20  down the road that there was a dispute.

21      Q    All right.  Who would've been more

22  primarily involved besides Mr. Burkhart?  I see

23  Mr. Kevorkian a lot, but I understand he had some

24  health issues going on during this time.

25      A    That would be correct.

                                    22

1       Q    Would Mr. Longman have had intimate

2  involvement?

3       A    He would not have intimate involvement.

4       Q    What about Mr. Poverud?

5       A    No.

                    Page 23

6      Q      Where does he live?

7      A      Mr. Poverud, Oklahoma.

8      Q      Oklahoma.  All right.  So if we go up the

9  chain -- and I'm talking about the real people that

10  were actively involved -- Kevorkian and

11  Mr. Burkhart, who else?

12      A      I believe the national claims manager was

13  involved, which is Chuck Eldredge.

14      Q      Chuck Eldredge.  All right.  Is that who

15  Mr. Burkhart reported to?

16      A      Correct.  2012, he did.

17      Q      Do you know who made the final decision

18  on what to ultimately do with regard to the Bruhn

19  claim?

20      A      No, I do not.

21      Q      I want to ask you a few questions about

22  the crop-hail lost adjustment manual, Exhibit 40.

23              MR. DILLEY:  I've got a copy of it here.

24  BY MR. BEATTIE:

25      Q      But let me ask you this before we start:
                                              23

1  You're within the subpoena power of the court.  Do

2  you have any plans on not being available for trial

3  which is set in March?

                    Page 24

*Relevance 403*

4     A     No, I don't.

5     Q     No vacations out of the country or

6 anything like that?

7     A     None that I'm aware of.

8     Q     Maybe that changes though; right?

9     A     No, it will not just because of this

10 court case.

11     Q     Gotcha.

12           Going to the crop-hail loss adjustment

13 manual, Exhibit 40, is this considered something

14 that you expect the crop-hail loss adjusters to

15 follow?

16     A     Yes.  If there's any procedure in there,

17 I would.

18     Q     Let me run through this quickly.  Okay?

19 I think we can get through it very quickly.  If you

20 go to page 741 of Exhibit 40, you can see under the

21 heading, The Agent, keep the agent informed.

22           Do you think that's important?

23     A     Yes, I do.

24     Q     And you expect your adjusters to talk to

25 the agent, keep them aware of what's going on?

                                              24

1     A     Yes.

2     Q    And the next paragraph, Insured's Claim,

3  do you expect your crop-hail adjusters to be in

4  contact with the insured -- I'm going to say the

5  farmer because we're dealing with farmers, aren't

6  we?

7     A    Most cases, yes.

8     Q    Get them involved, take them out to the

9  fields, get them involved in doing whatever

10  adjusting there is so that they know, they can see

11  it firsthand.  If there's an issue, we'll get it

12  worked out?

13     A    Yes, we do.  We even encourage insureds

14  to go with us so they can see the adjusting process

15  we're using depending on the stage of the crop, get

16  involved with the counts even.

17     Q    In fact, I see where it says let the

18  insured record some of the numbers.  That's what

19  you're talking about?

20     A    Correct.

21     Q    That's just good adjustment, isn't it?

22     A    It makes the claim go easier and the

23  insured understands the process the adjuster is

24  using to arrive at the percentage of damage of the

25  loss.

1     Q    We know from Mr. Grieme that there are

2   handwritten notes the adjusters make of counts and

3   other pertinent information when they're out in the

4   field?

5     A    There could be, yes.

6     Q    What is the record retention policy on

7   those handwritten notes in the event that an

8   adjuster gets challenged on what his count was or

9   what his procedure was?

10     A    I'm not familiar with any record

11   retention on those because once he takes those

12   notes, he inputs them into the computer because we

13   have an electronic program that calculates the loss

14   for them.  Some adjusters do use notes.  Some of

15   them just input their numbers directly into the

16   computer when they're in the field.

17     Q    How is there any way of knowing what

18   counts an individual adjuster did on an individual

19   field or what their procedure -- that's not records

20   in the final product, as I understand?

21     A    Yes, it would be.  It would be recorded

22   on the survey sheets, which is electrically inside

23   the computer program.

Page 27

24     Q    Mr. Cerven, this is loss number five,

25  which is the loss primarily at issue in this case.

                                              26

1          MR. DILLEY:  For the record, Exhibit 39.

2          MR. BEATTIE:  What did I say?

3          MR. DILLEY:  You said loss number five.

4          MR. BEATTIE:  I'm sorry.  It is loss

5   number five, Exhibit 39.

6   BY MR. BEATTIE:

7      Q    If I wanted to know how many -- what

8   adjusters went to what fields, would that will show

9   me, that program?

10     A    This front copy of this loss?

11     Q    Any part of the documents in there.

12     A    I would have to review it.  This is the

13  first time I've seen this document.  Which

14  adjusters went to which fields?

15     Q    Yeah.  I'm going to ask you -- yes,

16  that's the first question.

17          Mr. Cerven, could I stop you so I don't

18  make this excruciatingly long.  I want to know not

19  only what adjusters went to what fields, what their

20  counts were for each strips, pods, how they

21  conducted the adjustment or anything like that.

