IN THE UNITED STATE DISTRICT COURT
FOR THE NOTHERN DISTRICT OF IOWA
WESTERN DIVISION

| | |
|---|---|
| BRUHN FARMS JOINT VENTURE,<br><br>          Plaintiff,<br><br>-vs-<br><br>FIREMAN'S FUND INSURANCE COMPANY,<br><br>     Defendant. | No. ____13-CV-4106_____<br><br>**PLAINTIFF'S BRIEF IN SUPPORT OF RESISTANCE TO DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, CONSTITUTIONAL REDUCTION OF PUNITIVE DAMGES AWARD** |

COMES NOW, the Plaintiff Bruhn Farms Joint Venture and respectfully files this Brief in

Support of Its Resistance to Defendant's Renewed Motion for Judgment as a Matter of Law or, in

the Alternative, Constitutional Reduction of Punitive Damages Award:

## TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | INTRODUCTION | 2 |
| II. | FACTS | 3 |
| | A.  Defendant issued a $6 Million crop-hail policy to Plaintiff, charging $260,000 in premiums for the 2012 crop year. | 3 |
| | B.  The insurance policy required Defendant to timely adjust all losses pursuant to the industry standard NCIS Soybean Loss Manual. | 3 |
| | C.  September 2012 hail storms caused damage to Plaintiff's soybean crops. | 4 |
| | D.  Defendant horribly delayed adjustment of the soybean loss, causing an underpayment of benefits to Plaintiff. | 4 |
| | E.  Defendant did not adjust all of the soybean fields submitted by Plaintiff for the September 2012 hail storms. | 7 |
| | F.  Defendant's senior management conducted a sham review of the adjustment. | 8 |
| | G.  Defendant led Plaintiff down the Primrose Path only to intentionally underpay Plaintiff benefits. | 10 |
| | H.  Defendant clearly knew that it potentially underpaid Plaintiff more than $700,000 in benefits. | 12 |
| III. | ARGUMENTS AND AUTHORITIES | 12 |
| | A.  Defendant's renewed Motion for Judgment as a Matter of Law should be denied. | 12 |

1

| | | | | |
|---|---|---|---|---|
| | 1. | | The Court properly instructed the jury concerning the law of bad faith and punitive damages. | 13 |
| | 2. | | Plaintiff presented sufficient evidence in support of its bad faith and punitive damages claim. | 14 |
| | 3. | | Defendant's argument that the amount due was fairly debatable misstates the standard and law as instructed by the Court. | 16 |
| B. | | | Defendant's Motion to Reduce Punitive Damages should be denied. | 16 |
| | 1. | | The degree of reprehensibility of Defendant's conduct justifies a punitive damages verdict of $1.5 Million | 18 |
| | 2. | | The ratio of compensatory damages awarded to punitive damages awarded by the jury does not make the $1.5 Million punitive damage award "unconstitutionally excessive." | 22 |
| | | a. | Using the jury's compensatory award to compare to the punitive damage award is unreliable because of the difficulty Plaintiff encountered in proving its compensatory damages due to the bad faith conduct supporting the punitive damage award. | 23 |
| | | b. | The correct ratio must include consideration for *potential* or *possible* harm and attorney fees and costs. | 23 |
| | | c. | Even if the ratio is 45.8:1, the punitive damage award of $1.5 Million is not "unconstitutionally excessive" and falls in line with other punitive damage awards. | 26 |
| | | d. | The comparable civil or criminal penalties justifies a punitive damage verdict of $1.5 Million. | 30 |
| CONCLUSION | | | | 31 |

# I.    INTRODUCTION

This case was tried to an 8-person jury beginning March 6, 2017, with a verdict returning on March 10, 2017.  The jury found that Defendant breached its crop-hail insurance contract with Plaintiff and acted in bad faith by paying Plaintiff less than it was entitled to receive under the insurance contract.  The jury awarded $32,700 for breach damages and $1.5 Million in punitive damages.  Defendant now seeks judicial immunity from its bad faith, willful and wanton conduct,

asking this Court to reduce the jury's $1.5 Million punitive damage verdict to a maximum of $130,800. Defendant is a $10 Billion insurance company.[1] The jury's modest punitive damage award (when compared to the conduct of Defendant that made it especially difficult to prove Plaintiff's compensatory damages, Defendant's refusal to acknowledge its bad faith conduct, and Defendant's net worth) is not "unconstitutionally excessive" and should stand. Defendant's Due Process rights have not been violated.

## II.    FACTS

The facts are well known to the Trial Court. The evidence set forth below must be viewed in the light most favorable to Plaintiff (nonmoving party), and all reasonable inferences and resolution of factual disputes must be made in Plaintiff's favor." *Liberty Mutual Fire Ins. Co. v. Scott*, 486 F.3d 418, 422 (8th Cir. 2007).

### A.    Defendant issued a $6 Million crop-hail policy to Plaintiff, charging $260,000 in premiums for the 2012 crop year.

Defendant, a $10 Billion insurance company, issued a crop-hail insurance policy to Plaintiff, a family farm operation in Iowa, for Plaintiff's 2012 crop season. (*Trial Ex. 2; Trial Ex. 9*). The policy included coverage for Plaintiff's 7,934 acres of soybean crop. (*Trial Ex. 4, p. 1*). Defendant set Plaintiff's premium for the 2012 crop year at $259,567. (*Trial Ex. 4, p. 1*). Plaintiff paid the premium, less a small discount, and Defendant accepted liability risks of $5,924,350 for Plaintiff's 2012 crop year. (*Trial Ex. 4, p. 1*).

### B.    The insurance policy required Defendant to timely adjust all losses pursuant to the industry standard NCIS Soybean Loss Manual.

The relationship between the parties was governed by the four corners of the insurance contract. (*Trial Ex. 2*). Pursuant to the insurance policy, Defendant was to adjust all losses

---

[1] The jury's punitive damage verdict represents .015% of Defendant's total assets and 25% of the total risk Defendant assumed on this *single* insurance policy for 2012 ($6 Million).

3

submitted by Plaintiff. (*Trial Ex. 2, p. 1*). The crop-hail policy was a percentage of loss policy, meaning that it paid the percentage of loss caused to Plaintiff's crop by the covered peril, hail. (*Trial Ex. 2, p. 1*). The contract provided that the percentage of loss to be paid would be determined using the crop-hail loss adjustment procedures published by National Crop Insurance Services (NCIS). (*Trial Ex. 2, p. 1; Trial Ex. 13*). Under the contract, Defendant and Plaintiff were to agree upon a percentage of loss after Defendant's adjustment, and if an agreement was not reached, either party could demand appraisal of the crop. (*Trial Ex. 2, p. 2*).[2]

**C.      September 2012 hail storms caused damage to Plaintiff's soybean crops.**

The jury was presented with evidence that Plaintiff suffered damage to all of his soybean farms following storms that passed through the area in September 2012. Plaintiff presented testimony from combiners who saw the hail damage in all of the fields as well as a weather expert who confirmed the probability of hail based on NEXRAD data. In fact, Defendant's own experts testified that NEXRAD data confirmed a massive September 12 storm passed through the area, producing 4.6 inches of rain and a 70% probability of ½ inch hail in the area of the Bruhn Farms. (*Trial Ex. 70; Trial Ex. 75; Trial Testimony of John Mewes*).

**D.      Defendant horribly delayed adjustment of the soybean loss, causing an underpayment of benefits to Plaintiff.**

The jury was presented with significant evidence that Defendant horribly delayed adjustment of the soybean loss, making it difficult for Plaintiff to prove its full compensatory damages at trial. After receiving notice of this large loss in September 2012, Defendant horribly delayed adjustment, not sending any adjusters to the Bruhn Farm until October 29th and 30th, *47*

---

[2] Plaintiff's ability to demand appraisal assumes the crop has not deteriorated due to Defendant's delay in adjustment.

4

*days after* the hail event.[3]  (*Trial Ex. 12*).[4]  During this time, the critical evidence used to determine the percentage of loss (the actual crop itself) was being naturally destroyed.  (*Trial Ex. 147*).