                    Page 28

22          And while you're looking, I'm going to

23   run to the bathroom real quick.

24      A    So you're wanting to know which adjusters

25   went to which fields?

27

1       Q    How they conducted their counts, what

2    they're counts were.

3       A    Okay.

4                (A brief recess was taken.)

5       A    For the documents provided in this file

6    here, I cannot ascertain which adjuster took which

7    counts.

8    BY MR. BEATTIE:

9       Q    Does it show what the count was for each

10   strip or anything like that?

11      A    From each individual strip?

12      Q    Yes, sir.

13      A    No, it does not.  There's individual

14   tests, if you could relate them back to the numbers

15   on the survey sheet map you possibly could, but you

16   would not know which adjuster took which counts.

17      Q    Mr. Cerven, Exhibits 37 is the soybean

18   corn (sic) loss manual.  Who designed that?

19      A    That would be our trade association,

Page 29

20  National Crop Insurance Services.

21      Q    The last page which is Bates 238, do you

22  see that it's labeled soybean survey sheet?

23      A    Correct.

24      Q    Are you familiar with that page?

25      A    Yes.

                                            28


1       Q    All right.  That's not a part of RCIS

2  procedure to utilize a sheet like that, is it?

3       A    Not this exact form, no.

4       Q    Because each individual adjuster is

5  required to sign it and date it?

6       A    Correct.

7       Q    For each area that they assess?

8       A    Correct.

9       Q    And there's a whole lot more detailed

10  information that is included in there than what is

11  in the RCIS information.  Would you agree with

12  that?

13      A    Yes.

14      Q    Do you know why?

15      A    No, I do not.

16      Q    You anticipated my question.  You don't

17  know why RCIS doesn't utilize the soybean survey

Page 30

18   sheet?

19       A    They do not when the claim is worked on a

20   computer.

21       Q    I'm not sure I understand what you mean

22   by that.

23       A    Okay.  The bulk of our claims are worked

24   on a laptop computer, and then they're

25   electronically transmitted up to the company once

                                                    29

1    the claim is finished.  If there's something --

2    there could be a case or a specific situation or

3    the adjuster computer does not work.  And they

4    could work them manually, but then the numbers have

5    to be entered later -- on the crop-hail side, into

6    an electronically program for them to be

7    transmitted up to the company.

8        Q    Do you know what was done with this

9    particular claim?

10       A    No, I do not.

11       Q    Still referring to Exhibit 37, the loss

12   instruction manual, if you go to Bates 198, which

13   is page 10, the heading Time Interval Chart do you

14   see that?

15       A    Yes.

Page 31

16    Q    Tell me what you understand that to be.

17    A    This chart at the bottom of the page?

18    Q    Yes, sir.

19    A    That's approximate number of days that

20  last between the soybean plant going from one stage

21  to the next stage.  Those days are approximate

22  number of days.  That can vary.

23    Q    Well, is this what adjusters are to

24  utilize in determining staging?

25    A    Staging of the crop.

                                          30


1    Q    Adjustment for the loss?

2    A    I'm not sure what you're asking.

3    Q    All right.  When adjusters go out to

4  adjust a site, they're supposed to put a stage on

5  at the time of the loss and at the time of the

6  adjustment; correct?

7    A    Correct.

8    Q    And how do they determine what the loss

9  is at the time of the -- the stage is at the time

10  of the loss?

11    A    They normally look at the crop stage when

12  they're out there on the date of adjustment, and

13  then backstage it to the date of the loss.

Page 32

14     Q     And look at the chart to tell you what

15  the stage would be?

16     A     Approximate stage would be, correct.

17     Q     If you had a field that had been

18  adjusted, let's say, about three weeks before a

19  subsequent loss and a stage put on it by previous

20  adjusters, then you could figure forward from the

21  date of the previous loss to the date of the

22  subsequent loss what the stage would be; correct?

23     A     You could get very close.

24     Q     And if that information was available, it

25  should be used, shouldn't it?

                                            31

1     A     Yes.  Should be taken into account.

2     Q     In fact, if you had an assessment on what

3  the stage of the crops were about three weeks, give

4  or take a few days, by an RCIS adjuster prior to

5  the hail loss, would you consider that to be more

6  accurate than adjusters going out six weeks after a

7  hail loss and trying to backstage what the stage

8  was at the time of the hail loss?

9     A     I would say not necessarily.  Reason

10  being different -- depending on the weather

11  conditions, the growing conditions, the -- if

                        Page 33

12  there's any stress on the crop, and also the

13  variety.  Different soybean varieties ripen at

14  different intervals once you get to the tail end of

15  the growing season.

16      Q    Would you grant me this, that if there

17  was an assessment by an RCIS adjuster that three

18  weeks before a hail loss the crops are at a stage

19  3.5, that they wouldn't be a 3.7 in three weeks?

20  Or R7.

21      A    So they a 3.5?

22      Q    And then three weeks later, they would

23  not be at an R7 according to a time interval chart?