Defendant does not deny being "horribly late" to adjust this loss.  (*Trial Ex. 34; Trial Ex. 33*).  Bruhn complained at the time that Defendant was significantly delaying the adjustment, and that the adjusters should have been out to adjust before harvest, but the complaints fell on deaf ears.[5]  (*Trial Ex. 35*).  The horrible delay in adjustment likely caused an underpayment of benefits to Plaintiff, although the specific amount of the underpayment was difficult for Plaintiff to prove because Defendant's delay destroyed the critical evidence involved in crop-hail policies, the actual damage to the crop itself as determined by the NCIS procedures.[6]

The Court is familiar with the concept of staging the crop for purposes of determining the percentage of loss under the insurance policy.  Proper staging of the crop at the time of the hail event is important because crops in stages R1 through R6.5 must be evaluated for leaf area destruction (defoliation) in addition to direct damage to the pods and beans on the plant.  (*Trial Ex. 13, p. 27*).  All witnesses admitted that Defendant would pay less in benefits to Plaintiff if defoliation was not considered by Defendant.  Thus, when Defendant intentionally staged crops at

---

[3] There are numerous documents produced by Defendant incorrectly identifying the dates of adjustment as October 22nd and 23rd.  (*Trial Ex. 39, p. 1; Trial Ex. 20*).

[4] The adjuster expense logs revealed that lead adjuster Sornson worked no claims for Defendant from October 5th until he showed up at Defendant's property on October 29th.  (*Trial Ex. 201, p. 6*).

[5] Defendant's internal documents reveal that upper management was "throwing rocks" at the adjusters for the delay in adjustment, knowing that the adjustment was horribly late.  (*Trial Ex. 52*).

[6] From the outset of the claim, Defendant's Corporate Adjustment Manual required the company to "study liability coverage to determine potential high dollar loss" even before meeting with the insured.  (*Trial Ex. 14*, p. 5).  This clearly was not done despite all witnesses testifying that the amount of acres should have triggered a high dollar loss analysis.  The early identification of "High Dollar Claims" is important because any claim with the potential of having more than $100,000 exposure required "pictures from all adjusters."  (*Trial Ex. 14, p. 45*).  Here, Defendant violated its own Adjustment Manual and took no pictures to document the stage of the crop, making it difficult for Plaintiff to prove its breach of contract damages, but lending further support to Defendant's bad faith conduct.

5

R7, and ignored the contract requirements, it underpaid on claims to its insureds, including Plaintiff.

According to the insurance contract, to determine the reproductive stage of the crop at the date of loss, the adjuster *must* follow the following process:

> 1. Determine the reproductive stage at the date of adjustment.
> 2. Record the dates when previous stages occurred using the Time Interval Chart (page 10).
> 3. Reproductive stage at date of loss is the stage that occurred on or immediately before the date of the storm.

(*Trial Ex. 13, p. 17*)

All parties agreed that on the date of adjustment, the soybean crops at the Bruhn Farms were all R8. Thus, according to the NCIS manual required to be followed under the contract of insurance, the Time Interval Chart must be used to stage the crop at the date of loss, using September 12.

**TIME INTERVAL CHART**

REPRODUCTIVE STAGES

| | |
|---|---|
| R1 to R2 | 3 days |
| R2 to R3 | 7 days |
| R3 to R4 | 9 days |
| R4 to R5 | 9 days |
| R5 to R6 | 15 days |
| R6 to R7 | 18 days |
| R7 to R8 | 9 days |

Time intervals for half-stages are one-half the number of days between whole stages.

(*Trial Ex. 13, p. 14; Trial Ex. 152, p. 3*)

Following the contract requirement of the Time Interval Chart, Bruhn's soybeans should have been staged at R4.5 at the time of the hail event, causing Defendant to pay for leaf defoliation damage caused by the hail storm. Defendant, however, admitted at trial that it intentionally breached the contract term requiring Defendant to follow the NCIS Time Interval Chart, and

6

instead, staged all but one of the Bruhn Fields at the time of the hail event at R7, allowing it to avoid paying any benefits for defoliation damage.[7] For the one field that it did stage at R6.5, Defendant failed to pay any defoliation damage as well. (*Trial Ex. 12, p. 19*).[8]

### E. Defendant did not adjust all of the soybean fields submitted by Plaintiff for the September 2012 hail storms.

The jury was presented with significant evidence that Defendant failed to adjust all of Plaintiff's soybean fields submitted under the policy. It was undisputed that Plaintiff submitted all soybean acres to be adjusted following the September 2012 hail damage. (*Trial Testimony Terry Nielsen; Trial Ex. 12*). This meant that Defendant was required to adjust 7,934 acres.[9] However, Defendant's Quest system documented that Defendant only adjusted 4,422.5 acres at most. (*Trial Ex. 23*). Notably, though, the Quest Documents were inconsistent with Defendant's actual field notes, which documented that Defendant only adjusted 3,630 acres. (*Trial Ex. 22*). Additionally, Ryan Gotto testified that he was asked to accompany Defendant to only 2,689.2 acres. (*Gotto Trial Testimony*). Thus, the jury was presented evidence that Defendant failed to adjust anywhere between and 2,077 and 5,244 acres under this claim. Stating the obvious, Defendant's failure to adjust all of the acres likely resulted in an underpayment of benefits to Plaintiff. However, identifying the specific amount of the underpayment was difficult for Plaintiff

---

[7] Defendant's 2012 Crop-Hail Loss Adjustment Manual provided that "The adjuster's responsibility is to use industry-accepted procedures to determine the percentage of loss." (*Trial Ex. 14, p. 2*).

[8] Plaintiff was able to present further evidence of the incorrect staging using Defendant's own records. Prior to the September 12, 2012 loss, Defendant had representatives present at the Bruhn Farms to adjust an August 15, 2012 loss. (*Trial Ex. 11*). During that adjustment, Defendant's adjusters staged Plaintiff's soybeans for Line No. 39 at R3.5 as of August 15, 2012. (*Trial Ex. 11, p. 7*). Applying the Time Interval Chart forward from August 15, 2012, one would have to account for 28 days to September 12, 2012. Using Defendant's own records for the Bruhn Farm representing Line 39, the soybean crop should have been no later than R6 in development, and defoliation should have been considered.

[9] Defendant's internal documents revealed that it knew it was to adjust at least 6,500 acres. (*Trial Ex. 60*; *Trial Ex. 38*; *Trial Ex. 34*; *Trial Ex. 33*)

7

to prove because Defendant's failure to adjust the acres destroyed all evidence supporting the actual percentage of loss on the fields not actually adjusted.

### F. Defendant's senior management conducted a sham review of the adjustment.

The jury was presented with significant evidence that Defendant's senior management conducted a sham review of the adjustment. The documents revealed that National Claims Manager, Larry Burkhart, became aware of the claim on October 31, 2012. (*Trial Ex. 33*).[10] However, he did nothing to review the claim at that time. (*Trial Ex. 33*). Instead, on November 19, 2012, Burkhart, despite conducting no review of the file, and despite the fact that the High Dollar Review was not completed, made the determination to just pay Bruhn $417,636 on the claim. (*Trial Ex. 147; Trial Ex. 148, p. 1*).