24      A    I couldn't say for certain they would be.

25      Q    If you're following the chart on page 10,

                                        32

1   they wouldn't be, would they?

2       A    If you're strictly going by a chart.

3       Q    Well, that would be true if you're going

4   by the chart on page 10; correct?

5       A    Correct, by the number of day intervals

6   they have listed.

7       Q    And adjusters are supposed to follow the

8   soybean loss manual; right?

9       A    Correct.

                    Page 34

10     Q   Do you know how long it would take

11  adjusters to adjust a field if they're doing an R7

12  staging at time of hail loss as opposed to R6 or

13  R5?

14     A   No, I could not state that.

15     Q   Or how long it would take them to do

16  adjusting if it's a total shatter loss.

17  post-harvest?

18     A   No.  Because you've got -- each storm is

19  different.  You're going to have varying

20  intensities of the hail and a number of samples

21  left out there if you're going from strips versus

22  walking a whole field of planted soybeans.

23     Q   I'm talking if there are no strips.  If

24  the farmer went out and harvested everything and

25  you have a shatter loss post-harvest?

                                       33

1     A   I could not say that.

2     Q   Couldn't say how long it would take?

3     A   Yeah.

4     Q   Going back to number 40, starting at

5  Bates 742, there's a lot of requirements placed on

6  an adjuster and how to properly adjust; correct?

7     A   You stated a lot?

                          Page 35

8      Q     A lot of requirements.

9      A     A lot is pretty subjective and broad, but

10    there's several.

11     Q     Several.  Okay.  I'll go with several.

12    In other words, they have to have proper count

13    locations; correct?

14     A     Correct.

15     Q     Now, here is where it kind of gets me

16    with that, if you tell a farm to leave test strips,

17    then the adjuster is predetermined as to what his

18    count location would be?

19     A     If the farmer has left the strips out

20    there, yes.  The adjuster has no latitude if

21    they're just working from strips in the field.

22     Q     Is it the policy of RCIS to tell farmers

23    to leave strips in the field if you're going to

24    harvest the crop?

25     A     Before we get the adjustment performed?

                                                       34

1      Q     Yes, sir.

2      A     Yes, that's common practice, especially

3     when we're getting down to soybean harvest losses.

4      Q     There's no requirement on a farmer to

5     leave test strips, is there?

                        Page 36

6     A     Can I see the policy?

7           MR. HICKS:  Are you looking for 37.

8           MR. DILLEY:  No.

9           MR. HICKS:  Are you looking for the

10 actual insurance policy?

11    A     Paragraph 3 A 2, continued care for each

12 damage of insured crop until we have examined the

13 field.  Provided with our written consent, you may

14 preserve represented samples in each damaged field

15 of insured crop.

16          MR. BEATTIE:  What's the Bates stamp

17 number on that?

18          MR. DILLEY:  FFIC15.

19          MR. BEATTIE:  Okay.

20 BY MR. BEATTIE:

21    Q     So you think they can be required to

22 leave test strips?

23    A     Yes, I do.  In the terms of the policy.

24    Q     Do you educate the farmer where and how

25 to leave the test strips?
                                         35


1     A     Yes.  An adjuster would tell them where

2 to leave the strips.

3     Q     And it's important that the entire field
                        Page 37

4   is checked out one way or another; right?

5      A    Define checked out one way or another.

6      Q    Visually inspected.

7      A    Yes.

8      Q    Above the heading Adjuster/Adjuster

9   Trainee, it talks about if you encounter a crop

10  condition not caused by hail and you don't know the

11  cause of the crop stress.  That goes to the fact

12  that you want your adjusters looking to make sure

13  that you're adjusting a hail loss and not something

14  else; right?

15     A    Correct.

16     Q    Then if you go to the next page, 743,

17  under the qualifications, you want your adjusters

18  to understand plant physiologies; right?

19     A    That's what the manual says, correct.

20     Q    That's what you expect?

21     A    Yes, I would.

22     Q    And to identify stress factors other than

23  hail that can affect crop yields?

24     A    Yes.

25     Q    Mr. Cerven, if you go to 745, as I read a
                                        36

1   lot of that, the agent is supposed to be doing a

Page 38

2   lot of things prior to talking to the agent and/or

3   the insured to get ready?

4       A   I'm sorry, you said agent.  Do you mean

5   adjuster?

6       Q   I mean, no, agent.

7           MR. HICKS:  I think you meant adjuster is

8   supposed to do before talking.

9   BY MR. BEATTIE:

10      Q   Yeah.  The adjuster before talking to the

11  agent or insured.  There's some things they need to

12  do to make sure that they're on the same page and

13  get ready to adjust the loss; correct?

14      A   Could you restate the question, please?

15      Q   I'll have her.

16                  (The requested material was

17                  read back by the reporter.)

18      A   Yes.

19  BY MR. BEATTIE:

20      Q   If you go to page 747, Adjuster

21  Procedure, do you expect your procedures to follow

22  what's on that page of Exhibit 40, Bates

23  number 747?