In making that decision on November 19, 2012, Burkhart also noted that "the bean strips have deteriorated now to the point we cannot get accurate count…" (*Trial Ex. 147; Trial Ex. 148, p. 1*). This meant that Defendant was paying without agreement (as required by the contract), but also that the timing of the delayed payment deprived Plaintiff of a meaningful appraisal right because of the crop deterioration caused by Defendant's delay. Further, it is important to note that Burkhart instructed payment on November 19, 2012 of $417,636, despite another manager's correspondence indicating that he believed around $450,000 was due based on the actual adjustment performed. (*Trial Ex. 57*). Shockingly, when making that decision to underpay the claim on November 19, 2012, Burkhart made numerous false and insulting comments in internal documents directed towards Bruhn, including:

---

[10] As discussed above, Defendant's Claim Handling Manual dictated that Burkhart or other senior management should have been made aware of this claim as a potential High Dollar Loss immediately after it was turned in.

| Trial Exhibit | Date | Substance |
|---|---|---|
| Ex. 48 | November 19, 2012 | "Any idea why the insured has not been available to sign for ½ M $ check. Any possible reason he has something to argue about, be pretty gutsy if he does." |
| Ex. 47 | November 19, 2012 | "Hate to give this guy anything to complain about, like no signature. Don't know what his angle might be." |
| Ex. 148 | November 19, 2012 | "1/2 M must not mean as much to him as it would the rest of us." |
| Ex. 58 | November 19, 2012 | "We got rid of this guy 10 years ago because of things just like this." – Admitted false statement |
| Ex. 57 | November 19, 2012 | "The insured was one that kicked Grieme off farm about 3 years ago" – Admitted false statement |

Despite Burkhart making the decision to pay without signature on November 19, 2012, it was not until November 27, 2012, that Grieme conducted a High Dollar Review of his own work. (*Trial Ex. 34*). The High Dollar Review required Grieme to review, analyze, and certify how the claim was handled. (*Trial Ex. 34*).[11]   In reality, the High Dollar Review was no review at all. (*Trial Ex. 34*). Most of the answers in the Review were knowingly false representations, and the decision to pay had already been made more than a week prior. A true review would have revealed the horrible delay, incorrect staging, and that the adjusters failed to go to more than 2,000 acres of Plaintiff's soybean farms.

Following the High Dollar Review, the evidence presented at trial showed that Burkhart engaged in a review designed at attacking Bruhn instead of reviewing whether the claim was properly paid and documented correctly. This included the following evidence:

---

[11] In the Review, Grieme answered "yes" to whether the correct charts were used despite knowing that they intentionally ignored the Time Interval Chart. (*Trial Ex. 34*). He answered "yes" to the question of whether the acres reflect the percent of damage despite knowing that nearly half of the acres were not actually adjusted. (*Trial Ex. 34*). He answered "yes" to the question of whether all facts were noted in the fact sheet despite the fact that following the High Dollar Review, Larry Burkhart had to ask elementary questions to gather the facts of the adjustment. (*Trial Ex. 34*). He admitted that the loss was not uploaded on a timely basis. (*Trial Ex. 34*). He answered "yes" to the question of whether the NCIS procedures were followed despite knowing that they were intentionally ignored. (*Trial Ex. 34*).[11] He answers "yes" to the question of whether pictures were included despite knowing that the adjusters took 0 pictures even though Defendant's own manual required them to take pictures. (*Trial Ex. 34*). To cover for this, he snapped two terrible pictures the day of the High Dollar Review. (*Trial Ex. 205*).

9

| Trial Exhibit | Date | Substance |
|---|---|---|
|  |  |  |
| Ex. 59 | December 15, 2012 | "It's a long story and we have a history with this insured." |
| Ex. 45 | December 17, 2012 | "…but you know Al….." |
| Ex. 52 | December 20, 2012 | Burkhart asking for the amount of Bruhn's premium (1/4 M) instead of getting information on the actual loss |
| Ex. 20 | December 20, 2012 | Burkhart admitting that he had not spoken to the adjusters for any information despite making the decision 1 month prior to just "pay without signature" |
| Ex. 53 | January 4, 2013 | Burkhart asking for basic information like the date of loss, date reported, date assigned to the adjuster, date worked, and information on contact with Bruhn despite making the decision more than 1 month prior to just "pay without signature." |
| Ex. 60 | Undated Summary | "All of the Iowa adjusters have had problems with this insured." – Admitted False Statement |
| Ex. 60 | Undated Summary | "Adjusters said it was extremely hard to make contact with this insured." – Admitted False Statement |

It was undisputed at trial that comments claiming Bruhn was difficult to make contact with were patently false. Moreover, it was undisputed that Defendant did not "have a history" with Bruhn. In fact, Grieme testified that the only prior issue was one where Bruhn was justified in being a bit upset with Defendant's decision on payment. From the evidence presented at trial, the jury was able to conclude that Defendant's management conducted a sham review, focusing on an attack against Bruhn instead of analyzing whether Defendant's adjustment was properly completed pursuant to the insurance contract.

### G. Defendant led Plaintiff down the Primrose Path only to intentionally underpay Plaintiff benefits.

The jury was also presented with significant evidence that Defendant led Plaintiff down the Primrose Path concerning resolving the claim through agreement, only to intentionally underpay Plaintiff benefits and deny the claim, trying to shift the burden to Plaintiff to prove his

10

damages. The evidence presented at trial indicated that on November 5, 2012, Sornson discussed some of the findings with Bruhn, and Bruhn was unhappy with the amount of benefits presented by Sornson. (*Trial Ex. 37*). On November 19, 2012, Burkhart made the decision to just pay without signature. Defendant, however, did not complete its hail loss summary until December 3, 2012, and then sent a check to Plaintiff that was slipped under his door around December 4, 2012. (*Trial Ex. 3*).

Shortly thereafter, Rod Nelson, Defendant's Sales Manager, entered the picture and discussed with Terry Nielsen and Bruhn regarding resolving the claim, and Nelson stated that they were "one drink away" from having the claim resolved. (*Trial Testimony Al Bruhn; Trial Testimony Terry Nielsen*). Nelson, though, backed away, and Chuck Eldredge entered the picture, who then got Burkhart back involved to meet with Bruhn. (*Trial Testimony Al Bruhn; Trial Testimony Terry Nielsen*). Burkhart made an offer of around $900,000 additional benefits, and he and Bruhn were $25,000 apart on negotiations. (*Trial Testimony Al Bruhn; Trial Testimony Larry Burkhart*). Bruhn agreed to compromise the $25,000 difference, communicated that to Defendant, but Defendant refused to pay the $900,000 agreement, and instead ended up paying no more benefits. On January 25, 2013, Burkhart issued a denial letter to Plaintiff by certified mail. (*Trial Ex. 49*). The letter falsely claimed that they "adjusted and processed the claim in accordance with procedure." (*Trial Ex. 49*). The letter then tried to shift the burden to Bruhn, instructing him that "if you disagree with [Defendant's] decision, please provide a written explanation and all supporting documentation." (*Trial Ex. 49*). The jury could conclude that this negotiation tactic was unfair and not done in good faith, causing further delay of the claim, making it even more difficult for Plaintiff to prove his compensatory damages. Clearly, but for the verdict on bad faith and punitive damages, Defendant's plan worked.

## H. Defendant clearly knew that it *potentially* underpaid Plaintiff more than $700,000 in benefits.

The jury was presented with significant evidence that Defendant's payment of $417,636 was potentially an underpayment of more than $700,000 in benefits, and Defendant knew back in December 2012 that it potentially underpaid Plaintiff more than $700,000 in benefits. Trial Exhibit 207 is conclusive evidence that Defendant knew that its bad faith conduct caused a *potential* or *possible* harm of at least $727,000 to Plaintiff. (*Trial Ex. 207).* Defendant's December 20, 2012 email admits that there was a *potential* or *possible* harm to Plaintiff of at least $727,000 by comparing Plaintiff's 2012 actual production shortfall to his 10 year APH (Actual Production History). While Defendant offered a justification at trial that the *actual* harm was not $727,000 because of "other weather conditions" affecting the 2012 yield, it is undisputed that the *potential* or *possible* harm of Defendant's bad faith conduct was at least $727,000.[12] [13]

## III. ARGUMENTS AND AUTHORITIES

## A. Defendant's Renewed Motion for Judgment as a Matter of Law Should be Denied.

Defendant renewed its Motion for judgment as a matter of law as to the bad faith and punitive damages claims. Defendant does not challenge the jury's factual finding that it underpaid benefits to Plaintiff. The law is well settled that "motions for [judgment as a matter of law] are to be granted only when nonmoving party has presented insufficient evidence to support jury verdict in his favor." *Svoboda v. Bowers Distillery, Inc.*, 745 F.2d 528 (8th Cir. 1984). In determining

---

[12] Plaintiff does not concede that "other weather conditions" affected the 2012 yield. In fact, a review of Defendant's own documents reveals that it rated the Plaintiff's soybeans as "good condition" on 9 of the 17 fields it adjusted. (*Trial Ex. 12, p. 11, 24, 27, 30, 32, 42, 58, 62, 67).* Defendant rated the Plaintiff's soybeans as "fair condition" on 6 of the 17 fields it adjusted. (*Trial Ex. 12, p. 19, 35, 38, 44, 52, 65).* Finally, Defendant only rated 2 of the 17 fields it adjusted as having a soybean crop in "poor condition". (*Trial Ex. 12, p. 14, 55).*