24      A   Yes.

25      Q   And it talks about the first meeting with

Page 39

1 the insured and there's a list of items. One, two

2 three. And then if you go over to 748, it talks

3 about the field adjustment. There you're talking

4 about items of -- talking to the insured, find out

5 what's going on, where the damage is, items like

6 that. It's all about involving the insured, isn't

7 it, in the claim?

8      A    Correct.

9      Q    Mr. Cerven, tell me what you would do to

10 determine the stage of a soybean hail damage claim

11 if you go to adjust six weeks after the loss as to

12 what the stage would be six weeks previous?

13      A    If I myself went out to work a loss?

14      Q    Six weeks after the hail loss.

15      A    On a normal crop-hail claim on soybeans,

16 I would first determine the stage that crop was at

17 in the field on the date of adjustment. Then back

18 up as far as using the normal intervals listed in

19 the chart. Once you get to mature soybean, though,

20 you cannot do that, if it's a mature crop.

21      Q    Are you saying if you go out to adjust

22 and the crop is mature, you can't backdate?

23      A    Not using the chart per se because that

Page 40

24    crop could've been matured two weeks prior.  You've

25    got to --

                                              38

1        Q    So how do you determine, then, what the

2    adjustment is, or what the staging is at the date

3    of the loss?

4        A    The crop was gone.  You mean, if we just

5    got strips out there?  Then we're working from

6    strips that had been previously combined or are we

7    talking about the whole field crop is still in the

8    field?

9        Q    Strips.  Let's go with the strips.

10        A    Okay.

11        Q    Determine what the condition of the field

12    was six weeks previous to the date you'd been out

13    there and it's been mature when you go out to

14    adjust.

15        A    You'd try to find out when the harvest

16    date was because it definitely was -- at the

17    harvest date, it would be an R8, mature soybeans.

18        Q    Okay.  Is that the primary thing?

19        A    Because the crop would not have been

20    harvested before it reached R8, which is mature

21    soybean.

                        Page 41

22    Q    I want to make sure I understand what

23  you're saying.  One of the ways of determining what

24  the staging is is when it was harvested; right?

25    A    Correct.

                                                    39

1    Q    You wouldn't know that unless you asked

2  the insured?

3    A    In most cases, yes.

4    Q    So if the harvest was done, let's say, a

5  week or two before the adjusters were out there to

6  adjust, what would that tell you then on backing

7  up?

8    A    That they were definitely R8s at the time

9  the soybeans were harvested.  They could've been at

10  that point for some time, but you do not know that

11  unless you were physically out there.

12    Q    So what's the adjuster to do then?

13    A    He would have to ask when the soybeans

14  were harvested.

15    Q    All right.  You got that.  And if you --

16  is that the only thing you find out then and

17  backdate from when it was harvested?

18    A    I can't think of anything else that you

19  would use.

                        Page 42

20      Q    Well, let me -- if you had some

21   information as to what the condition of staging was

22   of the crops within 30 days of the hail date, that

23   would be valuable information to help you, wouldn't

24   it?

25      A    That could assist in conjunction with the
                                                    40

1   harvest date.

2              MR. BEATTIE:  Would you read his answer?

3                       (The requested material was

4                       read back by the reporter.)

5              MR. BEATTIE:  Let's go off the record.

6                       (A brief recess was taken.)

7   BY MR. BEATTIE:

8      Q    Mr. Cerven, I want to go on to talk about

9   some e-mails and what you actually did in the case

10   according to the e-mails so we can get those two

11   out of here and get you out of here.

12      A    Okay.

13      Q    Exhibit 41, Bates 307, do you remember

14   ever seeing that before?

15      A    I don't recall seeing it for sure, no.

16      Q    Do you know what it is?

17      A    Might be electronic notes contained in

                        Page 43

18   our Quest crop-hail program.

19       Q    And that's not anything that you recall

20   you ever looked at before -- or any time during the

21   adjustment of this case?

22       A    Correct.  No, I do not recall.

23       Q    I'm going to give you Exhibit 43, which

24   is Bates 107.

25            MR. BEATTIE:  Do you have that there?

                                                    41


1            MR. DILLEY:  I don't know.  I'm sure I

2    do.

3            MR. BEATTIE:  Okay.  That would be great.

4    BY MR. BEATTIE:

5        Q    Do you see that, Mr. Cerven?

6        A    Yes, I do.

7        Q    I think it really starts a series of

8    e-mails -- it looks to me like the first e-mail, if

9    I'm not mistaken, is in the middle one on page 107

10   from Longman to Burkhart, you're copied in?

11       A    Okay.

12       Q    And it's on November 19th of 2012.  Do

13   you recall being involved in this claim prior to

14   that date?

15       A    Involved as far as making any decisions

                        Page 44

Add

17        Q    Well, let me ask you this:  We know that

18    the adjusters now were out there the 29th and

19    30th of October, thereabouts.

20        A    Okay.

21        Q    And were you -- when were you first aware

22    of this claim?

23        A    The claim being filed?

24        Q    Anything about Bruhn Farms.

25        A    Well, I was aware when the claim was
                                              42

1    filed just because of the size of the claim.

2        Q    Back in September?

3        A    Yes, because I think Steve alerted me

4    to -- Steve Kevorkian alerted me to it.