[13] Defendant's knowledge was further confirmed on December 31, 2012, when Supervisor Dan Bird wrote to other managers, indicating that they had a disputed claim in the "neighborhood of $700,000." (*Trial Ex. 40).*

Case 5:13-cv-04106-CJW   Document 160   Filed 04/11/17   Page 12 of 32

whether there is insufficient evidence to support the jury verdict in Plaintiff's favor in this case, "the Court views the evidence in the light most favorable to the nonmoving party, drawing all reasonable inferences in its favor and resolving all factual disputes in its favor." *Liberty Mutual Fire Ins. Co. v. Scott*, 486 F.3d 418, 422 (8th Cir. 2007). "In drawing all reasonable inferences in favor of the nonmoving party, the Court does not make credibility determinations or weigh the evidence." *Meyers v. Starke*, 420 F.3d 738, 741 (8th Cir. 2005). "The Court assumes that the jury resolved all conflicts of evidence in favor of the non-moving party, assume as true all facts which the prevailing party's evidence tended to prove, and deny the motion, if in light of the foregoing, reasonable jurors could differ as to the conclusion that could be drawn from the evidence. *Id.* at 741-742. The Eighth Circuit has consistently held that "the Court is reluctant to set aside the jury's verdict and will not do so lightly." *Kelly v. Armstrong*, 206 F.3d 794, 797 (8th Cir. 2000); *CNH Capital Am. LLC v. McCandless*, 2007 U.S. Dist. LEXIS 62125; No. C05-2087 (N.D. Iowa August 22, 2007).

### 1. The Court properly instructed the jury concerning the law of bad faith and punitive damages.

"A jury is presumed to follow its instructions." *United States v. Flute*, 363 F.3d 676, 678 (8th Cir. 2004). Defendant makes no argument claiming that the jury was improperly instructed on bad faith or punitive damages. Plaintiff agrees. The Court properly instructed the jury concerning the law of bad faith in Iowa at the beginning of trial and again in its final instructions provided to the jury. (*Jury Instructions Nos. 17-19*)(Doc #144). The Court also properly instructed the jury concerning the standard for punitive damages in Iowa after the conclusion of the evidence in this matter. (*Jury Instructions Nos. 21-23*) (Doc #144).

## 2. **Plaintiff presented sufficient evidence in support of its bad faith and punitive damages claim**.

The jury was presented with more than sufficient evidence in support of its finding of bad faith and punitive damages. The jury was able to conclude from the facts the following:

- Defendant intentionally delayed adjustment of Plaintiff's soybean hail loss claim, knowing that the claim was likely a "High Dollar Claim" under its own policies and procedures.

- Defendant's intentional delay of the adjustment destroyed the critical evidence (the crop itself) that proves the correct percentage of loss to be paid under the policy.

- Defendant intentionally breached the insurance contract when deciding to stage all but one of Bruhn's soybean fields as mature (R7) at the time of the hail loss. Defendant intentionally breached the insurance contract because the contract required Defendant to follow the NCIS Time Interval Chart for staging the crop at the time of the hail loss.

- Defendant's intentional breach of the insurance contract and staging of the crop at R7 instead of R4.5-R6.5 resulted in an underpayment of benefits to Plaintiff because Defendant was able to avoid its contractual obligation to pay Plaintiff for the leaf damage (defoliation) to the crop.

- When Defendant's adjusters finally arrived at the Bruhn Farm "horribly late," they failed to adjust anywhere between 2,077 and 5,244 of his soybean acres.

- Defendant's intentional decision not to adjust all of Bruhn's soybean acres likely resulted in an underpayment of benefits because Bruhn likely suffered hail loss on all of his soybean crops following the storm that produced more than 4.5 inches of rain and a 70% probability of ½ inch hail.

- In addition to intentionally breaching the insurance contract, Defendant violated its corporate adjustment manual.

- After the adjusters arrived "horribly late" to adjust the loss, Defendant's senior management conducted a sham review of the claim.

- Defendant's senior management intentionally breached the insurance contract when it decided to "just pay without signature" in mid-November instead of trying to reach an agreement on the percentage of loss with the insured, as required by the contract.

14

- Defendant's senior management knew when it decided to "just pay without signature" that the claim was at least $450,000 based on the information in the file, meaning that Defendant intentionally underpaid the claim.

- In internal documents not provided to Plaintiff until after the lawsuit was filed, it was learned that Defendant's senior management wrote numerous false and slanderous statements about Plaintiff to try to apparently justify its conduct.

- After Defendant slipped a check under Plaintiff's door for $417,636 in early December 2012, Defendant continued to lead Plaintiff down the Primrose Path, leading him to believe the claim would be corrected and a settlement reached.

- Defendant discussed settlement of an additional $900,000, which Plaintiff reluctantly agreed to, only to have the $900,000 ripped away from him by Defendant, who eventually paid nothing more.

- Defendant's own expert, Greg Meek, admitted that the way Defendant conducted settlement discussions constituted "unethical" conduct by the Defendant.

- As early as December 20, 2012, Defendant knew that it potentially underpaid Plaintiff more than $727,000 based on a comparison of Plaintiff's 2012 yield to his 10 year APH.

- Despite knowing all of its many indiscretions and bad faith conduct, Defendant in late January 2013, wrote Plaintiff denying the claim for additional benefits, and tried to shift the burden to him to prove the amount of underpayment (despite the fact that it was Defendant's contractual responsibility to conduct a proper adjustment).

The facts above establish a clear pattern of practice by Defendant to minimize its liability to Plaintiff by (1) delaying adjustment, (2) not adjusting all of the fields, (3) intentionally breaching the contract requirement for staging of the crop, (4) leading Plaintiff down the Primrose Path regarding settlement of the claim prior to suit, and (5) denying Plaintiff any meaningful right of appraisal. The facts supporting the jury's verdict in this case are similar to other Iowa cases where bad faith was found involving issues such as inadequate investigations and underpayment of insurance benefits. See *Dolan v. Aid Ins. Co.*, 431 N.W.2d 790 (Iowa 1988); *Gibson v. ITT Hartford Ins. Co.*, 621 N.W.2d 388 (Iowa 2001); *Chadima v. Nat'l Fid. Life Ins. Co.*, 55 F.3d 345,

346, 350 (8th Cir. 1995); *A.W.G. Farms, Inc. v. Fed. Crop Ins. Corp.*, 757 F.2d 720, 728-29 (8th Cir. 1985).

### 3. Defendant's argument that the amount *due* was fairly debatable misstates the standard and law as instructed by the Court.

In its "analysis of the evidence," Defendant spends considerable time arguing that the additional amount *due* was fairly debatable, relying on the fact that Bruhn asserted the "correct" amount of the underpayment was between $900,000 - $3.5 Million. (Defendant's Brief, p. 8-9). However, as the Court noted in Instruction No. 17, in proving the elements of bad faith, Plaintiff did not have the burden to prove the additional amount *due*, rather, Plaintiff's burden was to prove that: "Fireman's Fund paid Bruhn Farms *less* than Bruhn Farms was entitled to receive under the insurance contract, and that there was no reasonable basis for paying Bruhn Farms *less* than Bruhn Farms was entitled to under the insurance contract." (Doc #144, No. 17).

As discussed with the Court when the parties worked on the jury instructions, there is a significant difference between placing the burden on Plaintiff to prove the "correct" amount, as opposed to placing the burden to prove bad faith in the conduct of Defendant in handling this claim and in paying less than what was owed to Plaintiff. While it is true that evidence of $900,000 (yield analysis) - $3,549,778 (strict breach analysis) underpayment was presented to the jury, the fact that the jury did not award that amount does not make Defendant's bad faith conduct or failure to pay at least the amount it determined it owed upon initial review any less evidence of bad faith. This is especially true in this case where it was Defendant's bad faith conduct that made it difficult for Plaintiff to prove the exact amount of the underpayment.