5        Q    Because there were a lot of acres?

6        A    Yes.

7        Q    Is it common for you at RCIS to have that

8    many acres involved in a single claim?

9        A    I wouldn't say it's normal.

10        Q    Pardon me?

11        A    It's not normal.

12        Q    Okay.  What did you do or what did you

13    know about the file between September when RCIS was

                        Page 45

14  notified on November 19th?

15      A    Nothing.  I just -- the only thing I knew

16  was they were securing a team of adjusters to work

17  the claim because of the amount of acres involved

18  in the claim.

Foundation

19      Q    All right.  You know they worked the

20  claim and that Al Bruhn didn't sign the loss,

21  didn't agree with it.  That came sometime in

22  November.  What did you know before about what was

23  going on before November 19th?

24      A    Nothing on this specific claim with this

25  storm date.
                                                     43


1       Q    The bottom of page 107, Mr. Cerven, is

2   Kevorkian sent an e-mail to you at 2:30.  It says,

3   As I stated, Larry Grieme worked this.  And it says

4   what it says here.

5            Did you -- do you recall conversations

6   before that with anybody?

7       A    I do not recall.

8       Q    Then if we go to the next one, apparently

9   you responded about five minutes later at 2:35 and

10  sent an e-mail to Longman?

11      A    Correct.

Page 46

12      Q    You say, Normally send it up without

13   signatures.

14           Does that mean pay the claim?

15      A    Send it on up the chain.

16      Q    All right.  But you go ahead and said,

17   This was policy which had rye on it with a big

18   loss.  The insured was the one who kicked Grieme

19   off the farm about three years ago and also when

20   Nielsen took liability for corn and soybeans when

21   affective date was questionable.

22           Where did you get all of that

23   information?

24      A    As far as on the rye, the rye I was aware

25   of it.

                                                44

1       Q    All of that information.

2       A    The rye having a loss was a loss earlier

3    in the year, and there was some question of whether

4    the corn and soybeans liability was affective on

5    the storm date that hit the rye back in the --

6       Q    There was as question about what?

7       A    As far as whether the liability on the

8    corn and soybeans and the effective date of those

9    two crops -- the effective date of the policy for

Page 47

10  coverage on the corn and soybeans was effective at

11  the storm date.

12      Q    That was an issue?

13      A    There was a question about it.

14      Q    Who was raising the question?  Was it you

15  or what?

16      A    No.  It was the adjusters out in the

17  field because the rye was already on the policy and

18  then the policy -- an application to put corn and

19  soybeans on the same policy.

20      Q    Was that the May claim?

21      A    I believe it could've been.

22      Q    Did RCIS take that corn and soybean

23  claim?

24      A    I believe they did.

25      Q    Where did you get the information that

                                            45

1  the insured kicked Grieme off the farm?

2      A    I'm not for sure.  It could've been --

3  I'm not sure where I got that information at.

4      Q    You say, High dollar review is complete.

5            Did you do the high dollar -- did you see

6  a high dollar review?

7      A    No, I did not.

8    Q    How did you know it was completed at that

9    time?

10    A    Probably conversation with Kevorkian.

11    Q    Are you talking about the high dollar

12    review that Grieme did?

13    A    Yes, I believe Larry did.

14    Q    I think the notes -- here is Exhibit 46,

15    is that the high dollar review that you're

16    referring to?

17    A    Yes, it would've been.

18    Q    Now, your dates don't fit because on

19    November 19th, the high dollar review on Exhibit 46

20    shows November 27th?

21    A    The date on -- the 27th would've been

22    the date he reviewed it with Sornson.

23    Q    Is that different from the high dollar

24    review you're referring to in Exhibit 43?

25    A    No, it would be the same review.

                                                    46


1    Q    How can you review a claim that hasn't

2    been done yet?

3    A    I cannot speak for Larry.  I would be

4    guessing.  I was just going by the information that

5    was relayed to me.

Page 49

Argumentative
Speculation

6     Q    Well, sounds to me like somebody

7  predetermined what their review was going to be and

8  they reduced it to writing later?

9     A    I could not say that.

10    Q    You don't really know?

11    A    I don't have any knowledge.

12    Q    All you know is that you think Kevorkian

13  told you that a high dollar review had been

14  completed and paying about 450,000?

15    A    Correct.

16    Q    You don't think you saw any documents?

17    A    No.  I know I didn't see any documents at

18  that time.

19    Q    Is it proper for an agent to do a high

20  dollar review on his own work?  Or not an agent.

21         Is it proper for an adjuster to do a high

22  dollar review on his own work?

23    A    It does happen on the crop-hail side.  If

24  he worked a claim solely by himself, no, he could

25  not do a review on that claim, but Larry was one of

                                            47

1  six adjusters working that claim.

2     Q    He's still involved in the process,

3  wasn't he?

4      A      Yes.  Certain percentage he was.

5      Q      And they all did the same procedures,

6  same process, so in a way, he's reviewing his own

7  work, isn't he?