### B. Defendant's Motion to Reduce Punitive Damages Should be Denied.

Defendant next argues that the jury's determination of punitive damage of $1.5 Million should be reduced to $130,800 or less. Defendant relies primarily on *BMW of North America, Inc.*

16

*v. Gore*, 517 U.S. 559, 116 S.Ct. 1589 (1996) in support of its argument that the Bruhn jury's determination of $1.5 Million in punitive damages was "unconstitutionally excessive" and thus violated Defendant's Due Process rights.  In developing the analysis for unconstitutionally excessive punitive damage verdicts in *BMW*, Justice Stevens wrote that "elementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receives *fair notice* not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose."  *Id.* at 573.[14]

Despite arguing under the *BMW* standard, Defendant provides no explanation why it did not have "fair notice" that its bad faith conduct and intentional breach of the crop-hail insurance policy could result in a punitive damage verdict of $1.5 Million.  It is hard for Plaintiff to comprehend how Defendant, a sophisticated and large insurance company, who charged Plaintiff $259,567 in insurance premiums, and accepted liability risks of $5,924,350, did not have "fair notice" that its bad faith conduct and intentional breach of the crop-hail insurance policy may result in $1.5 Million in punitive damages.

Defendant's failure to argue "fair notice" is likely due to the fact that its competitor was hit with the *exact same* punitive damage verdict in 1991 upon proof of similar crop-hail casualty losses of $107,454.  *Owens v. International Bus. & Mercantile Reassurance Co.*, 1991 U.S. App. LEXIS 17914; Nos. 89-2242, 89-2271 (unreported decision)(10th Cir. July 26, 1991).  *Owens* involved, inter alia, claims of breach of a crop-hail insurance policy and bad faith conduct of the defendant crop-hail insurance company.  *Id.*  The *Owens* jury returned a verdict for Owens for, inter alia, $107,454 in casualty losses under the crop hail policy.  *Id.*  The jury also assessed punitive damages in Owens' case of $1.5 Million.  *Id.*  The *Owens* case is helpful because it clearly

---

[14] Justice Breyer in his concurring opinion also referenced the concept of "notice" of punishment as a justification for constitutional constraints and oversight of punitive damages.

places the crop-hail insurance industry on notice that the bad faith underpayment of crop-hail benefits may result in a punitive damage award of $1.5 Million, the exact amount assessed by the jury in *Bruhn*. Defendant's failure to argue "fair notice" may also be due to the fact that its competitor in 1985 was found to have led farmers down a "primrose path" that ultimately resulted in the defeat of the insurance claim, contrary to the covenant of good faith and fair dealing implied in every contract. See *A.W.G. Farms, INc. v. Fed. Crop Ins. Corp.*, 757 F.2d 720, 728-29 (8th Cir. 1985).

Punitive damages play an important role in our judicial system. As the *BMW* Court noted, "punitive damages may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition." *BMW* at 568. If the Bruhn jury verdict is to properly punish and deter Defendant and like conduct in the crop-hail industry, the jury's determination of $1.5 Million must stand. A review of the *BMW* guideposts follows.

**1. The degree of reprehensibility of Defendant's conduct justifies a punitive damages verdict of $1.5 Million.**

The first *BMW* guidepost for Due Process analysis of punitive damages is to "evaluate whether the reprehensible nature of [Defendant's] conduct warrants punitive damages." *May v. Nationstar Mortgage, LLC*, No. 16-1307 (8th Cir. March 29, 2017). "The presence of just one indicium of reprehensibility is sufficient to render conduct reprehensible and support an award of punitive damages." *Id.* (citing *Trickey v. Kaman Indus. Techs. Corp.*, 705 F.3d 788, 799 (8th Cir. 2013). "The jury's substantive conclusion is relevant in a determination of reprehensibility." *Id.* (citing *Grabinski v. Blue Springs Ford Sales, Inc.*, 203 F.3d 1024, 1027 (8th Cir. 2000). Here, there are many facts supporting an indicium of reprehensibility of Defendant's intentional, bad faith conduct.

18

One element of reprehensibility is analyzing whether the conduct involved was one single bad act or involved repeated actions by the defendant. See *May*, *supra*. As the Court noted in *May*, a pattern of misconduct constitutes repeated actions. *Id.* (citing *Diesel Mach., Inc. v. B.R. Lee Indus., Inc.*, 418 F.3d 820, 839 (8th Cir. 2005). Here, Defendant engaged in a pattern of misconduct in the handling of the Bruhn file that constitutes reprehensible conduct. The pattern of reprehensible conduct was designed to minimize payments to Bruhn while at the same time limiting the evidence Bruhn could present in support of the proper percentage of loss and payment due under the policy. Defendant intentionally delayed the adjustment of Plaintiff's crop, and was horribly late in getting to his property. Once there, instead of making any attempt to determine the stage of the crop at the time of the loss, Defendant assumed that the crop was fully mature (R7) so that it could avoid paying any benefits for leaf damage (defoliation).

After arriving horribly late to adjust, the adjusters admittedly did not adjust anywhere from 2,077 to 5,244 of the soybean acres. Plaintiff was then presented with recordkeeping from Defendant that was more than suspect, including field notes and data that was, at times, entirely inconsistent. Defendant then led Plaintiff down the Primrose Path, leading him to belive that the claim would be resolved. In fact, Defendant's representatives offered $900,000, which Plaintiff accepted, only to have it withdrawn by Defendant. Defendant knew that its adjustments did not comport with Plaintiff's 10 year APH, yet it chose to do nothing about it, instead trying to shift the burden to Plaintiff to prove his percentage of loss. While leading Plaintiff down the Primrose Path after being "horribly late" to adjust the claim, Plaintiff was deprived of his right to an appraisal because Defendant admitted that by mid-November, the evidence of the percentage of loss was too far deteriorated. In short, the jury was able to conclude, and did conclude, that Defendant engaged in a calculated scheme to delay and deny benefits to Plaintiff while at the same time

Case 5:13-cv-04106-CJW   Document 160   Filed 04/11/17   Page 19 of 32

making it difficult, if not impossible, for Plaintiff to use any meaningful administrative or legal remedy to determine the correct percentage of loss. This type of pattern of misconduct constitutes repeated actions and is highly reprehensible, especially in light of the structure of the crop-hail policy, which is designed for timely adjustment, agreement as to benefit amount, and administrative remedy.

A second element of reprehensibility is a showing of indifference to or a reckless disregard of the health or safety to others. *Zimmer v. Travelers Ins. Co.*, 521 F. Supp.2d 910 (S.D. Iowa 2007). In the context of bad faith litigation, the *Zimmer* Court noted that the failure to evaluate a claim "in accordance with reasonable claims handling practices and that the departure was done intentionally" can reasonably be seen to evince an indifference to, or reckless disregard for the health and welfare of the beneficiary of the insurance policy. *Id.* at 952. In this case, the jury could find, and did find, that on numerous occasions, Defendant's conduct was not in accordance with reasonable claims handling practices and that the departure was done intentionally. In fact, with respect to the way settlement discussions were handled, Defendant's own expert, Greg Meek, testified that Defendant's conduct would be not only in bad faith, but "unethical."

A third element of reprehensibility is a showing that the harm to Plaintiff was the result of intentional malice, trickery, or deceit, as opposed to mere accident. *Zimmer*, 521 F. Supp. 2d at 952; See also *Asa-Brandt, Inc. v. Farmers Co-Op Soc.*, 2002 WL 1714197; No. C01-3021-MWB (N.D. Iowa 2002). The jury was presented with significant evidence that Defendant's conduct involved intentional malice, trickery, or deceit. For example, Defendant's National Claims Manager, directed numerous false and slanderous statements at Bruhn, despite knowing (or should have known) that the statements were blatantly false and unprofessional. Moreover, it is undisputed that the breach of the contract by Defendant was intentional. The jury was instructed

that a mere breach is not enough to find bad faith or punitive damages, so clearly the jury concluded the intentional breach satisfied the finding of legal or actual malice on behalf of Defendant. The entire claim was handled in a deceitful manner by Defendant. Defendant was dishonest with respect to its conduct, what it knew and when, and with respect to its ability to resolve the claim short of appraisal, arbitration, or litigation. Defendant's conduct was substantially more reprehensible than the conduct supporting a $1 Million punitive damage award for bad faith in *Zimmer*, 521 F. Supp. 2d at 960.