8      A      A percentage of the claim, yes, was his

9      Q      Now, still on Exhibit 43, at the top

10  e-mail, Burkhart is asking Longman with copy to

11  you, Any idea why the insured has not been

12  available to sign for half a million dollar check?

13  Any possible reason he has something to argue

14  about?  Be pretty gutsy if he does.

15          Did you respond to that?

16      A      No, I did not.

17      Q      How did that strike you?

18      A      I guess I didn't think about it one way

19  or the other.

20      Q      Well, it sounds to me like Burkhart is

21  saying, God, we're giving him a half million dollar

22  check.  Why is he bitching?

23      A      I couldn't say what Larry was thinking

24  when he typed that.

25      Q      Almost like, Take what we're giving you

                                                  48

1  and be grateful for it; right?

                    Page 51

*argumentative speculation* (handwritten margin note)

2    A   I couldn't say that.

3    Q   If you go to Bates 109 -- and of course,

4 if you got a million dollar loss as opposed to a

5 half million dollar loss, that affects the bottom

6 line on profitability and bonuses, doesn't it?

7    A   It could eventually.

8    Q   On Bates 109 of Exhibit 43, about eight

9 minutes after Burkhart fires off the 2:52 e-mail to

10 you and Longman, he sends another one to you and

11 Longman.

12    Do you know what was going on there?

13    A   As far as Larry's comments?

14    Q   Yeah.

15    Well, let me back up.  After Burkhart

16 fired off his 2:52 e-mail, you responded four

17 minutes later telling him you're not aware of any

18 reason.  We had six adjusters out there to finalize

19 those numerous acres.

20    And then he fires back, Would be another

21 attempt at a phone call and leave message if

22 possible.  Hate to give this guy anything to

23 complain about like no signature.  Don't know what

24 his angle might be.

25    That kind of sounds negative, doesn't it,

Page 52

1    like Mr. Bruhn is up to something fishy?

2            MR. DILLEY:  Object to the form.  You can

3    answer if you can.

4        A    I don't know what Larry was thinking when

5    he typed the e-mail.

6    BY MR. BEATTIE:

7        Q    Well, were you aware during November 19th

8    that nobody had sat down and tried to tell

9    Mr. Bruhn about the counts, the staging, or

10   anything else that was going on --

11       A    I was not aware one way or the other.

12       Q    Now, if you go to Bates 112, which is

13   Exhibit 44, on these pages that we got, we have to

14   jump around a little bit.  After the 3:00 p.m.

15   e-mail from Burkhart to you and Longman, there's

16   another e-mail at 3:04 on the 19th that you're

17   sending to Kevorkian, Larry Grieme, with copies to

18   Burkhart and Longman.  Do you see that?

19       A    Yes.

20       Q    It says, Burkhart says leave one more

21   message for him.

22            Do you remember saying that or sending

23   that?

Page 53

24    A    Yes.

25    Q    And then half an hour later, Burkhart

                                                    50

1   sends another e-mail to all of you, Half a million

2   must not mean as much to him as it would the rest

3   of us.

4            Now, what in the world is Burkhart trying

5   to say there?

6        A    I cannot tell you what his state of mind

7   was or what he was meaning by that.

8        Q    What did you interpret that to mean?

9        A    I guess I didn't think anything about it

10  at the time.

11       Q    As you sit and look at it, it's not a

12  very kind e-mail about Mr. Bruhn, is it?  Like he's

13  getting a half a million dollars, what's his bitch?

14  Is that a way to read that?

15       A    One could interpret that way, but . . .

16       Q    Well, you'd be upset if you're getting

17  paid a half million dollars on a million and a half

18  dollar claim, wouldn't you?

19            MR. DILLEY:  Object to the form.  You can

20  still answer.

21       A    I might.

                    Page 54

*Argumentative*
*Speculation*

BY MR. BEATTIE:

23    Q    I know I would.

24    A    Well, depends on the circumstances too.

25    Q    And then still on Bates 112, at almost

51

1  8:00 that evening, Burkhart sends an e-mail direct

2  to Grieme. Is it standard procedure for Burkhart

3  to bypass you to go directly to adjusters under

4  your fold, your authority?

5    A    On crop-hail situations like this, it's

6  not unusual because Larry was involved in with this

7  claim.

8    Q    Would this be true to say, Mr. Cerven,

9  that the chain of command didn't really work when

10  it was a crop-hail claim as far as you were

11  concerned?

12    A    Yes and no.

13    Q    Okay. Tell me the yes and tell me the

14  no.

15    A    Yes, I'm on a straight chain of command.

16  It should've gone down through the org structure,

17  but it's not unusual on a crop-hail claim for Larry

18  to be speaking with adjusters directly over a

19  supervisor.

Page 55

20    Q    Tell me what the reason is for that.

21    A    I couldn't tell you.

22    Q    It's just the way it was?

23    A    Yes.

Speculation

24    Q    Is that the way it was when you came on

25    and took your job?

52

1    A    I couldn't tell you what it was before I

2    came on and took the job.

3    Q    Was it that what way when you assumed

4    your duties, that Larry Burkhart would go direct to

5    adjusters and bypass the chain of command?