In proving the reprehensibility of the defendant's conduct, evidence of harm to nonparties is admissible as well as the consideration of the *potential* harm to the Plaintiff. *Philip Morris USA v. Williams,* 549 U.S. 346, 355, 127 S. Ct. 1057 (2007). Here, the jury was presented with evidence in this case that Defendant claimed that it "handled 1000s of cases like the Bruhn claim." (*Testimony of Larry Grieme*). The Supreme Court has made it clear that "punitive damages may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition." *BMW*, 517 U.S. at 568. The jury was free to conclude that Defendant's conduct was highly reprehensible because of its failure to acknowledge its bad faith conduct and cavalier attitude that it has handled 1000s of claims just like it did for Bruhn. Moreover, the jury was presented with evidence that Defendant's conduct caused the *potential* harm of $700,000 or greater to Plaintiff. While Plaintiff had difficulty proving the exact amount because of Defendant's failure to timely and properly document and adjust the loss, it is undisputed that the *potential* financial harm to Plaintiff was greater than $700,000, making the conduct highly reprehensible.

Defendant argues, principally, that because the jury decided that Plaintiff was able to prove compensatory damages in the amount of $32,700, the conduct was not reprehensible and was not putting Bruhn in a financially vulnerable position. Defendant's argument misconstrues the

reprehensibility argument and instead attempts to improperly mix the comparison of compensatory to punitive damages to determine the reprehensibility of Defendant's conduct. Judge Bennett's discussion of reprehensibility in *Asa-Brandt, Inc.* is helpful. *Id.* There, Judge Bennett noted that "the high degree of culpability warrants a substantial punitive damages award." *Id.* In discussing the harm and reprehensibility of the defendant's conduct, Judge Bennett noted that "if [Defendant's] plan had succeeded, plaintiffs would have been required to pay…$3.9M" *Id.* Similarly, in this case, Defendant's plan to delay, diminish, and underpay Plaintiff's claim did succeed. Defendant is a sophisticated crop-hail insurance company. Plaintiff is a family farm operation. Plaintiff paid for, and relied on Defendant to properly adjust this loss. Defendant clearly did not, and the jury held Defendant accountable. Because of this, Plaintiff's soybean yield for 2012 (on the fields actually adjusted) was at least $727,000 less than his 10 year APH, placing a significant financial burden on him. Accordingly, the facts, when construed in the light most favorable to Plaintiff evidence a high degree of reprehensibility, justifying a $1.5 Million punitive verdict.

> **2.  The ratio of compensatory damages awarded to punitive damages awarded by the jury does not make the $1.5 Million punitive damage award "unconstitutionally excessive."**

The Supreme Court has consistently rejected the notion that the constitutional line of punitive damages is marked by a simple mathematical formula, even one that compares actual *and potential* damages to the punitive award. *BMW*, 517 U.S. at 582. "Low awards of compensatory damages may properly support a higher ratio than high compensatory awards." *Id.* Also, "a higher ratio may be justified in cases in which the injury (or damage) is hard to detect." *Id.*; See also *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408; 123 S. Ct. 1513 (2003).

> **a.** **Using the jury's compensatory award to compare to the punitive damage award is unreliable because of the difficulty Plaintiff encountered in proving its compensatory damages due to the bad faith conduct supporting the punitive damage award.**

From the outset, it should be emphasized that this is the type of case that the damage to Bruhn with respect to underpayment was hard to detect to a reasonable degree of certainty because of Defendant's own conduct in delaying adjustment, delaying the proof of loss, delaying agreement on percentage of loss, denying any meaningful appraisal right, and failing to adequately document its file. Defendant asks this Court to reward its grossly inadequate investigation, horrible delay, and terrible record keeping by overturning the jury's punitive damage award based on the ratio to compensatory damages. However, to do so based on the $32,700 awarded ignores the *potential* damages to Plaintiff that were not awarded by the jury because Plaintiff lacked sufficient proof due to the handling of the claim by Defendant. Instead, a proper ratio analysis should consider the *potential* harm to Plaintiff, which was at least $700,000, and as Defendant acknowledges in its brief, could have been as great as $3,000,000 based on the evidence presented at trial.

> **b.** **The correct ratio must include consideration for *potential* or *possible* harm and attorney fees and costs.**

In *TXO Prod. Corp. v. Alliance Res. Corp.*, 509 U.S. 443, 460; 113 S.Ct. 2711, 2721-2722 (1993), the Supreme Court noted that it is appropriate for a reviewing Court, in applying constitutional analysis to punitive damages, to "consider the magnitude of the *potential harm*" in addition to the actual harm suffered. *Id.* (also holding it appropriate to consider harm to other victims in future if behavior not deterred). The Eighth Circuit and the Northern District of Iowa has cited *TXO Prod. Corp.* with approval for the proposition that *potential harm* may be considered under the second guidepost. See *Hallmark Cards, Inc. v. Monitor Clipper Partners, LLC*, 758 F.3d 1051 (8th Cir. 2014)(noting that potential harm an appropriate consideration); *Dean v. Olibas*,

129 F.3d 1001 (8th Cir. 1997)(noting that potential harm to Plaintiff and future victims was significant and an appropriate consideration); *Pulla v. Amoco Oil Co.*, 72 F.3d 648 (8th Cir. 1995)(noting that potential harm an appropriate consideration); *Northeast Iowa Ethanol, L.L.C. v. Drizin*, 2006 U.S. Dist. LEXIS 4828; No. C03-2021 (N.D. Iowa Feb. 7, 2006)(noting that it is appropriate to consider whether there is a reasonable relationship between the punitive damages award and the harm likely to result from defendant's conduct as well as the harm that actually occurred); *Sherman v. Kasotakis*, 314 F. Supp. 2d 843 (N.D. Iowa 2004)(noting that possible harm is an appropriate consideration); See also *Wightman v. Conrail*, 715 N.E.2d 546 (Ohio 1999)(noting that harm can include the harm likely to result from the defendant's conduct as well as the harm that actually has occurred); See also *Hockenberg Equip. Co. v. Hockenberg's Equip & Supply Co.*, 510 N.W.2d 153 (Iowa 1993)(holding it is appropriate to consider in a due process punitive damage argument the damages the jury was unable to assess and the potential harm).

Thus, the *potential* or *possible harm* to Plaintiff (and others) must be considered when comparing the ratio of the harm to the punitive damage award. In so doing, Plaintiff states that Trial Exhibit 207 is conclusive evidence that Defendant knew that its bad faith conduct caused a *potential* or *possible* harm of at least $727,000 to Plaintiff on the soybean acres that Defendant actually bothered to adjust. (*Trial Ex. 207*). Defendant's December 20, 2012 email admits that there was a *potential* or *possible* harm to Plaintiff of at least $727,000 by comparing Plaintiff's 2012 actual production shortfall to his 10 year APH (Actual Production History). While Defendant offered a justification at trial that the *actual* harm was not $727,000 because of "other weather conditions" affecting the 2012 yield, it is undisputed that the *potential* or *possible* harm of Defendant's bad faith conduct was at least $727,000.[15] Thus, in considering the *potential* or

---

[15] Plaintiff does not concede that "other weather conditions" affected the 2012 yield. In fact, a review of Defendant's own documents reveals that it rated the Plaintiff's soybeans as "good condition" on 9 of the 17 fields it adjusted.

24

*possible* harm to Plaintiff, there is no dispute that the ratio to punitive damages is only 2:1. Accordingly, the Court should give due consideration to the *potential* or *possible* harm to Plaintiff (as admitted by Defendant) when considering the ratio of harm to punitive damages.