6    A    It wasn't unusual.

7    Q    That's what I was trying to get at.  This

8    wasn't unusual?

9    A    No, not at all.

10    Q    Did you have any say in the review of the

11    claim?  In other words, like Exhibit 46, that

12    review conducted by Grieme, did you have any input,

13    any say, or anything like that into it?

14    A    No, I did not, and I did not see it in

15    2012 either.

Speculation

16    Q    Go to Bates 114, 115, which is

17    Exhibit 45.  And I think we had been in Exhibit 44

Page 56

18  and previous exhibits on November 19, so as far as

19  I can determine, a week later on the 26th of

20  November, we have a chain where Burkhart is sending

21  e-mails to Kevorkian and copies to you, Grieme, and

22  Longman.

23          Do you see all that chain?

24      A   Yes, I do.

25      Q   And at 11:10, Burkhart says, Not much to

                                                53

1  do but pay it.  Include complete explanation in the

2  claim documentation.

3          What did he mean by that, include

4  complete explanation?

5      A   I'm not sure what Larry was intending on.

6      Q   But before that Kevorkian had told

7  Burkhart, We could not make contact with Mr. Bruhn,

8  talked with the adjuster.  The adjuster says

9  Mr. Bruhn is not happy with RCIS; right?

10      A   Correct.

11      Q   Is it your understanding during this time

12  in November going on that Burkhart was in charge of

13  reviewing the claim?

14      A   I couldn't say one way or the other

15  whether Larry Burkhart reviewed the claim or not.

Page 57

Speculation
Hearsay

16      Q     Have you seen Exhibit 47, which is

17  Bates 60?  I mean, this carries into December

18  obviously?

19      A     No, I've not seen that e-mail.

20      Q     What do you know of what was going on in

21  December regarding the Al Bruhn claim?

22      A     At that time I knew nothing was going on.

23      Q     You didn't know anything was going on?

24      A     No.  I just thought the check went out

25  the door, and that's all I knew about it.

                                                54

1      Q     And that was a decision you had no part

2  in?

3      A     Correct.

4      Q     I'm going to give you Exhibit 51, which

5  is an e-mail from Burkhart to Chuck Eldredge.  Had

6  you ever seen that before?

7      A     No, I've not.  First time I've seen that

8  document.

9      Q     Do you remember any involvement after

10  November in this file one way or another?

11      A     As far as involvement in the file, no.

12  They may have apprised me what was going on, but I

13  cannot recall if I was.

                        Page 58

14    Q    You were just more or less out of the

15  loop by then.  Would that be fair to say?

16    A    Yes, I was.

17    Q    Have you been involved in a farmer

18  requesting appraisal before?

19    A    Yes, I have.

20    Q    When in your opinion is appraisal

21  triggered, the deadlines for appraisal triggered?

22    A    There really is no set time limit on

23  appraisal being requested.  Either the insured or

24  the company can request appraisal of the other

25  party for the contract policy.                    55

1    Q    So it could be done about any time?

2    A    There's no time limit, no time frame

3  specified anywhere in the policy.

4    Q    So theoretically Al Bruhn could demand

5  appraisal today?

6    A    Still have to be -- crop would still have

7  to be out there in the field.

8    Q    Does it say that in the insurance policy

9  on appraisal?

10    A    6A, The entire crop or represented sample

11  of the crop as defined in the policy must remain in

Page 59

12  tact until a determination of percentage of loss is

13  rendered by these procedures.

14          MR. BEATTIE:  What Bates page was that?

15          MR. DILLEY:  16, FFIC16.

16  BY MR. BEATTIE:

17      Q    Are you aware of anybody from RCIS

18  demanding that Al Bruhn not harvest the check

19  strips since there was a dispute?

20      A    I am not aware.  I wasn't intimately

21  involved with this claim.

22      Q    Do you see any -- did you see any

23  evidence in the file that supports the claim that

24  the September loss was staged based upon day of the

25  harvest?
                                        56

1      A    Could you restate that question, please?

2      Q    I'll have her read it back.

3                  (The requested material was

4                  read back by the reporter.)

5      A    No, I do not.

6      Q    Have you seen any evidence whether, it's

7  in the file or otherwise, that the adjusters staged

8  the loss based upon date of harvest?

9      A    I do not recall seeing any documents that

Page 60

10   I reviewed.

11      Q   As a manager, if it isn't documented, it

12   didn't happen?

13      A   Not necessarily.

14      Q   When would something happen without it

15   being documented?

16      A   There could be all kinds of things that

17   could happen without being documented.

18      Q   Like what?  Just give me an example.

19      A   In a crop loss?  As far as in the file,

20   there could be numerous contacts, conversations,

21   phone calls made that the adjuster did not put all

22   the contacts in the claim file.

23      Q   But you want all that in the file, don't

24   you, documented?

25      A   I prefer it to be in the file.

                                              57

1      Q   Mr. Cerven, I want to ask you this -- and

2   I'm getting close to being done.  We'll be done.

3          Did you ever look at the Bruhn historical

4   crop production records?

5      A   No.

6      Q   Did you look at -- have any knowledge of

7   what the crop production records were in 2012 of

                    Page 61

8    soybeans that weren't hailed upon?