In addition, reviewing Courts are also permitted to consider attorney's fees and costs in comparing the ratio of harm to punitive damages. See *Willow Inn, Inc. v. Public Serv. Mut. Ins. Co.*, 399 F.3d 224 (3rd Cir. 2005). The facts of *Willow* are comparable to this case. In *Willow*, the Plaintiff was awarded $2,000 in compensatory damages for its breach of contract claim based on a delay in adjustment theory. *Id.* at 227. In addition, the Plaintiff in *Willow* was awarded $150,000 in punitive damages, resulting in a perceived ratio of 75:1 when simply comparing the compensatory award to the punitive damage award. *Id.* Defendant challenged the punitive damage award on constitutional grounds, and the Court analyzed the ratio of punitive damages to harm. *Id.* at 233-237. The Third Circuit in *Willow* concluded that it was appropriate to consider attorney fees and costs associated with pursuit of a bad faith action as "compensatory damages" for purposes of the *Gore/Campbell* ratio. *Id.* at 237.

In this case, Plaintiff incurred $115,718.45 in hourly attorney fees prior to the Eight Circuit's ruling on appeal of the Summary Judgment Order, and since that time, Plaintiff's current Counsel agreed to handle this matter on a 33.33% contingency fee, resulting in a fee of $510,900 on the verdict. (*See Plaintiff's Brief in Support of Motion Concerning Punitive Damages, Ex. 1-3, 10, Pl. Appx. 3-81, 143-150*). The amount of time and risk expended by Plaintiff's current Counsel justifies the 33.33% contingency fee on the entire jury award. Moreover, the Plaintiff has had to spend $56,824.43 in costs to simply bring this matter to trial. (*See Plaintiff's Brief in*

---

(*Trial Ex. 12, p. 11, 24, 27, 30, 32, 42, 58, 62, 67*). Defendant rated the Plaintiff's soybeans as "fair condition" on 6 of the 17 fields it adjusted. (*Trial Ex. 12, p. 19, 35, 38, 44, 52, 65*). Finally, Defendant only rated 2 of the 17 fields it adjusted as having a soybean crop in "poor condition". (*Trial Ex. 12, p. 14, 55*).

*Support of Motion to Tax Costs & Plaintiff's Brief in Support of Motion Concerning Punitive Damages*). Accordingly, when the harm to Plaintiff includes just costs in addition to the compensatory award, the ratio is 16.75:1. When attorney fees are considered with costs, the ratio of the harm to the punitive damage award is 2.19:1. Both are clearly within Constitutional limits and do not deprive Defendant of Due Process rights.

> **c.    Even if the ratio is 45.8:1, the punitive damage award of $1.5 Million is not "unconstitutionally excessive" and falls in line with other punitive damage awards.**

Even if the Court considers on review the ratio of 45.8:1, that ratio is not so shocking to make the $1.5 Million unconstitutionally excessive. Punitive damage verdicts greater than or near a ratio of 45.8.1 have been upheld by the Courts on numerous occasions since *BMW v. Gore*.

For example, the Eighth Circuit, and Judge Bennett have upheld double digit ratios on a number of occasions. See *United States v. Big D. Enters.*, 184 F.3d 924 (8th Cir. 1999)(upholding 100:1 ratio of compensatory damages to punitive damages after constitutional due process challenge by defendant); *Grabinski v. Blue Springs Ford Sales, Inc.*, 203 F.3d 10 (8th Cir. 2000)(upholding collective punitive damage award ratio of 27:1, including individual defendant ratio of 99:1 and 55:1 upon constitutional due process challenge by defendant); *Kimbrough v. Loma Linda Dev., Inc.*, 183 F.3d 782 (8th Cir. 1999)(holding that 10:1 ratio not excessive as a matter of law upon constitutional due process challenge by defendant); *Dean v. Olibas*, 129 F.3d 1001 (8th Cir. 1997)(holding that 14:1 ratio not excessive upon constitutional due process challenge by defendant); *Sherman v. Kasotakis*, 314 F. Supp. 2nd 843, 874 (N.D. Iowa 2004)(upholding $12,500 punitive damage award on $1 in nominal damages after constitutional challenge by defendant); *Arizona v. ASARCO LLC*, 773 F.3d 1050 (9th Cir. 2014)(upholding $300,000 punitive damage award on $1 in nominal damages after constitutional challenge by defendant)(N.D. Iowa

Honorable Mark W. Bennett presided over the trial, 798 F. Supp. 2d 1023); *Haynes v. Stephenson*, 588 F.3d 1152 (8th Cir. 2009)(upholding 2500:1 ratio); *Jcb, Inc. v. Union Planters Bank, NA*, 539 F.3d 862, 877 (8th Cir. 2008)(100,000:1 ratio).

Recently, the Eighth Circuit once again had the opportunity to examine a Due Process challenge to a punitive damage award. See *May v. Nationstar Mortgage, LLC*, No. 16-1307 (8th Cir. March 29, 2017). There, the Eighth Circuit upheld a punitive damage award ratio of 8:1. *Id.* In doing so, the Court emphasized two key points applicable to this case. First, the Court noted that "a higher ratio may be justified when the injury is hard to detect or the monetary damages are difficult to quantify." *Id.* Second, the Court emphasized that a punitive damage award that is a small fraction of a $1.2 Billion company is likely to not violate the Due Process clause as unconstitutionally excessive. *Id.*

Other Courts have similarly upheld double digit ratio of compensatory to punitive damages. See *Johansen v. Combustion Eng'g., Inc.*, 170 F.3d 1320 (11th Cir. 1999)(upholding 100:1 ratio and $4.5 Million punitive damage verdict compared to $47,000 compensatory damage verdict upon constitutional due process challenge by defendant); *Jeffries v. Wal-Mart Stores, Inc.*, 15 Fed. Appx. 252 (6th Cir. 2001)(unreported decision)(upholding 50:1 ratio and $425,000 punitive damage verdict compared to $8,500 compensatory damage verdict upon constitutional due process challenge by defendant); *Daka, Inc. v. Breiner*, 711 A.2d 86 (D.C. Cir. 1998)(upholding 39:1 ratio and $390,000 in punitive damage verdict compared to $10,000 in compensatory damage verdict upon constitutional due process challenge by defendant); *Rahn v. Junction City Foundry, Inc.*, 161 F. Supp. 2d 12 (D. Kan. 2001)(upholding 30:1 ratio upon constitutional due process challenge by defendant); *Bains LLC v. ARCO Prods. Co.*, 405 F.3d 764 (9th Cir. 2005)(upholding punitive damages in the range of $300,000 to $450,000 to $1 in nominal damages, emphasizing that when

compensatory damages are difficult to calculate, a higher ratio may be justified); *Willow Inn, Inc. v. Public Serv. Mut. Ins. Co.*, 399 F.3d 224 (3rd Cir. 2005)(upholding 75:1 ratio when not considering award of fees and costs in ratio); *Wightman v. Conrail*, 715 N.E.2d 546 (Ohio 1999)(upholding 6,250:1 punitive damage to compensatory damage ratio upon constitutional due process challenge by defendant); *Coalson v. Canchola*, 754 S.E.2d 525 (Va. 2014)(upholding 18:1 ratio upon Due Process challenge by defendant); *United States v. Veal*, 365 F. Supp. 2d 1034 (W.D. Mo. 2004)(upholding $1,055,000 in punitive damages on $47,804 in compensatory damage award); *CGB Occupational Therapy, Inc. v. RHA Pa. Nursing Homes*, 2005 U.S. Dist. LEXIS 13516; No. 00-4918 (E.D. Pa. July 7, 2005)(holding $2M punitive damage appropriate on proof of $109,000 in compensatory damages); *Superior Fed. Bank v. Jones & Mackey Const. Co., LLC*, 93 Ark. App. 317 (Ark. Ct. App. 2005)(upholding 17.6:1 ratio with $3.08M punitive to $175,000 tort award).