9        A    No.

10       Q    Did you ever look and see what the actual

11   production was of the hail-damaged soybean fields?

12       A    No.

13       Q    All right.  Would it surprise you to

14   learn that historically Mr. Bruhn had crop

15   production averaging about 50 bushel an acre of

16   soybeans, and his non-hail soybean crop that year

17   was around in the high 40s to 50 an acre?

18       A    Restate that, please.

19                    (The requested material was

20                    read back by the reporter.)

21       A    Now, the 50 bushel, you're saying, for

22   long-term average of yields?

23       Q    Historical.

24       A    Historical.  Yeah.  And the harvested for

25   2012 was?

                                            58

1        Q    High 40s to 50s of non-hail damaged.

2    Were you aware of that?

3        A    No, I was not aware of that.

4        Q    Okay.  And were you aware that the

5    drought -- excuse me.

Page 62

6          Were you aware that the hail-damaged

7    fields averaged about in the 20s for crop

8    reduction?

9        A    No, I was not aware.

10       Q    Do you know anything that would account

11   for the loss of 30 bushel besides hail?

12       A    It's hard for me to say that.

13       Q    Well, would you be aware of anything at

14   the time as we're sitting here today that accounts

15   for 30 bushel loss an acre for the soybeans?

16       A    You're asking me to guess?

17       Q    No.  I'm asking you to use your

18   experience and what you know about the file.

19       A    There could be several variables for the

20   difference.  It could be different soil types, land

21   location, plant dates, soil fertility.  The

22   non-hailed soybeans could be on heavier organic

23   soils versus soils that didn't have quite as much

24   organic matter.  The fertility levels could be

25   different.  Past crops, the crops that were grown

                                        59

1    on those fields the prior year could all enter into

2    it.

3        Q    Would that account for 30 bushel an acre?

                    Page 63

4    I mean, I could see some variation, but 30 bushel?

5        A    It could.

6        Q    It could?

7             Well, what if the historical records for

8    those fields show in the average of 50 bushel an

9    acre, and you throw that in there, what else could

10   account for the loss other than hail?

11       A    That's hard to tell.  I would be

12   guessing.

13       Q    All right.  I saw nothing in the file

14   where you were involved in any discussion of

15   drought.  Do you ever recall that?

16       A    I don't recall.  Like I said, my

17   involvement in this claim was very limited.

18       Q    You don't recall Burkhart in November or

19   whatever talking about, Well, it had to have been

20   drought.  It wasn't hail damage.  It had to have

21   been drought?

22       A    Not aware of having a conversation with

23   Larry Burkhart about drought.

24       Q    That could only come up as an excuse to

25   try and justify what RCIS paid, wouldn't you agree
                                            60

1    with that?

Page 64

*Foundation*
*Argumentative*
*Hearsay*

♀

2          MR. DILLEY:  Object to the form.

3     A    No.

4          MR. BEATTIE:  Let me take one minute real

5    quick.

6                   (A brief recess was taken.)

7    BY MR. BEATTIE:

8     Q    Dan Bird, who is Dan Bird?

9     A    Dan Bird would be -- in 2012, would have

10    been on the operations side, head of operations

11    side or processing policy side.

12    Q    Do you know where he lives?

13    A    Anoka area.

14    Q    What about Jim Baldwin?

15    A    Jim Baldwin is a regional claims

16    specialist on the crop-hail side.

17    Q    Where does he live?

18    A    Right outside of Kansas City.

19    Q    Do you work with him frequently?

20    A    Baldwin?  Bird?

21    Q    Either one of those guys.

22    A    I wouldn't say frequently, but we work

23    together.

24    Q    All right.  How many adjusters did you

25    have for crop-hail claims in 2012?

Page 65

1    A    Across my region?

2    Q    In Iowa.

3    A    I couldn't tell you.  It would be a

4  guess.

5         MR. BEATTIE:  Thanks.

6         MS. BUFKIN:  Thank you.

7         (Deposition concluded at 4:00 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

Page 66

24

25

♀

1                    C E R T I F I C A T E

2           I, the undersigned, a Certified Shorthand

3    Reporter of the State of Iowa, do hereby certify

4    that there came before me at the time, date and

5    place hereinbefore indicated, the witness named on

6    the caption sheet hereof, who was by me duly sworn

7    to testify to the truth of said witness'

8    knowledge, that the witness was thereupon examined

9    under oath, the examination taken down by me in

10   shorthand and later reduced to a transcript through

11   the use of a computer-aided transcript device

12   under my supervision and direction, and that the

13   deposition is a true record of the testimony given

14   and of all objections interposed.

15           I further certify that I am neither

16   attorney or counsel for, nor related to or employed

17   by any of the parties to the action in which this

18   deposition is taken, and further that I am not

19   a relative or employee of any attorney or counsel

20   employed by the parties hereto, or financially

21   interested in the action.

Page 67

22          Dated at Des Moines, Iowa, this 10th day of

23   October, 2016.

24

25                    _____
                      CERTIFIED SHORTHAND REPORTER

⚥