The Court may consider the Eighth Circuit's holding in *Moore v. Am. Family Mut. Ins. Co.*, 576 F.3d 781 (8th Cir. 2009) as informative as appropriate punitive damages in a breach of contract claim. In *Moore*, American Family denied a fire claim, asserting an arson defense. *Id.* at 784. Plaintiff asserted breach of contract, bad faith, and asked for punitive damages based on Defendant's failure to conduct an adequate investigation. *Id.* at 790. The jury awarded compensatory damages of $48,414.97 and punitive damages of $1,150,000, which were upheld on appeal to the Eighth Circuit. *Id.* at 790-791.[16]

It is important to remember that a review of the jury's determination of a punitive damage verdict is not one of "reasonableness," but rather whether Defendant's due process rights were violated by entry of the jury's determination of the punitive damage award. See *Johansen v.*

---

[16] The Court also considered the separate award of $1,150,000 for bad faith damages separate from the compensatory damage award. *Id.*

*Combustion Eng'g, Inc.*, 170 F.3d 1320, fn. 25 (11th Cir. 1999)(noting that punitive damages awards may be the constitutional maximum, and the province of the jury should not be invaded by determining the amount on a reasonableness standard). "A judgment that is a product of fair procedures is entitled to a strong presumption of validity." *TXO Prod. Corp. v. Alliance Res. Corp.*, 509 U.S. at 457; *Dean v. Olibas*, 129 F.3d 1001 (8th Cir. 1997)(holding that trial procedures resulting in impartial jurors, evidence from both sides, and proper instruction of the law by the Court provides strong presumption of validity of the result).

Here, Defendant clearly had "fair notice" that its conduct may result in a breach of the duty of good faith and fair dealing. See *A.W.G. Farms, Inc. v. Fed. Crop Ins. Corp.*, 757 F.2d 720, 728-29 (8th Cir. 1985). Moreover, Defendant had "fair notice" that its bad faith conduct may result in a punitive damage award of at least $1.5 Million. *Owens v. International Bus. & Mercantile Reassurance Co.*, 1991 U.S. App. LEXIS 17914; Nos. 89-2242, 89-2271 (unreported decision)(10th Cir. July 26, 1991) See also *Lakin v. Richards Farm, Ltd.*, 2015 Iowa App. LEXIS 38; No. 13-1634 (Iowa Ct. App. Jan. 28, 2015)(holding that $1.4 Million punitive damage verdict against person worth $150 Million was appropriate to satisfy reasons behind punitive damages). Both *A.W.G. Farms* and *Owens* involved Defendant's competitors, yet apparently the entry of a previous judgment of $1.5 Million against a crop-hail insurance company, and a specific finding by the Eighth Circuit that a crop-hail insurance company is not to lead an insured down the Primrose Path was not enough to deter Defendant from engaging in similar conduct here. Accordingly, not only did Defendant have "fair notice" that its conduct was in bad faith and a reasonable punitive damage verdict was $1.5 Million, Defendant clearly did not get the messages sent in *A.W.G.* and *Owens*, and if punitive damages are to deter and punish, letting Defendant off the hook from this jury's verdict would certainly undermine that goal.

29

### 3. The comparable civil or criminal penalties justifies a punitive damages verdict of $1.5 Million.

Defendant argues that Iowa Code Chapter 507B provides for a maximum civil penalty against Defendant for intentional bad faith of $50,000. "Chapter 507B is based upon model legislation proposed by the National Association of Insurance Commissioners." *Seeman v. Liberty Mut. Ins. Co.*, 322 N.W.2d 35 (Iowa 1982). It is "regulatory in nature." *Id.* It is "intended only to invest the insurance commissioner with administrative enforcement powers." *Id.* Therefore, the Court in *Seeman* held that Chapter 507B did not give rise to a private cause of action. *Id.* Recognizing that Chapter 507B did not give right to a private cause of action, the Iowa Supreme Court held 6 years later that the tort of bad faith would be recognized. *Dolan v. Aid Ins. Co.*, 431 N.W.2d 790 (Iowa 1988)(permitting punitive damages in bad faith action); See also *Terra Indus. V. Commonwealth Ins. Co. of Am.*, 990 F. Supp. 679 (N.D. Iowa 1997); *Weber v. State Farm Muta. Auto. Ins. Co.*, 873 F. Supp. 201 (S.D. Iowa 1994). Accordingly, reliance on the maximum civil penalty under Chapter 507B for comparison to a punitive damage verdict appears to be inconsistent with how the Iowa Supreme Court has viewed the role of bad faith and punitive damages as compared to Chapter 507B.

While Defendant argues that the punitive damage award to civil penalty ratio is high (30:1), there are many instances of cases upholding similar or higher ratio of civil penalty to punitive damages. See *Deters v. USF Ins. Co.*, 2011 Iowa App. LEXIS 37 (Iowa Ct. App. 2011)(noting that remedy for first party bad faith is through civil prosecution of bad faith and there are no comparable civil penalties); *McClure v. Walgreen Co.*, 613 N.W.2d 225 (Iowa 2000)($150,000 punitive damage award on civil penalty of $2,500); *Wolf v. Wolf*, 690 N.W.2d 887 (Iowa 2005)($25,000 punitive damages vs. jail time); *Becker v. Longinaker*, 2010 Iowa App. LEXIS 304 (Iowa Ct. App. 2010)($80,000 punitive damages vs. $1,000 fine); *Cortese v. Rosales*, 2016 Iowa

App. LEXIS 7 (Iowa Ct. App. 2016)(40:1 ratio upheld); *Zimmer v. Travelers Ins. Co.*, 521 F. Supp. 2d 910 (S.D. Iowa 2007); *SEC v. Das*, 2012 U.S. Dist. LEXIS 190311 (D. Neb. May 29, 2012)(noting that civil penalties of $50,000 might not have a deterrent effect); *Condon Auto Sales & Serv., Inc. v. Crick*, 604 N.W.2d 587, 595 (Iowa 1999)(upholding 43:1 ratio); *Myers v. Workmen's Auto Ins. Co.*, 95 P.3d 977 (Idaho 2004)(upholding $300,000 punitive damage verdict to $735 compensatory damage verdict, 408:1 ratio, in a bad faith action); *Rodriguez-Torrez v. Caribbean Forms Mfr., Inc.*, 399 F.3d 52 (1st Cir. 2005).

Moreover, Defendant's argument fails to recognize the possible penalty under Iowa Code § 507B.7(1)(b), where Defendant's license can be revoked if it knew or should have known that its conduct was in violation of Chapter 507B. As the Eighth Circuit recently recognized in *Moore v. Am. Family Mut. Ins. Co.*, 576 F.3d 781 (8th Cir. 2009), the possible suspension or loss of the right to sell insurance in a State is a significant civil penalty, justifying a punitive damage verdict in excess of $1 Million.

## **CONCLUSION**

The jury has spoken. While Defendant may not like the fact that its conduct was found to be in bad faith, that alone does not give this Court authority to overturn the jury's verdict. Plaintiff, who is entitled to have the evidence viewed in its favor, presented substantial evidence of a calculated claim handling practice, designed to intentionally breach the insurance contract to minimize the payment of crop-hail claims while at the same time depriving the insured of any meaningful administrative remedy through an appraisal. This Court should not let Defendant off the hook. Defendant had "fair notice" that $1.5 Million in punitive damages was a possibility given its conduct in handling this claim, which carried a maximum exposure to Defendant of just shy of $6 Million. Accordingly, Defendant's Motion should be denied in its entirety. The jury's

31

finding of bad faith and willful and wanton conduct should stand. The jury's punitive damage verdict amount should stand as well. Defendant's Due Process rights have certainly not been violated by this Northwest Iowa jury.

BEATTIE LAW FIRM, P.C.

By___/s/ _Donald G. Beattie_____
 Donald G. Beattie (AT0000736)
 Nile Hicks (AT0009391)
 4300 Grand Ave.
 Des Moines IA 50312
 Phone: (515) 263-1000
 FAX: (515) 263-1411
 don.beattie@beattielawfirm.com
 nile.hicks@beattielawfirm.com
SPAULDING, BERG & SCHMIDT, P.L.C.

 Nicholas L. Shaull (AT0010096)
 2423 Ingersoll Ave.
 Des Moines IA 50312
 Phone: (515 277-6559
 Fax: (515) 277-7536
 Email: nick.shaull@sbsattorneys.com
Attorneys for Plaintiff

CERTIFICATE OF SERVICE

 The undersigned hereby certifies that on _April 10__, 2017, a true and correct copy of the foregoing was served via email upon the following counsel of record:

Jeff Dilley
Elizabeth Bufkin
Henke Bufkin
Post Office Box 39
Clarksdale, MS 38614
ATTORNEYS FOR DEFENDANT

 ___/s/ Kelly L. Brandt Beattie_____

32